# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-138 |
|  | ) |
|  | ) **District Judge James E. Boasberg** |
| AARON MOSTOFSKY, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**DEFENDANT MOSTOFSKY'S SECOND MOTION TO DISMISS COUNTS ONE, TWO, FIVE AND SIX OF THE SUPERSEDING INDICTMENT**

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Aaron Mostofsky*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................... 1

STATUTORY HISTORY AND FACTUAL BACKGROUND ................................ 3

    A.     Section 1512(c)'s structure and legislative history ................... 3

    B.     Section 231(a)(3)'s structure and legislative history ............... 7

    C.     Section 1752 and the U.S. Secret Service ......................... 8

          1.  The legislative history of § 1752 ........................... 8

          2.  The current § 1752 ........................................ 10

    D.     The Superseding Indictment (SI) ............................ 12

ARGUMENT .......................................................................................... 13

    I.     Standard for a Rule 12(b) motion to dismiss ................. 13

    II.    The Section 1512(c)(2) count should be dismissed ............. 14

         A.     The SI fails to state a § 1512(c)(2) offense ............... 14

             1.    The Electoral College vote count did not involve the
                 administration of justice ............................ 14

             2.    The government's interpretation of § 1512(c)(2) conflicts
                 with the canon of *ejusdem generis* ................... 25

         B.     If the government's interpretation of § 1512(c)(2) is applied
            it is unconstitutionally vague as to Mostofsky ............. 28

             1.    § 1512(c)(2) does not provide fair notice that "official
                 proceedings" includes proceedings unrelated to the
                 administration of justice ............................ 28

             2.    The government's interpretation of "corruptly" fails
                 this circuit's *Poindexter* test ...................... 30

         C.     The rule of lenity dictates that any ambiguities in § 1512(c)(2)
            be resolved in Mostofsky's favor ........................ 34

         D.     The novel construction principle of the Due Process Clause

requires rejection of the government's interpretation, which would operate as an *ex post facto* law ................................................ 34

E.    The SI's application of § 1512(c)(2) is invalid under the First Amendment, as applied to Mostofsky ................................ 36

III.    The Section 231(a)(3) count should be dismissed ........................... 39

    A.    The government does not allege a "federally protected function" .... 39

    B.    Section 231(a)(3) exceeds Congress's Commerce Clause authority ........................................................................ 44

        1.    The police power and the Commerce Clause's prohibition on Congress's regulation of intrastate activity that does not "substantially affect" interstate commerce ...................... 44

        2.    Section 231(a)(3) does not substantially affect interstate commerce…………………………………………......... 45

            (a)    Section 231(a)(3) does not regulate economic activity ........................................................ 46

            (b)    The jurisdictional element of § 231(a)(3) does not limit its reach to activities that substantially affect interstate commerce ................................ 47

            (c)    Congress did not find that § 231(a)(3)'s activities substantially affect interstate commerce ................ 49

            (d)    The relationship between § 231(a)(3)'s activities and any effect on interstate commerce is too attenuated ................................................ 50

    C.    The Section 231(a)(3) charge must be dismissed, or limited to prohibiting acts of violence, to avoid overbreadth ............... 51

IV.    The Section 1752 counts should be dismissed ............................. 54

    A.    The SI fails to state an offense because only the USSS restricts areas under § 1752 ........................................................ 54

    B.    If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Mostofsky ........................... 58

C.   The rule of lenity dictates that any ambiguities in § 1752 be resolved in Mostofsky's favor .............................................................. 59

D.   The novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law .......... 60

CONCLUSION ...................................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                        **Page**

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) .............................................5, 18

*Baker v. Carr*, 369 U.S. 186 (1962) .............................................................................21-24

*Begay v. United States*, 553 U.S. 137 (2008) ..............................................................26-27

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) .........................................................passim

*Brown v. Louisiana*, 383 U.S. 131 (1966) ...........................................................................37

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..................................................................................37

*Bush v. Gore*, 531 U.S. 98 (2000) ...............................................................................20, 22

*City of Houston v. Hill*, 482 U.S. 451 (1987) .............................................................38, 51

*Edwards v. District of Columbia*, 755 F.3d 886 (D.C. Cir. 2014) ....................................36

*Hamling v. United States*, 418 U.S. 87 (1974) ...................................................................14

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) .......................passim

*Hubbard v. United States*, 514 U.S. 695 (1995) ............................................................40-43

*Luther v. Borden*, 48 U.S. 1 (1849) ....................................................................................21

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .............................................................passim

*Snyder v. Phelps*, 562 U.S. 443 (2011) ..............................................................................37

*Texas v. Johnson*, 491 U.S. 397 (1989) ..............................................................................36

*Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 397 (1989) ..............................37

*Trump v. Mazars United States*, 940 F.3d 710 (D.C. Cir. 2019) .......................................41

*United States v. Am. Trucking Ass'ns, Inc.* 310 U.S. 503 (1969) ......................................56

*United States v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) .............................................28

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) ..................................................55-56

*United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661 (D.S.C. Sept. 13, 2004) .........55-56

*United States v. Caputo*, 201 F. Supp. 3d 65 (D.D.C. 2016) .................................. 38

*United States v. Dean*, 55 F.3d 640 (D.C. Cir. 1995) .................................. 40-43

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) .................................. 14-16

*United States v. Grace*, 461 U.S. 171 (1983) .................................. 37

*United States v. Granderson*, 511 U.S. 39 (1994) .................................. passim

*United States v. Kozminski*, 487 U.S. 931 (1988) .................................. 45

*United States v. Lanier*, 520 U.S. 259 (1997) .................................. 28

*United States v. Lopez*, 514 U.S. 549 (1995) .................................. passim

*United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979) .................................. 55

*United States v. Morrison*, 529 U.S. 598 (2000) .................................. passim

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) .................................. 40-42

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) .................................. passim

*United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) .................................. 21

*United States v. Rumley*, 345 U.S. 41 (1953) .................................. 20

*United States v. Santos*, 553 U.S. 507 (2008) .................................. passim

*United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019) .................................. 18

*United States v. Wiltberger*, 18 U.S. 76 (1820) .................................. 45

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) .................................. 20, 22

*Virginia v. Hicks*, 539 U.S. 113 (2003) .................................. 44

*Williams v. Fears*, 179 U.S. 270 (1900) .................................. 52

*Yates v. United States*, 574 U.S. 528 (2015) .................................. 25-27

**STATUTES**

18 U.S.C. § 1752 .................................. passim

18 U.S.C. § 3056 .................................................................................................. passim

18 U.S.C. § 1512(c)(2) ....................................................................................... passim

18 U.S.C. § 231(a)(3) ......................................................................................... passim

18 U.S.C. § 1503 .................................................................................................. passim

18 U.S.C. § 1505 .................................................................................................. passim

## RULES AND REGULATIONS

Federal Rule of Criminal Procedure 7 .......................................................... 14

Federal Rule of Criminal Procedure 12 ........................................................ 14

31 Code of Federal Regulations Part 408 ..................................................... 10

## OTHER AUTHORITIES

DOJ Resource Manual ........................................................................................ passim

Defendant Mostofsky, through his counsel, files this second motion to dismiss Counts One, Two, Five and Six of the Superseding Indictment (SI), pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure.

## **INTRODUCTION**

The SI charges that, on January 6, 2021, Mostofsky first unlawfully entered a "restricted area" at the Capitol.  18 U.S.C. § 1752(a)(1).  Then, while he was there, Mostofsky interfered with a law enforcement officer during a "civil disorder," § 231(a)(3), and, simultaneously or perhaps sequentially, obstructed an "official proceeding," i.e., "Congress's certification of the Electoral College Vote," in violation of 18 U.S.C. § 1512(c)(2).  SI, Counts One, Two, Five, Six. Dressed though he was in a Purim costume, the government alleges that Mostofsky worked hard that day.

The legal theories on which those charges rest were crafted after January 6 by lawyers tasked with "finding" bases to transform traditional misdemeanor offenses into novel felonies. This was done at the expense of statutory text, case law, and legislative history.  The wager: if the public cares a good deal less about those dry legal subjects than about splashy photos of fur-pelted protesters, public pressure might inspire the courts to go along with it.  Either way, those charges should be dismissed because:

**Section 1512(c)(2).**  The government's obstruction theory distorts the plain meaning of Section 1512(c) in several ways.  First, every circuit to address the issue has construed the statute's phrase "official proceeding" to mean one with a truth-seeking function carrying the threat of a penalty, i.e., administering justice.  That is why the Department of Justice's handbook for prosecutors instructs that Section 1512's "official proceeding" is no different from the "proceeding" found in Section 1505, which limits obstruction-of-Congress offenses to

1

congressional inquiries or investigations.  It is why, before January 6, the DOJ stipulated in court the synonymity between "proceedings" under Sections 1512 and 1505.  Because the government concedes that the joint session of Congress on January 6 was not an inquiry or investigation, its Section 1512(c) charge must be dismissed.  It must also be dismissed as its argument requires the Court first to resolve a political question: what are the constitutionally proper procedures for certifying Electoral College votes, a question reserved for Congress under the Rulemaking Clause.  U.S. Const. Art. I, § 5, cl. 2.  Courts say what the law is but only Congress says what its parliamentary rules are.

Second, by taking the traditional parading-in-Congress misdemeanor offense and claiming it now constitutes felony "obstruction of justice" under the financial and audit reforms of the Sarbanes-Oxley Act of 2002, the government's interpretation of Section 1512(c)'s "residual clause" conflicts with the canon of *ejusdem generis*.  Unless Section 1512(c)(2) is to swallow the rest of Chapter 73 (and Title 40), it must be cabined to actions directed at undermining a proceeding's truth-finding function by impairing the integrity and availability of evidence.  That standard is not satisfied by the allegation that Mostofsky entered the Capitol in a fur pelt.

Third, the government's interpretation of Section 1512's adverbial "corruptly" element is flawed under any of the formulas it offers.  Its theory is that "corruptly" means nothing more than "wrongfully." Decades ago, the D.C. Circuit found that construction unconstitutionally vague.  It still is.

**Section 231(a)(3).**  Enacted as part of the Civil Obedience Act of 1968—a retort to the civil rights movement—Section 231 was designed as a nightstick for civil rights leaders.  That partly explains why the government virtually never uses it.  The other reason: it is

constitutionally infirm.  Police powers belong to the States.  The Commerce Clause did not give the sponsors of the Civil Obedience Act the power to direct them.  The government's attempt to duck the issue by claiming the January 6 "civil disorder" adversely affected a "federally protected function" is a kluge: congressional entities, such as the U.S. Capitol Police (USCP), are not "departments" or "agencies" "of the United States." § 232(3).  Anyway, the only court of appeals to construe Section 231(a)(3) has cabined it to acts of violence—not alleged here—to avoid unconstitutional overbreadth.

Section 1752.  Since 1970, Section 1752 has criminalized the unlawful entry into areas restricted for the protection of U.S. Secret Service (USSS) protectees.  Statutory text, legislative history, and common sense all point to the conclusion that the sole agency that restricts such areas is the one that guards them, i.e., the USSS.  An opinion by DOJ's Office of Legal Counsel agrees.  But here, the government contends that any federal or state entity may criminalize a person's movements under federal law.  It alleges that Mostofsky violated § 1752 because the Capitol was visibly restricted by the USCP.  But the USCP do not guard the USSS protectees identified in § 1752; they protect members of Congress, who are neither guarded by the USSS nor covered by § 1752.

On all these grounds, the Court should dismiss Counts One, Two, Five and Six of the SI.

## STATUTORY HISTORY AND FACTUAL BACKGROUND

### A.    Section 1512(c)(2)'s structure and legislative history

Section 1512(c) provides: "Whoever corruptly—

(1)    alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2)    otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . .

3

§ 1512(c).

Section 1515 defines the term "official proceeding" as used in Section 1512(c).  "[T]he term 'official proceeding' means—

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

> (B) a proceeding before the Congress;

> (C) a proceeding before a Federal Government agency which is authorized by law; or

> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

§ 1515(a)(1).

Section 1515 also defines the term "corruptly"—but only for obstruction offenses charged "in section 1505." § 1515(b).  Before this definition was added, the D.C. Circuit had determined that § 1505's adverb "corruptly" was unconstitutionally vague.  *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).  Congress subsequently amended § 1515 to provide,

> *As used in section 1505*, the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

§ 1515(b) (emphasis added).

Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002 (SOX).  SOX was "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.  As the previous U.S. attorney general described it, SOX "was prompted by Enron's massive accounting fraud and revelations that the company's

outside auditor, Arthur Andersen, had systematically destroyed potentially incriminating documents." Mem. of William P. Barr, dated June 8, 2018 ("Barr Mem."), p. 5, available at: https://bit.ly/2RYVZ47.  Upon a review of the statute's legislative history, the former attorney general concluded that the plain purpose of § 1512(c)(2) was a "loophole closer meant to address the fact that the existing section 1512(b) covers document destruction only where a defendant has induced another person to do it and does not address document destruction carried out by a defendant directly." *Id.*

The legislative history supports the former attorney general's interpretation of § 1512(c)(2)'s purpose.  A Senate Judiciary Committee report described SOX's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations." S. Rep. No. 107-146, at 2 (2002).  The report states that the Corporate Fraud Accountability Act was designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15.  Section 1512(c) did not exist as part of the original proposal.  S. 2010, 107th Cong. (2002).  Rather, Senator Trent Lott introduced it as an amendment in July 2002.  148 Cong. Rec. S6542 (daily ed. July 10, 2002).  The senator explained the purpose of adding § 1512(c):

> [This section] would enact stronger laws against *document shredding*.  Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . [T]his section would allow the government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena.

*Id.* at S6545 (emphasis added).

Senator Orin Hatch explained that § 1512(c) would "close [] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents. *Id.*  As the former attorney generally summarized this history, "The legislative history thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence." Barr Mem., p. 6.

Unlike § 1512(c), Section 1505 concerns obstruction of congressional proceedings "by threats or force." It provides criminal penalties for:

> Whoever corruptly, or by threats or force . . . influences, obstructs, or impedes . . . the due and proper exercise of *the power of inquiry* under which *any inquiry or investigation* is being had by either House, or any committee of either House or any joint committee of the Congress—

§ 1505 (emphasis added).

The italicized portions of that section show that Congress limited the obstruction-of-Congress offense to a specific kind of congressional "proceeding": those pursuant to Congress's "power of inquiry," which are "inquir[ies] or investigation[s]." § 1505. The legislative history of § 1505 shows that it was designed to prevent obstruction of only those proceedings held pursuant to Congress's investigative power.  *Poindexter*, 951 F.2d at 380-81.  Section 241, the predecessor of § 1505, was passed in 1940 to bar witness tampering before Congress.  As the D.C. Circuit summarized the legislative history: "The Senate and House Reports and the floor debates concerning [§ 1505's predecessor] . . . state that the 'proposed legislation simply extends the protection now provided by law for witnesses in Court proceedings to witnesses in proceedings before either House of Congress or committees of either House (or joint committees).'" 951 F.2d at 381 (quoting .R. Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939); S. Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939)).

**B.      Section 231(a)(3)'s structure and legislative history**

Section 231 provides criminal penalties for:

> Whoever commits or attempts to commit any act to obstruct, impede, or
> interfere with any fireman or law enforcement officer lawfully engaged in the
> lawful performance of his official duties incident to and during the commission of
> a civil disorder which in any way or degree obstructs, delays, or adversely affects
> commerce or the movement of any article or commodity in commerce or the
> conduct or performance of any federally protected function—

§ 231(a)(3).

Section 231(a)(3) was enacted as part of the Civil Obedience Act of 1968 (COA).  Pub.

L. 90-284, Apr. 11, 1968, Title X.  Senator Russell B. Long of Louisiana sponsored the COA

during the Senate's debates over the Civil Rights Act of 1968.  114 Cong. Rec. 1294-96 (Jan. 29,

1968).  It was proposed as a rejoinder to the civil rights bill and to the civil rights movement.

Long explained the purposes of the COA in floor debate.  First, the COA was to nullify the legal

protections proposed under the "hate crime" title of the Civil Rights Act of 1968.  Codified at 18

U.S.C. § 245, that title criminalized interfering with another person because of the person's race

or because he engaged in federally protected activity.  Senator Long was clear that the COA was

designed to diminish the hate crime law.  114 Cong. Rec. 1287-94 (Jan. 29, 1968).  His "greatest

immediate concern" about the hate crime law was "the unwitting stumbling block it could place

before State and local officials in their honest attempts to detain and prosecute incendiary rabble

rousers." *Id.* at 1289.  He noted that "half of the Baton Rouge police force could have been

thrown into jail" under the hate crime law for beating and setting attack dogs on peaceful

protestors.  *Id.*

Second, it was the COA's purpose to jail civil rights leaders.  For example, Senator Long

said the COA was needed due to "a so-called civil rights march led by Dr. Martin Luther King in

the streets of Birmingham in March of 1963." 114 Cong. Rec. 1294 (Jan. 29, 1968).  During that

7

march, Long complained, Dr. King had "addressed a tense crowd with inflammatory words," while in jail, King "wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt unjust." *Id.*  Long offered similar explanations for the COA by reference to other civil rights leaders.  114 Cong. Rec. 5536 (Mar. 6, 1968).  As for the constitutional power Congresses needed to pass the COA—the Commerce Clause—Long explained the COA would apply to intrastate conduct so that it would "not leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." 114 Cong. Rec. 5533.

Third, Senator Long said the COA would "strike at" the "doctrine . . . that one should not obey the laws that stand in the way of alleged 'civil rights.'" 114 Cong. Rec. 1295 (Jan. 29, 1968).  As to the COA section that would become § 231(a)(3), Senator Long explained that this section "would make it a Federal offense for people to snipe at firemen or shoot at policemen while they are trying to do their duty protecting lives and property." 114 Cong. Rec. 5542.

C.      **Section 1752 and the U.S. Secret Service**

1.      *The legislative history of § 1752*

Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).  At the time, the USSS was part of the Treasury Department.

Later Congresses would amend Section 1752, but like its current iteration, the 1970 statute provided that it was "unlawful for any person . . . (1) willfully and knowingly to enter or remain in . . .(ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting. . ." 84 Stat. 1891-92. The statute made clear which entity "prescribed regulations" governing the "posted, cordoned off, or otherwise

restricted areas where the President is or will be temporarily visiting": the Treasury Department, of which the USSS was then part. § 1752(d)(2); 84 Stat. 1892.

In 1969, Senators Roman Lee Hruska and James Eastland designed S. 2896, which would later be codified at § 1752. The very purpose of the bill was to give the Secret Service the power to restrict areas for temporary visits by the president, a power which no other federal agency then possessed. S. Rep. No. 91-1252 (1970). The Senate Judiciary Committee report accompanying S. 2896 made clear that in 1970, "[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices." S. Rep. No. 91-1252, at 7 (emphasis added).

Similarly, during floor debate on the bill, senators explained that the key purpose of the legislation that would become § 1752 was to vest the Secret Service in particular with the authority to set restricted areas, cutting through the patchwork of existing State laws and local ordinances and freeing the Secret Service from reliance on other government agencies. Explaining the need for S. 2896, Senator McClellan stated:

> Protecting the President . . . is a formidable task for the Secret Service, which is charged with safeguarding the personal life of the President. As difficult as this task is, however, it is rendered even more difficult because the Secret Service's present powers are somewhat limited. Title 18, section 3056 of the United States Code authorizes the Secret Service to protect the life of the President, but does little more. *Consequently, the Service must rely upon a patchwork of State laws and local ordinances and local officers to clear areas for security perimeters, to provide for free ingress and egress when the President is visiting, and to protect the President's private homes from trespassers.*

116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) (emphasis added).

Similarly, Senator Hruska explained that S. 2896 was needed to empower the Secret Service to set restricted areas:

It would be unconscionable not to recognize the obvious fact that the President's vulnerability is maximized when he is traveling or residing temporarily in another section of the country.  It would be unconscionable not to recognize the obvious fact that *the Secret Service does not presently possess adequate Federal authority during these most vulnerable occasions.*  This body cannot ignore the obvious responsibility and duty it has at this moment to *create the needed* protection and *authority*.

116 Cong. Rec. 35,653 (statement of Sen. Hruska) (emphasis added).

Following enactment, Treasury promulgated regulations governing restricted areas under § 1752 in Chapter IV, part 408 of title 31 of the Code of Federal Regulations.  31 C.F.R. §§ 408.1-408.3.  Section 408.1 stated that "the regulations governing access to such restricted areas where the President or any other person protected by the Secret Service is or will be temporarily visiting are promulgated pursuant to the authority vested in the Secretary of the Treasury by 18 U.S.C. § 1752." 31 C.F.R. § 408.1.  Part 408 provided many examples of the USSS, and no other agency, exercising its power under § 1752 to set and define restricted areas.  § 408.2(a)-(c).  As for gaining lawful access to areas restricted under § 1752, Part 408 was clear that authorization must be obtained from the Secret Service.  § 408.3.  No other federal agency was mentioned in Part 408.

2.    *The current § 1752*

In its current version, Section 1752 criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1).  It also criminalizes,

knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. . .

§ 1752(a)(2).

In turn, "restricted building or grounds" is statutorily defined.  In Section 1752,

(1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance;

18 U.S.C. § 1752(c)(1).

The first two subparts of Section 1752(c) concern individuals protected by the USSS. In subpart (A) those individuals are the President (at the White House) and the Vice President (at his or her official residence). In subpart (B) the individual protected by the Secret Service is the President or "other person protected by the Secret Service." Members of Congress are not protected by the Secret Service. 18 U.S.C. § 3056(a) (setting forth persons USSS is "authorized to protect"). Protection of Congressmen and Senators is the role of a separate federal agency, the United States Capitol Police. The U.S. Capitol Police do not provide for the protection of Secret Service protectees. *See* United States Capitol Police: Our Mission, available at: https://www.uscp.gov/; § 3056(a).

The final Section 1752(c) subpart concerns "a building or grounds so restricted in conjunction with an event designated as a special event of national significance." "Designation" in this subpart refers to a specific federal agency process. Major federal government or public events that are considered to be nationally significant may be designated by the President—or his representative, the Secretary of the Department of Homeland Security (DHS)—as National Special Security Events (NSSE). 18 U.S.C. § 3056(e)(1). Section 3056 designates the USSS as the lead federal agency responsible for coordinating, planning, exercising and implementing

security for NSSEs.  *Id.*[1]  Accordingly, all three subparts of 18 U.S.C. § 1752(c)(1) concern

decision-making authority or action by the Secret Service.

Section 3056 sets forth the "Powers, authorities, and duties of United States Secret

Service." 18 U.S.C. § 3056.  Subsection (d) criminalizes interfering with agents "engaged in the

protective functions authorized by this section *or by section 1752 of this title. . .*" 18 U.S.C. §

3056(d) (emphasis added).  Subsection (g) stresses the independence of the Secret Service's

mission.  "The United States Secret Service shall be maintained as a distinct entity within the

Department of Homeland Security. . . No personnel and operational elements of the United

States Secret Service shall report to an individual other than the Director of the United States

Secret Service, who shall report directly to the Secretary of Homeland Security without being

required to report through any other official of the Department." 18 U.S.C. § 3056(g).

> **D.      The Superseding Indictment and bill of particulars response**

The SI charges Mostofsky with the following offenses:

**Count One**: committing, and attempting to commit, "an act" to obstruct, impede, and

interfere with "a law enforcement officer lawfully engaged in the lawful performance of his/her

official duties incident to and during the commission of a civil disorder, and the civil disorder

obstructed, delayed, and adversely affected the conduct and performance of a federally protected

function," in violation of 18 U.S.C. § 231(a)(3).

**Count Two**: corruptly obstructing, influencing, and impeding an "official proceeding,"

"that is, a proceeding before Congress, specifically, Congress's certification of the Electoral

---

[1] The joint session of Congress that met at the U.S. Capitol on January 6, 2021, to open, certify, and count the November 2020 presidential election votes was not designated an NSSE. National Special Security Events: Fact Sheet, Jan. 11, 2021, p. 1, Congressional Research Service, available at: https://fas.org/sgp/crs/homesec/R43522.pdf.

College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18," in violation of § 1512(c)(2).

**Counts Five and Six**: unlawfully and knowingly entering "a restricted building and grounds, that is, any posted, cordoned off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting," in violation of § 1752(a)(1), and engaging in disorderly and disruptive conduct that in fact disrupted the orderly conduct of government business while in that restricted area, in violation of § 1752(a)(2).

In its bill-of-particulars response, the government added detail to its Section 231(a)(3) charge:

> The government intends to argue that the defendant's actions or attempted actions that were intended to obstruct, impede, or interfere with any law enforcement officer defending and protecting the U.S. Capitol and its occupants on January 6th include: defendant's *act of pushing*, *individually or with others*, *against law enforcement officers setting up or adjusting barriers in a restricted area near the U.S. Capitol*; and defendant's act of positioning himself in a way to prevent law enforcement from setting up or adjusting barriers between themselves and rioters outside the U.S. Capitol. . .

ECF No. 38, p. 2 (emphasis added).

The government also specified which alleged "federally protected functions" were "adversely affected" by the "civil disorder" on January 6.  ECF No. 38, pp. 3-4.

## ARGUMENT

### I.   Standard for a Rule 12(b) motion to dismiss an indictment

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1).  This rule performs several constitutionally required functions, including protecting against prosecution for crimes based on

13

evidence not presented to the grand jury, as required by the Fifth Amendment.  *See, e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).  Rule 12 provides that a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).  It also permits such a motion on the basis of a "defect in instituting the prosecution," including "an error in the grand-jury proceeding." Fed. R. Crim. P. 12(b)(3)(A)(v). *Hamling v. United States*, 418 U.S. 87, 117-18 (1974) (an indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged").

## II.     The Section 1512(c)(2) count should be dismissed

### A.     The SI fails to state a § 1512(c)(2) offense

#### 1.     *The Electoral College vote count did not involve the administration of justice*

Count Two charges that Mostofsky attempted to, and did, obstruct, influence and impede an "official proceeding," namely, "Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and §§ 15-18." SI, Count Two.  The first reason this charge fails to state an offense is that the Electoral College vote in Congress is not an "official proceeding," as it is not one with a truth-seeking function carrying the threat of a penalty, i.e., administering justice.

Every time the government has attempted to give any Chapter 73 "proceeding" a meaning other than the business of a legal tribunal, it has failed.  In *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), for example, the government argued that an FBI investigation qualified as an "official proceeding" under § 1512(c).  The Court will notice that an FBI

investigation arguably has a greater claim to being an "official proceeding" than the Electoral

College vote count, as it is at least an investigation.  Yet the Ninth Circuit rejected the

government's argument for the following reasons:

- Section 1512's descriptor "official" indicates a sense of formality associated with "*legal proceedings*." 752 F.3d at 1169 (emphasis added).

- The word "proceeding" in § 1515(a)(1) is "surrounded with other words that contemplate a *legal usage* of the term, including 'judge or court,' 'federal grand jury,' '*Congress*,' and 'federal government agency.'" *Id.* (emphasis added).

- Legal dictionaries define "proceeding" as "'a word much used to express the *business done in courts*.'" *Id.* (quoting Black's Law Dictionary 1241 (8th ed. 2004)) (emphasis original).

- The "use of the preposition 'before' suggests an appearance in front of [a body] *sitting as a tribunal*." *Id.* at 1171 (emphasis added).

- "Section 1512 refers to 'prevent[ing] the attendance or testimony of any person in an official proceeding'; 'prevent[ing] the production of a record, document, or other object, in an official proceeding'; and 'be[ing] absent from an official proceeding to which that person has been summoned by legal process.' 18 U.S.C. § 1512(a)(1)(A)-(B), (a)(2)(B)(iv).  The use of the terms 'attendance,' 'testimony,' 'production,' and 'summon[]'" when describing an official proceeding strongly implies that some formal hearing *before a tribunal* is contemplated." *Id.* at 1172 (emphasis added).

The Court will notice that all of these points apply with equal force to Section

1515(a)(1)'s "a proceeding *before* the Congress," and that § 1512(c) refers to the "impair[ment]

[of an] object's integrity or availability for use in an official proceeding," § 1512(c)(1), which

also "strongly implies that some formal hearing *before a tribunal* is contemplated." *Ermoian*,

752 F.3d at 1172 (emphasis added).

Equally telling is *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994).  *Kelley* is

significant not only because it is binding D.C. Circuit law, but because it concerned charges

under both §§ 1505 and 1512, affording an opportunity for the court of appeals to find

determinative distinctions between them, if any.  The "proceeding" at issue was an investigation

15

conducted by the Officer of the Inspector General at the Agency for International Development. The first thing to notice in *Kelley* is that the government *stipulated and agreed that § 1505's "proceeding" should be construed the same as § 1512's "official proceeding." Kelley*, 36 F.3d at 1128. That prompted the D.C. Circuit to premise part of its decision on that basis. *Id.* The second thing to notice: the D.C. Circuit determined that the investigation at issue constituted a "proceeding" because (1) other § 1505 cases cited by the D.C. Circuit involved agency investigations "with some *adjudicative* power" or with "the power to enhance their investigations *through the issuance of subpoenas or warrants*"; and (2) the IG in the AID investigation at issue was "empowered to issue subpoenas and to compel sworn testimony in connection with *an investigation*. . ." *Kelley*, 36 F.3d 1118 at 1127 (emphasis added).[2] Thus, it is binding D.C. Circuit law that Section 1512/1505 "proceedings" at the very least entail a baseline investigation (though, as seen in *Ermoian*, the courts often require more than that).

The point is underscored by the D.C. Circuit's decision in *Poindexter.* As noted above, *Poindexter* determined that the legislative history of § 1505 shows that it was designed to prevent obstruction of only those proceedings held pursuant to Congress's investigative power. *Poindexter*, 951 F.2d at 380-81.

Every other circuit decision construing a Chapter 73 "proceeding" is in accord with *Ermoian*, *Kelley*, and *Poindexter. See United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) (holding that a federal agency's internal investigation was not a Section 1512 "official

---

[2] *Kelley* relied on these authorities: *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984) (Department of Energy investigation including issuance of administrative subpoena was proceeding under § 1505); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (IRS investigation including issuance of subpoena was a proceeding under § 1505); *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964) (SEC investigation with authority to issue subpoenas and administer oaths was "proceeding" under § 1505).

proceeding" because that phrase "is consistently used throughout § 1512 in a manner that contemplates a formal environment *in which people are called to appear or produce documents*") (emphasis added); *United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) (holding that BOP panel investigation was a Section 1512 "official proceeding" because "the review panel must '*determine*' if there has been a violation of BOP policy, must make '*findings*,' and may '*decide*' to refer the matter to senior departmental authorities . . .") (emphasis added).

Before January 6, the government adopted Mostofsky's interpretation of Section 1512. To this day, the DOJ's Resource Manual instructs prosecutors that there is no difference between a Section 1505 "proceeding" and an "official proceeding" in Section 1512.  DOJ Resource Manual, § 1730 ("This definition [of 'proceeding' in § 1512] is in large part a restatement of the judicial interpretation of the word 'proceeding' in § 1503 and 1505."), available at: https://www.justice.gov/archives/jm/criminal-resource-manual-1730-protection-government-processes-official-proceeding-requirement.[3]  Indeed, as recently as three years ago, the government argued in federal courts that the meaning of "official proceeding" in § 1512(c) is "limited to quasi-adjudicative investigations or inquiries that involve the making of findings of fact and the issuance of rulings or recommendations for government action." *United States v. O'Connell*, 2017 U.S. Dist. LEXIS 172491, *14 (E.D. Wisc. Sept. 5, 2017) (summarizing DOJ's interpretation of § 1512(c)).

The government concedes the Electoral College vote count on January 6 was not an inquiry or investigation.  *See*, *e.g.*, *United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 (D.D.C. 2021) ("[T]he certification of the Electoral College vote is not an 'inquiry or

---

[3] The DOJ Manual clarifies that the only difference between "proceeding" in § 1505 and "official proceeding" in § 1512 is that the latter "does away with the pending proceeding requirement," which has nothing to do with the government's argument.  DOJ Resource Manual, § 1730.

investigation.'"").  Instead, it relies exclusively on the provisions of the Electoral Count Act of

1887 (ECA).  SI, Count Two (citing 3 U.S.C. §§ 15-18).  Congress's role in certifying Electoral

College votes is of "grave significance," it observes.  The ECA's provisions, it adds, create a

procedure for members of Congress to object to the certification of Electoral College votes.  See,

e.g., 3 U.S.C. § 16.  So, just as a judge and legal parties occupy specific locations in a courtroom,

so too do members of Congress in the "Hall." *Id.*  The ECA, the government continues, specifies

where desks should be placed in the "Hall." *Id.*  In sum, the Electoral College vote count is an

"official proceeding" because of the solemnity—but also the furniture.

To be clear: before January 6, the government never charged "obstruction of a

congressional proceeding," under any statute, where the "proceeding" was not an investigation or

inquiry.  No court has found an "official proceeding" based on congressional solemnity and

furniture alone.  The ECA procedures identified by the government do not concern the "back and

forth between citizens and government" within which zone the obstruction statutes aim to

prevent the former's impairment of information bearing on the latter's decision-making. *United

States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (Wilkinson, J.).  They do not perform a

truth-seeking function carrying the threat of a penalty, i.e., they do not concern the

administration of justice.  *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005)

("Chapter 73 of Title 18 of the United States Code provides criminal sanctions for those who

obstruct justice.").

So contorted are the legal arguments required to arrive at its predetermined outcome that

the government finds itself lost in its own positions.  Because the Electoral College vote count

plainly does not concern obstruction "of justice," it has fallen back on the claim that Section

1512 does not require impeding "justice," merely obstruction of an "official proceeding."  See,

e.g., *United States v. Brady Knowlton*, 21-cr-46, ECF No. 41, pp. 12-13 (D.D.C. 2021) (Moss, J.)

(Government brief: "The 'proceeding before Congress' is not limited to proceedings solely

related to the administration of justice"). Yet it did not realize, or care, that in that case, the

Frankenstein offense it tries to create cannot be properly sentenced under the U.S. Sentencing

Guidelines. For the Guidelines indicate that a Section 1512 conviction is sentenced under USSG

§2J1.2—entitled "Obstruction of Justice." And every single specific offense characteristic under

§2J1.2 requires interference with "the administration of justice," §2J1.2—a context that the

government has conceded is not present in the January 6 cases. *Knowlton*, 21-cr-46, ECF No.

41, pp. 12-13.[4]

There are additional problems with the government's novel hypothesis that the Electoral

College vote certification is an "official proceeding" under the obstruction statutes. The ECA is

treated by most constitutional scholars as a so-called non-binding internal House rule given

statutory form. That is for two reasons. First, under the constitutional principle of "legislative

entrenchment," one legislature cannot bind a future legislature, i.e., purport to pass legislation

---

[4] The government advised the Court that it was insisting that Mostofsky stipulate to an 8-level
enhancement for obstructing "the administration of justice" by "causing or threatening to cause
physical injury to a person. . .," §2J1.2(b)(1)(B), and a 3-level enhancement for "substantial
interference with the administration of justice." §2J1.2(b)(2). Thus does the government insist
that Mostofsky disagree with the government's own position that this particular "obstruction of
official proceeding" does *not* involve "the administration of justice."

A comparison of the penalty provisions in § 1505 and § 1512(c) demonstrates that Congress
could not have intended to give the latter the all-encompassing meaning pushed by the
government here. Section 1505 criminalizes the obstruction of a congressional "inquiry or
investigation" by "threats or force." § 1505. The statutory maximum sentence is five years'
imprisonment. *Id.* By contrast, the statutory maximum sentence under Section 1512(c) is 20
years' imprisonment. § 1512(c). According to the government, then, Congress views
obstruction of its investigations by "threats and force" far less seriously than it does obstruction
of ceremonial proceedings by means short of "threats and force."

that a future Congress cannot amend.  *See*, *e.g.*, *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996).  And, second, the ECA purported not only to bind future Congresses with legislation but to do so on the subject of parliamentary procedure, over each Congress's constitutional power to set its own rules.  U.S. Const. Art. I, § 5, cl. 2 ("each House may determine the Rules of its Proceedings.") (the "Rulemaking Clause").  Consequently, the ECA is generally interpreted as a hortatory House internal rule in statutory form, in order to avoid the serious constitutional questions it raises.  *Is the Electoral Count Act Unconstitutional?*, Vasan Kesavan, 80 N.C.L. Rev. 1653, 1793 (2002).

The implications of the government's novel attempt to import the federal obstruction statutes into Congress's self-governing election rules, and vice versa, are enormous.  Consider the government's claim that one "corruptly" obstructs the Electoral College vote certification by delaying it "wrongfully." According to the government, Democratic presidential candidate Al Gore, and everyone who facilitated his statewide recount of Florida votes during the 2000 presidential election (co-conspirators), was guilty of obstruction of an "official proceeding." They are all guilty, according to the government because (1) they attempted to delay the Electoral College vote certification by insisting on statewide recounts of ballots; and (2) they acted "wrongfully" (thus, "corruptly") because the recounts they engineered violated the Equal Protection Clause rights of voters by valuing their votes less than others.' *Bush v. Gore*, 531 U.S. 98, 104 (2000).  Or consider the members of Congress who objected on January 6 to vote certification for certain States.  They are guilty of obstruction of an "official proceeding," and they are all felons, because (1) they delayed the vote certification; and (2) they acted "wrongfully" because, after all, there was no recognized legal basis for objecting that the vote counts in those States were fraudulent to a degree overbalancing proper vote tallies.

20

The government's interpretation of "official proceeding" (and of "corruptly," addressed *infra*) requires the Court to first answer nonjusticiable political questions. *See Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962); *see also Luther v. Borden*, 48 U.S. 1 (1849) (holding courts could not decide whether the defendant trespassed during an insurrection as that would first require deciding the political question whether the Royal Charter government of Rhode Island satisfied the Constitution's republican form of government guarantee). The political question doctrine is a facet of the separation of powers. Under *Baker*, "an issue is non-justiciable if 'prominent on the surface' of that issue one finds:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion . . .

*United States v. Rostenkowski*, 59 F.3d 1291, 1304 (D.C. Cir. 1995) (quoting *Baker*, 369 U.S. at 217).

The D.C. Circuit has paid close attention to the political question doctrine in cases where criminal prosecutions turn on interpretation of ambiguous House rules. "[T]he Rulemaking Clause of Article I clearly reserves to each House of the Congress the authority to make its own rules and judicial interpretation of an ambiguous House Rule runs the risk of the court intruding into the sphere of influence reserved to the legislative branch under the Constitution." *Rostenkowski*, 49 F.3d at 1306. Added the D.C. Circuit, where "a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserved to each House alone." *Id.*

As noted, the ECA is treated as a non-binding internal House rule given statutory form, to avoid constitutional conflict with the Rulemaking Clause and the legislative anti-entrenchment

21

principle. *Winstar Corp.*, 518 U.S. at 872; Kesavan, 80 N.C.L. Rev. 1653, 1793. Moreover, as certain Justices and many legal observers have noted over the years, the ECA's legislative history is littered with indications that Congress did not intend for any role for federal courts in the interpretation of the ECA. *See*, *e.g.*, *Gore*, 531 U.S. at 153-54 (noting that the ECA's legislative history "makes clear its intent to commit the power to resolve disputes [about the meaning of ECA] to Congress," citing House reports and congressional record) (Breyer, J., dissenting).

Yet, here, the government relies, almost exclusively, on this Court imposing a judicial gloss on the ECA's notoriously opaque House procedures, in order to establish an "official proceeding" under Section 1512. SI, Count Two. It also relies on this Court to define Congress's constitutional powers and duties concerning the Electoral College vote count under the Twelfth Amendment—an amendment so vague that Congress felt prompted to enact the (no less vague) ECA after the scandals of the Presidential election of 1876. *Congress Sowed the Seeds of Jan. 6 in 1887: the Electoral Vote Count Act lets Congress think it can choose the President, but it's unconstitutional*, Judge J. Michael Luttig and David B. Rivkin, Jr., Wall Street Journal, Mar. 18, 2021, available at: https://www.wsj.com/articles/congress-sowed-the-seeds-of-jan-6-in-1887-11616086776. Judge Luttig notes that, contrary to the government's claim here that the ECA demonstrates Congress's decision-making discretion during the Electoral College vote count (which is supposed to show that it was an adjudicative-type "official proceeding"), the ECA was enacted "largely to *limit* Congress's role in determining which electoral votes to accept" (emphasis added). ECA aside, the former Fourth Circuit judge adds, "The Constitution's Electors Clause gives state legislatures plenary authority over the manner of choosing electors and relegates Congress to determining on what day the Electoral College would cast its votes.

The 12th Amendment, ratified in 1804, reformed the Electoral College by providing for separate votes for president and vice president. It also reiterates the Article I, Section 1 language that the certified state electoral results are to be transmitted to Washington, opened by the president of the Senate, and counted in the presence of both congressional houses.  No constitutional provision empowers Congress to resolve disputes over the validity of a state's electoral slate—or for that matter addresses who is to resolve these disputes. Significantly, the 12th Amendment gives Congress no power to enact legislation to enforce its provisions. . .".  So: it is clear why the government relies on the ECA alone to establish its adjudicative-type "official proceeding" point.

Thus, the government's "official proceeding" argument implicates the first three political question factors under *Baker*: (1) there is "a textually demonstrable constitutional commitment of the [Electoral College vote count] issue to a coordinate political department." *Baker*, 369 U.S. at 217.  The authority to determine the rules of Congress's proceedings is given exclusively to Congress under the Rulemaking Clause, not the federal courts.  U.S. Const. Art. I, § 5, cl. 2.  In any case, as Judge Luttig observes, neither the Electors Clause nor the 12th Amendment empowers Congress to resolve disputes over the validity of a state's electoral slate.  As to the vice president's constitutional role in the Electoral College vote certification, Vice President Pence himself correctly pointed out that the duties of the President of the Senate were "largely ceremonial," i.e., not "adjudicative," as the government (and former president) would have it. Ltr. of Vice President Mike Pence, Jan. 6, 2021, available at: https://bit.ly/2WVy9s0. (2) The notoriously ambiguous ECA offers "a lack of judicially discoverable and manageable standards for resolving" the "official proceeding" question.  *Baker*, 369 U.S. at 217.  That is shown by the mismatch between the archaic ECA procedures cited by the government and all of the Section

1512 case law analyzed by the parties.  It is also demonstrated by the imponderables created by the government's importation of House rules into obstruction-of-justice jurisprudence, and vice versa, such as whether every person who delays the vote count "wrongfully" (a hopelessly vague political question) is a felon; and (3) it is impossible to decide the "official proceeding" question in the government's favor "without an initial policy determination" left to a coordinate political branch, *Baker*, 369 U.S. at 217, i.e., what are the procedures permissible to Congress in counting and certifying Electoral College votes under the Constitution and ECA?

The equation of the joint session of Congress with a Chapter 73 "official proceeding" raises additional political questions.  The government centers its "official proceeding" argument on the procedures of the joint session convened to certify Electoral College votes.  Yet a full hour before the first protester intrusion into the Capitol, the joint session had been suspended. 167 Cong. Rec. H77 (Jan. 6, 2021).  That is because, shortly before 1:15 p.m. Eastern Time, members of Congress objected to the certificate from the State of Arizona.  *Id.*  As a result, the Vice President directed "the two Houses [to] *withdraw from the joint session*." *Id.* (emphasis added). What the January 6 protesters "obstructed" was not the joint session composed of both Houses, but instead separated House deliberations on Republican objections to the Arizona certificate.  As the ECA procedures relied on by the government itself show, there was no possibility of the separated Houses certifying, or not certifying, Electoral College votes before reconvening in the joint session.  3 U.S.C. § 15.  The joint session reconvened at approximately 11:35 p.m. that day, with the Vice President announcing the "resumption" of the joint session. The government asks the Court not only to declare the joint session an "official proceeding" under the obstruction laws, but to find that, under the parliamentary rules of Congress (either chamber? Both?), a joint session that "retired" and was "suspended" before, and not as a result

of, those intrusions, and that could not formally certify or decertify Electoral College certificates, was also an "official proceeding." For all of these reasons, Count Two fails to allege an offense under Section 1512(c)(2).

2.   *The government's interpretation of § 1512(c)(2) conflicts with* ejusdem generis

Beyond the government's misunderstanding of § 1512's "official proceeding," there are other reasons Count Two fails to state a Section 1512(c)(2) offense.  Again, the "residual clause" in subpart (2) penalizes, "Whoever corruptly— (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so . . .or (2) *otherwise* obstructs, influences, or impedes any official proceeding. . .§ 1512(c) (emphasis added).

"*[E]jusdem generis* counsels: Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the proceeding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (cleaned up).  In *Yates*, the Supreme Court showed that the SI misapplies § 1512(c), an evidence impairment statute, to criminalize political protest at Congress.  There, a fisherman caught an undersized red grouper in the Gulf of Mexico, contrary to federal law.  To prevent federal authorities from finding out, he ordered a crew member to toss the catch into the sea.  He was charged with an obstruction offense under § 1519, which penalizes "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, *or tangible object* with the intent to impede, obstruct, or influence the investigation . . ." 574 U.S. at 532 (quoting § 1519) (emphasis added).  The Supreme Court reversed Yates' conviction as the term "tangible object" did not cover the grouper.  Like Section 1512(c), Section 1519 was enacted as part of the Sarbanes-Oxley Act of 2002.  574 U.S. at 532. To apply Section 1519 to sea creatures, the Court held,

would cut § 1519 loose from its financial-fraud mooring to hold that it encompasses any and all objects, whatever their size or significance, destroyed with an obstructive intent. *Mindful that in Sarbanes-Oxley, Congress trained its attention on corporate and accounting deception and cover ups, we conclude that a matching construction of § 1519 is in order*: A tangible object captured by § 1519, we hold, *must be one used to record or preserve information.*

574 U.S. at 532 (emphasis added).

Nearly every aspect of *Yates'* limitation of the phrase "tangible object" in Section 1519 applies to the phrase "or otherwise obstructs, influences, or impedes" in Section 1512(c)(2). As in *Yates*, the government implies here that § 1512(c)(2) "extends beyond the principal evil motivating its passage." 574 U.S. at 536. But *Yates* held that Section 1519, a companion to § 1512(c)(2) in SOX, could not be properly read outside the context of SOX's financial and audit reforms. *Id.* at 541. The Court also held that "the words immediately surrounding 'tangible object' in § 1519—'falsifies, or makes a false entry in any record [or] document]'—also cabin the contextual meaning of that term." *Id.* at 542. The *noscitur a sociis* canon thus operated to limit "tangible object" to "the subset of tangible objects involving records or documents, i.e., objects used to record or preserve information." *Id.* at 544. And under the related *ejusdem generis* canon—"[W]here general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the proceeding specific words"—"tangible object" could not be read "to capture physical objects as dissimilar as documents and fish." *Id.* at 546.

In reaching that interpretation of § 1519, *Yates* relied on *Begay v. United States*, 553 U.S. 137, 142-43 (2008). *Yates*, 574 U.S. at 545. In *Begay*, the Court used *ejusdem generis* to determine what crimes were covered by the statutory phrase "any crime . . . that . . . is burglary, arson, or extortion, involves use of explosives, or *otherwise involves* conduct that presents a serious potential risk of physical injury to another." 553 U.S. at 142 (quoting 18 U.S.C. §

26

924(e)(2)(B)(ii)) (emphasis added).  *Begay* held that the "otherwise involves" provision covered "only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'"  *Id*.  Had Congress intended the latter "all encompassing meaning," "it is hard to see why it would have needed to include the [preceding statutory] examples at all." *Id.*

 *Yates* and *Begay* mean that § 1512(c)(2)'s reference to acts that "*otherwise* obstruct[], influence[], or impede[] any official proceeding," covers "only similar crimes" to those enumerated in § 1512(c)(1), i.e., "alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding." Had Congress intended the "or otherwise obstructs. . ." language to create an unlimited obstruction catch-call crime, "it is hard to see why it would have needed to include the examples [in § 1512(c)(1)] at all." *Yates*, 553 U.S. at 142.  Indeed, or why it would have any need for the rest of the obstruction crimes in Chapter 73.  Here, the SI's obstruction theory has nothing to do with the impairment of evidence.  Rather, it contends Mostofsky violated § 1512(c)(2) by virtue of his physical presence per se inside a building.  That underscores the government's attempt to transform the parading-in-Congress misdemeanor offense into felony obstruction.  40 U.S.C. § 5104(e)(2)(G).  Section 5104(e)(2)(G) makes it a misdemeanor to "parade, demonstrate, or picket in any of the Capitol Buildings." *Id.*  If Section 1512(c)(2) reaches "obstructive" conduct that has nothing to do with evidence impairment, such as appearing in the Capitol without permission, there is no conceptual distinction between the Title 40 misdemeanor offense carrying a 6-month sentencing maximum and a felony Section 1512 offense carrying a 20-year statutory maximum.  For if one "parades" or "demonstrates" inside the Capitol, one is by definition "obstructing," "impeding," or "influencing" Congress or attempting to do so.

Recently, Judge Moss stated in a January 6 case that he was concerned by the lack of any limiting principle in applying Section 1512(c)(2) in a way that would swallow the rest of Chapter 73. *Montgomery*, 21-cr-46, 8/3/21 Hr'g (D.D.C. 2021) (Moss, J.). Judge Moss is right: the Section 1512(c)(2) charge here does not state an offense because it does not concern the impairment or availability of evidence.

### B. If the government's interpretation of § 1512(c)(2) is applied, it is unconstitutionally vague as to Mostofsky

A criminal statute is unconstitutionally vague if it "'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'" *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 67 (1997). In addition, if the law at issue "interferes with the right of free speech or of association, a more stringent vagueness test [] appl[ies]." *Hoffman Estates v. Flipside*, *Hoffman Estates*, 455 U.S. 489, 500 (1982). If the government's novel interpretation of § 1512(c)(2) is applied here, it is unconstitutionally vague for the following reasons.

#### 1. *§ 1512(c)(2) does not provide fair notice that "official proceedings" includes proceedings unrelated to the administration of justice*

As indicated above, § 1512(c)(2) has never been used to prosecute a defendant for the obstruction of an "official proceeding" unrelated to the administration of justice, i.e., a proceeding not charged with hearing evidence and making factual findings. Moreover, there is no notice, much less fair notice, in § 1512(c)(2) or in any statute in Chapter 73 that a person may be held federally liable for obstructing a proceeding in a way that does not interfere with the

availability or integrity of evidence.  Accordingly, the government's interpretation of §

1512(c)(2) here is void-for-vagueness as applied to Mostofsky.

In this case, the void-for-vagueness doctrine's function of guarding against arbitrary or

discriminatory law enforcement is worth elaborating.  As Justice Gorsuch memorably put it in a

*Dimaya* concurrence,

> Vague laws invite arbitrary power.  Before the Revolution, the crime of treason in
> English law was so capaciously construed that the mere expression of disfavored
> opinions could invite transportation or death.  The founders cited the crown's abuse of
> 'pretended' crimes . . .as one of their reasons for revolution. . . Today's vague laws may
> not be as invidious, but they can invite the exercise of arbitrary power all the same—by
> leaving the people in the dark about what the law demands and allowing prosecutors and
> courts to make it up.

*Sessions v. Dimaya*, 138 S. Ct. 1204, 1223-24 (2018).

The concern about vagueness-enabled arbitrary enforcement is manifested here.  It takes

two forms, which might be called specific and general arbitrariness.  At a general level, the

government's enforcement of § 1512(c)(2) against Mostofsky is arbitrary because, prior to

January 6, the government had never charged "obstruction of a congressional proceeding," under

any statute, where the "proceeding" was not an investigation or inquiry.  Accordingly, the

government's election to put a new interpretation on the statute for a select group of related cases

raises questions about discriminatory law enforcement.  Those questions are only underlined by

the patently political nature of the circumstances of the offense, as well as the criminalization of

Mostofsky's First Amendment rights to political speech, assembly, and to petition the

government for a redress of grievances.  U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500.

Perhaps more serious is the specific arbitrariness enabled by the government's vague

interpretation.  Hundreds of January 6 defendants entered the Capitol Building, many of whom

made statements about their intent to demonstrate against Congress inside the building.  Yet

29

some are charged with traditional misdemeanor "parading" offenses under Title 40 carrying six-month maximum sentences, while others are charged with felony obstruction carrying a 20-year maximum.  Consider *United States v. Kevin Cordon*, 21-cr-277 (D.D.C. 2021).  Cordon was charged with obstruction of an official proceeding under Section 1512(c)(2).  His criminal complaint shows that he entered the Capitol Building and, after January 6, made a statement to the press giving direct insight into his intent.  Among other things, he stated, in writing, that he entered the Capitol to "take back our democratic republic. . .We're not going to take this lying down. . . We're taking our country back.  This is just the beginning." 21-cr-277, ECF No. 1-1.  Although this "obstructive" intent is far more clearly demonstrated than anything Mostofsky said, the government dropped its obstruction charge against Cordon.

Similarly, in another recent case, the Chief Judge raised questions about the supposed conceptual difference between a misdemeanor "parading in the Capitol" offense and felony "obstruction" of Congress.  *United States v. Glenn Wes Lee Croy*, 21-cr-162 (D.D.C. 2021).  The government's plea agreement with Croy, who entered the Capitol Building, concerned a misdemeanor parading offense.  But if Croy did not intend to impede or influence Congress, Chief Judge Howell observed, what was the purpose of the "parading, demonstrating, or picketing" inside the Capitol Building? The Chief Judge was right.  Only, the implication is not that the traditional misdemeanor offense should yield to the newly created felony, but that the latter is merely a misdemeanor masquerading as a felony.   Insofar as it alleges that Mostofsky obstructed a type of "official proceeding" nowhere identified in §§ 1512(c)(2) and 1515 and alleges a crime conceptually indistinguishable from a misdemeanor parading offense, Count Two must be dismissed under the Due Process Clause of the Fifth Amendment.

        2.     *The government's interpretation of "corruptly" fails this Circuit's* Poindexter *test*

In *United States v. Poindexter*, a former U.S. national security advisor was charged under § 1505 for obstructing a congressional investigation into the Iran/Contra affair. 951 F.2d 369, 371 (D.C. Cir. 1991). The defendant's obstruction consisted of lying to or misleading Members of the House and Senate Intelligence Committees about U.S. shipments of missiles to Iran. *Id.* at 372. The relevant passage of § 1505 provided, "Whoever corruptly . . . . influences, obstructs, or impedes or endeavors to influence, obstruct or impede . . .the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House . . .shall be [punished]. . ." The court held that Poindexter's lying to Congress, while a violation of § 1001, was not an obstruction offense under § 1505.

The D.C. Circuit arrived at that conclusion in the following way. First, it determined that the adverb "corruptly" was vague. 951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific—than 'corrupt.'"). Searching for a way out of the mess, the court observed that the verb "corrupt" "may be used transitively ('A corrupts B,' i.e., 'A causes B to act corruptly') or intransitively ('A corrupts,' i.e., 'A becomes corrupt, depraved, impure, etc.')." 951 F.2d at 379. It similarly determined that § 1505's adverb "corruptly" could take on either a transitive or intransitive meaning. Accordingly, to avoid the unconstitutional vagueness in a value-laden interpretation (e.g., "immoral"), the court decided that § 1505 "favor[ed] the transitive reading." *Id.* Thus, the *Poindexter* court construed § 1505 "to include only 'corrupting' another person by influencing him to violate his legal duty." *Id.* The court further found that even that definition of "corruptly" may suffer from unconstitutional vagueness where the defendant's purpose is not "to obtain an improper advantage for himself or someone else. . ." *Id.* at 385. The court gave this example of congressional activity the adverb "corruptly" may not cover without vagueness problems:

31

> [S]omeone who influences another to violate his legal duty [but] to cause the enactment of legislation that would afford no particular benefit to him or anyone connected to him. Or, as the Chief Judge instanced at the oral argument of this case, there "would be some purposes that would be corrupt and some that wouldn't be . . . Suppose the [defendant acted] to protect the historical reputation of some historical figure that has been dead for 20 years and he decides that he doesn't want to mar that person's reputation."

*Poindexter*, 951 F.2d at 386.

As indicated above, following *Poindexter* Congress amended § 1515 to clarify that "As used *in Section 1505*, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering or destroying a document or other information." § 1515(b) (emphasis added).  However, Congress did not amend § 1515 to define "corruptly" as used in § 1512.  In addition, the phrase "improper purpose" was held unconstitutionally vague in *Poindexter*.  951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific—than 'corrupt.'").

*Poindexter* is still good law in this circuit.  *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) (affirming § 1512 conviction because the defendant had committed "transitive" corruption in the *Poindexter* sense by persuading a witness to violate their legal duty to testify truthfully in court); see also *United States v. Kanchanalak*, 37 F. Supp. 2d 1, 4 (D.D.C. 1999) (Friedman, J.) (finding that even after Congress amended § 1515 in the wake of *Poindexter* to define "corruptly" for purposes of § 1505, § 1515's definition of "corruptly" to mean acting with an "improper purpose" is still unconstitutionally vague under *Poindexter*).

More broadly, the most widely accepted definition of "corrupt" intent, as understood in the obstruction statutes, is acting with the intent to obtain an improper advantage for oneself or an associate.  *United States v. North*, 910 F.2d 843, 882, 285 U.S. App. D.C. 343 (D.C. Cir. 1990), *opinion withdrawn and superseded in other part on reh'g*, 920 F.2d 940, 287 U.S. App.

32

D.C. 146 (D.C. Cir. 1990) (holding that a "corrupt" intent means "the intent to obtain an improper advantage for oneself or someone else. . ."); *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) ("[A] well-accepted definition of corruptly" is "to act with the intent to secure an unlawful advantage or benefit either for one's self or for another"); *United States v. Dorri*, 15 F.3d 888, 895 (9th Cir. 1994) (holding that "corruptly" element was satisfied by evidence that defendant acted "with a hope or expectation of [a] benefit to one's self"); *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991) ("Corruptly" means "done with the intent to secure an unlawful benefit either for oneself or another"); *United States v. Reeves*, 752 F2d 995, 1001 (5th Cir. 1985) ("To interpret 'corruptly' [in obstruction statute] as meaning 'with an improper motive or bad or evil purpose' would raise the potential of overbreadth' in this statute because of the chilling effect on protected activities. . . Where 'corruptly' is taken to require an intent to secure an unlawful advantage or benefit, the statute does not infringe on first amendment guarantees and is not 'overbroad.'").

In the January 6 cases, the government has made clear that by "corruptly" it means nothing more than "wrongfully"—a term it declines to define with any precision. As Judge Moss recently observed, that is likely unconstitutionally vague in this circuit under *Poindexter* and *North*. And as Mostofsky noted above, a definition as vacuous as "wrongfully" would, among other things, render Al Gore a felon for organizing vote recounts in the 2000 presidential election. The government's interpretation also contributes to the collapse of any distinction between a misdemeanor parading-in-Congress offense and felony obstruction of an official proceeding, as its understanding of "corruptly" means nothing more than the intent to impede or influence. Because the SI does not allege that Mostofsky "obstructed" the joint session by 'corrupting' another person by influencing him to violate his legal duty," *Poindexter*, 951 F.2d at

385, or that Mostofsky somehow acted to gain a material advantage for himself or an associate, it either fails to state a Section 1512(c) offense or alleges an unconstitutionally vague one.

### C.   The rule of lenity dictates that any ambiguities in § 1512(c)(2) be resolved in Mostofsky's favor

Even if § 1512(c)(2) is not unconstitutionally vague as applied to Mostofsky, any ambiguities in the statute should be resolved in his favor under the rule of lenity.  Under that principle, "where text, structure, and history fail to establish that the government's position is unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994).

Here, even if the Court decides that the government's interpretation of § 1512(c)(2) is correct—i.e., that "official proceedings" of Congress include those which are not held pursuant to its investigatory power, that § 1512(c)(2) applies outside the context of the impairment of evidence, and that "corruptly" includes a disinterested but mistaken purpose—it is plainly not unambiguously so.   That is shown by the lack of any case law supporting the government's interpretations, by the legislative history which tells against those interpretations, and by the text and structure not just of § 1512(c) but of all sections of Chapter 73.

 Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Mostofsky's favor by dismissing Count Two. *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

### D.   The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an *ex post facto* law

Because no court has construed § 1512(c)(2) as the government does in this case, to retroactively apply that construction against Mostofsky in this matter would violate the novel construction principle of the Due Process Clause of the Fifth Amendment.  *Bouie v. City of*

*Columbia*, 378 U.S. 347, 353 (1964).  "[A]n unforeseen judicial enlargement of a criminal

statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of

the Constitution forbids." *Id.*  If a "legislature is barred by the *Ex Post Facto* Clause from

passing such a law, it must follow that a [court] is barred by the Due Process Clause from

achieving precisely the same result by judicial construction." *Id.*

     *Bouie* also concerned a trespass prosecution that gave indications of being politically

motivated.  The 1964 case involved a combination drugstore and restaurant in South Carolina.

The establishment would not serve black Americans.  Two black college students took seats in

the restaurant.  After they entered, an employee hung up a "no trespass" sign.  The store manager

called the police, who asked the students to leave.  When they refused, they were arrested and

charged with trespass.  The students were tried and convicted, with the State Supreme Court

upholding the trespass convictions.  The Supreme Court vacated the convictions based on the

novel construction principle of the Due Process Clause.  It reasoned that the South Carolina

Supreme Court's construction of the trespass statute was effectively an *ex post facto* law.  By its

terms, the state statute merely prohibited "*entry* upon the lands of another . . .*after* notice from

the owner . . prohibiting such entry. . ." 378 U.S. at 355 (emphasis added).  However, there "was

nothing in the statute to indicate that it also prohibited the different act of *remaining* on the

premises *after* being asked to leave.  Petitioners did not violate the statute as it was written; they

received no notice before entering either the drugstore or the restaurant department."  *Id.*

(emphasis added).  Finally, "the interpretation given the statute by the South Carolina Supreme

Court  . . . ha[d] not the slightest support in prior South Carolina decisions."  *Id*. at 356.

     So too here.  Mostofsky did not "violate the statute as it was written." *Bouie*, 378 U.S. at

355.  Section 1512 prohibits obstruction of "official proceedings" which all courts have

construed to mean proceedings before a tribunal that mimic a court of law.  There is "nothing in the statute to indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of interfering with proceedings that do not hear evidence or find facts.  "The interpretation given the statute by the [government] . . . has not the slightest support in prior [§ 1512] decisions." *Id.*

Accordingly, the novel construction principle requires rejection of the government's interpretation, which would operate as an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.

### E.     The SI's application of § 1512(c)(2) is invalid under the First Amendment, as applied to Mostofsky

As the government acknowledges, Mostofsky's activities on January 6 included political expression, assembly and petitioning of the government for a redress of grievances.  U.S. Const. amend. I.  Insofar as the § 1512(c)(2) charge characterizes protest per se as obstruction of congressional proceedings, it is an unconstitutional application of the statute as applied to Mostofsky.

To prevail on an as-applied challenge under the First Amendment, Mostofsky must merely show that § 1512(c)(2) is being unconstitutionally applied as to the specific protected activity for which he is charged.  *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014).  The first question is whether Mostofsky's alleged conduct was "expressive." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).  "[T]o bring the First Amendment into play," Mostofsky must merely show "[a]n intent to convey a particularized message was present" and "the likelihood . . . that the message would be understood by those who viewed it." *Id.*  Next, the court assesses whether the challenged statute is related in any way to the suppression of free expression.  If so, and if the law is content-neutral, the court must subject the statute to intermediate scrutiny.  *Edwards*, 755 F.3d at 1002.  Under that standard, the statute is

constitutionally applied only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Here, there is no argument that the conduct charged under § 1512(c)(2) was not protected expression.  The entire thrust of the § 1512(c)(2) offense is that Mostofsky and others protested at the Capitol concerning the results of the 2020 presential election.  That is the very core of the First Amendment.  A fur pelt sends a message.  *See*, *e.g.*, *Johnson*, 491 U.S. at 404 (flag burning expressive); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503, 505 (1969) (students wearing black armbands to protest war is expressive); *Brown v. Louisiana*, 383 U.S. 131, 141-142 (1966) (sit-in to protest segregation expressive); *United States v. Grace*, 461 U.S. 171 (1983) (picketing is expressive); *Snyder v. Phelps*, 562 U.S. 443, 444 (2011) ("A statement's arguably inappropriate or controversial character . . . is irrelevant to the question [of] whether it deals with a matter of public concern.").

Similarly, there is no argument that § 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the government for a redress of grievances.  Again, the thrust of the obstruction claim is that Mostofsky and the other defendants intended to affect the actions of Congress: otherwise known as political demonstration and protest.  Critically, the government's obstruction claim is not *limited* to any alleged intent to enter the Capitol and to affect congressional action *by force or threats*.  SI, Count Two.  After all, the government could have attempted to charge such an offense under § 1505, prohibiting obstruction of Congress's investigatory powers by force or threats.  The SI does not charge that

offense and its obstruction theory encompasses the very act of protesting to affect congressional action itself.  Accordingly, § 1512(c)(2) is here "related to the suppression of free expression." *See*, *e.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016) (restricted area statute "related to the suppression of free expression" where charged defendant jumped White House fence to protest executive action).

Under an intermediate scrutiny test, the Court applies the *O'Brien* factors to determine the constitutionality of § 1512(c)(2)'s application here.  The following two factors show that the statute's application here is unconstitutional: (1) the government's interest *is* related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms *is* greater than is essential to the furtherance of that interest.  *O'Brien*, 391 U.S. at 377.  As explained, that the § 1512(c)(2) theory in this case is not limited to an attempt to influence Congress by threats or force can only mean that it covers acts that influence Congress through protest and demonstration.  Moreover, nothing in the SI cabins Mostofsky's "obstruction" to the act of entry into the Capitol Building. (In the January 6 cases, the government has charged many protesters with felony "obstruction of Congress" who did not enter the Capitol.)  If his "obstruction" encompasses protest outside the Capitol Building, the government is criminalizing not just his expression, but the expression of every group that politically demonstrates outside that building with a view to affecting, or "obstructing," legislation.  Second, that restriction is far greater than is "essential" to the furtherance of the government's legitimate interest in preventing obstruction of official proceedings of Congress.  For the government could adequately protect that interest merely by preventing obstruction of Congress "by threats or force"—*i.e.*, using the proper statute for the crime it is failing to allege, 18 U.S.C. § 1505—or at the very least by preventing obstruction of Congress through unlawful entry into the building.  *City of Houston v.*

*Hill*, 482 U.S. 451, 459 (1987) ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."). Accordingly, the SI's overbroad charge against Mostofsky under § 1512(c)(2) unconstitutionally infringes on his First Amendment rights and should be dismissed.

## III.     The Section 231(a)(3) count should be dismissed

### A.     The government does not allege a "federally protected function"

To establish Mostofsky is guilty of a Section 231(a)(3) offense, the government must allege and prove beyond a reasonable doubt that the "civil disorder" on January 6 had an adverse effect on a "federally protected function," § 231(a)(3), as the government disclaims any reliance on interstate commerce in the January 6 cases.  None of the entities listed in the government's bill-of-particulars response is a "federally protected function." Even if one were, it was not properly presented to the grand jury.

"Federally protected function" is defined as any "function, operation or action carried out . . . by any *department, agency, or instrumentality of the United States* or by an officer or employee thereof." 18 U.S.C. § 232(3) (emphasis added).  Section 6 of Title 18 defines "department" and "agency" for the title:

> The term "department" means one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government.

> The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

18 U.S.C. § 6.

The Supreme Court has held that Section 6's definition of "department" as "one of the *executive* departments enumerated in section 1 of Title 5" presumptively controls any Title 18

statute's use of that term unless the government makes a "fairly powerful" "showing" that Congress intended, in the statute at issue, that "department" should refer to the "legislative, or judicial branches of government," which the Court held was the "unusual sense" of the term. *Hubbard v. United States*, 514 U.S. 695, 700 (1995).  In *Hubbard*, a man was convicted under a now-superseded version of § 1001 that punished "'Whoever, in any matter within the jurisdiction of *any department or agency of the United States* knowingly and willfully . . . makes any false, fictitious or fraudulent statements. . .'" 514 U.S. at 698 (quoting § 1001) (emphasis added).  The man had filed false records in a bankruptcy court.  The lower courts upheld his conviction on the ground that such a court was a "department . . .of the United States," in the sense that the executive, legislative and judicial branches of government were sometimes referred to as "departments" in the 18th century.  *Id.*  Not only did the Supreme Court reverse his conviction on the ground that this interpretation of "department" was inconsistent with § 6, it overruled its own prior contrary precedent notwithstanding the gauntlet of *stare decisis.*  514 U.S. at 701.

Applying the *Hubbard* rule, the D.C. Circuit has held that congressional entities do not satisfy Section 6's "department" and "agency" "of the United States" because they are not *executive* departments and agencies.  See *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (after Supreme Court's decision in *Hubbard*, "an *entity within the Legislative Branch* cannot be a 'department' within the meaning of § 1001 and 18 U.S.C. § 6," nor is Congress an "agency" under § 6) (emphasis added); *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995) (reversing convictions under § 1001 for false statements to Congress, as *Hubbard* "narrowed the reach of ["department" and "agency"] *to matters within the executive branch*") (emphasis added). *See also Trump v. Deutsche Bank AG*, 943 F.3d 627, 645 (2d Cir. 2019) (applying *Hubbard* and § 6 and holding that the Right to Financial Privacy Act's reference to a

"department or agency" does not apply to Congress) *rev'd and remanded on other grounds sub. nom. Trump v. Mazars USA LLP*, 140 S. Ct. 2019 (2020); *United States v. Perraud*, 672 F. Supp. 2d 1328, 1344 n. 4 (S.D. Fla. 2009) (Congress neither a "department" nor an "agency").

Beyond those decisions, Title 18 distinguishes between congressional entities, on the one hand, and "departments" or "agencies" "of the United States," on the other.  Consistent with *Hubbard-Oakar-Dean*, the latter always lie "within the executive branch." See, e.g., 18 U.S.C.§ 1505 (distinguishing between obstruction of congressional proceedings and "proceeding[s] . . . before any department or agency of the United States. . .").

Against that backdrop, the government's bulleted list of "federally protected functions" fails as a matter of law for the following reasons:

- **U.S. Capitol Police**.  The USCP is not a "federally protected function" for several reasons.  First, USCP is not an executive department or agency.  It is operated by the Capitol Police Board, which is composed solely of congressional not executive entities, see Capitol Police Board, U.S. Capitol Police, https://www.uscp.gov/the-department/oversight/capitol-police-board.  One of the federal statutes cited in the government's particulars response explicitly states that USCP is not an executive department or agency.  2 U.S.C. § 1970.  Second, the USCP are among the "law enforcement officers" the government alleges Mostofsky "interfered" with under § 231(a)(3) during the "civil disorder." If the USCP are also the "federally protected function"— i.e., the police are both the protecting function and the function that is protected— the term "federally protected function" adds nothing to the meaning of § 231(a)(3).  Statutes must be construed to avoid surplusage.  *See*, *e.g.*, *Indep. Ins. Agents of Am.*, *Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000); *United States v. Rupert*, 2021 U.S. Dist. LEXIS 53152, *43 (D. Minn. Jan. 6, 2021) (Had the government not been relying alternatively on interstate commerce in that case, the court would have dismissed the Section 231(a)(3) charges because the government merely pointed to law enforcement officers, not a "federally protected function").

- **"Executive departments and agencies."** The government cites 2 U.S.C. § 1970, which states that executive departments and agencies "may assist the United States Capitol Police in the performance of its duties by providing services . . ." § 1970(a)(1).  But it does not identify the "function, operation, or action carried out" by any "executive department or agency" on January 6 that was adversely affected by the civil disorder. § 232(3).  And, again, if the executive department or agency at issue is a "law enforcement agency," the government's interpretation of Section 231(a)(3) is tautological.

- **Archivist of the United States**.  The government states, "pursuant to 3 U.S.C. § 6, the Archivist of the United States has the responsibility to safeguard the electoral certificates

submitted by the states." ECF No. 38, p. 3.  However, Section 6 does not actually say that. Rather, it states that the Archivist has the duty to transmit to Congress "copies in full" of the certificates, which need not entail "safeguarding" them, whatever the government may mean by that. (Same-day mail and email now exist, unlike in 1887.) § 6.  In any case, the Archivist is the administrator for the National Archives and Records Administration which is neither an executive "department" nor an "agency" under 18 U.S.C. § 6, and the government does not explain how the certificates were adversely affected by the civil disorder; it merely states a legal conclusion.

- **The President of the Senate.**  The government notes the Vice President's role as President of the Senate under the ECA.  It is not clear what argument the government intends to make, as the Senate is not a "department, agency or instrumentality of the United States" under 18 U.S.C. § 6, even assuming the President of the Senate could be characterized as an "officer" or "employee" thereof.  § 232(3).  *Dean*, 55 F.3d at 659.

- **Commencement of term of office statute.**  The government cites the statute stating that the term of office for President "shall, in all cases, commence on the 20th day of January next succeeding the day on which the votes of the electors have been given."  3 U.S.C. § 101.  The "function" described in § 101 is that the President and Vice President's term shall begin on January 20.  But the government does not argue that the "civil disorder" adversely affected that function.  Rather, it alleges that the disorder "affected the counting of the votes of the electors" on January 6, which is not the "function" in § 101; the joint session resumed on January 6.  SI, Count Two.

- **The Secret Service.**  Officers of the U.S. Secret Service, like that of the U.S. Capitol Police, are "law enforcement officers" under § 232(7).  See 18 U.S.C. § 3056(b)(3), (d) (describing USSS as a "law enforcement agency").  The government alleges the USSS were "engaged in the enforcement . . . of criminal laws of the United States," § 232(7), on January 6 because the government alleges that protesters breached a "restricted area" under § 1752, which it is the duty of the USSS to enforce. § 3056(d).  As explained above, if the USSS are also the "federally protected function," the term "federally protected function" adds nothing to the meaning of § 231(a)(3).  *Hawke*, 211 F.3d at 644 (statutes must be construed to avoid surplusage); *Rupert*, 2021 U.S. Dist. LEXIS 53152, *43.

- **Department of Homeland Security (DHS)**.  The government represents that DHS had the responsibility to protect the Capitol and its grounds on January 6, pursuant to 40 U.S.C. § 1315 and that was a "federally protected function." First, that is not accurate.  The USCP are designated with the statutory duty to protect the Capitol and its grounds, not DHS.  2 U.S.C. § 1961(a).  Second, the government does not specify what DHS agency it is referring to, or how it was adversely affected, but if it is a "law enforcement agency," that would not identify a "federally protected function" because that reading of Section 231(a)(3) is tautological.  *Rupert*, 2021 U.S. Dist. LEXIS 53152, *43.

Besides not satisfying the definitions of "department" and "agency" in § 6, the above list suffers from another flaw.  As indicated above, the "civil disorder's" "adverse effect" on a

"federally protected function" is an element of the SI's § 231(a)(3) charge.  That means the government was required to establish probable cause of a "federally protected function" to the grand jury to satisfy the Fifth Amendment's presentment requirement.  U.S. Const. amend. V; *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (holding that under the Fifth Amendment, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt").

Here, the only entity in the above list that the government even arguably presented to the grand jury as a "federally protected function" was the USCP.  As explained above, the USCP is not an executive "department" or "agency" "of the United States." But it is almost certainly the case that the government did not even present the USCP as the "federally protected function." For every single criminal complaint charging a § 231(a)(3) offense on the DOJ's January 6 website states that the "federally protected function" was this: the joint session of Congress. Capitol Breach Cases, DOJ, available at: https://www.justice.gov/usao-dc/capitol-breach-cases. *Hubbard-Oakar-Dean* show that Congress is not a "department" or "agency" "of the United States."

To the extent the government claims that any other entity was presented to the grand jury as a "federally protected function," it should produce that evidence in response to Mostofsky's motion to compel or provide it to the Court for review *in camera*.  Because Congress/USCP are not an executive department or agency, the government has not alleged, and did not present to the grand jury, a "federally protected function" that was "adversely affected" by the "civil disorder." Accordingly, the Section 231(a)(3) offense must be dismissed for failure to state an offense and for a grand jury error.

## B.    Section 231(a)(3) exceeds Congress's Commerce Clause authority

Whether or not the government now attempts to rely on interstate commerce, the Section 231(a)(3) offense must be dismissed because Congress lacked the constitutional power to legislate.  The Commerce Clause prohibits the criminalization of noneconomic intrastate activity unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995).  Under that test, the Supreme Court has invalidated federal criminal laws prohibiting gun possession in a school zone and domestic violence in the Violence Against Women Act.  *Lopez*, 514 U.S. at 552-64; *United States v. Morrison*, 529 U.S. 598, 607-19 (2000).  Following *Lopez* and *Morrison*, § 231(a)(3) constitutes an unconstitutional exercise of Congress's power.

        1.     *The police power and the Commerce Clause's prohibition on Congress's regulation of intrastate activity that does not "substantially affect" interstate commerce*

"Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n. 3 (internal quotation marks omitted). Accordingly, the Supreme Court in *Lopez* concluded that, in the criminal context, Congress's "power . . . [t]o regulate Commerce with foreign Nations, and among the several States[,]" under Article I, § 8, cl.3, is inherently limited by the Tenth Amendment's reservation of police power to the States. The limited federal commerce power permits Congress to regulate only three categories of activity: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "those activities that *substantially* affect interstate commerce." *Id.* (emphasis added).

The Supreme Court developed the third *Lopez* category in order to define "the outer limits" on Congress's authority to enact legislation "regulating intrastate economic activity" that "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 559; *see also United States v.*

*Robertson*, 514 U.S. 669, 671 (1995) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects") (emphasis in original). The regulated activity must "substantially affect" interstate commerce because "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

In *Morrison*, the Supreme Court established a "controlling four-factor test for determining whether a regulated activity 'substantially affects' interstate commerce." *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d 1114, 1119 (9th Cir. 2003)). Those factors are:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Adams*, 343 F.3d at 1028 (citing *Morrison*, 529 U.S. at 610-612). "The 'most important' factors for a court to consider are the first and the fourth." *Id.*

### 2.    *Section 231(a)(3) does not substantially affect interstate commerce*

Section 231(a)(3) criminalizes "any act" that obstructs, impedes, or interferes with a local police officer performing lawful duties "incident to and during the commission of a civil disorder which *in any way or degree* obstructs, delays, or adversely affects commerce of the movement of any article or commodity in commerce. . ." (emphasis added).  Since § 231(a)(3) is not directed at the channels or instrumentalities of commerce, only the third *Lopez* factor is at issue. However, under the four controlling factors described in *Adams* and *Morrison*, § 231(a)(3) does

45

not regulate activity that substantially affects interstate commerce. Accordingly, the statute is unconstitutional.

> a)      Section 231(a)(3) does not regulate economic activity

As in *Lopez* and *Morrison*, the act of interfering with the duties of a law enforcement officer in a civil disorder is not economic in nature. It therefore fails the first *Morrison* factor.

In *Lopez*, the Court found the activity of gun possession under the Gun-Free School Zones Act has "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 567.  Further, the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* Similarly, in *Morrison*, the Supreme Court concluded that the civil remedy for gender-motivated violence under Violence Against Women Act was a regulation of noneconomic activity that exceeded Congress's commerce authority. 529 U.S. at 617.  Even though the VAWA was enacted with the support of significant congressional findings regarding the "nationwide, aggregated impact" of gender-motivated violence on interstate commerce, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. The "noneconomic, criminal nature of the conduct at issue was central" to the *Lopez* and *Morrison* rulings. *Morrison*, 529 U.S. at 610.

In contrast to *Lopez* and *Morrison*, in *Gonzales v. Raich*, the Supreme Court upheld a federal law prohibiting the intrastate cultivation of marijuana for personal use because the law formed an "essential part" of the Controlled Substances Act (CSA), which encompassed "a larger regulation of economic activity." 545 U.S. 1, 24-25 (2005) (quoting *Lopez*, 514 U.S. at

561). The majority observed that the "primary purpose" of the CSA is "to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Raich*, 545 U.S. at 19. Understood within that larger framework, the challenged provision was a regulation on "economic activity" because "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* at 22.

As with the statutes under consideration in *Lopez* and *Morrison*, the activity regulated by § 231(a)(3) is noneconomic for purposes of the first *Morrison* factor. The gravamen of § 231(a)(3) criminalizes obstruction, interference, and impeding state officers, with no direct connection to commerce or economic activity. And, unlike in *Raich*, § 231(a)(3) is not part of any larger body of economic regulation; it involves "a brief, single-subject statute[,]" which "by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." *Raich*, 545 U.S. at 23-24 (distinguishing *Lopez*, 514 U.S. at 561) (internal quotation marks omitted); *accord Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity").

> b)  The jurisdictional element of § 231(a)(3) does not limit its reach to activities that substantially affect interstate commerce

Although § 231(a)(3) contains a commercial nexus element, the element is faulty because it does not limit the reach of the statute to activities that "substantially affect" interstate commerce.  There are several problems under the second *Morrison* factor on limitations to the statute's reach.

First, the commercial nexus element is not connected to the "any act" element. Section 231(a)(3) makes it a crime to:

> commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way*

> *or degree obstructs, delays, or adversely affects commerce or the movement of any*
> *article or commodity in commerce.*

(Emphasis added). The commercial nexus clause unambiguously modifies the term "civil disorder," not "any act." Thus, a charge under § 231(a)(3) need not be supported by evidence that a defendant's *act* impacted interstate commerce. Instead, it requires evidence only that the act interfered with an officer engaged in the performance of duties "incident to and during the commission of a civil disorder," and that the civil disorder, not the individual's act, minimally affected commerce.

The statutory "incident to and during" connector further diminishes any required link to interstate commerce. Although the statute does not make clear whether the connector applies to the act itself or to the lawful performance of official duties, either construction places the interstate commerce element another step removed from the regulated activity. The term "incident" as an adjective connotes a degree of separation, in that one occurrence of lesser importance is "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." INCIDENT, BLACK'S LAW DICTIONARY (11th ed. 2019). Activity with only an incidental connection to an event that affects commerce is not a permissible subject of federal criminal law.

Finally, the commercial nexus element of § 231(a)(3) does not require a *substantial* effect on interstate commerce, but instead requires a civil disorder that affects commerce "in any way or degree." The terms are virtual opposites. Substantial means "[c]onsiderable in extent, amount, or value," whereas the word "any" is expansive and unqualified. *Compare* SUBSTANTIAL, BLACK'S LAW DICTIONARY (11th ed. 2019) *with* ANY, BLACK'S LAW DICTIONARY (11th ed.

2019); *see St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550 (1978) (statutory language that covered "'any' act" was "broad and unqualified"). An "any way or degree" impact on commerce is not a "substantial" impact.  The second *Morrison* factor is not satisfied.

> c)   Congress did not find that § 231(a)(3)'s activities substantially affect interstate commerce

Formal congressional findings are neither required nor sufficient to establish a valid exercise of federal commerce authority.  *Lopez*, 514 U.S. at 562-63; *Morrison*, 529 U.S. at 614. Congressional findings may demonstrate that an activity "substantially affects interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Lopez*, 514 U.S. at 563. But "the existence of congressional findings is not sufficient" when Congress merely offers a "but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." *Morrison*, 529 U.S. at 615.

Here, Congress made no findings to establish that the activity regulated by § 231(a)(3) substantially affects interstate commerce beyond any impact "visible to the naked eye." The only potentially relevant findings relate to the impact of "riots" on interstate commerce.  114 Cong. Rec. 1294-95 (Jan. 29, 1968). Upon first proposing the Civil Obedience Act, Senator Long stated certain facts, without citation, concerning what he called the "wholesale Negro violence," which he said "was an almost nightly affair in the streets of our cities" between 1965 and 1967.  114 Cong. Rec. 1295. For example, he said:

> In [1967], nearly 100 people were killed. Nearly 2,000 were injured. Police reported 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated property loss was in the neighborhood of $160 million. The estimated economic loss to riot-torn businesses was $504 million.

*Id.*  Senator Long asserted that these "riots" impeded interstate commerce:

> Any riot, as we know and experience them today, generally does impede the flow of goods in interstate commerce. It stops the movement of people in interstate

commerce. It interferes with the goods that were intended to move in interstate commerce.

114 Cong. Rec. 5535-36 (Mar. 6, 1968).

But the statutory definition of "civil disorder" involving "acts of violence by assemblages of three or more persons" (18 U.S.C. § 232(1)) has no connection to riots on the scale described by Senator Long.  Moreover, § 231(a)(3) does not target the destructive behavior attendant to a riot; the criminalized conduct is interference with an official's duties "incident to and during" a civil disorder. The congressional record contains no findings that individual interference with police and firefighters as defined under § 231(a)(3) substantially affects interstate commerce. The third *Morrison* factor is not satisfied.

> d)   The relationship between § 231(a)(3)'s activities and any effect on interstate commerce is too attenuated

Any causal chain that could link the activity proscribed under § 231(a)(3) to any substantial impact on interstate commerce is too far attenuated to place the activity within reach of Congress' commerce authority. The offense conduct of § 231(a)(3) need not affect commerce directly. It suffices to establish that a person's acts interfered with an official's duties performed "incident to and during" any "civil disorder" that, in turn, affects commerce. Such an "incidental effect on interstate commerce . . . does not warrant federal intervention." *Musick v. Burke*, 913 F.2d 1390, 1397 (9th Cir. 1990). The noneconomic conduct penalized by § 231 by definition is too attenuated to satisfy the "substantially affects" test for commercial impact.

Even if interference with police § 231(a)(3) could affect commerce in the aggregate, when considered on a nationwide scale, that would be insufficient to place those acts within the federal commerce authority. In *Morrison*, the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's

50

aggregate effect on interstate commerce." 529 U.S. at 617. Here, the paucity of cases prosecuted under § 231(a)(3) further negates any claim of an aggregate effect. In sum, the four *Morrison* factors demonstrate that § 231(a)(3) regulates purely local, noneconomic activities that do not "substantially affect" interstate commerce. As a result, § 231(a)(3) falls outside of Congress's power to regulate under the Commerce Clause.

### C.    The Section 231(a)(3) charge must be dismissed, or limited to prohibiting acts of violence, to avoid overbreadth

"In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 481 (2010).  Here, the Court should either invalidate Section 231(a)(3) or else construe the statute so that its applications are limited to prohibiting unprotected acts of violence.

Section 231(a)(3) extends to a substantial amount of constitutionally protected speech and expressive conduct in excess of the law's legitimate sweep. Such broad criminal statutes like § 231(a)(3) "must be scrutinized with particular care." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987); see also *Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement.").  Criminal laws that "make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id.* Several of the statute's terms are so left so broad and indefinite as to impose unqualified burdens on a range of protected expression.

First, by penalizing "any act," § 231(a)(3) reaches to the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to

convey a message or symbolic content.  *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020).

Second, § 231(a)(3) imposes a substantial burden on protected expression by requiring that "any act . . . obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties." The term "interfere," which the statute leaves undefined, reaches a broad range of speech and expressive conduct. The law's author acknowledged this when, in a Senate hearing two days after he introduced the Civil Obedience Act, he criticized the term "interference" as used in the hate crime law by asking whether "almost anything could be regarded as an interference?" 114 Cong. Rec. 1819 (Feb. 1, 1968) (Sen. Long)).  In the context of the § 231(a)(3), Senator Long's interpretation of "interference" rings true because "there are numerous examples in which a person's speech could interfere with . . . a police officer in the lawful discharge of the officer's duties." *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) (invalidating a state statute for overbreadth that made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties.").

Indeed, § 231(a)(3) authorizes a felony conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or to encourage resistance, or one who records police activity with a cell phone. *Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of government officials in public spaces."). The First Amendment does not permit such an unqualified prohibition on "interference" with police duties because "the freedom of individuals verbally to oppose or challenge police action without

thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state" *Hill*, 482 U.S. at 462–63 (1987).

Third, the term "civil disorder," as defined under § 232(1), is extremely far-reaching, applying to "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property." Rather than limiting the statute, § 231(a)(3)'s language reaches "any public disturbance" in the types of traditional public fora where First Amendment protections are at their zenith. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir.2009) ("In traditional public fora . . . First Amendment protections are strongest, and regulation is most suspect.").

Moreover, the "civil disorder" definition sweeps broadly to cover incidents in which three or more persons cause an immediate danger of injury to persons or property. 18 U.S.C. § 232(1). The definition can just as easily be met by a violent mob of thousands as it can by the ejection of several unruly individuals from a bar, concert, or sporting event, or even by three teenagers whose skateboarding damages property. Finally, to be convicted under § 231(a)(3), a person's interference with police duties must merely occur "incident to and during" the civil disorder, and it need not be shown that the defendant incited the civil disorder or engaged in "acts of violence" that the civil disorder "involves." The term "civil disorder" fails to limit the overbreadth of penalizing "any act" of interference with police duties.

For all those reasons, the Court should invalidate Section 231(a)(3) for overbreadth. But if it does not, it should at least construe the statute so as to avoid constitutional conflict. That means limiting Section 231(a)(3)'s applications to acts of violence. That is precisely what the Eighth Circuit did in *United States v. Mechanic*, 454 F.2d 849, 853-54 (8th Cir. 1971). To avoid the defendant's overbreadth challenge, the court of appeals held that Section 231(a)(3) "applies

only to *violent* physical acts." *Id.* (emphasis added).  In that case, the violent physical acts

included throwing "a barrage of bricks, stones, glass, and cherry bombs" at police officers.  *Id.* at

851.  *See also Rupert*, 2021 U.S. Dist. LEXIS 46798, *20 (applying *Mechanic* and limiting

Section 231(a)(3) to violent acts, in that case involving providing explosive devices to rioters

who threw them at police officers).

Such a statutory construction also happens to be consistent with virtually every

application by DOJ of Section 231(a)(3).[5]  And, in virtually every January 6 case in which

Section 231(a)(3) is charged, an act of violence is alleged.  This is shown in the chart attached to

this motion as Exhibit 1.  Accordingly, to the extent the Court does not find Section 231(a)(3)

constitutionally overbroad, it should construe the statute to be limited to "violent physical acts."

*Mechanic*, 454 F.2d at 853-54; *Rupert*, 2021 U.S. Dist. LEXIS 46798, *20.

## IV.     The Section 1752 counts should be dismissed

### A.     The SI fails to state an offense because only the USSS restricts areas under § 1752

Counts Five and Six contend that Mostofsky violated § 1752 by entering the Capitol

Building, which the SI characterizes as a "restricted building and grounds," as that phrase is

defined in § 1752.  However, it does not allege that the U.S. Secret Service (USSS) restricted

that area under the statute.  The government's position that any government entity may set a

---

[5] See, e.g., *United States v. Wood*, 2021 U.S. Dist. LEXIS 134774, *2 (D. Del. July 20, 2021)
(defendant threw bricks at police); *United States v. Patton*, 2021 U.S. Dist. LEXIS 108479, * 2
(D. Utah June 8, 2021) (defendant set a police car on fire); *United States v. Featherston*, 461
F.2d 1119, 1122 (5th Cir. 1972) (defendants made explosives for the "coming revolution");
*United States v.* Casper, 541 F.2d 1275, 1277 (8th Cir. 1976) (defendants shot at law
enforcement); *United States v. McArthur*, 419 F. Supp. 186, 192 (D.N.D. 1975) (same); *United
States v. Jaramillo*, 380 F. Supp. 1375, 1377 (D. Neb. 1974) (same).

restricted area under § 1752 finds no support in the statutory text, the case law, or the legislative history.

Penal statutes are strictly construed. *United States v. Moore*, 613 F.2d 1029, 198 U.S. App. D.C. 296 (D.C. Cir. 1979). The plain meaning of § 1752 unequivocally indicates that the USSS alone sets restricted areas. As shown above, all three definitions of "restricted building or grounds" in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency. Section 3056, concerning the "powers, authorities, and duties of United States Secret Service," confirms that § 1752 is a statute directed to the USSS and not any other federal agency. 18 U.S.C. § 3056(d).

Section 1752 defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" in any of three scenarios set forth in the statute. § 1752(c)(1). If an area is to be "restricted," § 1752(c)(1), some person or government entity must do the restricting. Areas do not restrict themselves. That statutory phrase's neighboring provisions, and common sense, reveal exactly which entity does the restricting. First, the restricting entity must be a government agency. If a § 1752 restricted area could be set by any person, it would be illegal to enter an area "cordoned off" around the White House by a homeless person using tinfoil traffic cones. § 1752(c)(1)(A). Second, that government agency is the USSS because each of the three types of "restricted area" are patrolled and managed by that specific agency and no other. § 1752(c)(1)(A)-(C).

That is why what little § 1752 precedent there is supports Mostofsky, while none supports the government's interpretation. To be clear: before January 6, the government never prosecuted a § 1752 case where the "restricted area" was set by any entity other than the USSS. Instructive is *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005). There, Bursey entered an

area restricted by the USSS in advance of a political rally in South Carolina held by the

president.  *Id.*, at 304.  Reviewing the trial record, the Fourth Circuit observed that "the Secret

Service designated an area near [the rally] as a restricted area." *Id.*  It also noted that the

"authorized persons" admitted into the area all "wore lapel pins issued by the Secret Service,"

meaning that the USSS was the entity that granted "lawful access" to the area.  *Id.*  Intending to

protest the Iraq war, Bursey approached the restricted area with a megaphone.  A Secret Service

Agent advised him he could not remain in that area.  He was repeatedly advised thereafter of the

same by multiple law enforcement agents over a twenty to twenty-five minute period.  *Id.*

Bursey was charged and convicted under § 1752(a)(1).

One sufficiency argument Bursey raised on appeal was that, as a matter of *mens rea*, "he

was never advised that the area was a federally restricted zone, *so designated by the Secret*

*Service.*" 416 F.3d at 308 (emphasis added).  The Fourth Circuit rejected this argument.  But not

on the ground that § 1752 restricted areas need not be so restricted by the USSS.  Instead, trial

evidence showed that Bursey "understood the restriction to have been created by the Secret

Service (as opposed to state or local law enforcement)." *Id.*  Added the Fourth Circuit, "[T]here

was ample evidence that Bursey understood the area to have been restricted by the Secret

Service, *and thus a federally restricted zone.*" *Bursey*, 416 F.3d at 309 (emphasis added).

The import of the Fourth Circuit's logic is clear.  Had the Fourth Circuit even contemplated the

idea that entities other than the USSS could restrict areas under § 1752, the above reasoning

would lack sense.

The government's anyone-may-restrict interpretation yields absurd results.  *See United*

*States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345

(1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court

56

has looked beyond the words to the purpose of the act.").  Consider a Secret Service protectee who is "temporarily visiting" a place.  § 1752(c)(1)(B).  The Secret Service sets a "restricted area" of one block around the protectee's presence.  Under the government's construction, any local police unit could decide to extend the "restricted area" to 20 blocks, without authorization from the Secret Service: the agency charged with protecting the person for whose sake the area is restricted in the first place.  If any person were to enter the expanded area without "lawful authority" (from the local police? The Secret Service?) the same government that deemed the area limited to one block could also prosecute a person for entering block 20.  The statute has simply never worked that way, as the Secret Service would readily attest.

At the very least, the *government's* interpretation is not unambiguously correct on the face of the statute.  In that case, the Court would look to legislative history.  As shown above, that history could hardly be clearer: the entire purpose of Section 1752 was to vest a specific federal agency with area-restricting authority which no agency then possessed: the USSS.  A Senate Judicial Committee report explicitly states that the purpose of § 1752 was to vest the Secret Service specifically with the power to set federal restricted areas.  S. Rep. No. 91-1252 (1970), at 7 ("[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices.") (emphasis added).

This is not just Mostofsky's view.  It is also the view of the Office of Legal Counsel of the Department of Justice.  *See Citizens for Responsibility & Ethics in Wash. v. United* States, 922 F.3d 480, 483 (D.C. Cir. 2019) ("The authority of the OLC is nearly as old as the Republic itself.").  In May 1995, the Secretary of the Treasury requested a legal opinion from the OLC on

whether the Secretary had authority to restrict traffic on a segment of Pennsylvania Avenue in order to protect the President. *Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. Off. Legal Counsel 109 (1995). In crafting this opinion, OLC painstakingly examined the text of § 1752 and its legislative history. *Id.* at 109-122. OLC determined that § 1752 did, in fact, specify which government entity restricts areas under that statute. It is the Secret Service *via* the Treasury Department: "Section 1752 plainly grants *the [Treasury] Secretary* authority to limit ingress and egress to an area where the President will be visiting *to create a security perimeter*." Op. Off. Legal Counsel, p. 113 (emphasis added). If any government entity could set § 1752 restricted areas, there was no reason for OLC to conduct the analysis in the first place. Accordingly, Counts Five and Six should be dismissed because the government does not allege the "restricted area" Mostofsky entered was set by the USSS (the government concedes it was not).

## B.     If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Mostofsky

If the Court concludes that the SI properly charges Mostofsky with violating § 1752 by crossing a boundary set by an agency other than the USSS, the statute is unconstitutionally vague as applied to him. Assuming the truth of the government's allegations, Mostofsky saw police lined up outside the U.S. Capitol. But if the text, legislative history and common sense inform an "ordinary person" that he violates § 1752 by entering an area the Secret Service has restricted, there is no notice in the statute that being on the wrong side of a police barricade is, independent of the Secret Service, in violation of that statute. The concern about vagueness-enabled arbitrary enforcement is evident. Generally, the government's enforcement of § 1752 against Mostofsky is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the

USSS.  Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement, heightened in the context of Mostofsky's rights to political speech, assembly, and to petition the government for a redress of grievances.  U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500.  Perhaps more serious is the specific arbitrariness.  Hundreds or perhaps thousands of other protesters "entered" the same "restricted area" as Mostofsky on January 6.  Yet it is undisputed that many of those people have not been charged under § 1752 like him.  Mostofsky was singled out for reasons that do not concern the animating purpose of the Secret Service statute.  Insofar as they both allege that Mostofsky entered and remained in a "restricted area" set by an agency nowhere identified in the statute, Counts Five and Six are unconstitutionally vague.

### C.     The rule of lenity dictates that ambiguities in § 1752 be resolved in Mostofsky's favor

Even if the Court decides that the government's interpretation of § 1752 is somehow formally correct—i.e., that any entity may set restricted areas under § 1752(c)—it is plainly not unambiguous*ly* so.  That is shown by the lack of any references in § 1752 to agencies other than the USSS; the statute's legislative history, which similarly focuses exclusively on the USSS; the clear role that the USSS plays in all three definitions of "restricted buildings or grounds" in § 1752(c); the indication in Section 3056 that the USSS enforces restricted areas in § 1752; the lack of any case law supporting the government's position; and the common sense notion that if the USSS patrols and guards the restricted areas in § 1752, it also sets them.  Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Mostofsky's favor by dismissing Counts Five and Six.  *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

**D.** **The novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law**

Because no court before January 6 ever construed Section 1752 to mean that agencies other than the USSS may set restricted areas under the statute, such a construction would be retroactively applied to Mostofsky and would constitute an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment. *Bouie*, 378 U.S. at 353.

<u>**CONCLUSION**</u>

For all the foregoing reasons, Mostofsky respectfully requests that the Court dismiss Counts One, Two, Five and Six of the SI.

Dated: August 31, 2021                          Respectfully submitted,

<u>*/s/ David B. Smith*</u>
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 722-1096
nds@davidbsmithpllc.com

*Counsel to Mostofsky*