**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-138 (JEB)** |
| | : | |
| **AARON MOSTOFSKY,** | : | |
| | : | |
| **Defendant** | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S SECOND MOTION TO DISMISS COUNTS ONE, TWO, FIVE AND SIX OF THE SUPERSEDING INDICTMENT**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTUAL NARRATIVE .................................................................................................. 3

PROCEDURAL HISTORY ............................................................................................... 4

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT .................................................................................................................... 6

   I. Mostofsky's Challenges To Count Two, Charging Obstruction Of A Congressional
      Proceeding In Violation of 18 U.S.C. § 1512(c)(2), Are Meritless. ............................ 6

     A. Count Two Properly Charges Obstruction Of An Official Proceeding In
        Violation of § 1512(c)(2). ...................................................................................... 6

        1. The Electoral College Certification Vote Was An Official "Proceeding"
           Under § 1512(c)(2), Regardless of Whether It Had A "Truth-Seeking
           Function." ........................................................................................................ 7

        2. Mostofsky's Extra-Textual Arguments That § 1512(c)(2) Is Limited To
           Adjudicatory Proceedings Or Document Destruction Fail. ............................. 11

        3. In Any Event, Count Two Does Charge An Interference With An
           Adjudicatory Proceeding. ............................................................................... 12

        4. Permitting the § 1512(c)(2) Charge to Proceed Would Not Ensnare
           This Court in "Political Questions." ................................................................ 14

     B. *Ejusdem Generis* Does Not Compel Mostofsky's Cramped Reading of the
        Statute. .................................................................................................................. 17

     C. Section 1512(c)(2) Is Not Unconstitutionally Vague As Applied Against
        Mostofsky. ............................................................................................................ 20

     D. The Rule Of Lenity Does Not Compel Mostofsky's Cramped Reading Of
        The Statute. .......................................................................................................... 26

     E. Application of § 1512(c)(2) to Mostofsky's Criminal Conduct Does Not
        Violate the *Ex Post Facto* Clause. ..................................................................... 27

     F. Prosecution Of Mostofsky Under § 1512(c)(2) Does Not Violate The First
        Amendment. ......................................................................................................... 29

   II. Mostofsky's Challenges to Count One, Charging a Violation of 18 U.S.C.
      § 231(a)(3), are Meritless. ........................................................................................ 33

     A. At Trial, The Government Will Prove That Mostofsky Deliberately
        Interfered Or Attempted To Interfere With Law Enforcement Officers
        Engaged In Three Separate "Federally Protected Functions." ........................... 34

        1. Congressional Certification Of The Electoral College Vote. ......................... 34

        2. The Capitol Police Protecting The U.S. Capitol. ........................................... 39

        3. The U.S. Secret Service Protecting The Vice President. ................................ 40

ii

**B.  Mostofsky's Challenge To The Government's Grand Jury Presentation Fails.** .... 40

**C.  Mostofsky's Challenge To The "Commerce Clause" Prong of § 231(a)(3) Is Beside The Point, As The Grand Jury Did Not Indict Him For Interfering With Commerce.** .................................................................................. 42

**D.  Mostofsky's Overbreadth Claim Fails.** ............................................................ 43

**E.  This Court Should Not Consider Mostofsky's Belated Vagueness Challenge To § 231(a)(3), Which In Any Event Lacks Merit.** .................................. 48

**III.  Mostofsky's Challenges To Counts Five And Six, Charging Violations of 28 U.S.C. § 1752(a)(1) and (2), Respectively, Are Meritless.** ........................... 50

**A.  Section 1752 Makes No Mention Of Which Official Entity Can Restrict Egress Into Areas Covered By The Statute, Much Less Require That Only The Secret Service Can Do So.** .................................................................... 51

**B.  Section 1752 Is Not Unconstitutionally Vague As Applied to Mostofsky's Crimes.** ........................................................................................................... 54

**C.  The Rule Of Lenity Does Not Shield Mostofsky's Conduct, Which Plainly Violated § 1752.** ............................................................................................ 56

**CONCLUSION** ................................................................................................................ 57

**Introduction**

In his Second Motion to Dismiss ("MTD"), ECF47, four of the eight counts in the superseding indictment, ECF25, Defendant Aaron Mostofsky claims that charges brought pursuant to 18 U.S.C. § 1512(c)(1) (Count Two), § 231(a)(3) (Count One), and § 1752(a)(1) (Count Five) and § 1752(a)(2) (Count Six) fail to state an offense. He contends those statutes do not prohibit his conduct on January 6, 2021—when he, as part of a mob of thousands of persons, stormed the United States Capitol, busted through doors, and assaulted law enforcement officers who tried unsuccessfully to stem the tide of the mob. The superseding indictment charges that Mostofsky, along with his fellow rioters, sought to obstruct a Joint Session of the United States Congress from carrying out its Constitutionally mandated duty to certify the votes of the Electoral College in the 2020 Presidential election.

The *leitmotiv* of the MTD is that those charges are impermissible because the government has never charged anyone before January 6 with violating any of those statutes for the kind of conduct at issue here. *E.g.*, MTD2, 18, 28-29, 55. Although that may seem to bear upon Mostofsky's void for vagueness claims in the MTD (but ultimately does not demonstrate vagueness), it has no logical bearing on the meaning and scope of the statutes charged in the challenged counts. There is no substantially similar antecedent for the charges against Mostofsky because his crimes were *sui generis*: never in the country's history had a violent mob sought to disrupt a Congressional proceeding. And under *United States v. Lanier*, 520 U.S. 259 (1997), the absence of a prior prosecution based on substantially similar facts is insufficient to support a finding of unconstitutional vagueness.

Mostofsky relatedly contends that his unlawful conduct amounted to nothing more than misdemeanor trespass. *E.g.*, MTD1 (government seeks to "transform traditional misdemeanor

offenses into novel felonies"). Mostofsky is correct that the government has not previously used the felony statutes charged in this case against an assault on the United States Capitol. Again, that's because before January 6, 2021, no one did what Mostofsky and his compatriots did.

Mostofsky's farfetched suggestion that he was merely celebrating Purim on the wrong date, MTD1, is a paltry effort at minimization. He goes on to accuse the government of "wagering" that this Court will succumb to public pressure and fail to impartially apply the law. *Id*. As in every case it brings, the Department of Justice is guided by the fair and principled application of the rule of law. Mostofsky's wager, then, is that by casting aspersions on the government's motives for selecting the criminal charges in this case, he may succeed in distracting the Court from the holes in his legal analysis. The Court should not be distracted: Proper application of the law shows the relevant statutes prohibit Mostofsky's alleged conduct on January 6.

**Factual Narrative**

The criminal complaint filed on January 11, 2021 in this case, ECF1, recites the most

salient facts of Mostofsky's crimes as follow:

> On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, [during which] elected members of the United States House of Representatives and the United States Senate were meeting … to certify the vote count of the Electoral College of the 2020 Presidential Election…. The joint session began at approximately 1:00 p.m. …..

> With the joint session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades surround the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building…. [T]he joint session was still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows… [A]at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including … Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m….

> \* \* \* \*

> On January 6, 2021, [Mostofsky], who identified himself to a New York Post reporter in an interview, was profiled in a New York Post article titled, "NYC man says he stormed US Capitol to fight stolen election." In the video interview, [Mostofsky] explained his actions by stating: "the election was stolen", "we were cheated", and "I don't think 75 million people voted for Trump. I think it was close to 85 million"…. The New York Post video interview was conducted inside the Capitol Building, during which [Mostofsky] is observed carrying what appears to be a U.S. Capitol Police riot shield containing the U.S. Capitol Police logo, as well as wearing a U.S. Capitol Police officer's bullet proof vest labeled "Police".

> \* \* \* \*

3

The police riot shield and police vest are items of value belonging to the United States, specifically the U.S. Capitol Police.

ECF1 at 1-2.

## Procedural History

On January 11, 2021, the government charged Mostofsky by criminal complaint with theft of government property, in violation of 18 U.S.C. § 641; knowingly entering or remaining in any restricted building or grounds without lawful authority, in violation of 18 U.S.C. § 1752(a); knowingly, with intent to impede government business or official functions, engaging in disorderly conduct on capitol grounds, in violation of 18 U.S.C. § 1752(a)(2), and unlawful entry and disorderly conduct, in violation of 40 U.S.C. § 5104(e)(2)(D) and (G). ECF1. He was arrested the following day in the Eastern District of New York and released on personal recognizance. ECF5. He has remained on release throughout this case.

The grand jury returned an eight-count indictment against Mostofsky on February 19, 2021. On June 23, 2021, the grand jury returned a superseding indictment, charging Mostofsky with eight counts:

- civil disorder, in violation of 18 U.S.C. § 231(a)(3);

- obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) and § 2;

- assaulting and resisting or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1);

- theft of government property, in violation of 18 U.S.C. § 641;

- entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1);

- disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. 1752(a)(2);

- disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and

4

- parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

ECF25.[1]

## Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) states, in relevant part, "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Before trial, a defendant may move to dismiss an indictment or count thereof for failure to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v).

An indictment is sufficient if it "first … contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second … enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (cleaned up) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). The indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007).

---

[1] The complaint incorrectly stated that the value of the police vest was $1,905. ECF1. In fact, the U.S. Capitol Police purchased it for $427. When the government realized its mistake, it corrected it in the superseding indictment, which reduced the theft of government property offense from a felony to a misdemeanor. ECF25.

**Argument**

I.    **Mostofsky's Challenges To Count Two, Charging Obstruction Of A Congressional Proceeding In Violation of 18 U.S.C. § 1512(c)(2), Are Meritless**.

Mostofsky contends he is improperly charged with violating 18 U.S.C. § 1512(c)(2) because he did not attempt to disrupt an "official proceeding" that had "a truth-seeking function," and "every circuit to address this issue" has limited "official proceeding in that manner." MTD1. To the contrary, although courts have held that proceedings with adjudicative functions can be official proceedings under § 1512, none has held that § 1512(c)(2) applies *only* in that limited context. *See generally United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (rejecting the claim that 18 U.S.C. § 1505 "applies only to adjudicatory or rule-making activities and does not apply to wholly investigatory activity"; "the formal investigation opened by the Office of the Inspector General of AID was a 'proceeding' within the meaning of § 1505"). And no wonder, because such a reading would violate the statutory text.

A.    **Count Two Properly Charges Obstruction Of An Official Proceeding In Violation of § 1512(c)(2).**

Section 1512(c)(2) prohibits "corruptly obstructing, influencing, or impeding any official proceeding." 18 U.S.C. § 1512(c)(2). An "official proceeding" is, *inter alia*, "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B).

Count Two of the superseding indictment tracks that statutory text:

On or about January 6, 2021, within the District of Columbia and elsewhere, AARON MOSTOFSKY, attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18.

ECF25, Count Two.

1.     **The Electoral College Certification Vote Was An Official "Proceeding" Under § 1512(c)(2), Regardless of Whether It Had A "Truth-Seeking Function."**

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). Where, as here, the words of the statute "are unambiguous, the judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (cleaned up).

Mostofsky contends the Electoral College certification vote in Congress was not an "official proceeding," as "it is not one with a truth-seeking function carrying the threat of a penalty, *i.e.*, administering justice." MTD14. That's at odds with the statutory language, which contains no such limitation. Section 1515 defines the term, "official proceeding," "as used in" § 1512(c)(2). 18 U.S.C. § 1515(a)(1). As one of the defined forms of "official proceedings" in § 1515(a), "a proceeding before Congress" is unrestricted in the statutory text. Because it is unrestricted, the commonsense reading of that phrase is "*any* proceeding before Congress." That's because to "supply omissions transcends the judicial function." *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991) (quoting *Iselin v. United States*, 270 U.S. 245, 250-51 (1926)). "[I]t is not the role of courts to engraft restrictive language onto statutes." *United States v. Dawkins*, 999 F.3d 767, 776 (2d Cir. 2021) (rejecting a defense request to "shorten the reach of 18 U.S.C. § 666(a)(2), limiting the universe of 'agents' to be influenced and 'businesses' involved"). *See also Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir. 2002) ("Because the words '[f]ederal civil action' are not qualified, they include federal civil actions brought to vindicate constitutional rights."); *Vance v. Microsoft Corp.*, 2021 WL 963485, at *8 (W.D. Wash. Mar. 15,

2021) ("In essence, Microsoft wishes the court to read the limitation 'directly from the person' into § 15(b) where none exists. The court cannot do so.").

The absence of a textual qualification on "a proceeding before the Congress" is, at the very least, powerful proof that Congress did not intend to impose the limitation Mostofsky proposes. *See United States v. Francois*, 2017 WL 3208724, at *4 (S.D. Fla. July 14, 2017) (denying motion to dismiss § 1518 counts where "there is nothing in the 'plain language of Section 1518' requiring the involvement of a third party in the offense"), *report and recommendation adopted*, 2017 WL 3189721 (S.D. Fla. July 26, 2017). Based on the plain text of 18 U.S.C. § 1512(c)(2) and § 1515(a)(1)(B), the certification of the Electoral College vote as mandated by the Constitution and federal statute is a "proceeding before the Congress."

Ignoring the statutory text, Mostofsky argues that no court has permitted the government to prosecute a violation of § 1512(c)(2) unless the proceeding was "the business of a legal tribunal," MTD14-16. But none of Mostofsky's cited cases construed the scope of "a proceeding before Congress" under § 1515(a)(1)(B). *See United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013) (§ 1515(a)(1)(C) "does not encompass a criminal investigation"); *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (an official proceeding under § 1515(a)(1)(C) "does not apply to routine agency investigations of employee misconduct"). Other decisions he cites *affirmed* convictions for obstruction and so cannot support Mostofsky's claim that those cases set limits on the obstruction statutes at issue, much less on § 1512(c)(2). *See Kelley*, 36 F.3d at 1127 (preliminary inquiries of Inspector General of USAID was a proceeding for purposes of 18 U.S.C. § 1505);[2] *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (investigation of BOP

---

[2] Mostofsky contends that the D.C. Circuit's decision in *Kelley* stands for the proposition that "Section 1512/1505 'proceedings' at the very least entail a baseline investigation." MTD16. But

corrections officers regarding assault on an inmate was an official proceeding under § 1512 and 1515(a)(1)(C); the investigation was "sufficiently formal" where investigators "had to make findings and decide whether to refer the matter to senior BOP officials").

Nor does Mostofsky explain why a judicial interpretation of differently worded statutes controls the construction of 18 U.S.C. § 1512(c)(2) and § 1515(a)(1)(B). *See Francois*, 2017 WL 3208724, at *4 (defendant's "attempt to engraft the 'from one party' language onto Section 1518 is solely based on the language of a different statute"). After all, Congress deals with matters of utmost national importance, certainly by comparison to investigations of possible misconduct by individuals or small groups of persons at issue in the cases Mostofsky cites. Congress had good reason to establish a robust statutory scheme to prohibit the obstruction of *all* its proceedings, unlike the proceedings of other entities. That's especially true of the proceedings intended to ensure the peaceful transition of Presidential power.

Had Congress intended to restrict obstruction of only those Congressional proceedings with an adjudicative function it could have crafted language similar to that in 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. No such restriction appears in § 1515(a)(1)(B). *See generally Perez*, 575 F.3d at 169 (internal review within the Bureau of Prisons of allegations that corrections officers assaulted an inmate was an official proceeding under § 1512 and 1515(a)(1)(C), which applies to "a proceeding before a Federal Government

---

*Kelley* did not address § 1515(a)(1)(B)'s "proceeding before congress," since it involved an obstruction of "proceedings before departments, agencies, and committees" in violation of 18 U.S.C. § 1505. Moreover, *Kelley* held that the investigation by the Inspector General of the United States Agency for International Development was an "official proceeding," but had no occasion to consider as a general matter whether official proceedings must involve investigations.

agency which is authorized by law," notwithstanding the lack of witnesses or a final adjudication).

Even if some marginal proceedings before Congress do not qualify for protection under § 1512(c)(2), Congressional certification of the Electoral College vote, as mandated by the Constitution and federal statute, is hardly one of that body's insignificant responsibilities. *Cf. United States v. Aguilar*, 515 U.S. 593, 599 (1995) (construing 18 U.S.C. § 1503: "it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority"). The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President, while acting as the President of Senate, "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 carefully prescribes the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection ... five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint

10

Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16. This very formal and solemn process, mandated by the Constitution, requires no additional features to be an "official proceeding" under of 18 U.S.C. § 1512(c)(2). *See Perez*, 575 F.3d at 169 (internal BOP review was an "official proceeding" because the review panel followed formal procedures).

Mostofsky's cramped reading of "proceeding before the Congress" by importing an extra-textual "quasi-judicial" requirement violates the statute's broad text. The certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019).

> **2.**     **Mostofsky's Extra-Textual Arguments That § 1512(c)(2) Is Limited To Adjudicatory Proceedings Or Document Destruction Fail.**

Mostofsky also leans heavily on legislative history and a memorandum written by former Attorney General William Barr (while in his private capacity) to argue that § 1512(c)(2) was intended only to "close a loophole" in obstruction statutes that allowed persons, acting alone, to destroy documents. MTD4-6. Neither can substitute for a close examination of the statutory text. *See Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1288 (D.C. Cir. 2007) ("The absence of any relevant ambiguity … closes the door on … petitioners' … argument, based on the wording of an earlier version of the statute and on legislative history"). Section 1515(a)(1)(B) says that "a proceeding before Congress," without limitation, is one of the "official proceedings" that § 1512(c)(2) was intended to protect against disruption. That unadorned language needs no resort to legislative history to divine its meaning.   *See United*

*States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 251-52 (S.D. Tex. 2020) (declining to consider § 1512's legislative history in rejecting the claim that the statute was limited to document destruction)

Mostofsky contends the government cannot prosecute him under § 1512(c)(2) because, if convicted, he "cannot be properly sentenced under the U.S. Sentencing Guidelines" because "every single specific offense characteristic under [U.S.S.G.] § 2J1.2 requires interference with 'the administration of justice.'" MTD18-10. That's wrong, irrelevant, and premature. First, if this Court were to conclude at sentencing that none of the specific offense characteristics in § 2J1.2(b) apply to Mostofsky's criminal conduct, it would apply the base offense level of 14. *See* U.S.S.G. § 2J1.2(a). Whether Mostofsky's conduct also "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," resulting an 8-level increase, if contested, will be resolved at sentencing if Mostofsky is convicted. It has no bearing on whether Count Two states an offense.

### 3.    In Any Event, Count Two Does Charge An Interference With An Adjudicatory Proceeding.

Even if Mostofsky is correct that § 1512(c)(2) contains an unspoken requirement that "a proceeding before Congress" must be adjudicatory, the Electoral College vote certification is such a proceeding because several of its requirements are judicial-like:

- It involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15;

- Just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform");

- That body renders a "yes/no" judgment on whether to certify the votes cast by Electors in the presidential election just as a jury renders a verdict at a criminal or civil trial, 18 U.S.C. § 15;

- Participants may lodge objections to the certification and speak for or against the objection just as advocates do in a court proceeding, *id.*;

- When an objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it, *id.*;

- Just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result," 3 U.S.C. § 16.

Those features make the certification of the Electoral College vote sufficiently similar to an adjudicatory proceeding to overcome Mostofsky's claim.

Pointing to a footnote in a government brief in another Capitol Breach case, Mostofsky claims the government has conceded that the certification of the Electoral College vote was not an inquiry or investigation. MTD2, 17-18, citing *United States v. Pepe*, D.D.C. 21-cr-52, ECF55 at 8 n.3. That argument is flawed. The argument in that brief, as here, was that the certification of the Electoral College vote qualified as an "official proceeding" under that provision's plain text, *id.* at 5-9, but that even if the statute required that the proceeding be "quasi-judicial," the certification proceeding qualified, *id.* at 12. The footnote simply explained that the certification of the Electoral College vote did not qualify as an "investigation or inquiry" for purposes of 18 U.S.C. § 1505, a point that has no bearing on how to interpret "official proceeding" for purposes of Sections 1512 and 1515.

13

### 4. Permitting the § 1512(c)(2) Charge to Proceed Would Not Ensnare This Court in "Political Questions."

Mostofsky claims that allowing the § 1512(c)(2) charge to proceed would force this Court to resolved non-justiciable "political questions." He argues the Court will be called upon to interpret what he claims is the constitutionally suspect Electoral College Act ("ECA"), which, he contends, only Congress can do. MTD19-23. His support for his claim that the certification vote is unconstitutional is an op-ed opinion in the *Wall Street Journal* by a former federal judge. MTD22-23. This claim fails.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)). A "narrow exception to that rule" is the "political question" doctrine. *Id.* It bars judicial resolution of certain issues textually and exclusively committed by the Constitution to one or both of the other branches of the Federal Government. *See Baker v. Carr*, 369 U.S. 186, 217 (1962); *Harbury v. Hayden*, 522 F.3d 413, 418-19 (D.C. Cir. 2008). The doctrine applies when there is a "lack of judicially discoverable and manageable standards for resolving" a case. *Baker*, 369 U.S. at 217.[3]

Although Mostofsky posits questions he believes are "political" that could arise in this case, MTD20, 24-25, this Court can and should deny the MTD without addressing the constitutionality of the ECA or whether only Congress can determine the procedural rules

---

[3] Other features of a "political question" are: "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; "an unusual need for unquestioning adherence to a political decision already made"; and "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker*, 369 U.S. at 217.

governing the certification of the Electoral College vote. Rather, it need only decide if the Electoral College certification was an "official proceeding" under § 1512(c)(2) under traditional methods of statutory interpretation, a responsibility the Constitution has delegated to the courts. *See generally Marbury v. Madison*, 1 Cranch 137, 177 (1803) (when an Act of Congress is alleged to conflict with the Constitution, "[i]t is emphatically the province and duty of the judicial department to say what the law is"). That duty will sometimes involve the "[r]esolution of litigation challenging the constitutional authority of one of the three branches," but courts cannot avoid their responsibility merely "because the issues have political implications." *INS v. Chadha*, 462 U.S. 919, 943 (1983).

The "general nature of the inquiry, which involves the analysis of statutes and legislative materials, is one that is familiar to the courts and often central to the judicial function." *United States v. Munoz-Flores*, 495 U.S. 385, 395 (1990); *see also Zivotofsky*, 566 U.S. at 201 ("Resolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do."). "When deciding the claim merely requires the court to engage in garden-variety statutory analysis and constitutional reasoning, it has authority to do so (*i.e.*, the claim is justiciable)." *Mobarez v. Kerry*, 187 F. Supp. 3d 85, 92 (D.D.C. 2016). The scope or constitutionality of the ECA have no bearing on that question. *See United States v. North*, 708 F. Supp. 375, 379 (D.D.C. 1988) (denying motion to dismiss indictment because the court would supposedly be called upon to resolve political questions; "It is the Court's duty to interpret statutes and Executive Orders, and the indictment does not indicate that the case should be dismissed as involving a non-justiciable political question."). That being so, Mostofsky's "parade of horribles" that would necessarily flow from a judicial

finding that Mostofsky "corruptly obstructed the Electoral College vote" by delaying it, MTD20, is a red herring. *See Nat'l Treasury Emps. Union v. U. S. Dep't of Treasury*, 656 F.2d 848, 853 (D.C. Cir. 1981) ("we are not persuaded that our decision will have such baleful effects").[4]

Mostofsky also contends he could not have violated § 1512(c)(2) because Congress "suspended" the joint session an hour before the rioters entered the Capitol in order for the Senate and House to separately rule on an objection, and only resumed the joint session after all the rioters were removed. Mostofsky argues that the rioters therefore did not obstruct the joint session, but only "separate House deliberations." MTD24. That's sophistry. The joint session could not be resumed for several hours because of the riot. That certainly amounts to obstruction, which in common parlance means "block," "impede," or "hinder." *See Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (citing dictionaries); *United States v. Zolin*, 491 U.S. 554, 572 (1989) ("that production of the additional evidence will not unduly disrupt or delay the proceedings"). The happenstance that the two houses of Congress were in separate deliberations when the rioters breached the Capitol says nothing about their intentions to disrupt the joint session, which they in fact accomplished.

---

[4] In any event, Mostofsky's contention that his participation in the riot cannot be meaningfully distinguished from Al Gore's efforts in 2000 to litigate the accuracy of the popular vote count in Florida or the votes of some Senators and Members of Congress against certification of Joe Biden's victory in the Electoral College in 2020 blinkers reality. It ignores that Gore and the elected Senators and Representatives did not attempt to disrupt the election by force, including assaulting law enforcement officials and making threats that caused the Vice President and members of the Senate and Congress to flee for their lives. Rather, Gore (like Donald Trump in 2020) exercised his undisputed right to seek relief in the courts and the Senators and Representative exercised their undisputed legislative authority—and responsibility—to vote on certification.

**B.**     ***Ejusdem Generis* Does Not Compel Mostofsky's Cramped Reading of the Statute.**

Mostofsky argues that interpreting "official proceeding" in § 1512(c)(2) to apply to the Electoral College certification vote would violate the statutory construction canon of "*ejusdem generis*." It counsels that "where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015). Mostofsky contends "§ 1512(c)**(2)**'s reference to acts that 'otherwise obstruct[], influence[], or impede[] any official proceeding,' covers 'only similar crimes' to those enumerated in § 1512(c)**(1)**, *i.e.*, 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object ... with the intent to impair the object's integrity or availability for use in an official proceeding." MTD27 (emphasis added).

This claim fails. "[B]efore … *ejusdem generis* … applies, there must be ambiguity in the statute—and we see none." *United States v. Espy*, 145 F.3d 1369, 1371 (D.C. Cir. 1998). As shown in Point I(D) of this opposition, there is no ambiguity in § 1512(c)(2) so the rule of lenity does not apply. Nor does *ejusdem generis*.

Mostofsky is conflating separate statutory clauses, § 1512(c)(1) and (c)(2) in order to theorize a unitary list of similar terms. That did not occur in the cases he cites. *Compare Yates*, 574 U.S. at 531 (construing the phrase, "tangible object," as used in 18 U.S.C. § 1519, which lists, in a single provision, "a false entry in any record, document, or tangible object") and *Begay v. United States*, 553 U.S. 137, 140 (2008) (construing the phrase, "otherwise involves conduct that presents a serious potential risk of physical injury to another," as used in 18 U.S.C. § 924(e)(2)(B)(ii), which lists, in a single provision, "burglary, arson, or extortion, involves use

of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another"), *abrogated by Johnson v. United States*, 576 U.S. 591 (2015).

Section 1512(c) contains no such unitary list in a single subsection. It contains two separate clauses, (c)(1) and (c)(2), showing that Congress did not "remain[] focused on [a] common attribute" when enacting § 1512(c)(2). *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 225 (2008) (rejecting application of *ejusdem generis*). Section 1512(c)(2) says nothing about "impairing" an "object's integrity or availability." *Compare* 18 U.S.C. § 1512(c)(1) *with* 1512(c)(2). That being so, Mostofsky's invocation of *ejusdem generis* conflicts with the more directly applicable "scope-of-subparts canon." It states that "material within an indented subpart relates only to that subpart; material contained in unindented text relates to all the following or preceding indented subparts." Scalia and Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012), Syntactic Cannon 22. Here, Mostofsky yokes together two separately indented subsections in an attempt to create a single list of related items. That violates the "scope-of-subparts canon."

*Ejusdem generis*, on the other hand, applies only when a statute sets forth "a list of specific items separated by commas and followed by a general or collective term." *Ali*, 552 U.S. at 225. "The absence of a list of specific items" in § 1512(c)(2) "undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Id*.

Mostofsky contends that construing "official proceeding" to cover the Electoral College certification vote would mean the catch-all provision of § 1512(c)(2) would swallow "the rest of Chapter 73" of Title 18. MTD27. But that's not § 1512(c)(2)'s function. Instead, the catch-all in § 1512(c)(2) serves to capture "known unknowns." *See Yates*, 574 at 551 (Alito, J., concurring)

(quoting *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009)). Indeed, "the whole value of a generally phrased residual clause ... is that it serves as a catchall" to ensure that the full range of conduct Congress sought to regulate comes within the statute, including "matters not specifically contemplated" by more specific provisions. *Beaty*, 556 U.S. at 860. In any event, "[r]edundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54.

Judicial treatment of the nearby omnibus clause in Section 1503, which prohibits "corruptly ... influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice," 18 U.S.C. § 1503, is instructive. Drafted in "very broad language," the omnibus clause or "catchall provision," *see Aguilar*, 515 U.S. at 599, principally operates to criminalize obstructive conduct that falls outside the narrower prohibitions within  § 1503 and neighboring prohibitions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to remove documents from house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (corruptly warning suspect about impending search warrant to prevent discovery of heroin). No court, however, has held that the omnibus clause's broad language, which necessarily encompasses Section 1503's narrower prohibitions, renders those narrower prohibitions superfluous. *Cf. Pasquantino v. United States*, 544 U.S. 349, 359 n.4 (2005) ("The mere fact that two federal criminal statutes criminalize

19

similar conduct says little about the scope of either."). The same is true for the catch-all provision in Section 1512(c)(2).

C.     **Section 1512(c)(2) Is Not Unconstitutionally Vague As Applied Against Mostofsky.**

Mostofsky contends that § 1512(c)(2) is unconstitutionally vague as applied to him owing to the uncertain meaning of the word, "corruptly," as used in the statute. MTD28-34. He contends "there is no notice, much less fair notice" in any obstruction statute "that a person may be held federally liable for obstructing a proceeding in a way that does not interfere with the availability or integrity of evidence." MTD18-29. That claim fails.

The void for vagueness doctrine is narrow. The challenger must overcome the "strong presumptive validity that attaches to an Act of Congress," which has led the Supreme Court "to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). A statute is not void for vagueness simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). Rather, a statute is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it *reasonably clear* at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997) (emphasis added). The relevant question is "whether

the statute, either standing alone or as construed, made it reasonably clear at the relevant time

that the defendant's conduct was criminal." *United States v. Sineneng-Smith*, 982 F.3d 766, 775

(9th Cir. 2020), quoting *Lanier*, 520 U.S. at 266.

To prove a violation of § 1512(c)(2), the government must establish that Mostofsky acted

"corruptly," that is, "with an improper purpose and to engage in conduct knowingly and

dishonestly with specific intent to subvert, impede, or obstruct." *United States v. Gordon*, 710

F.3d 1124, 1151 (10th Cir. 2013). *See also United States v. Watters*, 717 F.3d 733, 735 (9th Cir.

2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of

wrongdoing"); *United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007) (upholding

instruction defining "corruptly" as acting "with the purpose of wrongfully impeding the due

administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A

person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due

administration of justice."). The requirement of "corruption" is a clear-cut and adequate limiting

principle that distinguishes Mostofsky's conduct in this case from, for instance, standing

peacefully outside the Capitol grounds and urging by-passers to email their representatives not to

attend the certification vote.

Reprising his earlier claim, Mostofsky states that § 1512(c) has "never been used to

prosecute a defendant for [] obstruction … unrelated to the administration of justice." MTD28.

That's myopic. Section 1512(c)(2) has never been applied to the unprecedently brazen attack that

Mostofsky and others carried out on the Capitol because a horde of thousands never previously

attempted such conduct. The attack on the Capitol on January 6 was the first time the Capitol had

been breached since 1812 and the first time it was breached in a non-military conflict.

*Lanier* is instructive here. There, the Court held that a judge who sexually assaulted

women in his chambers could be convicted of violating 18 U.S.C. § 242 by acting under the color of law to deprive the victims of their constitutional rights to be free from unauthorized physical abuse, even though the statutory language was capacious and the government had not previously prosecuted state officials for similar acts. 520 U.S. at 272. Because "[t]he easiest cases don't even arise," there is no constitutional requirement that a "fundamentally similar" prosecution must have previously been brought. *Id*. at 270-71 (internal quotation omitted). In other words, the Constitution surely allows first-of-its-kind prosecutions like the Capitol Breach cases.

Mostofsky relies, MTD30-32, on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) but that addressed a different statute, 18 U.S.C. § 1505, that prohibited corruptly obstructing a congressional inquiry. There, the D.C. Circuit held that the term "corruptly" was "vague … in the absence of some narrowing gloss." *Id*. at 378. The statute "does not at all clearly encompass lying to the Congress," *id.*, and "the term 'corruptly' [was] too vague to provide constitutionally adequate notice" as to which lies it prohibited, *id.* at 379.

*Poindexter* is inapposite for three reasons. First, the D.C. Circuit narrowly confined Poindexter's analysis to § 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. In *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction for "corruptly" influencing the testimony of a potential witness at trial. *Id*. at 629-630. Other courts have recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see id.* at 501 (Section 1512(b) was not unconstitutionally vague; "Even the *Poindexter* majority would have

had no difficulty finding the term 'corruptly' sufficiently clear as applied to a defendant's efforts to persuade someone else to lie to Congress"); *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (distinguishing *Poindexter* and rejecting a vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (declining "to extend *Poindexter* [which "must be read narrowly"] to another section of the obstruction-of-justice statutes"); *see id*. at 1301 ("It is reasonable to attribute to the 'corruptly persuade' language in Section 1512(b), the same well-established meaning already attributed by the courts to the comparable language in Section 1503(a), *i.e.*, motivated by an improper purpose."); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503).

Second, *Poindexter* predated *Arthur Andersen v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id*. at 705, citing BLACK'S LAW DICTIONARY 371 (8th ed. 2004); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 512 (1993), and AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 299-300 (1981). That commonplace definition of "corruptly" should apply to § 1512(c)(2) because there is no statutory definition of the term for that subsection. *Cf.* 18 U.S.C. § 1515(b) (defining "corruptly" "as used in section 1505," as "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.").

Third, courts have encountered little difficulty when addressing § 1512(c)'s elements following *Arthur Andersen*. Indeed, judicial decisions and model jury instructions have incorporated that formulation of "corruptly" when construing § 1512(c)(2). *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (quoting *United States v. Mintmire*, 507 F.3d 1273,

1289 (11th Cir. 2007)); *Gordon*, 710 F.3d at 1151 (quoting *Friske*; *United States v. Watters*, 717

F.3d 733, 735 (9th Cir. 2013); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A

person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due

administration of justice.").

Mostofsky contends that charging him with violating § 1512(c)(2) "raises questions about

discriminatory law enforcement," "underlined by the patently political nature of the

circumstances of the offense." MTD29. The Court should reject this claim, as Mostofsky does

not attempt to show he was targeted for prosecution because of his political beliefs. To

demonstrate discriminatory prosecution based on the exercise of First Amendment rights, the

defendant "may not simply point out the similarities he shares with the other unprosecuted"

persons. *United States v. DeChristopher*, 695 F.3d 1082, 1097 (10th Cir. 2012). Instead, he

"must show the other defendants' circumstances present no distinguishable legitimate

prosecutorial factors that might justify making different prosecutorial decisions with respect to

them." *Id.* (cleaned up). *See generally United States v. Armstrong*, 517 U.S. 456, 465 (1996)

("To establish a discriminatory effect in a race case, the claimant must show that similarly

situated individuals of a different race were not prosecuted.").

Mostofsky also complains that he was unfairly charged with felonies while similarly

situated rioters were charged with only misdemeanors. MTD30. He points to cases in which

other defendants were initially charged with felonies but were permitted to plead guilty to

misdemeanors. *Id.* But "[f]ew subjects are less adapted to judicial review than the exercise by the

Executive of his discretion in deciding when and whether to institute criminal proceedings, or

what precise charge shall be made, or whether to dismiss a proceeding once brought." *United*

*States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (cleaned up).

24

Moreover, the vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304 (emphasis added). Mostofsky cites no authority that charging decisions postdating the offense conduct have any bearing on this inquiry. And far from demonstrating that the § 1512(c)(2) charge is a "misdemeanor masquerading as a felony," MTD30, the substantial overlap between different statutory offenses and the government's substantial discretion in electing which offenses to charge is no basis for a finding of unconstitutional vagueness.

Section § 1512(c)(2) was intended to reach broadly: it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)). The statute provided fair notice to Mostofsky not to "corruptly" obstruct a proceeding before Congress by joining a violent mob to invade the Capitol to bring a halt to the certification of the Electoral College vote. See id. at 446-47 (8th Cir. 2015) ("Section 1512(c)(2) gives defendants fair warning in plain language that a crime will occur in a different ... manner compared to § 1512(c)(1) if the defendant 'obstructs, influences, or impedes any official proceeding' without regard to whether the action relates to documents or records."). Mostofsky's contention that a prohibition against corruptly obstructing a proceeding before Congress by joining an enormous riot outside and inside the U.S. Capitol at the precise moment when a highly contested Congressional certification vote was taking place, the effect of which was to delay that vote for hours, does not pass the straight face test.

**D.      The Rule Of Lenity Does Not Compel Mostofsky's Cramped Reading Of The Statute.**

Mostofsky contends that even if "'official proceedings' of Congress include those which are not held pursuant to its investigatory power," the "rule of lenity" prevents the government from prosecuting him for violating § 1512(c)(2). MTD34. This claim fails, as the plain language of the statute conclusively rejects Mostofsky's "lenient" construction of the statute.

The rule of lenity is a canon of "last resort." *Guedes v. Bureau of Alcohol, Tobacco and Firearms*, 920 F.3d 1, 27-29 (D.C. Cir. 2019). It applies only "if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (cleaned up). Otherwise stated, it "applies only if, after seizing everything from which aid can be derived, ... we can make 'no more than a guess as to what Congress intended.'" *Muscarello v. United States*, 524 U.S. 125, 138 (1998) (cleaned up).

That is not this case. As shown above, Mostofsky's interpretation of § 1512(c)(2)'s phrase, "official proceeding," and § 1515(a)(1)(B)'s phrase, "proceeding before Congress" to contain an unspoken requirement that the proceeding be adjudicatory cannot be reconciled with the statutory text. In that situation, the rule of lenity has no role to play.[5]

---

[5] Mostofsky seizes on language from *United States v. Granderson*, 511 U.S. 39 (1994) that the rule of lenity is applied unless the government's interpretation is "unambiguously correct." MTD34. Mostofsky cherry picks those two words from what the Court actually said: "*where text, structure, and history* fail to establish that the Government's position is unambiguously correct," the rule of lenity applies. 511 U.S. at 54. (emphasis added). The Court concluded that all those conditions were met in *Granderson*. *Id*. at 45-46 (the government's textual argument was unconvincing, whereas defendant's "interpretation avoids linguistic anomalies presented by the Government's construction"), *id*. at 48 (government's interpretation would create "startling disparities"); and *id*. at 50 (government's legislative history argument was unconvincing). Here, Mostofsky fails to demonstrate any shortcomings in the government's interpretation of the text of § 1512(c)(2), so his rule of lenity argument can't get out of the starting block.

26

E.     **Application of § 1512(c)(2) to Mostofsky's Criminal Conduct Does Not Violate the *Ex Post Facto* Clause.**

Mostofsky contends that charging him under § 1512(c)(2) violates the *Ex Post Facto* clause of the Fifth Amendment because it would be a "novel interpretation of the statute." MTD34-36. This argument proceeds from his claim that all previous prosecutions for violation of that statute involved obstruction of "proceedings before a tribunal that mimic a court of law." MTD35-36. As that argument fails as demonstrated above, so does this one.

"The *ex post facto* prohibition forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (citing cases). "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Id*. at 28-29 (citing cases). "The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id*. at 29 (citing cases).

So construed, the "*Ex Post Facto Clause* is a limitation upon the powers of the Legislature and does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191 (1977) (citation omitted). Nevertheless, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 at 266. *See United States v. Bailey*, 259 F.3d 1216, 1219 (10th Cir. 2001) ("because he challenges judicial interpretations of a statute rather than the statute itself, Bailey raises a due process argument rather than one based directly on the *Ex Post Facto* Clause").

But a judicial interpretation of a criminal statute violates due process only if it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964); s*ee also Johnson v. Kindt*, 158 F.3d 1060, 1063 (10th Cir. 1998) ("The test for determining whether the retroactive application of a judicial decision violates due process is essentially one of foreseeability."). A ruling would violate due process, for instance, if it both disadvantaged the defendant and conflicted with prior judicial announcements on the same subject. *See Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018) (no *ex post facto* violation where "Williams has identified no pre-*Cavanaugh* authority from Nevada courts that is inconsistent with the rule *Cavanaugh* adopted, and we have found none"; "[w]e cannot say that the Nevada Supreme Court's interpretation of § 200.033(5) constitutes an "unexpected and indefensible" break with prior Nevada law"); *Washington v. Boughton*, 884 F.3d 692, 701 (7th Cir. 2018) (no *ex post facto* violation where the "state court's extension of [its prior decisions] to the materially similar facts here was not an 'unexpected and indefensible' departure from established Wisconsin law, but rather within the permissible scope of 'incremental and reasoned development of precedent that is the foundation of the common law system'); *Bailey*, 259 F.3d at 1219 ("we reject [the due process] argument both because [defendant] cites no authority from this or any other court interpreting § 3583 in the manner he seeks and because interpreting § 3583(e)(3) and Rule 32.1(a)(2) to allow post-term revocation hearings is clearly foreseeable").

Mostofsky cites not a single case holding that §§ 1512(c)(2) and 1515(a)(1)(B) prohibit the obstruction of only those proceedings before Congress that are adjudicatory. He cannot demonstrate a due process violation.

28

**F.      Prosecution Of Mostofsky Under § 1512(c)(2) Does Not Violate The First Amendment.**

Mostofsky claims the government violated his First Amendment rights because it seeks to punish him for "activities on January 6 includ[ing] political expression, assembly and petitioning of the government for a redress of grievances." MTD36. He contends he "protested at the Capitol concerning the results of the 2020 presential election," and "intended to affect the actions of Congress: otherwise known as political demonstration and protest," which "is the very core of the First Amendment." MTD37.

This claim fails. Count Two charges Mostofsky for his unlawful and non-expressive *conduct* on January 6, not for his motives in joining the riot or anything he said or otherwise expressed. Had Mostofsky silently disrupted the confirmation vote by engaging in precisely the same conduct, his actions still would have violated § 1512(c)(2). *See generally Shotts*, 145 F.3d at 1301 ("by prohibiting only that persuasion which has an improper purpose, Section 1512(b) does not impermissibly limit protected speech, and provides adequate notice that such persuasion is proscribed"); *see id*. ("[W]e hold that the term "corruptly" as used in 18 U.S.C. § 1512(b) is neither unconstitutionally broad nor vague.").

The First Amendment states "Congress shall make no law ... abridging the freedom of speech." Constitution, Amendment One. "'[T]he First Amendment means that government' generally 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Moreover, "a message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative." *Clark v. Community. for Creative Non-*

29

*Violence*, 468 U.S. 288, 294 (1984). "Symbolic expression of this kind may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech." *Id*.

The government may "'constitutionally impose reasonable time, place, and manner regulations' on speech, but the precedents restrict the government from discriminating 'in the regulation of expression on the basis of the content of that expression.'" *Id.* (quoting *Hudgens v. NLRB*, 424 U.S. 507, 520 (1976)). *See also Community for Creative Non-Violence*, 468 U.S. at 293 ("Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions.").

"Content-based laws" are "those that target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Such restrictions "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* (citing cases). Mostofsky identifies nothing in § 1512(c)(2) that seeks to regulate the content of a person's expression. At most, it imposes limits on disruptive conduct that may include such expressions.

When assessing a First Amendment challenge to a charge brought by a defendant in a criminal case, the court must determine whether the defendants' conduct "constituted expressive conduct." *Texas v. Johnson*, 491 U.S. 397, 403, (1989). If not, the challenge fails. *Id*. If the conduct was expressive, the court must determine if the statute is "related to the suppression of free expression." *Id*. If the statute is not related to the suppression of free expression, the court applies the "less stringent standard" for noncommunicative conduct laid out in *United States v.*

*O'Brien*, 391 U.S. 367, 377 (1968). *Johnson*, 491 U.S. at 403. If the statute is related to the suppression of free expression, the court must apply a "more demanding standard" to determine if the government's interest justifies imposition of criminal liability. *Id.*

Mostofsky argues that, under *O'Brien*, the § 1512(c)(2) charge is permissible only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." MTD37. He contends this prosecution violates two of the *O'Brien* factors: (1) the government's interest is related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms is greater than is essential to the furtherance of that interest." MTD38.

Here, Mostofsky violated § 1512 because of his non-expressive conduct of unlawfully entering the Capitol grounds and building with the intent to disrupt the on-going certification vote. Just as a bank robber could not avoid prosecution by shouting in the middle of the robbery, "Stop the steal," the fact that Mostofsky was also exercising his expressive rights while engaging in the unlawful conduct is of no moment. *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65-66 (2006) ("[W]e reject[] the view that conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea."). And regardless of his motives, Mostofsky's charged conduct of forcibly invading the Capitol in order to disrupt the confirmation vote was not "expressive," so his First Amendment challenge fails before reaching the *O'Brien* factors.

But even if the *O'Brien* factors apply, Mostofsky's First Amendment challenge still fails. First, the government's paramount interest in protecting the integrity and continuity of

congressional proceedings is unrelated to any incidental impact that the application of the law may have on the ability to petition the government for a redress of grievances. That interest is substantially threatened by any conduct that disrupts the certification vote, whether it is setting off a bomb inside the Capitol or peacefully lying in the halls of the Capitol building to prevent the Senators or Representatives from entering or exiting the areas in which the certification must take place.

Section § 1512 goes no further than what is "essential" to prevent the obstruction of official proceedings of Congress. The Supreme Court has upheld restrictions on demonstrations in Washington, D.C. with far less at stake than the integrity of the U.S. Presidential Election. *See Community for Creative Non-Violence,* 468 U.S. at 299 (upholding a ban on overnight camping on the National Mall and finding a "substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties").

Mostofsky claims the government targeted his protected rights of expression rather than any conduct that threatened members of Congress "by force or threats" because it did not charge him with violating 18 U.S.C. § 1505. MTD38. He contends that, if the government sought to punish only unlawful conduct rather than disfavored speech, § 1505 would be "the proper statute for the crime [the government] is failing to allege." *Id*. Putting aside that "'judicial authority is ... at its most limited' when reviewing the Executive's exercise of discretion over charging determinations." *Fokker Servs. B.V.*, 818 F.3d at 741 (quoting *Community for Creative Non-Violence*, 786 F.2d at 1201), § 1505 requires a defendant, as relevant here, to obstruct a "pending proceeding" before a "department or agency," which typically (though not always) does not include Congress, or to obstruct an "inquiry or investigation," which does not include the

32

certification of the Electoral College vote. *See* 18 U.S.C. § 1505. In sum, the government has not

violated the First Amendment by charging Mostofsky with violating § 1512(c)(2).

## II.     Mostofsky's Challenges to Count One, Charging a Violation of 18 U.S.C. § 231(a)(3), are Meritless.

Mostofsky contends that Count One, charging a violation of 18 U.S.C. § 231(a)(3), is

fatally defective because it charges that he interfered with the Electoral College certification

vote, but that vote was not a "federally protected function," as that term is defined by 18 U.S.C.

§ 232(3). He argues that the relevant provisions of Title 18 distinguish between Congressional

entities, on one hand, and "departments" or "agencies" of the United States, which are part of the

Executive branch, on the other. MTD40-41. This claim fails.[6]

Section 231(a)(3) makes unlawful

commit[ing] or attempt[ing] to commit any act to obstruct, impede, or interfere
with any fireman or law enforcement officer lawfully engaged in the lawful
performance of his official duties incident to and during the commission of a civil
disorder which in any way or degree obstructs, delays, or adversely affects
commerce or the movement of any article or commodity in commerce or the
conduct or performance of any federally protected function.

18 U.S.C. § 231(a)(3).

A "federally protected function" is

any function, operation, or action carried out, under the laws of the United States,
by any department, agency, or instrumentality of the United States or by an
officer or employee thereof; and such term shall specifically include, but not be
limited to, the collection and distribution of the United States mails.

18 U.S.C. § 232(3).

---

[6] Mostofsky's opening salvo against § 231(a)(3) is that it was intended to suppress civil rights
protests by African Americans and was supported by a racist United States Senator. MTD7-8.
But such objections to the motives behind the legislation is no basis to find it unconstitutional if
it does not target, directly or indirectly, protected minorities. *See United States v. Howard*,  2021
WL 3856290, at *7 (E.D. Wis. Aug. 30, 2021) (rejecting a similar challenge to § 231(a)(3));
*United States v. Wood*, 2021 WL 3048448, at *4 (D. Del. July 20, 2021) (same).

As used in Title 18, a "department" is "one of the executive departments enumerated in section 1 of Title 5, *unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government*." 18 U.S.C. § 6 (emphasis added). An agency includes

> any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, *unless the context shows that such term was intended to be used in a more limited sense*.

*Id*. (emphasis added).

### A.    At Trial, The Government Will Prove That Mostofsky Deliberately Interfered Or Attempted To Interfere With Law Enforcement Officers Engaged In Three Separate "Federally Protected Functions."

In response to this Court's order and opinion, ECF36 and 37, that the government identify with particularity the federally protected functions that it will seek to prove Mostofsky obstructed on January 6, the government identified eight functions. *See* ECF38. Since responding to that order for particularities, the government has pared down the list to three federally protected functions it will seek to prove at trial that Mostofsky obstructed on that day. Those are:

### 1.    Congressional Certification Of The Electoral College Vote.

Congressional certification of the Electoral College vote is a federally protected function for two reasons. First, the Vice President is an officer or employee of an agency, namely, the Office of the Vice President, who is carrying out the same certification function. Second, Congress qualifies as a "department" for purposes of 18 U.S.C. § 231(a)(3) and § 232(3) and the certification is a "function, operation, or action," § 232(3) that Congress carries out.

The first theory is straight-forward. The Vice President, while serving as the President of the Senate, presides over the certification of the Electoral College vote. *See* 3 U.S.C. § 15. The

Vice President is an "officer or employee" of an agency, namely the Office of the Vice President. The Office of the Vice President is an "authority," *see* 18 U.S.C. § 6, and the Vice President wields the power under that authority as prescribed under the Constitution and federal statute. *Cf. United States v. Espy*, 145 F.3d 1369, 1373-74 (D.C. Cir. 1998) (even if the Executive Office of the President was an agency under § 6, it was not an "agency" under § 1001 because the false statement was not made "within the jurisdiction" of that office; the "jurisdictional" restriction in § 1001 does not appear in § 231(a)(3) or § 232(3)).

Under the second theory, § 231(a)(3) broadly criminalizes obstructing an officer during a civil disorder where that civil disorder "in any or degree obstructs, delays, or adversely affects" either interstate commerce or the "conduct or performance of any federally protected function." Congress surely intended to cover the most dangerous civil disorders, such as those targeting some of the most consequential Congressional decisions in very seat of Congress.

Section 232(3)'s definition of "federally protected function," speaks broadly of "*any* function, operation, or action" performed under federal law, but specifies that such function, operation, or action be carried out by a "department, agency, or instrumentality of the United States or by an officer or employee thereof." "Law enforcement officer" is defined expansively to include "*any* officer or employee of the United States, *any* State, *any* political subdivision of a State, or the District of Columbia, while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, any political subdivision of a State, or the District of Columbia[.]" 18 U.S.C. § 232(7) (emphasis added); *cf.* 18 U.S.C. § 111 and § 1114 (providing a narrower definition of a law enforcement officer).

The definition and use of the term, "federally protected function," also reveals the statute's broad scope. That term appears only three times in the United States Code—exclusively

35

in connection with the civil disorder statute at issue here. *See* 18 U.S.C. §§ 231(a)(1), 231(a)(3), and 232(3). As used in § 231(a)(1) and (3), the term "federally protected function" appears alongside (and as an alternative to) a broad invocation of Congress's expansive power to regulate under the Commerce Clause. In that context, "federally protected function" demonstrates Congress's intent to ensure that its anti-riot statute could reach any unlawful interference with law enforcement officers during a civil disorder that the federal government had authority to regulate. The breadth in the term is also apparent in its definition. "Federally protected function" is defined as "*any* function, operation, or action carried out, under the laws of the United States, by *any* department, agency, or instrumentality of the United States or by an officer or employee thereof." 18 U.S.C. § 232(3) (emphasis added). The statutory language reflects Congress's broad aim—to criminalize any interference with firemen and law enforcement officials during and incident to a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. 232(1) (defining "civil disorder"). The text underscores Congress's intent to broaden the statute's application.

Mostofsky claims *Hubbard v. United States*, 514 U.S. 695 (1995) controls the outcome of this claim. MTD40-41. Not so. There, the Court held that the judicial branch was not a "department" or "agency" as that term was used under since-amended language in the False Statements Act, 18 U.S.C. § 1001, which applied to statements made "within the jurisdiction of any department or agency." *Id.* at 700-01. *Hubbard* overruled *United States v. Bramblett*, 348 U.S. 503 (1955), where the Court interpreted "department" in § 1001 to encompass the "executive, legislative, and judicial branches of the Government." *Id.* at 509. The following year, Congress amended § 1001 to extend its coverage to "any matter within the jurisdiction of the

executive, legislative, or judicial branch of the Government of the United States," effectively

overturning *Hubbard*. *See* False Statements Accountability Act of 1996, Pub.L. No. 104–292,

§ 2, 110 Stat. 3459 (1996).

To the extent *Hubbard* has any continuing vitality beyond § 1001, it is distinguishable.

Section 6 of Title 18 contains an exception to the definition of a "department" as an "executive

branch entity." The exception applies when the "context" of a particular statute that incorporates

the § 6 definition of "department" shows that Congress intended "department" "to describe" all

three branches of the federal government. 18 U.S.C. § 6. Section 6 contains a similar exception

to the definition of "agency." After concluding that the judicial branch was not a "department" or

"agency" under 18 U.S.C. § 6, the *Hubbard* Court held that the foregoing exception in § 6 did

not apply to § 1001 because "there is nothing in the text of [§ 1001], or in any related legislation,

that even suggests—let alone 'shows'—that the normal definition of 'department' was not

intended." 514 U.S. at 701.

That is decidedly not the case with § 231(a)(3). The phrase, "unless the context shows

that such term was intended to describe the executive, legislative, or judicial branches of the

government," refers to the text of the statute that incorporates § 6 or of related statutes. *See*

*Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993)

(interpreting the Dictionary Act, 1 U.S.C. § 1, which states "[i]n determining the meaning of any

Act of Congress, unless the context indicates otherwise": "'Context' here means the text of the

Act of Congress surrounding the word at issue, or the texts of other related congressional Acts").

Here, that context supports an interpretation that, "department," as used in § 231(a)(3),

includes Congress. In § 231(a)(3), Congress paired the phrase, "federally protected function,"

with the phrase, "affects commerce or the movement of any article or commodity in commerce."

"[A]ffects commerce or the movement of any article or commodity in commerce" and "federally protected function" are twin "jurisdictional hooks" demonstrating a Congressional intention to regulate in an area that might otherwise be subject to purely state or local power. *See United States v. Galo*, 239 F.3d 572, 575 (3d Cir. 2001) ("the requirement that at least one of the materials used to produce the child pornography travel in interstate commerce provides the jurisdictional hook"). "Affecting commerce" are "words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).[7]

Like the Congressional exercise of its commerce power in § 231(a)(3), its protection of "federally protected functions" in the same phrase of the same statute should be interpreted broadly. Specifically, yoking "commerce" and "federally protected function" in the context of the statutory text suggests that Congress sought to broadly prohibit unlawful conduct that might otherwise fall within the general police powers of the states. This Court should apply the extension clause of § 6 and find that "department" as used in § 232(3) "was intended to describe the executive, *legislative*, or judicial branches of the government." 18 U.S.C. § 6.

A contrary interpretation, moreover, would yield "patent absurdity." *Hubbard*, 514 U.S. at 703 (citation omitted). Assume a mob gathered in front of the Washington, D.C. office Federal Bureau of Investigation (FBI), which falls within the Department of Justice and thus

---

[7] *Accord, Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) ("The phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause."); *Jones v. United States*, 529 U.S. 848, 856 (2000) (noting "the recognized distinction between legislation limited to activities 'in commerce' and legislation invoking Congress's full power over activity substantially 'affecting ... commerce'"); *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995) ("[T]he words 'affecting commerce' ... normally mean a full exercise of constitutional power").

incontestably qualifies as a "department" as that term is used in Section 232. Assume further that the mob surged inside the building, disrupting the investigative activities, and began interfering with law enforcement officers responding to the riot. Under Mostofsky's view, Section 231(a)(3) would apply there, but not to civil disorder that erupted in the very seat of the federal legislature. That is not the statute that Congress intended or enacted.

### 2.     The Capitol Police Protecting The U.S. Capitol.

The Capitol Police have a statutory obligation to protect the U.S. Capitol. *See* 2 U.S.C. § 1961 (Capitol Police "shall police the United States Capitol Buildings and Grounds," and shall do so "under the direction of the Capitol Police Board"). The "purpose" of the Capitol Police Board, in turn, is "to oversee and support the Capitol Police in its mission." Pub. L. No. 108-7, div. H, § 1014(a)(1). Because an agency includes any "board," 18 U.S.C. § 6, it includes the Capitol Police Board. And the Capitol Police, as its website describes, is "a federal law enforcement agency." See https://www.uscp.gov/the-department.

Mostofsky claims that "[i]f the USCP are also the 'federally protected function'— i.e., the police are both the protecting function and the function that is protected—the term 'federally protected function' adds nothing to the meaning of § 231(a)(3)." MTD41. He's wrong. Law enforcement officers engaged in a regular responsibility—such as protecting the Capitol—whose responsibility is adversely affected by a civil disorder are no less protected under the statute than any other law enforcement officials. The courts have upheld convictions for violating § 231(a)(3) under similar circumstances. *See United States v. Dodge*, 538 F.2d 770, 780 (8th Cir. 1976) (law enforcement officers responding to civil disorder on federal enclave were "engaged in a federally-protected function"); *United States v. Jaramillo*, 380 F. Supp. 1375, 1377-78 (D. Neb. 1974) (§ 231(a)(3) properly invoked where the defendant interfered with FBI agents when they

were responding to the Wounded Knee reservation for the purpose of "investigating [] reported crimes and the operation of the post office"; both were federally protected functions and "there was interference of both by the occupation of Wounded Knee").

### 3.     The U.S. Secret Service Protecting The Vice President.

During the afternoon of January 6, officials of the United States Secret Service were engaged in the federally protected function of protecting the Vice President and the Vice President-elect. *See* 18 U.S.C. § 3056(a)(1). Because the civil disorder on January 6 required the Secret Service to move the Vice President to a secure location, the disorder in some "way or degree obstruct[ed], delay[ed], or adversely affect[ed]" that protective function. It makes no difference what capacity the Vice President was serving (*i.e.*, as the Vice President or President of the Senate) at the time the civil disorder arose because the Secret Service protects the Vice President at any and all times. And of course, the Secret Service, an agency of the Department of Homeland Security, is part of an executive department. *See* 5 U.S.C. § 101.

### B.     Mostofsky's Challenge To The Government's Grand Jury Presentation Fails.

Mostofsky challenges the § 231(a)(3) charge because "the only entity … the government even arguably presented to the grand jury as a 'federally protected function' was the USCP." MTD43. Whether the government presented evidence of any particular federally protected function to the grand jury is of no moment. First, there is no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof." *Kaley v. United States*, 571 U.S. 320, 328 (2014), quoting *Costello v. United States*, 350 U.S. 359, 362-63 (1956). "The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Id*.

40

Second, an indictment that charges an offense by tracking the statutory language and identifies all the elements is generally sufficient to call for a trial on the merits. *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) ("The validity of alleging the elements of an offense in the language of the statute is, of course, well established."). The indictment need not identify the particulars of how the offense is committed. *See Resendiz-Ponce*, 549 U.S. at 108-09 (indictment charging attempted unlawful entry into the United States, in violation of 8 U.S.C. § 1326(a), was not defective because it did not allege whether the substantial step was satisfied by defendant walking into an inspection area, presenting a misleading identification card, or lying to the customs inspector); *Hamling*, 418 U.S. at 117-18 (indictment was sufficient where it alleged that defendant mailed "obscene" material in violation of 18 U.S.C. § 1461 but did not identify the allegedly obscene materials).

Mostofsky's claim cannot be reconciled with *United States v. Williamson*, 903 F.3d 124 (D.C. Cir. 2018). There, defendant was convicted of making a threat against a federal law enforcement officer "with intent to retaliate against such ... officer on account of the performance of official duties." 18 U.S.C. § 115(a)(1)(B). He moved to dismiss the indictment because it failed to "identify particular 'official duties' performed by [the victim] that motivated Williamson's threat." *Id*. at 131. But such specificity was not required. "Specifying a particular official duty (or duties) that may occasion a threat against an officer is not at all 'central to every prosecution under the statute.'" *Id*. "The statute speaks in terms of a threat made 'on account of the performance of official duties,' not to draw attention to a particular official duty, but instead to assure that the threat generally relates to the officer's performance of official duties rather than to a personal dispute having nothing to do with the officer's job functions." *Id*. Likewise here, § 231(a)(3) requires the government to prove that the defendant obstructed a federally protected

41

function, "not to draw attention to a particular" function but to prevent conviction for obstructing activity that is not a concern of federal authorities.

Similarly, in *Haldeman*, *supra*, the defendant was convicted of obstruction of justice in violation of 18 U.S.C. § 1503. On appeal, he claimed the indictment was deficient because the court permitted the jury to convict him based on evidence and instructions that the charged obstruction could be accomplished by the misuse of the CIA, even though the indictment did not identify such misuse as a means of obstruction. The D.C. Circuit disagreed. "[N]either the constitution, the federal rules of criminal procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed." 559 F.2d. at 124.

Here, obstructing a federally protected function is the element, and the particular function that was obstructed is only a means of violating the statute. *See generally Mathis v. United States*, 136 S. Ct. 2243, 2254 (2016) (distinguishing between elements and means under the "categorical approach" that determines if a particular statutory offense is a "violent felony" under the ACCA). If the indictment need not specify the particular federally protected function to validly charge a violation of § 231(a)(3), then it cannot be deficient because the government did not present evidence to the grand jury of a specific federally protected function.

### C.   Mostofsky's Challenge To The "Commerce Clause" Prong of § 231(a)(3) Is Beside The Point, As The Grand Jury Did Not Indict Him For Interfering With Commerce.

Mostofsky argues at length, MTD44-51, that Count One should be dismissed because the Commerce Clause "prohibits the criminalization of noneconomic intrastate activity unless 'the regulated activity 'substantially affects' interstate commerce.'" MTD44 (quoting *United States v. Lopez*, 514 U.S. 549, 559 (1995). This claim is misplaced. Section 231(a)(3) has two separate

42

and independent prongs: interference with commerce and interference with a federally protected

function. The superseding indictment charges that Mostofsky violated only the second prong and

makes no mention of the commerce prong. ECF25, Count One. *See United States v. Rupert*, 2021

WL 1341632, at *17 (D. Minn. Jan. 6, 2021) (government need only prove effect on commerce

or federally protected function prong of § 231(a)(3), not both), *report and recommendation*

*adopted*, 2021 WL 942101 (D. Minn. Mar. 12, 2021). This Court need not address Mostofsky's

Commerce Clause claims.[8]

###    D.    Mostofsky's Overbreadth Claim Fails.

Mostofsky contends that § 231(a)(3) is unconstitutionally overbroad under the First

Amendment because "it extends to a substantial amount of constitutionally protected speech and

expressive conduct in excess of the law's legitimate sweep." MTD51. He argues that "by

penalizing 'any act,' § 231(a)(3) reaches to the outer limits of verbal and expressive conduct

without drawing any distinction that could exclude acts undertaken merely to convey a message

or symbolic content." MTD50-51. He also contends that the word, "interfere," as it appears in

the statute, which the statute leaves undefined, "reaches a broad range of speech and expressive

conduct reaches a broad range of speech and expressive conduct." MTD52.

This claim fails. Overbreadth can invalidate a criminal law only if "'a substantial

number' of its applications are unconstitutional, 'judged in relation to the statute's plainly

---

[8] In any event, the argument that "Congress exceeded its power under the Commerce Clause in enacting § 231(a)(1) fails to rise to the level of a substantial constitutional question and is rejected." *United States v. Featherston*, 461 F.2d 1119, 1123 (5th Cir. 1972) (citing *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)). *Accord, Wood*, 2021 WL 3048448, at *6 (rejecting Commerce Clause challenge to § 231(a)(3); ("Defendant has failed to cite any case in which a statute with an explicit jurisdictional hook was invalidated based on the Commerce Clause, nor has this Court found one in its own independent research. Therefore, his challenge to § 231(a)(3) as exceeding Congress's Commerce Clause powers fails.").

legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008), quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982); *see also City of Houston v. Hill*, 482 U.S. 451, 458 (1987). "A statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). An overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as § 231(a)(3) assuredly does. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

In *United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971), the Eight Circuit rejected a similar overbreadth challenge to § 231(a)(3). "The operative words of the statute are 'whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer." *Id*. 852. "Thus, the section applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute." *Id.*

The Eighth Circuit held that "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle throwing at fireman who arrived to quell the disturbance] is not entitled to constitutional protection." 454 F.2d at 852. "The First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence." *Id*. (citing *National Mobilization Com. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969)). Thus, § 231(a)(3) "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen." *Id. See also United States v. Wood*, 2021 WL 3048448, at *7 (D. Del. July 20, 2021) ("This Court agrees with *Mechanic* that § 231(a)(3) applies to conduct, not speech."); *United States v. Phomma*, 2021 WL 4199961, at *5 (D. Or.

44

Sept. 15, 2021) ("Defendant has failed to make the required showing to strike down § 231(a)(3) as overbroad."). "The crime set forth by the statute is not mere presence at a civil disorder … but an act committed during the course of such a disorder," so "'civil disorder' simply describes the environment in which the act must be committed in order to be subject to prosecution under § 231(a) (3)." *Mechanic*, 454 F.2d at 853.

And because "the statute does not attempt to curtail speech the defendants may not challenge it as vague or overly broad if their own conduct may be constitutionally prohibited, since … one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *Id*. (citing *United States v. Raines*, 362 U.S. 17, 21 (1960)). Finally, "it is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Id*.

Mostofsky contends that *Mechanic*'s First Amendment holding applied only when the unlawful conduct involved "violent physical acts." MTD53-54. That's incorrect. *See Wood*, 2021 WL 3048448, at *7 (rejecting overbreadth challenge to § 231(a)(3); "Given that the language of the statute states 'any act to obstruct, impede, or interfere,' however, this Court does not agree that § 231(a)(3) applies only to 'violent physical acts.'"); *see id*. ("The act need only be one that obstructs, impedes, or interferes with law enforcement engaged in the performance of duties incident to, and during a civil disorder. Although it may be likely that violent conduct will be at issue with a defendant charged under the statute, it is possible for nonviolent acts to also fall within the statute's prohibition.").

Moreover, the statutory text itself requires proof of violent acts. It applies only in the event of a "civil disorder," which is "any public disturbance *involving acts of violence by assemblages of three or more persons*, which causes an *immediate danger of or results in damage or injury to the property or person of any other individual*." 18 U.S.C. § 231(a)(3) and § 232(a)(1). The statute does not require a particular defendant to engage in acts of violence, and Mostofsky does not contend, much less demonstrate, the First Amendment imposes such an obligation to avoid overbreadth. *See United States v. Howard*, 2021 WL 3856290, at \*14 (E.D. Wis. Aug. 30, 2021) ("the statute does not require the government to prove that the defendant created the civil disorder, or that he was participating in the civil disorder.").

Moreover, § 231(a)(3) requires the government to prove the defendant's acted "to obstruct, impede, or interfere with" a firefighter or police officer, *i.e.*, the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 454 F.2d at 854 ("§ 231(a) (3) must be construed to require intent"). That *scienter* requirement substantially undermines Mostofsky's overbreadth claim. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of a statute to protected speech); *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972) (§ 231(a)(3) is not unconstitutional on its face because the statute requires intent and "does not cover mere inadvertent conduct"). Even if the statute lacked an express *scienter* requirement, courts "generally interpret [] criminal statutes to include broadly applicable *scienter* requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a *mens rea* element even when none appears on the face of the statute.")

Mostofsky contends the statute's prohibitions would apply to someone who "flips off officers to distract or to encourage resistance," or "recording police activity with a cell phone." MTD52. He also contends that "civil disorder" is "extremely far-reaching," although noting in passing that the term is defined as "any public disturbance *involving acts of violence by assemblages of three or more persons, which causes an immediate danger of ... injury to the property*." MTD53 (emphasis added). This would apply, he contends, to "three teenagers whose skateboarding damages property." *Id.*

Mostofsky's parade of horribles does not demonstrate that § 231(a)(3) is unconstitutionally overbroad. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an "act" that "attempted to obstruct" an officer performing her lawful duties"). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles*, 466 U.S. at 801. Laws like § 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever … succeed." *Id.*

47

**E.      This Court Should Not Consider Mostofsky's Belated Vagueness Challenge To § 231(a)(3), Which In Any Event Lacks Merit.**

On September 10, 2021, Mostofsky filed a "Notice Of Recent Authority," ECF54, citing *Dream Defenders v. Desantis*, 2021 WL 3491751 (N.D. Fla. Aug. 9, 2021). There, the court enjoined the enforcement of the recently enacted Florida Statute § 870.01(2) on the ground that it was both overbroad and vague. According to Mostofsky, the state statute and § 231(a)(3) are so similar that this Court should find § 231(a)(3) unconstitutionally vague and overbroad based on the reasoning of *Dream Defenders*. ECF54 at 2.

*Dream Defenders* does not advance Mostofsky's claim. First, although he challenged § 1512(a)(2) and § 1752 as unconstitutionally vague, Mostofsky did not raise a vagueness challenge to § 231(a)(3) in his opening brief, and so cannot do so now. *See Plaquemines Port, Harbor & Terminal Dist. v. Fed. Maritime Comm'n*, 838 F.2d 536, 550 (D.C. Cir. 1988) (striking supplemental submission that was "an undisguised attempt to introduce new legal theories into the case … not stated in [the] original brief").

Moreover, every court to consider vagueness challenges to § 231(a)(3) has rejected them. *E.g., Mechanic*, 454 F.2d at 853–54 ("§ 232, read in conjunction with § 231(a) (3), is sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden under it"); *United States v. Banks*, 368 F. Supp. 1245, 1247 (D.S.D. 1973) (rejecting vagueness challenge to § 231(a)(3), following *Mechanic*), *abrogated on other grounds by United States v. Auginash*, 266 F.3d 781 (8th Cir. 2001); *see generally Wood*, 2021 WL 3048448, at *9 ("Defendant does not have standing to bring a facial vagueness challenge" to § 231(a)(3) because he failed to "demonstrate that [the statute]is vague as applied to his conduct"); *cf. United States v. Huff*, 630 F. App'x 471, 487-89 (6th Cir. 2015)

(unpublished) ("we reject Huff's void-for-vagueness argument [regarding § 231(a)(2) in all respects"). Because Mostofsky did not present a vagueness challenge to § 231(a)(3) in his opening brief, he does not address any of those cases, much less demonstrate they were wrongly decided.

In any event, Mostofsky's claim also fails on the merits. The holding in *Dream Defenders* that the statute was overbroad turned largely on what that court recognized was the significant difference between First Amendment challenges to state statutes as opposed to federal statutes. "When a federal law is at issue, this Court has a 'duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is fairly possible.'" 2021 WL 4099437, at *18 (citing *Boos v. Barry*, 485 U.S. 312, 331 (1988)). "[O]n the other hand, [when] a state law is at issue, this Court 'cannot adopt a narrowing construction ... unless such a construction is reasonable and readily apparent.'" *Id.*, citing *Boos*, 485 U.S. at 300. "The distinction is an important one" the court noted, "because when a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements." *Id.* (cleaned up).

Because Mostofsky is challenging a federal criminal statute as overbroad, this Court must "adopt[] a limiting construction if such a construction is fairly possible." As noted above, all the courts that have addressed overbreadth challenges to § 231(a)(3) using the more forgiving standard have rejected those challenges. *See Mechanic*, 454 F.2d at 852; *Featherston*, 461 F.2d at 1122; *Wood*, 2021 WL 3048448, at *7; *Phomma*, 2021 WL 4199961, at *5. The *Dream Defenders* court held that the state statute "implicates free expression and assembly rights protected by the First Amendment." 2021 WL 3491751 at *15. As noted above, the courts that

have addressed overbreadth challenges to § 231(a)(3) have uniformly found that it does not unreasonably impinge on expressive rights.

Finally, the *Dream Defenders* plaintiffs, including several civil rights organizations, presented "unrebutted evidence [that] through no fault of Plaintiffs, violence often occurs at their protests." *Id*. at *29. That included evidence that "white supremacists have spit on and attacked Plaintiffs' members at protests." *Id*. The court concluded that if it did not "enjoin the statute's enforcement, the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians." *Id*. Mostofsky, however, does not claim either that he was a peaceful protester on January 6 (the trial evidence will demonstrate the contrary), or that his expressive rights are being unfairly punished because of "lawless actions of a few rogue" rioters.

In short, *Dream Defenders* does not advance Mostofsky's overbreadth claim.

### III.   Mostofsky's Challenges To Counts Five And Six, Charging Violations of 28 U.S.C. § 1752(a)(1) and (2), Respectively, Are Meritless.

Invoking the legislative history of 18 U.S.C. § 1752 at length, MTD8-12, Mostofsky contends that statute does not apply to his conduct because the Capitol building and grounds he entered on January 6 where not restricted by the United States Secret Service, and only areas restricted by that agency fall within the purview of the statute. He claims that: (a) an interpretation "that any government entity may set a restricted area under § 1752 finds no support in the statutory text, the case law, or the legislative history," MTD54-55; and (b) the "plain meaning of § 1752 unequivocally indicates that the USSS alone sets restricted areas," because "all three definitions of 'restricted building or grounds' in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency." MTD55.

As with his challenge to the § 1512(c)(2) charge, Mostofsky against asks this Court to engraft restrictions on a statute beyond those set by Congress. This Court should decline the invitation. The text of § 1752 contradicts Mostofsky's contention that it reaches unlawful entry into only those areas restricted the Secret Service. It states:

(a) Whoever--

>> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

>> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

\* \* \* \*

>> (5) \* \* \* \*shall be punished as provided in subsection (b).

**A.      Section 1752 Makes No Mention Of Which Official Entity Can Restrict Egress Into Areas Covered By The Statute, Much Less Require That Only The Secret Service Can Do So.**

Section 1752(c) (1) provides three alternate definitions for the term "restricted buildings and grounds."

(c) In this section--

>> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area--

>>> (A)   of the White House or its grounds, or the Vice President's official residence or its grounds;

>>> (B)   of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

>>> (C)   of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

51

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752(c).

The definition that applies here is § 1752(c)(1)(B), "any posted, cordoned off, or otherwise restricted area ... of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." "Person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. *See* § 1752(c)(2); 18 U.S.C. § 3056(a)(1) ("Under the direction of the Secretary of Homeland Security, the United States Secret Service is authorized to protect the … the Vice President"). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, "knowingly and unlawfully entering or remaining … without lawful authority to do so," § 1752(a)(1) (Count 5), and "knowingly and with intent to impede or disrupt … government business," engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2) (Count 6).

This Court should decline Mostofsky's request to import an extra-textual requirement that the Secret Service is the only entity that can restrict an area under § 1752. As Judge McFadden of this Court recently held in rejecting that precise argument, advanced by Mostofsky's attorney in another case, "[t]hese extratextual arguments are unavailing." *United States Of America v. Couy Griffin*, No. 21-CR-00092 (TNM), __ F. Supp. 3d __, 2021 WL 2778557, at *4 (D.D.C. July 2, 2021). If § 1752 is "'directed to' anyone—a dubious claim—it would seem directed at prosecutors, would-be violators, and courts; it is not a regulatory statute." *Id*. " More importantly, the Court will not invoke the statute's supposed purpose or legislative

history to create ambiguity where none exists." *Id*. "If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around the principal, surely it would have said so." *Id*. at *6. *See United States v. Thomas Edward Caldwell*, D.D.C. 21-cr-28 (APM), ECF415 at p. 4 ("The court finds Judge McFadden's reasoning in *Griffin* persuasive and adopts it in full here.").

Judge McFadden also explained why the legislative history on which Mostofsky principally relies undercuts his argument:

> From its enactment in 1970 until 2006, Section 1752 contained a provision that authorized the Treasury Department (of which, until 2003, the Secret Service was a component) to "designate by regulations the buildings and grounds which constitute the" protected residences or offices of Secret Service protectees and "prescribe regulations governing ingress or egress to ... posted, cordoned off, or otherwise restricted areas where" protectees were present. 18 U.S.C. § 1752(d) (1970)....
>
> By 2006 Congress rewrote the statute, in the process eliminating reference to the Treasury Department and to any "regulations" from any executive branch agency. 18 U.S.C. § 1752 (2006). More, the new statute criminalized merely entering or remaining in a restricted area; the old statute required further action, such as impeding government business, obstructing ingress or egress, or physical violence. *Compare* 18 U.S.C. § 1752(a)(1) (2006) *with* 18 U.S.C. § 1752(a) (1970). But Congress did not stop there. In 2012 it reconfigured the statute, adding the term "restricted buildings or grounds" and then defining it under subsection (c), as it appears today. 18 U.S.C. § 1752(a) (2012). Congress did not take that opportunity to clarify who can or must do the restricting, leaving it open-ended. But Congress did lower the *mens rea* requirement, striking the requirement that a defendant act "willfully."

*Griffin*, 2021 WL 2778557, at *4 (footnote omitted).

Mostofsky claims "the government claims that any federal or state agency may unilaterally set a 'restricted area.'" MTD3. That's incorrect. The statute sets clear limitations on where restricted areas may be established. It criminalizes only entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will

be temporarily visiting." Thus, only agencies that have jurisdiction over such places can set the restrictions. In short, the plain meaning of the statute does not result in an "absurd" outcome. MTD56.

Mostofsky relies on *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005), but that case offers him no support. There, the Court of Appeals *affirmed* a § 1752 conviction for entering an airport hangar that was restricted by the Secret Service ahead of a rally involving the President. 416 F.3d at 309. On appeal, Bursey challenged the District Court's finding that he acted willfully. Rejecting that claim, the Fourth Circuit pointed to evidence proving that Bursey must have known he was violating the law by remaining in the restricted area, including evidence that "Bursey understood the area to have been restricted by the Secret Service, and thus a federally restricted zone." *Id.*

According to Mostofsky's tautology, the Secret Service restricted the airport hangar; the airport hangar was a restricted area under § 1752; therefore, only the Secret Service can restrict areas for purposes of § 1752. As Judge McFadden explained, "the Fourth Circuit [in *Bursey*] had no reason to analyze [whether the Secret Service must impose the restrictions] because all parties agreed that the Secret Service secured the hangar. There is no holding—binding or persuasive— on this question." *Griffin*, 2021 WL 2778557, at *5.

## B.  Section 1752 Is Not Unconstitutionally Vague As Applied to Mostofsky's Crimes.

Mostofsky claims that § 1752 as applied to his conduct is unconstitutionally vague. MTD58-59. He's wrong.

Count Five of the superseding indictment, tracking § 1752(a)(1), charges that, on January 6, 2021, Mostofsky

enter[ed] and remain[ed] in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, without lawful authority to do so.

ECF 25, Count Five.

Count Six, tracking § 1752(a)(2), charges that, on January 6, 2021, Mostofsky:

did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

ECF25, Count Six.

The trial evidence will prove that on January 6, the Capitol grounds and building were cordoned off by highly visible metal barricades bearing signs that entry past the barricades was forbidden. The grounds and building were guarded by scores of uniformed United States Capitol Police officers, many wearing tactical gear and holding highly visible riot shields. Consequently, Mostofsky was on unavoidable notice that the area surrounding the Capitol was restricted. Mostofsky had unavoidable notice that his entry onto the Capitol grounds and building was unlawful. He did not stumble, unawares, onto the Capitol grounds or into Capitol building on a misguided sightseeing tour. Rather, he joined and was surrounded by a mob of thousands of rioters who trampled the barricades and overwhelmed the police as they invaded the Capitol.

Judge McFadden explained why Mostofsky's vagueness claim is unconvincing. Section 1752 "does not invite arbitrary enforcement by criminalizing common activities or giving law enforcement undue discretion." *Griffin*, 2021 WL 2778557, at *6. "This law is no trap awaiting the unwary." *Griffin*, 2021 WL 2778557, at *6. *See also United States v. Caputo*, 201 F. Supp.

55

3d 65, 72 (D.D.C. 2016) (rejecting vagueness challenge to § 1752(a)(1); "[T]he White House's perimeter, demarcated by an imposing fence and manned by scores of Secret Service agents, unambiguously provides ordinary people with fair notice that unauthorized entry onto the grounds is unlawful.").

### C. The Rule Of Lenity Does Not Shield Mostofsky's Conduct, Which Plainly Violated § 1752.

Mostofsky contends the rule of lenity requires dismissal of Counts Five and Six. MTD59. He claims the rule applies because of "the lack of any references in § 1752 to agencies other than the USSS; the statute's legislative history, which similarly focuses exclusively on the USSS; the clear role that the USSS plays in all three definitions of 'restricted buildings or grounds' in § 1752(c); the indication in Section 3056 that the USSS enforces restricted areas in § 1752; the lack of any case law supporting the government's position; and the common sense notion that if the USSS patrols and guards the restricted areas in § 1752, it also sets them." *Id*.

Those points all ignore the statutory text, which abjures any special role for the Secret Service for setting the restrictions. As Judge McFadden pointed out, the legislative history rebukes Mostofsky' claim. That no previous case that applied § 1752 to a similar riot during which a mob of tens of thousands of persons stormed the Capitol in order to prevent the certification vote is because there has been no similar riot.

### D. Counts Five and Six Do Not Violate The *Ex Post Facto* Clause.

Mostofsky contends that charging him with violation § 1752 would violate the *Ex Post Facto Clause* "because no court before January 6 ever construed [that statute] to mean that agencies other than the USSS may set restricted areas under the statute." MTD60. As Judge McFadden explained, "Section 1752 is capacious, not ambiguous." *Griffin*, 2021 WL 2778557,

*6. "Nor has there been an 'unforeseen judicial enlargement' of a longstanding criminal statute so that it operates like an *ex post facto* law." *Id*. Mostofsky "allegedly violated a rarely charged statute, but that does not mean the construction of the statute unfairly blindsided him." *Id*. "There was no prevailing practice of courts forgoing or rejecting the interpretation that the Government now advances." *Id*. Mostofsky's *ex post facto* claim fails.

**Conclusion**

For the foregoing reasons, the government respectfully requests that this Court deny Mostofsky's Motion to Dismiss Counts One, Two, Five, and Six.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By:   /s/ *Graciela R. Lindberg*
Graciela R. Lindberg
Assistant United States Attorney
Bar No. TX 00797963
11204 McPherson Road
Suite 100A
Laredo, TX 78045
graciela.linberg@usdoj.gov
(956) 721-4960

s/Norman Gross
Norman Gross
Assistant United States Attorney
New Jersey Bar No. 062722014
401 Market Street
Camden, NJ 08101
norman.gross@usdoj.gov
(862) 754-2196