## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-138-JEB |
| | ) |
| AARON MOSTOFSKY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT MOSTOFSKY'S REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS SECOND MOTION TO DISMISS COUNTS ONE, TWO, FIVE AND SIX OF THE SUPERSEDING INDICTMENT

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Aaron Mostofsky*

# **TABLE OF CONTENTS**

Preliminary statement ......................................................................................... 1

Argument ............................................................................................................. 2

   I.     The § 1512(c)(2) count should be dismissed ............................... 2

        A.     The SI fails to state a § 1512(c)(2) offense ................... 2

             1.    The government's Congress-could-have-said-it-but-didn't method runs contrary to ordinary language usage ............... 2

             2.    Congress's electoral certificate "counting" powers are ministerial, not adjudicative ....................... 8

             3.    Applying § 1512(c)(2) to acts unrelated to the availability or integrity of evidence would make surplusage of: (1) "otherwise obstructs"; (2) the rest § 1512; and (3) swathes Chapter 73 ..................................... 14

                   (a)    The government's interpretation renders "otherwise" surplusage ........................... 14

                   (b)    The government's interpretation renders the rest of § 1512 surplusage ..................... 17

                   (c)    The government's interpretation renders swathes of Chapter 73 surplusage ................. 21

        B.     The government's interpretation of § 1512(c)(2) is unconstitutionally vague as to Mostofsky ............... 22

   II.    The § 231(a)(3) count should be dismissed ...................... 26

        A.     The government's "pared down list" still does not identify a "federally protected function" ...................... 26

        B.     The government did not present a federally protected function to the grand jury to secure a § 231(a)(3) charge............ 30

        C.     The government's own authorities counsel a construction limiting § 231(a)(3) to violent acts to avoid overbreadth ............... 32

Conclusion ...................................................................................................... 34

**Preliminary statement**

The government can hold January 6 defendants accountable and deter future misconduct without creating novel crimes and applying them retroactively.  And to use an obstruction-of-justice statute to prosecute a protest turned riot is to jam a square peg in a round hole.  That is why obstruction statutes have never been used to prosecute acts having no tie to the integrity or availability of evidence in a proceeding; why in ordinary language we call unruly protesters "riotous" or a "rabble" but not "corrupt"; and why over a century of federal jurisprudence does not yield an example of an obstructed "proceeding" that did not at least entail an inquiry or investigation.

The government concedes that the legal theories underpinning its case were never charged in court before January 6.  This monster ex post problem may be safely ignored without error, it says, because never before had a mob "stormed the United States Capitol, busted through doors, and assaulted law enforcement officers." Omitted is that the unarmed and costumed defendant in this case did not "storm" anything or "bust through" any door.  As for "assault," the government will not agree to say whether that's what it's alleging, for Mostofsky assaulted no one.  Indirect calls for collective punishment do a great deal of work for the government.  Anyway, the government's framing of the fair notice problem misleads.  The *standards* of the government's novel felony theories apply to countless prior instances of political protest at the Capitol—none of which drew the charges brought here for the first time.  Trust us, it says, we will only use these new theories to indict the wrong kind of nonviolent political protester in the future, not the right kind.

One January 6 defendant prowls the halls of Congress and pleads to misdemeanor parading-in-the-Capitol.  Another, who never enters the building, is guilty of novel felony

"obstruction of justice" and must stipulate to 21 months' imprisonment, says the government. Maybe the second defendant had a "tie" to a political group in bad odor, maybe it was the fur pelt he wore—no notice is given to set the boundary line (there isn't one).  The government cannot be bothered to explain a conceptual difference between the six-month-maximum misdemeanor and the 20-year-maximum felony that would begin to make these arbitrary charging discrepancies tolerable to due process.  To make its strained case for the novel obstruction felony, the government paints itself into a corner where the relevant Sentencing Guidelines no longer apply.  No matter: it will just change its position after getting the conviction.  The due process problems before the Court stand on stilts with flashing lights. Mostofsky's Motion to Dismiss Counts One, Two, Five and Six of the Superseding Indictment (SI) should be granted.

**Argument**

**I.      The Section 1512(c)(2) count should be dismissed**

      **A.      The SI fails to state a § 1512(c)(2) offense**

            1.      *The government's Congress-could-have-said-it-but-didn't*
                    *method runs contrary to ordinary language usage*

A century of obstruction jurisprudence does not yield an example of the government using any statute to prosecute obstruction of a congressional "proceeding" that did not involve an inquiry or investigation, qualities that the government concedes are absent in a joint session to tally Electoral College certificates.  Mostofsky's motion should still be denied, the government says, because the "ordinary meaning" of "a proceeding before the Congress" intended by the legislature in § 1515(a)(1) does not necessarily entail those staples of the legislative and judicial history of obstruction crimes generally.  It's "unambiguous." Gov't Opp., p. 7.

2

How does the government reach that counterintuitive conclusion? In § 1505, concerning obstruction of Congress, the legislature was explicit that the type congressional proceeding at issue was an "inquiry or investigation. . . being had by either House, or any committee of either House or any joint committee of the Congress." § 1505.  By contrast, Section 1512(c) and § 1515(a)(1) refer to obstruction of "a proceeding before the Congress." In the latter phrase, Congress "could have said" that "proceeding" meant a congressional inquiry or investigation but did not.  To "'supply omissions transcends the judicial function.'" Gov't Opp., p. 7 (quoting *W. Virginia Univ. Hosps.*, *Inc. v. Casey*, 499 U.S. 83, 101 (1991)).  So, the phrase "a proceeding before the Congress" is "unrestricted in the statutory text" and means "*any* proceeding before the Congress." Gov't Opp., p. 7 (emphasis original).  Analysis over.

At this point, the Court will flip through the next few pages of the government's brief looking for some dictionary definition of "proceeding," the operative term whose ordinary meaning we are reaching for.  It will keep flipping.  That's because, as the Ninth Circuit found in *United States v. Ermoian*, dictionaries define "proceeding" in roughly two ways: in a legal way and a lay understanding.  752 F. 3d 1165, 1171-72 (9th Cir. 2013).  The legal meaning concerns a "proceeding" that undertakes "the business done in courts." *Id.*  The court of appeals found not only that every "official proceeding" in § 1515(a)(1)—including "a proceeding before the Congress"—pointed to the legal understanding but that the history of obstruction jurisprudence does too.  *Id.*

It's worse than the case of the missing dictionary.  The Congress-could-have-said-it-but-didn't method is not consistent with ordinary language usage.  We are trying to understand what someone meant when they said something.  Mr. X says, "I want a glass of water." Ms. Y goes to the sink, fills a glass of water, walks back to Mr. X and pours it on his head.  To soothe Mr. X's

3

outrage, Ms. Y explains, with the sincerity of judicial principle, "I interpreted the plain meaning of 'I want a glass of water' to include water poured on your head because you could have said you wanted a glass of water so you could drink it but did not." This is inconsistent with ordinary language usage because before Mr. X's request, there was a long history of most people meaning something more specific than the proposition "I want a glass of water" might mean to a literalist strictly applying the could-have-said-it-but-didn't canon.

If an interpretive canon is needed to establish this simple point, one is at hand. Courts "assume Congress is aware of existing law when it passes legislation and is aware of the judicial background against which it is legislating." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). A party must clearly overcome that assumption to establish that Congress intended a change to the meaning given legal terms by related statutes and their judicial gloss. *Hubbard v. United States*, 514 U.S. 695, 700 (1995). "When Congress uses the language of one statute in another statute it usually intends both statutes to have the same meaning." *Avocados Plus Inc. v. Veneman*, 370 F. 3d 1243, 1249 (D.C. Cir. 2004). And when interpreting statutes, the "assumption is that Congress knows the law – by which the Supreme Court means judicial decisions." *Id.*[1]

---

[1] In a concurring opinion, Justice Gorsuch gilded this common sense with a citation to Blackstone. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212, 1223 (2018). An English statute made "stealing sheep, or other cattle" a felony. *Id.* at 1225 (citing 1 W. Blackstone, Commentaries on the Laws of England 88 (1769)). Back in the day, "the term 'cattle' embraced a good deal more than it does now (including wild animals, no less). . ." *Id.* Blackstone examined a case where the court considered whether the statute would cover, for example, a bull rustler. The English court did *not* hold that a bull rustler was covered because Parliament "could have said" that "cattle" was limited to *bos primigenius taurus* but did not. Instead, the court held that because the statute did not specify what it meant by "cattle" against the background of vague vernacular usage, it would not apply to a bull rustler. *Id.* "All of which, Blackstone added, had the salutary effect of inducing the legislature to reenter the field and make itself clear by passing a new law extending the statute to 'bulls, cows, oxen,' and more 'by name.'" *Id.*

4

Section 1512(c)(2) was codified after enactment of the Sarbanes-Oxley Act of 2002.  So, the plain meaning inquiry turns to the "existing . . . legislation and . . . judicial background against which [Congress was then] legislating." *Miles*, 498 U.S. at 32.  We assume Congress did not intend to stray from that background meaning unless shown otherwise.  *Id.*  What did "proceeding" refer to *in the obstruction statutes* before 2002?  First, in over a century of obstruction law and jurisprudence a "proceeding" shielded by criminalization of "obstruction" entailed, at least, an inquiry or investigation.  The government does not cite a single pre-2002 law or judicial decision where a defendant was prosecuted for "obstructing" a "proceeding" that was not an inquiry or investigation.  That is an irreducible minimum quality of what we mean by obstruction of justice or interference with the administration of justice.

Second, in 1991 the D.C. Circuit conducted a painstaking analysis of the entire legislative history of obstruction-of-Congress offenses specifically.  *United States v. Poindexter*, 951 F.2d 369, 380-82 (D.C. Cir. 1991).  It found that Section 241 was the primogenitor of obstruction-of-Congress statutes.  *Id.*  Since that time, the same basic offense has been tweaked and updated— but there is no new, special offense secreted in a corner of § 1515's definitions (because nonviolent January 6 defendant must be guilty of a felony, too).  In Section 241, Congress "simply extended the protection now provided by law for witnesses in Court proceedings to witnesses in proceedings before either House of Congress."  951 F.2d at 381.   Notice the parallel between that century-old concept and the very title of § 1512, "Tampering with a witness, victim or an informant."

Third, in 1994 the D.C. Circuit addressed charges under both § 1505 and § 1512.  *United States v. Kelley*, 26 F.3d 1118 (D.C. Cir. 1994).  Two significant points emerge.  To begin with, the government stipulated that "proceeding" meant the same thing in § 1505 and § 1512.  36

F.3d at 1128.  That prompted the D.C. Circuit to premise part of its decision on that basis.  *Id.*

Secondly, the court of appeals held that the OIG matter at issue qualified as a "proceeding"

under § 1505 because it possessed these quintessential obstruction-of-justice qualities: (1)

"adjudicative power" or "the power to enhance [its] investigation through the issuance of

subpoenas or warrants"; and (2) the OIG matter was an investigation.  *Kelley*, 36 F.3d at 1127.

The *Kelley* Court premised the debate about whether an investigation was a sufficient quality to

create a "proceeding" on the idea that it was *at least a necessary one*.[2]

All of these laws and judicial decisions preceded codification of § 1512(c)(2).  The

interpretive question is not what Congress could have said but did not.  (Congress could have

said by "proceeding" it meant something different from a century of obstruction jurisprudence

but did not.)  The Court assumes rather that Congress is aware of the "existing . . . legislation and

. . . judicial background against which [it was then] legislating." *Miles*, 498 U.S. at 32.

Therefore, in interpreting § 1515(a)(1)'s "proceeding before the Congress," the Court assumes

Congress meant by "proceeding" what it meant by that term in § 1505 (and every other

obstruction statute), i.e., an investigation with adjudicative power.  *Ermoian*, 752 F.3d at 1169.

The government's stabs at establishing that "proceeding" in "a proceeding before the

Congress" means something different from that term in the rest of Chapter 73 involve it in

motivated reasoning.  "[N]one of Mostofsky's cited cases construed the scope of a 'proceeding

before the Congress' under § 1515(a)(1)(B)." Gov't Op., p. 8.  True: before January 6 the

---

[2] *Kelley* relied on ample pre-2002 precedent for this definition of "proceeding": *United States v. Sutton*, 732 F.2d 1483, 1490 (10th Cir. 1984) (Department of Energy investigation including issuance of administrative subpoena was proceeding under § 1505); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (IRS investigation including issuance of subpoena was a proceeding under § 1505); *United States v. Batten*, 226 F. Supp. 492, 493 (D.D.C. 1964) (SEC investigation with authority to issue subpoenas and administer oaths was "proceeding" under § 1505).

government had never charged anyone under any statute for obstruction of a congressional "proceeding," or any other type of proceeding, that did not involve an investigation or inquiry. That is precisely why the government has not overcome the assumption that Congress did not mean something by "proceeding" in "a proceeding before the Congress" beyond what the same term means across the sections of Chapter 73 and the judicial decisions interpreting them.

The government says that some of Mostofsky's cases interpreting "proceeding" "*affirmed* convictions for obstruction and so cannot support [his] claim that those cases place limits on the obstruction statutes at issue." Gov't Opp., p. 8 (emphasis original).  That misses the point twice in one thought.  The convictions in those cases were affirmed precisely because the "proceeding" at issue possessed qualities that the Electoral College vote certification does not: "adjudicative power" and an "investigation," *Kelley*, 36 F.3d at 1127; similarly described as the power to "make findings" and "determine if there has been a violation of [rules]." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).  And "placing limits on the obstruction statutes at issue" assumes what the government is trying to prove: that "proceeding" in the obstruction statutes ordinarily covers activities that do not involve investigations or inquiries.  Like every other case the parties have cited, *Kelley* and *Perez* defined "proceeding" short of the government's outcome-oriented interpretation.

The government concedes that the Electoral College vote certification was not an inquiry or investigation.  *United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 (D.D.C. 2021) (Government brief: "[T]he certification of the Electoral College vote is not an 'inquiry or investigation.'").  It also cites no authority, and there is none in over a century of obstruction jurisprudence, for the proposition that the obstruction term "proceeding" is satisfied by vaguely described "formality" and "solemnity" alone.  Gov't Opp., p. 11.  So, to save its § 1512(c)(2)

charge, the government devotes most of its argument to the contention that the Electoral College vote certification was an "adjudicatory proceeding." Gov't Opp., pp. 12-13.  Even if so, the charge must still be dismissed as the joint session was not an inquiry or investigation, *Kelley*, 36 F.3d at 1127; *Poindexter*, 951 F.2d at 380-82, but Mostofsky will show why the government's next argument fails.

2.    *Congress's electoral certificate counting powers are ministerial, not adjudicative*

The claim that the Electoral College vote certification is an "adjudicatory proceeding" conflicts with the Constitution and the government's own theory of the case.  First, the basic premise of the January 6 investigation is that a mob attempted to stop the Electoral College vote certification after being misled by the former president into believing that Congress could reject electoral certificates affected by "massive voter fraud."  The former president's claim was false in several respects.  There was no massive voter fraud.  More to the point, Congress does not possess the "adjudicative" power to reject certificates on that basis and play kingmaker.  The government ignores the statement of the most outcome-influencing official in the vote certification, the presiding officer of the electoral count.  On January 6, the vice president stated that the former president was wrong, that the duties of the presiding officer were "largely ceremonial," not "adjudicative." Ltr. of Vice President Mike Pence, Jan. 6, 2021, available at: https://bit.ly/2WVy9s0.  Thus, to secure obstruction of justice convictions against people misled by the former president's statements, the government finds itself pretending that his statements were not misleading.  This is incoherent.  It is also not effective deterrence.

Second, the Constitution does not endow Congress with "adjudicative" powers to reject Electoral College certificates.  The so-called Elector Clauses merely provide that the Electors of

the Electoral College shall send certified lists (certificates) of their presidential votes to the "Seat

of Government of the United States," where the President of the Senate

> shall, in the Presence of the Senate and House of Representatives, open all the
> Certificates, and the Votes *shall* then be *counted*. The Person having the greatest Number
> of Votes *shall* be the President, if such Number be a Majority of the whole Number of
> Electors appointed. . .

U.S. Const. art. II, § 1, cl. 3 (emphasis added).[3]

The Twelfth Amendment keeps the same procedural structure except requires that each

Elector cast one electoral vote for president and one for vice president. U.S. Const. amend. XII.

The consensus view among legal scholars is that "counting" is a ministerial, not a judicial act.

*See*, *e.g.*, Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653,

1712 (2002); Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the*

*Constitution's Succession Gap*, 48 Ark. L. Rev. 215, 229 (1995) ("In counting votes, Congress

performs in effect a ministerial function, registering the will of the voters in the electoral

college"); *Congress Sowed the Seeds of Jan. 6 in 1887: the Electoral Vote Count Act lets*

*Congress think it can choose the President, but it's unconstitutional*, Judge J. Michael Luttig and

David B. Rivkin, Jr., Wall Street Journal, Mar. 18, 2021, available at:

https://www.wsj.com/articles/congress-sowed-the-seeds-of-jan-6-in-1887-11616086776.[4] This is

shown in several ways:

---

[3] See also U.S. Const. art. II, § 1, cl. 1-2, 4.

[4] The government pretends it does not understand the issue. Mostofsky does not "claim that the
certification vote is unconstitutional." Gov't Opp., p. 17. Rather, he cites the consensus view
that the Constitution commits Congress to the ministerial act of counting electoral certificates.
That is also the government's view, which it selectively abandons here because it simply cannot
be the case that Mostofsky is not guilty of some felony or another. Mostofsky's support for this
proposition is not only "an op-ed opinion in the *Wall Street Journal*." *Id.* Even if it were, Judge
Luttig is not just any "former federal judge."

- **Philadelphia Convention of 1787.**  The Framers rejected a proposal by James Madison and Hugh Williamson to insert the phrase "who shall have balloted" after the word "Electors." The purpose of this proposal was "so that the non-voting electors not being counted might not increase the number necessary as a majority of the whole—to decide the choice without the agency of the Senate." Kesavan, 80 N.C. L. Rev. at 1713 (quoting 2 The Records of the Federal Convention of 1787 at 515 (Max Farrand ed., 1911)).  John Dickinson successfully moved to insert after "Electors" the word "appointed." Thus, under the Elector Clauses, the requisite number of electoral votes needed for victory is "a Majority of the whole Number of Electors Appointed." U.S. Const. art. II, § 1, cl. 3. This history suggests that the Framers considered the possibility that there might not be a "vote," *but only if an elector shall not have balloted*.  They did not consider the possibility that an electoral vote might be unconstitutional because, say, vote tabulation machines did not recognize Sharpie ink. Kesavan, 80 N.C. L. Rev. at 1713.

- **The Elector Clauses' immediacy principle**.  The Twelfth Amendment provides that once the President of the Senate has opened all of the Certificates, "the votes shall *then* be counted." U.S. Const. amend. XII (emphasis added).  And in the case of electoral deadlock, the House of Representatives is to "immediately" choose the next president from those on the list.  *Id.*  At the Convention, James Wilson said, "If the election be made as it ought as soon as the votes of the electors are opened & it is known that no one has a majority of the whole, there can be little danger of corruption." Kesavan, 80 N.C. L. Rev. at 1715 (citing 2 Farrand, at 502).  The immediacy principle implies that the counting agents may not delay in counting the electoral certificates.  This militates against an "adjudicative" interpretation of "counting," as a judicial-like role necessarily entails deliberation not immediacy.

All of this explains why the government falls back on the obscure objection procedures of the Electoral Count Act of 1887 (ECA) to establish its "adjudicative proceeding" argument. Here, the government runs into a constitutional briar patch.  As explained above, neither the Elector Clauses nor the Twelfth Amendment give Congress "adjudicative" power to reject Electoral College certificates.  Moreover, the Twelfth Amendment gives Congress no power to enact legislation to enforce its provisions, unlike subsequent amendments expanding the franchise.  Cf. U.S. Const. amend. XV, § 2.  The Necessary and Proper Clause will not work to that end.[5]  Yet in the ECA Congress purported to grant itself the power to reject electoral

---

[5] Under the Clause, Congress has the power to carry into execution: (1) "the foregoing Powers," (2) "all other Powers vested by the Constitution into the Government of the United States"; and (3) "all other Powers vested by this Constitution . . . in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.  Number (1) does not apply because "foregoing powers" refers to the

certificates that "have not been so regularly given by electors whose appointment has been so certified." 3 U.S.C. § 15.  Because the Constitution does not permit Congress to exercise that power, the ECA is generally regarded as "merely precatory" to avoid constitutional conflict. Kesavan, 80 N.C. L. Rev. at 1793.  Thus, the government's argument that the ECA shows that congressional joint sessions to count electoral votes are necessarily adjudicative conflicts with the Elector Clauses and the Twelfth Amendment.

Second, even if the Congress of 1887 enjoyed the constitutional power to create adjudicative electoral vote procedures, it did not have the power to entrench the legislation, binding all future Congresses.  3 U.S.C. §§ 5, 15 (purporting to bind future Congresses to ECA procedures).  That is because the anti-entrenchment principle forbids one Congress from binding another. *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996); Kesavan, 80 N.C. L. Rev. at 1793 (ECA violates anti-entrenchment principle).  That is particularly so with respect to the ECA, which governs parliamentary rules.  Under the Rulemaking Clause, each Congress enjoys the power to set its own rules.  U.S. Const. Art. I, § 5, cl. 2 ("each House may determine the Rules of its Proceedings.").  Therefore, even if the ECA were constitutionally "adjudicative" in 1887, that did not make the joint session on January 6 necessarily adjudicative.

The government misapprehends the justiciability issue.  It says the "scope or constitutionality of the ECA [has] no bearing" on the question whether the electoral vote count is adjudicative and it is emphatically the province and duty of the judicial department to say what the law is.  Gov't Opp., p. 57 (citing *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).  The first

---

seventeen enumerated powers of Article I, section 8, and the Elector Clauses are in Article II. Number (2) does not apply because the Elector Clauses impose on the joint convention a duty—the electoral certificates "shall" be "counted"—not the discretion implied by the word "Power." Kesavan, 80 N.C. L. Rev. at 1736.  Number (3) does not apply because Congress is not a "Department." *Hubbard v. United States*, 514 U.S. 695, 700 (1995).

point is plainly wrong.  Recall that the government has cited no authority for the proposition that a "proceeding" in the obstruction statutes may lack adjudicative power.  And the only support offered for the point that the electoral vote count is adjudicative comes from the ECA's provision purporting to empower Congress to reject "irregularly given" certificates.  3 U.S.C. § 15.

As for the *Marbury* principle, the government is half right.  It is true that the Court's duty to say what the law is requires it to address whether in the ECA Congress constitutionally gave itself the adjudicative power to reject electoral certificates as "irregularly given."  The Court must address that question and the answer is that such power is inconsistent with the Elector Clauses and the Twelfth Amendment.  But if the Court should decide that Congress properly gave itself adjudicative power in the ECA, the next question it must resolve is nonjusticiable.

Even if the ECA properly endowed the Congress of 1887 with adjudicative electoral power, it still violates the entrenchment principle and the Rulemaking Clause.  Thus, as to future Congresses, including the joint session that convened on January 6, the ECA was at best a hortatory House rule given statutory form.  *Winstar Corp.*, 518 U.S. at 872; Kesavan, 80 N.C. L. Rev. at 1793.  The D.C. Circuit has held that the political question doctrine implies that criminal liability may not turn on the courts' construction of ambiguous House rules.  *United States v. Rostenkowski*, 59 F.3d 1291, 1304 (D.C. Cir. 1995).  That is because the Rulemaking Clause is a "textually demonstrable commitment of the [interpretation of parliamentary rules] to a coordinate political department." *Rostenkowski*, 59 F.3d at 1304 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  And there is a "lack of judicially discoverable and manageable standards for resolving" a question that turns on ambiguous House rules.  *Id.*

The notoriously obscure ECA parliamentary rules were manifested on January 6.  As Mostofsky showed, the joint session, on whose "adjudicative" procedures the government's

"official proceeding" argument turns, was suspended at 1:15 p.m. Eastern Time, fully an hour before the alleged obstructive acts in this case took place.  167 Cong. Rec. H77 (Jan. 6, 2021). This had nothing to do with the protesters who entered the Capitol but with the President of the Senate's order that "the two Houses . . .withdraw from the joint session" as a result of objections to the Arizona certificate by Members of Congress.  *Id.*  Thus, the government asks the Court to find not only that a joint session to count electoral votes is an "official proceeding" under the obstruction laws but that a suspended one is too, pursuant to hypothetical House rules it declines even to cite.  "Sophistry," cries the government.  Not so.  When a crime committed in Congress depends on the existence of a "competent tribunal," the legislature's House rules governing the requirements of such a proceeding must be satisfied.  *Christoffel v. United States*, 338 U.S. 84, 88 (1949) (reversing perjury conviction concerning false testimony given to House committee because jury was allowed to convict without finding that the committee's quorum rules were satisfied).

Changing tack, the government ventures that "the joint session could not be *resumed* for several hours *because of the riot*." Gov't Opp., p. 19 (emphasis added).  This case is not captioned, "United States v. The Riot," though the government would like the Court to treat it that way.  The government concedes that *Mostofsky* left the Capitol by approximately 2:35 p.m, about an hour and 15 minutes after the joint session had been suspended due to objections to the Arizona certificate.  Even after the joint session "resumed" at 11:35 p.m. that day, objections to State certificates continued into the wee hours.  167 Cong. Rec. H94 (Jan. 6, 2021).  If these objections continued for hours *after* protesters had been cleared from the Capitol, the government has offered no explanation as to why they would not have continued earlier in the

13

day, had protesters not intruded into the building.  Thus, there is no, and can be no, chronological

argument that *Mostofsky* was responsible for a delayed "resumption" of the joint session.

3.  *Applying § 1512(c)(2) to acts unrelated to the availability or integrity of evidence would render as surplusage: (1) "otherwise obstructs" in § 1512(c)(2); (2) the rest of § 1512; and (3) swathes of Chapter 73*

The government claims that § 1512(c)(2) reaches acts that do not intend to affect the

integrity or availability of evidence in a proceeding—here, Mostofsky's presence in the Capitol.

That reading improperly makes surplusage of: the subsection's phrase "or otherwise"; other

provisions in § 1512; and large portions of Chapter 73.

The Court looks first to the statutory language, "giving the words used their ordinary

meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014).  The Court must hew closely to the

"'endlessly reiterated principle of statutory construction . . . that all words in a statute are to be

assigned meaning, and that nothing therein is to be construed as surplusage.'" *Independent Ins.*

*Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (quoting *Qi-Zhuo v. Meissner*,

70 F.3d 136, 139 (D.C. Cir. 1995)).  And "the canon against surplusage is strongest when an

interpretation would render superfluous another part of the same statutory scheme." *Marx v.*

*General Rev. Corp.*, 568 U.S. 371, 386 (2013).

Again, the relevant statute penalizes, "Whoever corruptly—

(1) *alters*, *destroys*, *mutilates*, *or conceals* a *record, document, or other object*, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; *or*
(2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so . . ." § 1512(c) (emphasis added).

a)  The government's interpretation renders "otherwise" surplusage

If subsection (c)(2) reaches any and all obstructive acts, the words "or otherwise" have no

meaning.  That is because the subsection would reach just as far if it simply read, "Whoever

corruptly . . . obstructs, influences, or impedes any official proceeding . . .shall be fined. . ."
Conversely, a construction of subsection (c)(2) that reaches conduct directed at undermining the proceeding through actions that affect the integrity and availability of evidence *beyond object impairment*, gives meaning to the word "otherwise" in subsection (c)(2).

The government's cases do Mostofsky's work for him.  In every § 1512(c)(2) decision cited by the government, "otherwise" performs the task of capturing conduct that, while not "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object," § 1512(c)(1), yet still "otherwise" constitutes actions impairing the *integrity and availability of non-object information* used in the "official proceeding":

- *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance constituted evidence sufficient for jury to find "efforts were out of a desire *to influence what evidence came before the grand jury*") (emphasis added);

- *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation evidence sufficient to find purpose was to "*thwart evidence from reaching the investigation*") (emphasis added);

- *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (attempting to obtain false statement *to be used in pending federal charges* sufficient to satisfy § 1512(c)(2));

- *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) (making false statements "*directly to the grand jury itself*" sufficient to satisfy § 1512(c)(2)) (emphasis original);

- *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (false responses to interrogatories *that were filed in the official proceeding* sufficient to satisfy § 1512(c)(2));

- *United States v. Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) (making false statements to outside counsel "so that counsel *would provide misleading information to the grand jury*") (emphasis added).

The same point is shown in *Begay v. United States*, 553 U.S. 137 (2008), albeit using the *ejusdem generis* canon.  *Begay* is dispositive here.  There, the Court applied *ejusdem generis* to determine what crimes were covered by the statutory phrase "'any crime . . . that . . . is burglary,

15

arson, or extortion, involves use of explosives, or *otherwise involves* conduct that presents a serious potential risk of physical injury to another.'" 553 U.S. at 142 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)) (emphasis added).  *Begay* held that the "otherwise involves" provision covered "only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'" *Id*.  Had Congress intended the latter "all encompassing meaning," "it is hard to see why it would have needed to include the [preceding statutory] examples at all." *Id.*  By "similar crimes" *Begay* meant "crimes that are roughly similar in kind as well as in degree of risk posed to the [enumerated] examples themselves." *Id.* at 143.  There, the "example crimes" were "burglary, arson, extortion and crimes involving the use of explosives." *Id.*  *Begay* held that DUI was not "similar" to those because "the listed crimes involve purposeful, 'violent' and 'aggressive' conduct," which driving intoxicated did not necessarily entail.  *Id.*

Here, it's easy to grasp why Mostofsky's interpretation of § 1512(c)(2) satisfies *Begay* but the government's does not.  Mostofsky's interpretation of "or otherwise obstructs" is not limited to physical evidence destruction of the type enumerated in § 1512(c)(1).  However, the conduct his interpretation captures is still a "similar crime" to the enumerated list.  To use the government's own cases, although soliciting false testimony (§ 1512(c)(2)) is not identical to document shredding (§ 1512(c)(1)), it is *Begay*-similar because both crimes involve acts intended to affect the integrity or availability of evidence in a proceeding.  *Volpendesto*, 746 F.3d at 286; *Phillips*, 583 F.3d at 1265; *Petruk*, 781 F.3d at 447; *Carson*, 560 F.3d at 585; *Burge*, 711 F.3d at 809; *Ring*, 628 F. Supp. 2d at 223.

By contrast, the government's interpretation of § 1512(c)(2) does not even limn the contours of the acts it claims are covered.  At times, it appears to suggest that unlawful presence in the Capitol alone is covered.  Unlawful presence is not a crime "similar" to the document

16

destruction crimes enumerated in § 1512(c)(1) because that offense does not intrinsically concern preventing evidence from reaching a proceeding.  Trespass is not obstruction of justice.  At other times, the government appears to suggest the relevant covered conduct is intimidation or threatening behavior.   Those "offenses" are not "similar crimes" to those enumerated in § 1512(c)(1) for the exact same reason that, in *Begay*, DUI was not "similar" to "burglary, arson, extortion and crimes involving the use of explosives," namely, the crimes listed in § 1512(c)(1) do not necessarily entail "threatening" and "aggressive" conduct.  553 U.S. at 143.

It's critical to recognize that the government's interpretation out-*Begays Begay*.  Not only is its construction of § 1512(c)(2)'s "otherwise" crime not "similar" to the enumerated offenses in § 1512(c)(1), it is not *Begay*-similar to any other provision in § 1512.  Every crime in § 1512(a)-(c)(1) and (d) concerns actions designed to affect the integrity or availability of evidence in a proceeding.  The government posits that the residual clause is the only provision in a statute titled "Tampering with a witness, victim, or informant" that need not have any connection to evidence impairment.  That is frivolous.

       b)     The government's interpretation renders the rest of § 1512 surplusage

The government's interpretation of § 1512(c)(2) not only fails to give meaning to its phrase "or otherwise obstructs . . ." It also renders the other provisions in § 1512 surplusage, unlike Mostofsky's construction.  *Yates v. United States*, 547 U.S. 528, 542 (2015) ("We resist a reading of [an obstruction statute] that would render superfluous an entire provision passed in proximity as part of the same Act.").

Again, the government claims § 1512(c)(2) covers any act that obstructs, influences or impedes an official proceeding.  All of the following more specific provisions are rendered

useless by the government's "residual clause" interpretation, for they are all "acts" that obstruct, influence or impede proceedings:

- **§ 1512(a)(1)** penalizes whoever "kills or attempts to kill another person with intent to (A) prevent the attendance or testimony of any person in an official proceeding; (B) prevent the production of a record, document, or other object, in an official proceeding; or (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings. . ."

- **§ 1512(a)(2)** penalizes whoever "uses physical force or the threat of physical force against any person, or attempts to do so, with intent to (A) influence, delay, or prevent the testimony of any person in an official proceeding; (B) cause or induce any person to (i) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (ii) alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding; (iii) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or (iv) be absent from an official proceeding to which that person has been summoned by legal process; or (C) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings. . ."

- **§ 1512(b)** penalizes whoever "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to (1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding; (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding; (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or (D) be absent from an official proceeding to which such person has been summoned by legal process; or (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings. . ."

- **§ 1512(d)** penalizes whoever "intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from (1) attending or testifying in an official proceeding; (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; (3) arresting or seeking the arrest of another person in connection with a Federal offense; or (4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding. . ."

18

Indeed, when the government does vaguely identify the specific conduct said to constitute a subsection (c)(2) offense, it is already covered by the above provisions—without a need for § 1512(c)(2).  One might characterize the government's claim to be that Mostofsky "harassed" members of Congress.  Yet that conduct is already covered by § 1512(d)—except that provision makes clear that Congress referred to harassment *intended to prevent a person from testifying*.  § 1512(d)(1).  One might characterize the government's claim to be that Mostofsky intimidated or threatened congresspeople.  Again, that is already covered by § 1512(b)—except the "intimidation" or "threat[s]" must be made *with the intent to affect the integrity or availability of evidence.*  § 1512(b)(1), (2).  One might characterize its claim to be that Mostofsky used "the threat of physical force" against Congress.  Yet, again, that is already covered by § 1512(a)(2)—except, again, the threat must be made *with the intent to affect the integrity or availability of evidence*. § 1512(a)(2)(A), (B). The government makes no attempt to explain why Congress would go through the effort of crafting these provisions, carefully tying each type of obstructive act to the integrity or availability of evidence, only to follow them with a clause that covers the exact same actus reus—but without any tie to evidence availability.

The government's surplusage problem here is worse than the one that led the *Yates* Court to reject the government's construction of § 1519.  In *Yates*, the government contended that § 1519's "tangible object" in the phrase "any record, document, or tangible object" covered all physical objects, such as a dead fish, not just those that contain information.  574 U.S. at 542. The Court rejected this interpretation because if § 1519's "tangible object" covered all physical objects regardless of whether they record or preserve information, it would render as surplusage § 1512(c)(1), which proscribes "alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object. . ."  574 U.S. at 542.   Here, if § 1512(c)(2)'s "or otherwise obstructs"

covers all acts regardless of whether they intend to affect the integrity or availability of evidence, it makes surplusage out of every provision in § 1512 and much of Chapter 73, as shown below. And the canons of *ejusdem generis* and *noscitur a sociis* counsel more in favor of Mostofsky's interpretation here than the defendant's in *Yates*.  Section 1512(c)(2)'s "or otherwise obstructs. . ." follows a list of crimes in § 1512(c)(1) that all concern actions affecting the integrity or availability of evidence (*ejusdem generis*).  Indeed, all of the surrounding provisions in § 1512 concern such actions (*noscitur a sociis*).

The government argues that *ejusdem generis* and *noscitur a sociis* do not apply to § 1512(c)(2) because it is "independent of" the clause in subsection (c)(1).  If the government means that subsection (c)(2) is grammatically independent of (c)(1), it is wrong.  An "independent clause" is one that stands by itself as a simple sentence, i.e., it contains a subject and a predicate and completes a proposition by itself.  INDEPENDENT CLAUSE, Merriam-Webster Online Dictionary,https://www.merriamwebster.com/dictionary/independent%20clause. Section 1512(c)(2) is not an independent clause because "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned" contains neither a subject nor a complete predicate.  The predicate is not complete because the meaning of "or otherwise obstructs, influences, or impedes any official proceeding" cannot be determined without reference to the verb or verbs by which the comparative adverb "otherwise" modifies the verbs that follow "otherwise." If § 1512(c)(2) is not an independent clause it is a dependent clause, which means it is "connected to the main clause of a sentence." DEPENDENT CLAUSE, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/dependent%20clause.  The clause to which § 1512(c)(2) is "connected"

is § 1512(c)(1).  Thus, § 1512(c)(2) is not "independent of" § 1512(c)(1) in any relevant

grammatical sense.[6]

> c)    The government's interpretation renders swathes of Chapter 73
> surplusage

If § 1512(c)(2) covers any act that obstructs, influences or impedes any official

proceeding, it does not merely "overlap" with some other criminal section.  It renders useless

swathes of Chapter 73, all of which are covered by the government's § 1512(c)(2) construction

but concern more particular conduct:

- **§ 1503** criminalizes whoever corruptly, or by threats or force, or by any threatening letter or communication, influences, intimidates, or impedes jurors, officers of the court, law enforcement officers, or the administration of justice;
- **§ 1505** criminalizes, among other things, "Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress. . .";
- **§ 1510** criminalizes those who willfully endeavor by means of bribery to obstruct the communication of information relating to a violation of any criminal statute of the United States to a criminal investigator;
- **§ 1513** criminalizes those who retaliate against witnesses, victims or informants in official proceedings'
- **§ 1519** criminalizes "Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States. . ."

---

[6] The government cites to *Ali v. Fed. Bureau of Prisons*, 522 U.S. 214, 225 (2008).  The Court declined to apply *ejusdem generis* to 28 U.S.C. § 2680(c)'s "any officer of customs or excise or any other law enforcement officers." *Ali* does not apply here because, unlike § 1512(c), *Ali*'s statute contained no list followed by a general term.  The government also cites to decisions interpreting the "omnibus clause" in § 1503.  When its cases do address the scope of the clause, it is deemed cabined to acts that—everyone say it together now— intend to affect the integrity or availability of evidence in a proceeding.  *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (defendant hiding documents from proceeding); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of evidence to be used in proceeding).

The government's interpretation of § 1512(c)(2) must be rejected to avoid making surplusage out of all these sections. *Yates*, 547 U.S. at 542; *Begay*, 553 U.S. at 142.

**B.    The government's interpretation of § 1512(c)(2) is unconstitutionally vague as to Mostofsky**

The government contends that § 1512(c)(2)'s "corruptly" element merely requires it to prove that Mostofsky obstructed, influenced or impeded Congress "wrongfully." Gov't Opp., p. 22.  The government's error is fourfold: (1) it misreads *Poindexter*; (2) it ignores the consensus definition of "corruptly"; (3) it misreads of *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005); and (4) it mistakenly assumes that the meaning of "corruptly" is the same in every context.

First, *Poindexter*'s holding that a value-laden definition of "corruptly" in the context of congressional obstruction was unconstitutionally vague did not turn on language specific to § 1505.  "Corruptly" is used in the same grammatical way in both § 1505 and § 1512(c). *Poindexter*, 951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific—than 'corrupt.'").  The government implies that the D.C. Circuit declined to apply *Poindexter*'s "transitive" reading of "corruptly" (A corrupts B to obstruct a proceeding in violation of B's legal duty) to § 1512(b) in *United States v. Morrison*, 98 F.3d 629 (D.C. Cir. 1996).  Gov't Opp., p. 22.  That is false.  The § 1512 conviction in *Morrison* was upheld precisely because the defendant had committed "transitive" corruption in the *Poindexter* sense by persuading a witness to violate their legal duty to testify truthfully in court.  98 F.3d at 630.

Second, the Court will notice the government simply ignores Mostofsky's citations to the consensus definition of "corruptly": acting with a hope or expectation of unlawful financial gain or other unlawful benefit to oneself or a benefit to another person.  *United States v. Kelly*, 147

F.3d 172, 176 (2d Cir. 1998) ("[A] well-accepted definition of corruptly" is "to act with the intent to secure an unlawful advantage or benefit either for one's self or for another"); *United States v. North*, 910 F.2d 843, 882, 285 U.S. App. D.C. 343 (D.C. Cir. 1990) (a "corrupt" intent means "the intent to obtain an improper advantage for oneself or someone else. . ."); *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., dissenting in part and concurring in part) (same).  The government ignores this definition because it underscores that applying obstruction of justice statutes to political protest is a category mistake.

Third, *Arthur Andersen LLP* did not purport to address whether defining "corruptly" to mean "wrongfully" in every context would comport with due process.  Instead, it merely resolved the question whether it was erroneous for § 1512(b) jury instructions to exclude a *consciousness* of wrongdoing element.  It was.  544 U.S. at 706.  The Court was not presented with any challenge to the meaning of "corruptly" itself and explicitly declined to address the issue.  *Id.* ("The outer limits of this element need not be explored here because the jury instructions at issue simply failed to convey the requisite consciousness of wrongdoing.").

Fourth, the government's reliance on *Arthur Andersen LLP* points to another mistake. That case concerned obstruction of legal proceedings, i.e., destroying records that could be used in an SEC investigation.  544 U.S. at 699.  But whereas a value-laden definition of corruptly (e.g., "wrongfully") might not suffer from unconstitutional vagueness in the context of, e.g., trial proceedings where all or most acts that "influence" or "obstruct" the proceedings are inherently wrongful and thus corrupt, the same is not true in the context of congressional proceedings. *Aguilar*, 514 U.S. at 616 (whereas in the trial context "acts specifically intended to 'influence, obstruct, or impede, the due administration of justice' are obviously wrongful, just as they are necessarily 'corrupt,'" the same is not necessarily true of other proceedings) (citing *North*, 910

F.2d at 941 (Silberman, J., concurring) (finding that "corruptly" in congressional proceedings means something different from the term in legal proceedings)).  Mostofsky does not need to elaborate for the Court the constitutional problems that would arise if any attempt by a person to "influence" Congress were an obstruction felony so long as a jury finds it "wrongful." The D.C. Circuit was wise to the special-case-of-Congress problem decades ago.  *Poindexter*, 951 F.2d at 386 (not all political or personal motivations inspiring obstruction of Congress may be considered "corrupt" consistent with due process, citing the example of a person who obstructs Congress "to protect the historical reputation of some historical figure. . .").

The government's responses to Mostofsky's broader arguments under vagueness doctrine, the rule of lenity and the novel construction principle suffer from the same errors. Gov't Opp., pp. 24-28.  Dozens of January 6 defendants who entered the Capitol have pled guilty to the misdemeanor "parading in the Capitol" offense carrying a six-month-maximum sentence. 40 U.S.C. § 5104(e)(2)(G).  Others who engaged in identical acts, like Mostofsky, are said to be guilty of novel "obstruction of justice," carrying a 20-year-maximum sentence.  "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings," the government responds.  Gov't Opp., p. 24.  That is as transparently disingenuous as it sounds. The issue is not Executive discretion, but what is implied by the lack of any conceptual difference between a minor misdemeanor and a novel obstruction felony.  The outcome is that the line between a misdemeanor and a life-altering felony conviction is decided by the government, in secret, using factors that are not publicly disclosed.  Not only is there no "fair notice" about which conduct is a misdemeanor and which is a felony, there is zero notice—the government does not deign to explain the legal distinction

(there is none).  The absurd reality: the government likely insists that Mostofsky plead to a felony because the fur pelt he wore made him Internet notorious—and for no other reason.

The government's lenity and novel construction principle points misstate the modern standards.  Lenity does not apply only with a "grievous ambiguity" in the statute.  Gov't Opp., p. 26 (citing *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).  *Yates*, decided five years after *Barber*, applied a plain ambiguity standard to reject the government's interpretation of § 1519, which suffers from the same flaws as its construction of § 1512(c)(2) here.  574 U.S. at 548 ("[B]efore we choose the harsher alternative, [we] require that Congress . . . [speak] in language that is clear and definite.").  *See also Abramski v. United States*, 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) ("[C]ontrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, a reasonable doubt persists regarding whether Congress has made the defendant's conduct a federal crime.") (cleaned up).

Even if a "grievous ambiguity" standard were to apply, it's easily satisfied here.  No obstruction statute has ever been used in connection with a "proceeding" that involved no inquiry or investigation.  Section 1512 has never applied to acts that do not intend to affect the integrity and availability of evidence.  The government's definition of "corruptly" is hopelessly vague in a political context.  It cannot explain the conceptual difference between a six-month misdemeanor and a 20-year felony involving identical conduct.  If lenity does not apply even where the government's interpretation is not just wrong but in conflict with DOJ's own construction prior to prosecution, it never applies.

The government acknowledges that before January 6 no person had ever been charged with its obstruction theory.  That means applying it retroactively on Mostofsky is a due process

violation under the novel construction principle.  *Bouie v. City of Columbia*, 378 U.S. 347, 353

(1964); *United States v. Lanier*, 520 U.S. 259, 266 (1997) (*Bouie* still good law).  The

government responds that *Bouie* doesn't apply because "Mostofsky cites not a single case

holding that" (1) "proceeding" in the obstruction statutes requires at least adjudicative power and

an investigation; and (2) § 1512(c)(2) is limited to acts that intend to affect the integrity and

availability of evidence.  Gov't Opp., p. 28.  As the government knows, it states the *Bouie* rule

backwards.  As *Bouie* is a species of the fair notice issue, the due process question is whether *the*

*government* cites "a single case," decided before Mostofsky's acts, that *supports* its

interpretation.  *Bouie*, 378 U.S. at 256 ("The interpretation given the statute by" *the government*

. . . "has not the slightest support in prior South Carolina decisions.").  The government concedes

it does not.  The government says it cannot be faulted for citing no precedent as "never before in

the country's history had a violent mob sought to disrupt a Congressional proceeding." Gov't

Opp., p. 1.  Indeed, with the right characterization, any event can be described as the first in

history.  The question, rather, is whether the novel obstruction *standard* offered by the

government was satisfied by others' acts prior to Mostofsky's but not *charged*.  And that

standard covers countless acts of nonviolent protest at Congress which did not draw charges

under § 1512(c)(2) but could have, according to the government.  The government attempts to

account for none of them because it cannot.[7]

## II.     The Section 231(a)(3) count should be dismissed

### A.     The government's "pared down list" still does not identify a "federally

---

[7] One example among many: the protesters who "took control" of the Senate Judiciary
Committee Chairman's office during an "official proceeding" concerning a Supreme Court
nominee, chanting, "The system is corrupt, and that's why we disrupt." *Kavanaugh protestors
take over Sen. Grassley's office*, Wash. Post., Sept. 6, 2018, available at:
https://www.washingtonpost.com/video/politics/kavanaugh-protesters-take-over-sen-grassleys-
office/2018/09/06/9732de44-b1ef-11e8-8b53-50116768e499_video.html.

protected function"

The government's bill of particulars identified at least eight functions that it said were (i) adversely affected by the "civil disorder" on January 6 and (ii) carried out by a "department, agency, or instrumentality of the United States or by an officer or employee thereof. . ." ECF No. 38 (citing § 18 U.S.C. 232(3)).  The government now presents a new, "pared down list" of such functions "that Mostofsky obstructed on that day." Gov't Opp., p. 34.  As another judge in this court suggested in a hearing on September 21, this transparent attempt to avoid the Commerce Clause issue is unpersuasive.  *U.S. v. Nordean*, 21-cr-175-TJK, 9/21/21 Hr'g (D.D.C. 2021).

**Congressional certification of the Electoral College vote.**  Notice that the government nowhere addresses *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) and *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995).  That is because those decisions, which bind this Court, hold that congressional entities are not "departments" or "agencies" under 18 U.S.C. § 6, as they are not *Executive* departments and agencies.  That concludes the analysis.  But even if the Court were to ignore binding law like the government, its argument still fails.  To overcome the default definitions in § 6, the government must make a "fairly powerful" showing that in § 232(3) Congress intended the words "department" and "agency" in the "unusual sense" to include the judicial and legislative branches of government.  *Hubbard v. United States*, 514 U.S. 695, 700 (1995).  Here is why *Hubbard* held that the government did not make a "fairly powerful" showing that in the old § 1001 "department" included "the Judiciary," i.e., federal courts: because § 1001 did not explicitly define "department" to include federal courts.  514 U.S. at 701.

Here, Section 232(3) does not define the terms "department" or "agency" to include congressional entities.  The government does not point to anything "in the text of the statute" that

"powerful[ly]" shows that "the normal definition of 'department' [i.e. an Executive department] was not intended." *Hubbard*, 514 U.S. at 701. Its "powerful showing": Congress also criminalized acts interfering with law enforcement during civil disorders that affect interstate commerce, not just those affecting federally protected functions. Gov't Opp., p. 38. The government has the inference backwards. "Congressional intention to regulate in an area . . . subject to purely state or local power," Gov't Opp., p. 41, does not "powerfully show" that Congress intended Section 231 to cover all the activities of all *federal* entities. To the contrary, it shows a congressional focus on providing federal aid to state power. That is also what the entire dubious legislative history of § 231 shows. Mostofsky Mot., pp. 7-8.[8]

Finally, the government points to the vice president's role in Congress's electoral vote certification, arguing that the vice president is an "officer or employee" of an "agency," namely the Office of the Vice President, which is an "authority" under § 6. Gov't Opp., p. 34. The government's error is obvious. The presiding officer of a congressional joint session to count electoral certificates is the President of the Senate. U.S. Const. amend. XII. That the person occupying the office of vice president also fills the position of President of the Senate in this context does not mean that, in the latter role, he or she is also "carrying out" the "function" of an official of an Executive department. § 232(3). To the contrary, as the vice president himself noted on January 6, his obligations as President of the Senate were different from those of the Office of the Vice President, particularly when the vice president was simultaneously a candidate in the election at issue. The government's interpretation invites gross conflicts of interest.

---

[8] The government says it's "absurd" that § 231 covers a riot "in front of" the FBI building and not at the Capitol. Gov't Opp., p. 38. The government also complained that it would be "absurd" if § 1001 covered lies to the FBI and not in court. That argument lost in *Hubbard*.

**The U.S. Capitol Police.**  The U.S. Capitol Police (USCP) are a congressional entity, not an Executive department or agency.  The government does not dispute this.  Gov't Opp., p. 39. Indeed, its bill of particulars response cited a statute stating this fact.  2 U.S.C. § 1970 (providing that Executive departments and agencies may aid the USCP, which is therefore not the same thing).  That means USCP is not a "department" or "agency" under § 6.  *Hubbard*, 514 U.S. at 699 (Section 6 default is that "department" "refer[s] to a component of the Executive Branch"); *Oakar*, 111 F.3d at 153 ("[A]n entity within the Legislative Branch cannot be a 'department' within the meaning of . . . § 6," nor is Congress an "agency" under § 6); *Dean*, 55 F.3d at 659 (*Hubbard* "narrowed the reach of ["department" and "agency"] to *matters within the executive branch*") (emphasis added).

**U.S. Secret Service.**  Agents of the U.S. Secret Service (USSS) and USCP are "law enforcement officers" under Section 231. 18 U.S.C. § 232(7); 18 U.S.C. § 3056(b)(3) (USSS a "Federal law enforcement agency").  To establish a § 231(a)(3) crime, the government must prove (1) the defendant committed an act to obstruct, impede, or interfere with a "law enforcement officer"; (2) who was "lawfully engaged in the lawful performance of his official duties"; (3) incident to and during the commission of a "civil disorder"; (4) which in any way or degree obstructs, delays, or adversely affects the conduct or performance of any "federally protected function." § 231(a)(3).  The government's attempt to use interference with "law enforcement officers" to satisfy both elements (1) and (4) renders the federally protected function element surplusage.  It is tautological to say that law enforcement is both the function protecting the "federally protected function" and also the function being protected.  This is precisely what the government argues when it says the vice president is the "federally protected function"—and so are the "obstructed" law enforcement officers protecting him.  The

government's entire meaning would be captured by a statute that criminalized obstruction of law enforcement during a civil disorder—without any additional effect on a "federally protected function."[9] *United States v. Rupert*, 2021 U.S. Dist. LEXIS 53152, *43 (D. Minn. Jan. 6, 2021) (Had government not been relying alternatively on interstate commerce, court would have dismissed the Section 231(a)(3) charges as government merely pointed to obstructed law enforcement officers, not a "federally protected function").

**B.      The government did not present a federally protected function to the grand jury to secure its § 231 charge**

To charge Mostofsky with a § 231(a)(3) crime in compliance with his Fifth Amendment presentment right, the government must have presented to the grand jury evidence showing probable cause that each element of the offense is satisfied. *Hamling v. United States*, 418 U.S. 87, 117 (1974). The indictment must contain a "definite written statement of the essential facts constituting the offense charged. . ." Fed. R. Crim. P. 7(c). A central function of that rule is "serv[ing] the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999). When the evidence on which a defendant is tried broadens the possible bases for conviction beyond the indictment voted on by the grand jury, a constructive amendment occurs. *Stirone v. United States*, 361 U.S. 212, 217 (1960). In *Stirone*, the defendant was charged with Hobbs Act extortion involving a Pennsylvania contractor who supplied concrete to a steel plant in the same State. 361 U.S. at 213. The charge required the government to prove an effect on interstate commerce. The government only offered evidence to the grand jury that sand used to make the

---

[9] The government's cases do not hold that law enforcement itself is a federally protected function. *U.S. v. Jaramillo*, 380 F. Supp. 1375, 1377 (D. Neb. 1974) (post office is the federally protected function); *U.S. v. Dodge*, 538 F.2d 770 (8th Cir. 1976) (Native American reservation is the federally protected function).

concrete moved in interstate commerce.  However, at trial, the court allowed the government to present evidence that the plant's steel shipments also moved in interstate commerce.  *Id.* at 214. The Court reversed Stirone's conviction based on the presentment error.  Even if the steel shipments satisfied the interstate commerce element, Stirone could not be convicted based on evidence not presented to the grand jury.  Such constructive amendment is a "fatal error," for which prejudice is presumed.  *Id.* at 219.  *United States v. Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (constructive amendment per se violation of Grand Jury right); *United States v. Atul Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006) (same).

Here, if the Court decides that Congress, the USCP and the USSS do not satisfy § 231(a)(3)'s "federally protected function" element, there is no need to reach the presentment issue.  However, if the Court decides that some but not all constitute such a function, the *Stirone* problem is plainly ripe.  If, e.g., the government solely presented the defective Congress-as-federally-protected-function argument, "this . . . court can[not] know that the grand jury would have been willing to charge" a § 231(a)(3) offense if presented with another "function." *Stirone*, 361 U.S. at 217.  The government tries to obscure this by citing cases holding that courts lack "'authority for looking into" grand jury decisions "for the purpose of determining whether or not the finding was founded upon sufficient proof.'" Gov't Opp., p. 40 (quoting *Kaley v. United States*, 571 U.S. 320, 328 (2014)).  Here, however, there is no piercing the veil of grand jury secrecy and the issue is not sufficiency but whether any legally correct liability theory was presented.  In its bill of particulars response, the government has already cited a list of every possible "federally protected function" that may have been presented to the grand jury.  ECF No. 38. There is no "secret" here as to the exceedingly small universe of arguments that may have been presented.  Thus, Mostofsky has plainly made a showing of need particularized enough at

least to warrant *in camera* review of the relevant grand jury materials.  Def. Mot. to Compel, ECF No. 43, p. 8 (citing Fed. R. Crim. P. 6(e)(3)(E)(ii)); *U.S. v. Naegele*, 474 F. Supp. 2d 9, 10 (D.D.C. 2007).

### C.   The government's own authorities counsel a construction limiting § 231(a)(3) to acts of violence to avoid overbreadth

The government concedes that § 231(a)(3) is capable of applications that reach expressive activity protected by the First Amendment.  Gov't Opp., p. 47.  However, "[b]ecause Mostofsky is challenging a federal criminal statute as overbroad, this Court must adopt a limiting construction if such a construction is fairly possible." *Id.*, p. 49.  The Court should take up the government's suggestion and construe § 231(a)(3) so as not to reach nonviolent expressive conduct.

The government principally relies on *United States v. Mechanic*, where the Eighth Circuit rejected an overbreadth challenge to § 231(a)(3).  454 F.2d 849, 852 (8th Cir.1971).  But it did so precisely by limiting the offense "only to violent physical acts." *Id.*  The government must take the good with the bad.  As Mostofsky showed, virtually every precedent construing § 231(a)(3) concerns acts of violence.  Mostofsky Mot., p. 54.  That includes nearly every § 231(a)(3) charge in the January 6 cases.  ECF No. 47-1 (chart of § 231(a)(3) defendants).   The government falls back on two unpublished decisions that it says reject *Mechanic*'s violence-only construction. Gov't Opp., pp. 44-45 (citing *United States v. Wood*, 2021 U.S. Dist. LEXIS 134774 (D. Del. July 20, 2021); *United States v. Phomma*, 2021 U.S. Dist. LEXIS 17589 (D. Or. Sept. 15, 2021)). *Wood* is unpersuasive and the *Mechanic* limitation was not resolved in *Phomma*.[10]

---

[10] The *Phomma* defendant sprayed bear spray in the faces of police officers and the court noted that all the § 231(a)(3) cases under consideration concerned violent "acts." 2021 U.S. Dist. LEXIS 17589, at *14-15.

Considering an overbreadth challenge to § 231(a)(3), *Wood* "agree[d] with *Mechanic* that § 231(a)(3) applies to conduct, not speech." 2021 U.S. Dist. LEXIS 134774, at *18.  But the court rejected the Eighth Circuit's violence-only construction on the ground that the plain language of the statute covers "any act" that obstructs, impedes, or interferes with law enforcement.  *Id.  Wood* failed to address the question whether rejecting the *Mechanic* limitation would allow § 231(a)(3) to reach *expressive conduct*, merely citing without explanation to *Rumsfeld v. Forum for Acad. & Inst. Rights*, *Inc.*, 547 U.S. 47, 65-66 (2006).  But *Forum for Acad. & Inst. Rights*, *Inc* itself showed that *Wood* should have addressed the issue. There, the Supreme Court considered a First Amendment challenge to the Solomon Amendment.   That legislation withdrew federal funds from law schools that denied military recruiters access equal to other recruiters.  The Court rejected the law schools' claim that the Amendment reached expressive conduct, since recruiter access denial was not inherently expressive, compared to flag burning, which is. 547 U.S. at 66 (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)).  In turn, *Johnson* recognized the Court's long history of finding inherently expressive conduct in "picketing about a wide variety of causes." 491 U.S. at 404 (citing *Food Employees v. Logan Valley Plaza, Inc.*, 391 U.S. 308 (1968); *United States v. Grace*, 461 U.S. 171 (1983)).

Rejecting *Mechanic*'s violence limitation conflicts directly with this picketing precedent. "Picketing" is a "method of protesting where individuals stand outside of a workplace or organization to publicize an issue." PICKETING, Wex dictionary, Legal Information Institute, https://www.law.cornell.edu/wex/picketing.   The District of Columbia Code defines a "First Amendment assembly" to mean any "demonstration, rally, parade, march, picket line, or other similar gathering conducted for the purpose of persons expressing their political, social or religious views." D.C. Code § 5-331.02(2).  The government has described the alleged §

33

231(a)(3) conduct here as "defendant's act of pushing, individually or with others, against law enforcement officers setting up or adjusting barriers . . . near the U.S. Capitol; and defendant's act of positioning himself in a way to prevent law enforcement from setting up or adjusting barriers. . ." ECF No. 38, p. 2.  This description overlaps, if not wholly, then at least partly with the definition of establishing a picket line itself.  The government misunderstands the relevance of *Dream Defenders v. DeSantis*, 2021 U.S. Dist. LEXIS 170824 (N.D. Fla. Sept. 9, 2021). There, the court enjoined enforcement of a Florida riot act similar to § 231(a)(3) on overbreadth grounds because, *inter alia*, "the statute can be plausibly read to criminalize continuing to protest . . .even if the protesters are not involved in, and do not support, the violence." *Id*., *82.  The government flags the court's remark that, had the riot act been a federal law, the court would have a duty to "avoid constitutional difficulties by adopting a limiting construction if such a construction is fairly possible." *Id.*, *52.  That is precisely why this Court should follow the *Mechanic* violent-act limitation so as to avoid conflict with expressive act picketing jurisprudence.  *Bloem v. Unknown Dep't of the Interior Employees*, 920 F. Supp. 2d 154, 162. (D.D.C. 2013) (Boasberg, J.) ("Occupy DC" tent city is expressive conduct).

**Conclusion**

For all the foregoing reasons, Mostofsky respectfully requests that the Court dismiss Counts One, Two, Five and Six of the SI.

Dated: September 29, 2021                    Respectfully submitted,

                                             */s/ David B. Smith*
                                             David B. Smith (D.C. Bar No. 403068)
                                             Nicholas D. Smith (D.C. Bar No. 1029802)
                                             108 N. Alfred St.
                                             Alexandria, VA 22314
                                             917-902-3869
                                             *Counsel to Aaron Mostofsky*

**Certificate of Service**

I hereby certify that on the 29th day of September 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Graciela Lindberg
> Assistant United States Attorney
> 555 4th Street, N.W.
> Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Aaron Mostofsky*

35