UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) |
| v. | ) Case No. 1:21-cr-138-JEB ) |
| AARON MOSTOFSKY, | ) ) |
| Defendant. | ) ) ) |

**DEFENDANT MOSTOFSKY'S RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO HIS MOTION TO DISMISS COUNT ONE OF THE SECOND SUPERSEDING INDICTMENT**

In August, Mostofsky moved to dismiss Count One of the First Superseding Indictment, charging a violation of 18 U.S.C. § 231(a)(3), because, among other reasons, it did not allege an Executive "department, agency, or instrumentality of the United States" that had been "adversely affected" by the "civil disorder" on January 6.  § 232(3).  Mostofsky further argued that, to the extent Count One relied on § 231(a)(3)'s "commerce prong," the charge must be dismissed as that statute unconstitutionally criminalizes noneconomic intrastate activity.

In response, the government elected not to respond to the merits of Mostofsky's Commerce Clause challenge.  ECF No. 57.  It stated, "This Court need not address Mostofsky's Commerce Clause claims." *Id.*, p. 46.  However, on November 10 the government filed a Second Superseding Indictment.  ECF No. 69.  Unlike the Indictment and First Superseding Indictment, the Second Superseding Indictment alleges that the January 6 civil disorder did adversely affect "commerce and the movement of any article and commodity in commerce." *Id.*, p. 2.

Now the government has filed a supplemental opposition to Mostofsky's motion to dismiss.  ECF No. 76.  Mostofsky's Commerce Clause challenge, it says, remains "wholly beside

1

the point." *Id.*, p. 3.  Why, then, did the government feel compelled to supersede dozens of indictments to add a commerce predicate for its § 231(a)(3) charge in order to account for an argument wholly beside the point? Because, it argues, even if Congress lacked constitutional authority to assume control over the noneconomic police powers of fifty States—a proposition it contests without conviction, citing to unpublished decisions that deal with the binding *Lopez* and *Morrison* factors by omitting them from their analysis—the statute may enjoy a temporarily expedient afterlife in the District of Columbia alone, by virtue of Congress's region-specific police power there.

The government does not address this Circuit's current severability standard in the Commerce Clause context, much less provide a cogent argument as to why it is satisfied here.  It does not make, and therefore forfeits, any standing argument.  The third version of Count One should therefore be dismissed.

**Argument**

**A.    The government's argument that Mostofsky's Commerce Clause challenge is beside the point is itself beside the point: § 231(a)(3)'s D.C.-specific provisions plainly cannot be severed from the rest of the statutory scheme**

The government's supplemental brief makes three arguments:

(1) Congress possessed constitutional power to enact § 231(a)(3) under its "plenary power to legislate regarding matters affecting the District of Columbia," Gov't Suppl. Br., pp. 3-9 (citing U.S. Const. art. I, § 8, cl. 17);[1]

---

[1] The government contends that Congress's plenary power over D.C. self-evidently supports its § 231(a)(3) charge.  However, it was not always so evident to the government.  The Court will notice that in every charge brought in the Indictment and First Superseding Indictment, the government alleged Mostofsky's guilt under each possible permutation of the statutory elements—except under § 231(a)(3).  ECF Nos. 6, 25.  It was only in Count One, charging § 231(a)(3), that the government elected not to allege a possible statutory basis for liability: the

2

(2) Congress possessed constitutional power to enact the statute under the Commerce Clause, *id.*, pp. 9-12 (citing U.S. Const. art. I, § 8, cl. 3); and

(3) even if Congress lacked the power under the Commerce Clause, Count One is saved by virtue of the legislature's plenary power over D.C. *Id.*, p. 8.

Mostofsky will begin with points (1) and (3). The government does not address the modern severability standard in this context. Under it, the § 231(a)(3) charge must be dismissed if Congress did not possess power to enact the statute under the Commerce Clause.

In *Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013), the plaintiff owned a business that sold tobacco products across state lines. He sought a preliminary injunction against enforcement of provisions of the Prevent All Cigarette Trafficking Act (PACT) that required him, on pain of criminal penalty, to pay state and local tobacco taxes and banned him from sending his products through the U.S. mail. He argued that these provisions violated the due process clause because they did not require minimum contacts between the taxing sovereign and the taxed entity. *Id.* at 641. The district court entered a preliminary injunction barring the government from enforcing the tax provisions against the plaintiff at all, not just in those jurisdictions in which he lacked minimum contacts. *Id.* at 654.

On appeal the government argued that the district court improperly applied severability analysis. Even if PACT could not constitutionally reach jurisdictions where the tobacconist lacked minimum contacts, the government argued, the statute's "plainly legitimate sweep" should have been applied to the business in the jurisdictions with conceded minimum contacts. 721 F.3d at 654. The D.C. Circuit disagreed. It did so with a comparison to prevailing

---

civil disorder's effect on "commerce." The discrepancy between these charging decisions shows the government's omission of "commerce" from two indictments was no pleading oversight.

3

Case 1:21-cr-00138-JEB   Document 77   Filed 11/30/21   Page 4 of 14

severability analysis in the Commerce Clause context:

> [W]hen a statute erases the boundaries that define a sovereign's jurisdiction . . . any legitimate application is pure happenstance.  It is perhaps this consideration that has led the Supreme Court to sustain facial challenges to laws that omit constitutionally-required jurisdictional elements, even though all such laws necessarily have a "plainly legitimate sweep." For example, in *United States v. Lopez*, the Supreme Court struck down the Gun-Free School Zones Act of 1990, a federal law that prohibited individuals from knowingly possessing firearms within school zones. 514 U.S. 549, 551, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995). The text of the statute "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id*. at 561; *see also United States v. Morrison*, 529 U.S. 598, 613, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) (relying on *Lopez* to sustain a facial challenge to the Violence Against Women Act). Similarly, if [the tobacconist's] due process analysis is correct, the PACT Act contains "no jurisdictional element which would ensure" that the taxes it imposes comport with the Due Process Clause. It permits state and local taxing powers to bleed over from legitimate objects of taxation to cover objects foreign to the state or local jurisdiction. Following the Supreme Court's lead, we are not willing to hold . . . that [the tobacconist] is unable to maintain a facial challenge.

*Gordon*, 721 F.3d at 654-55.

*Gordon* is consistent with the Supreme Court's latest word on severability.  *Murphy v. NCAA*, 138 S. Ct. 1461, 1482 (2018).  The Professional and Amateur Sports Protection Act (PASPA) was passed to prevent widespread legalization of sports gambling.  Part 1 made it unlawful for a governmental entity to sponsor, operate, advertise, promote, license, or authorize by law sports gambling.  Part 2 made it unlawful for a person to sponsor, operate, advertise, or promote, pursuant to the law of a governmental entity, sports gambling.  New Jersey argued that Part 1 of PASPA was invalid because it violated anti-commandeering doctrine by prohibiting the State from legalizing sports gambling.  The Supreme Court struck Part 1 as a violation of the anti-commandeering doctrine.

The Court declined to sever Part 1 from PASPA.  The Court found that Parts 1 and 2 were meant to "work together" to achieve PASPA's goal of preventing "state legalization of sports gambling." 138 S. Ct. at 1482.  Second, after Part 1 was struck, Part 2 "cease[d] to

4

implement any coherent federal policy." *Id.* By itself, Part 2 would render *legal* under federal law sports gambling that was prohibited by state law and *illegal* under federal law sports gambling allowed by state law. *Id.* Because the Court doubted "that Congress ever contemplated . . . such a weird result" the Court declined to sever and instead held the statute infirm in its entirety. *Id.*

*Gordon* and *Murphy* show that the Court cannot simply ignore severability analysis here, as the government would have it do. The Court must "sustain facial challenges [under the Commerce Clause] to laws that omit constitutionally-required jurisdictional elements, even though all such laws necessarily have a 'plainly legitimate sweep.'" *Gordon*, 721 F.3d at 654. As shown below, the so-called "jurisdictional element" of § 231(a)(3) does not satisfy the Supreme Court's precedents in *Lopez* and *Morrison* and the cases on which the government relies do not show otherwise.

Moreover, the legislative history of § 231(a)(3) plainly reveals that Congress had no intention of creating a riot statute that would apply only in the District of Columbia. To the contrary, its central purpose ran in the opposite direction, i.e., to extend federal law enforcement assistance to the States in their arrests and prosecutions of civil rights leaders in those States.

Section 231(a)(3) was enacted as part of the Civil Obedience Act of 1968 (COA). Pub. L. 90-284, Apr. 11, 1968, Title X. Senator Russell B. Long of Louisiana sponsored the COA during the Senate's debates over the Civil Rights Act of 1968. 114 Cong. Rec. 1294-96 (Jan. 29, 1968). Senator Long was clear that the COA was designed to diminish the "hate crime" title of the Civil Rights Act of 1968. 114 Cong. Rec. 1287-94 (Jan. 29, 1968). Long announced that his "greatest immediate concern" about the hate crime law was "the unwitting stumbling block it could place *before State and local officials* in their honest attempts to detain and prosecute

incendiary rabble rousers." *Id.* at 1289 (emphasis added). For example, Long specifically noted that "half of the Baton Rouge police force could have been thrown into jail" under the hate crime law for beating and setting attack dogs on peaceful protestors. *Id.*

Another of the COA's key purposes was to jail civil rights leaders—in the States where they resided, not in D.C. Long said the COA was needed due to "a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963." 114 Cong. Rec. 1294 (Jan. 29, 1968). Long offered similar explanations for the COA by reference to other civil rights leaders who resided in other States. 114 Cong. Rec. 5536 (Mar. 6, 1968). Critically, the COA's sponsor addressed the Commerce Clause specifically. The COA would apply to instrastate conduct, Long said, so that it would "not leave available to Rap Brown or Stokely Carmichael the technical defense that they did not *cross the State boundary* with the intent to create a riot." 114 Cong. Rec. 5533 (emphasis added).

Thus, the legislative history is full of evidence that Congress "'would not have enacted [D.C.-alone] provisions which are within its power, independently of [those] which [are] not.'" *Murphy*, 138 S. Ct. at 1482 (quoting *Alaska Airlines*, *Inc. v. Brock*, 480 U.S. 678, 684 (1987)). To the contrary, the history shows that giving federal law enforcement aid to the States was the central purpose of the COA. Therefore, § 231(a)(3) is in no sense "fully operative" if it only applies in D.C. *Murphy*, 138 S. Ct. at 1482 (citing *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 509 (2010)). Indeed, the District of Columbia already benefits from a local "civil disorder" felony statute, enforced by local and federal law enforcement and carrying penalties that potentially reach higher than those in § 231(a)(3). D.C. Code § 22-1322. It would therefore make no sense, and would be entirely redundant, for Congress to enact § 231(a)(3) for the District of Columbia alone. *Murphy*, 138 S. Ct. at 1482.

Therefore, for the reasons that follow, the § 231(a)(3) charge should be dismissed because Congress did not possess the authority to enact that statute under the Commerce Clause.

**B.     Congress lacked power under the Commerce Clause to enact § 231(a)(3); the government's unpublished decisions fail to address the relevant constitutional framework**

The Supreme Court has set a "controlling four-factor test for determining whether a[n] activity 'substantially affects' interstate commerce" and is thus subject to congressional regulation pursuant to the Commerce Clause.  *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d 1114, 1119 (9th Cir. 2003)).  Those factors are:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Adams*, 343 F.3d at 1028 (citing *Morrison*, 529 U.S. at 610-612).

Although the "most important" factors are the first and the fourth, *Adams*, 343 F.3d at 1028, the government's supplement addresses only the second: whether an express "jurisdictional element" is provided in § 231(a)(3) to "limit its reach." Gov't Suppl. Br., pp. 9-12.  It has therefore forfeited any argument with respect to the remaining *Morrison* factors, including the first and fourth, which are the "most important."

The government argues that "in both *Lopez* and *Morrison*, the challenged statutes contained no 'jurisdictional element' that required the government to prove that the offense conduct affected interstate commerce." Gov't Suppl. Br., p. 10.  By contrast, § 231(a)(3) "has an 'explicit jurisdictional element' that requires the Government to prove that the offense conduct interfered with interstate commerce." *Id*.  Although the government does not specify where this

7

"jurisdictional element" lies in the statute, it appears to be alluding to the requirement that a charged "civil disorder" must "in any way or degree obstruct, delay[], or adversely affect[] commerce or the movement of any article or commodity in commerce . . . ." § 231(a)(3). This argument rests on several flaws.

First, the government's arguments are internally contradictory. If, as the government contends, § 231(a)(3)'s "jurisdictional element . . .requires the Government to prove that the offense conduct interfered with interstate commerce" and thereby satisfies *Lopez-Morrison*, Gov't Suppl. Br., p. 10, then it is not also the case that its § 231(a)(3) charge may survive based on Congress's plenary power over the District of Columbia alone. Gov't Suppl. Br., p. 7. But if the statute's "jurisdictional element" does *not* "require[] the Government to prove that the offense conduct interfered with interstate commerce" thanks to Congress's plenary D.C. power, then it fails the *Lopez-Morrison* second factor test, according to the government's own brief. Gov't Suppl. Br., p. 10.

Second, although the government repeatedly points to a "jurisdictional element" in § 231(a)(3), it does not explain what such an element substantively requires. That is because the statutory language to which it refers has virtually no resemblance to the jurisdictional element required by *Lopez-Morrison*. Federal laws that regulate "forms of conduct that, even in the aggregate, may not substantially affect commerce" must contain a jurisdictional element so that their "applications . . . do not exceed Congress's authority." *Taylor v. United States*, 136 S. Ct. 2074, 2081 (2016). "[T]he jurisdictional element 'insures, *on a case-by-case basis*, that a *defendant's* actions implicate interstate commerce to a constitutionally adequate degree.'" *United States v. Jones*, 231 F.3d 508, 514 (9th Cir. 2000) (quoting *United States v. Polanco*, 93 F.3d 555, 563 (9th Cir. 1996)) (emphasis added). All of the statutes that the government uses for

8

comparison are distinguishable because, unlike § 231(a)(3), the crimes referenced all require that a *defendant's* activity (a) *directly* impact commerce or (b) involve a commercial good.

Take the Hobbs Act.  In *United States v. Atcheson*, 94 F.3d 1237 (9th Cir. 1996), the Ninth Circuit upheld Hobbs Act robbery following the Supreme Court's decision in *Lopez*. The court determined "that *Lopez*'s 'substantially affects' test is not applicable" because "the Hobbs Act is concerned solely with *inter*state, rather than *intra*state state, activities." *Atcheson*, 94 F.3d at 1242 (emphasis in original). Rather than requiring a substantial effect "the Hobbs Act speaks to one who 'affects commerce' by robbery or extortion," implying "a *direct* impact on interstate commerce." *Id.* (emphasis added). "In contrast to the Gun Free School Zones Act, which was aimed at purely local, noneconomic activities, the Hobbs Act is directly aimed at economic activities which 'in any way or degree . . . affects commerce." *Id.* While robbery under the Hobbs Act can only be carried out by "affect[ing] commerce," § 231(a)(3) contains no requirement that an individual "affect commerce" by interfering with the duties of police officer.

Take RICO.  Unlike § 231(a)(3), RICO can apply criminal liability to any enterprise "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c). Courts of appeals have therefore upheld the constitutional validity of RICO under the Commerce Clause because, "[l]ike the Hobbs Act," RICO requires that a defendant's activities impact commerce directly, and that such direct effects "in the aggregate, have a substantial effect on interstate commerce." *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997). While both RICO and the Hobbs Act require direct impacts to interstate commerce that cause a substantial effect in the aggregate, § 231(a)(3) imposes no requirement "that a defendant's actions implicate interstate commerce to a constitutionally adequate degree." *Jones*, 231 F.3d at 514.

Take the Sherman Anti-Trust Act. In *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980), the Court held that an indictment under the Sherman Act must indicate that, "as a matter of practical economics," the defendant's offense had "a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246. As with the other offenses, the Sherman Act also requires some showing that the defendant's offense conduct itself affected commerce. While recognizing the Commerce Clause may "extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce," the Court in *McLain* added, "it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." *Id.* at 242.

The express terms of § 231(a)(3) – "in any way or degree" – require exactly such a nebulous connection to commerce and are not susceptible to a construction that could resolve the gap between the offense of interfering with police or firefighters and a civil disorder's commercial impacts. "Civil disorders," as 18 U.S.C. § 232(1) defines them, can occur in any situation, in any place, at any time, so long as three individuals are engaged in actions of violence threatening danger to property. Given such breadth, the law has vast potential to sweep up individuals who, while interfering with the duties of police, are utterly lacking in culpability with respect to the separate civil disorder that affected commerce. Nothing in the language of § 231(a)(3) can safeguard such individuals from liability for a federal felony conviction because the statutory language simply cannot be contorted to require that any commercial effect at all result from a defendant's actual acts.

Rather than make its own arguments under *Lopez-Morrison*, the government simply cites to a handful of unpublished, out-of-circuit decisions. Gov't Suppl. Br., p. 9. These are far from

10

persuasive. The government relies primarily on *United States v. Phomma*, 2021 U.S. Dist. LEXIS 175489, at *6-7 (D. Or. Sept. 15, 2021), where a defendant challenged § 231(a)(3) on Commerce Clause grounds. In rejecting the challenge, the *Phomma* court relied on the Ninth Circuit's upholding of a statute banning guns in school zones in *United States v. Dorsey*, 418 F.3d 1038, 1045-46 (9th Cir. 2005). The *Phomma* court conclusorily said the statute in *Dorsey* contained "jurisdictional elements" that were "similar" to § 231(a)(3). Not so. *Dorsey* perfectly illustrates the invalidity of § 231(a)(3).

In *Dorsey*, the Ninth Circuit addressed a previously invalidated statute after Congress addressed the issues rendering it unconstitutional and, by amending the statute, established Commerce Clause compliance. After *Lopez* invalidated the Gun-Free School Zones Act under the Commerce Clause, Congress amended the statute's language to require actual use of the channels of interstate commerce and made detailed congressional findings establishing bases for federal action. In *Dorsey*, the court addressed the new statutory language that narrowed the offense to possession of a firearm that has "moved in or that otherwise affects interstate or foreign commerce" 418 F.3d at 1045. This jurisdictional element, the Ninth Circuit recognized, established a "concrete tie to interstate commerce" by requiring, "through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Dorsey*, 418 F.3d at 1046. Section 231(a)(3) has no equivalent requirement on a defendant-by-defendant basis.

Further, the amended statute reviewed in *Dorsey* included extensive and detailed findings to establish a substantial effect on commerce. Unlike the general platitudes in the previous statute, and in § 231(a)(3), Congress considered and listed eight express and detailed findings establishing the effects on interstate commerce of guns in schools. 18 U.S.C. § 922(q)(1). Nothing remotely similarly to such findings can be gleaned from § 231(a)(3)'s legislative

history.[2]

The government's remaining unpublished decisions either do not provide any reasoning or rely on misplaced analogies to the Gun-Free School Zones Act, the Hobbs Act and § 922(g) which are distinguished above. *See United States v. Howard*, 2021 U.S. Dist. LEXIS 163431, at *13 (E.D. Wisc. Aug. 30, 2021) (upholding § 231(a)(3) on the basis of comparison to the Hobbs Act even though the latter, unlike § 231(a)(3), is concerned solely with *inter*state, rather than *intra*state state, economic activities such as robbery);[3] *United States v. Pugh*, 2021 U.S. Dist. LEXIS 177266, at *11-16 (S.D. Ala. May 13, 2021) (upholding § 231(a)(3) on the basis of comparison to Hobbs Act and § 922(g), both of which, unlike § 231(a)(3), contain elements requiring a link between the defendant's conduct and interstate commerce); *United States v. Huff*, 630 F. App'x 471, 484-85 (6th Cir. 2015) (unpublished) (upholding § 231(a)(2), which concerns a Commerce Clause issue different from that raised by subsection (a)(3), as subsection (a)(2) requires that the defendant's firearm move in interstate commerce).

The government's position that the Commerce Clause encompasses individual acts to interfere with police and firefighters, as described under § 231(a)(3), "would effectually obliterate the distinction between what is national and what is local and create a complete

---

[2] The government's reliance on *United States v. Hill*, 927 F.3d 188 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 272 (2020) is misplaced for similar reasons. The statute at issue in *Hill*, the Hate Crimes Act, specifically required that the victim of an unarmed assault be engaged in commercial activity at his place of work. 927 F.3d at 198. By contrast, § 231(a)(3) does not require the government to establish any connection between either the defendant or the victim and interstate commerce. Similarly, the government notes that it need not prove that the defendant's conduct itself affected interstate commerce in a Hobbs Act robbery case involving a victim who is a drug dealer. *Taylor v. United States*, 136 S. Ct. 2074 (2016). But that was because, unlike in this § 231(a)(3) prosecution, "the activity at issue, the sale of marijuana, [was] unquestionably an economic activity." 136 S. Ct. at 2080.

[3] *Atcheson*, 94 F.3d at 1242.

centralized form of government." *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). For that reason, and for all the other reasons cited in Mostofsky's motion to dismiss including overbreadth and vagueness, Count One should be dismissed.

Dated: November 30, 2021                    Respectfully submitted,

/s/ David B. Smith
David B. Smith, D.C. Bar No. 403068
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith, D.C. Bar No. 1029802
David B. Smith, PLLC
7 East 20th Street, Suite 4R
New York, NY 10003
(917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Aaron Mostofsky*

## Certificate of Service

I hereby certify that on the 30th day of November, 2021, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

Graciela Lindberg
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530
(202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com