## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:21-cr-00138-JEB** |
| | : | |
| **AARON MOSTOFSKY,** | : | |
| | : | |
| Defendant. | : | |

## MOTION IN LIMINE REGARDING
## <u>AUTHENTICATION OF VIDEO EVIDENCE</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following motion *in limine* regarding the authentication of video evidence at trial.

## BACKGROUND

The riot at, and attack on, the United States Capitol Building was an event of unparalleled size and scope. Much of the event was recorded on video: on surveillance footage captured by the U.S. Capitol Police ("USCP") cameras; on Metropolitan Police Department ("MPD") body-worn cameras; and on cameras and phones carried by journalists, members of the mob, and other persons present in the U.S. Capitol Building on January 6, 2021. The government's case at trial will rely heavily on such evidence to explain the defendant's specific conduct, to contextualize it through other contemporaneous events, and to give the jury a sense of the riot as a whole. This motion outlines the types of exhibits the government plans to use and seeks a pretrial ruling on their authenticity.

Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a

finding that the item is what the proponent claims it is." Rule 901(b) provides a non-exhaustive list of examples of evidence that satisfies this requirement. As relevant here, those examples include:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
> . . .
> (3) *Comparison by an Expert Witness or the Trier of Fact*. A comparison with an authenticated specimen by an expert witness or the trier of fact.
> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
> . . .
> (9) *Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b)(1), (3), (4), (9).

As a general matter, establishing an item's authenticity is not "a particularly high hurdle." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992); *see also United States v. Vidacak*, 553 F.3d 344, 349 (4th Cir. 2009) ("The burden to authenticate under Rule 901 is not high"); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("The burden of proof for authentication is slight."); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) ("The threshold for the Court's determination of authenticity is not high, . . . and the proponent's burden of proof for authentication is slight[.]") (citation and quotation marks omitted). Rule 901 "requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997) (citing cases). *See also, e.g.*, *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010) ("[A]uthentication itself is 'merely . . . the process of presenting sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be.'") (quoting *United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985)); *Vidacek*, 553 F.3d at 349 ("only a *prima*

*facie* showing is required"). Stated differently, "[t]he standard the district court must apply in evaluating a document's authenticity is whether there is enough support in the record to warrant a reasonable person in determining that the evidence is what it purports to be." *United States v. Blanchard*, 867 F.3d 1, 6 (1st Cir. 2017) (quoting *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994)). Once that showing is made, "[t]he factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Vidacek*, 553 F.3d at 349. *See also, e.g.*, *Belfast*, 611 F.3d at 819 ("Once that *prima facie* case is established, the evidence is admitted and the ultimate question of authenticity is decided by the jury.").

To make out a prima facie showing of authenticity, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). *See, e.g.*, *United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) (unpublished) ("Authentication may be established 'solely through the use of circumstantial evidence.'") (quoting *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)). And, importantly, the party seeking to admit evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). Rather, "the government must only 'demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated.'" *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)). *See, e.g.*, *United States v. Bowens*, 938 F.3d 790, 794-95 (6th Cir. 2019) (explaining that "[a]nyone could have used the defendants' Facebook accounts, just as the pictures could have depicted the men smoking tobacco cigars, and 'getting high' could have been a reference to skydiving," but that there was sufficient circumstantial evidence "for the jury to infer that the accounts belonged to the defendants, and that the defendants were the authors of the

3

posts about using marijuana"); *Broomfield*, 591 F. App'x at 852 (finding sufficient evidence of authenticity even though "there was no testimony establishing that the recording equipment was reliable or that the video was not altered or staged").

In deciding preliminary questions about the admissibility of these videos, "[t]he court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). In other words, the government may rely upon otherwise inadmissible evidence in establishing the authenticity of the video evidence described in this motion. *See, e.g.*, *United States v. White*, 116 F.3d 903, 914 (D.C. Cir. 1997).[1] Of course, even with a pretrial ruling that evidence is authentic, and thus admissible, the government must introduce sufficient evidence at trial from which a reasonable juror could reach the same conclusion regarding authenticity. *See, e.g.*, *United States v. Gammal*, 831 F. App'x 539, 542 n.6 (2d Cir. 2020) (unpublished) ("Insofar as the District Court relied on non-public information to make its preliminary determination, it did not err because it did not do so in lieu of the presentation of sufficient authenticating public evidence later at trial."); *United States v. Puttick*, 288 F. App'x 242, 246 (6th Cir. 2008) (unpublished) ("It is permissible for the judge to make a preliminary determination as to authentication, admit the evidence conditionally under Rule 104(b), and then allow the jurors to be the final arbiters of whether it was actually authenticated."); *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992) ("Thus, even though the district court may have ruled during an in camera proceeding that the proponent had presented sufficient evidence to support a finding that a tape recording was authentic, evidence that would

---

[1] This matters, for instance, in analyzing Parler videos publicly available through ProPublica, and discussed *infra* at 8-9 and 13-17. The government's argument for authentication of these videos relies in part on hearsay statements by ProPublica which the government does not intend to elicit at trial. Similarly, the government bases the John Sullivan video, discussed *infra* at 11-12, in part on portions that are confirmed by USCP footage elsewhere in the building but are unrelated to this defendant.

support this same ruling must be presented again, to the jury, before the tape recording may be admitted.").

## ANALYSIS

The government's evidence will show that all the videos described herein fairly and accurately depict events at the Capitol which are relevant to an issue of consequence in defendant's trial. While admission of USCP and MPD video footage should be non-controversial, the following discussion will address the evidentiary basis for authentication of all the videos the government intends to offer at trial, including those. The bulk of the discussion focuses on authentication of videos from other sources, the distinctive events and characteristics visible in those videos, and the corroboration of the authenticity of those videos found from other pieces of evidence.

### 1. U.S. Capitol Police Video Footage

Admission of footage from USCP's own systems is straightforward. The government will present a USCP witness to testify to their video surveillance system. This witness will be able to explain how the system is used, that it reliably records and depicts the areas where USCP has installed cameras, and the internal characteristics of videos—such as date and time stamps—which allow USCP to identify and retrieve particular segments of video. A USCP witness who was present during the attack on the Capitol will be able to explain that the videos offered by the government in this case accurately show the events that took place at the United States Capitol Building on January 6, 2021.

That testimony will satisfy Federal Rule of Evidence 901(b)(1), "Testimony of a Witness with Knowledge" to show that "an item is what it is claimed to be." Fed. R. Evid. 901(b)(1).  *See American Wrecking Corp. v. Secretary of Labor*, 351 F.3d 1254, 1262 (D.C. Cir. 2003) (photograph of accident site was properly authenticated by credible testimony of site supervisor); *United States v. Childs*, 5 F.3d 1328, 1336 (9th Cir. 1993) (custodian of records giving testimony

of facts necessary to establish exception to rule against hearsay for records of regularly conducted activity under Rule 803(6) also authenticated proffered exhibits under Rule 901(b)(1)).

Although Rule 901(b)(1) alone would be sufficient to support admission of the USCP testimony, that testimony will also satisfy Rule 901(b)(4), which allows authentication by way of "the appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). It also will accord with the requirements of Rule 901(b)(9), which allows authentication by "[e]vidence describing a process or system and showing that it produces an accurate result." Fed. R. Evid. 901(b)(9).

## 2. Body-Worn Camera Footage from the Metropolitan Police Department

The admissibility of footage from body-worn cameras, worn by MPD Officers on January 6, 2021, is likewise clear. Under Rule 901(b)(1), either the officer who wore the camera, or any other witness to the events depicted in the video, can authenticate the video based on their personal knowledge that the video fairly and accurately depicts the events that occurred. *See*, *e.g.*, *United States v. Patterson*, 277 F.3d 709, 713 (4th Cir. 2002) ("The necessary foundation for the introduction of a photograph is most commonly established through eyewitness testimony that the picture accurately depicts the scene in question[.]"); *United States v. Rembert*, 863 F.2d 1029, 1026 (D.C. Cir. 1988) (noting one method of authentication occurs where "a sponsoring witness (whether or not he is the photographer) who has personal knowledge of the scene depicted testifies that the photograph fairly and accurately portrays that scene").

While MPD officers deployed throughout the Capitol Building and grounds on January 6, 2021, this case will focus on MPD officers in the West Plaza. The West Plaza is outside and directly west of the U.S. Capitol Building, and on the ground level. On January 6, by about 12:55 p.m., rioters had penetrated USCP perimeters west of the Capitol and pushed USCP officers back

to the West Plaza. MPD officers began arriving in the West Plaza shortly after 1:10 p.m. From then until about 2:30 p.m., MPD officers attempted to maintain a police line that would prevent rioters from penetrating deeper into the Capitol grounds and, ultimately, breaching the Capitol building.

The defendant's assault on law enforcement officers, charged in Count Three, occurred in the West Plaza at around 1:35 p.m. Multiple body-worn cameras capture portions of the assault. Due to the nature of the event—a crowd of rioters pushing against a tight line of police officers— many cameras recorded slightly different angles on the same event. Any single officer who was present there will be able to testify that all the videos fairly and accurately depict what occurred. *See* Fed. R. 901(b)(1). The assault can also be seen from an elevated USCP surveillance camera, and a comparison of this birds-eye view of the assault with MPD body-worn cameras make clear that they record the same event. Thus, the USCP footage corroborates the events recorded on body-worn camera and supports their admissibility. *See* Fed. R. Evid. 901(b)(4) (authentication by comparison with another authenticated specimen).

### 3. Cameras Carried by Persons Present in the Crowd

The government also intends to offer numerous video clips from sources other than USCP and MPD. Some of these were taken from reporters who were present in the Capitol that day. Others were taken by the defendant's fellow rioters or other members of the crowd. Many were obtained through open-source means and are publicly available.

For these videos, as described further below, the government will establish authenticity by asking the jury to compare them with other, authenticated exhibits: USCP and MPD footage. Fed. R. Evid. 901(3). *See United States v. Thomas*, 987 F.2d 1298, 1301 (7th Cir. 1993) (jury could properly conclude that proffered sawed-off shotgun was authentic by comparing it to photograph

of shotgun found on premises by arresting officer when photograph was already in evidence). Police footage confirms these other videos are what they purport to be: recordings of the same events, captured from a slightly different perspective, and in some cases depicting events that were not fully captured by the USCP or MPD systems. The distinctive characteristics of the defendant's attire, combined with the distinctive characteristics of other rioters depicted captured on USCP and MPD footage, will further help support authentication of these exhibits. Fed. R. Evid. 901(4).

A.   *The Defendant's Approach to the Capitol*

By approximately 12:55 p.m., rioters overwhelmed police perimeters west of the Capitol building, forcing police to retreat to the West Plaza. The defendant approached the Capitol as the breach of the police line occurred. Two sources of video show the timing of these initial assaults on police lines in comparison with the defendant's approach. One clip, titled obtained from a YouTube account with the username Buggs Media Network ("the Buggs video"), is nine minutes and 52 seconds long.[2] From around time stamp 2:15 to around time stamp 3:55, the Buggs video shows a crowd of rioters storming and overrunning USCP's western perimeter. By around time stamp 4:35, the rioter recording this video had reached the West Plaza. At approximately time stamp 5:52, still within the West Plaza, the defendant appeared in this rioter's video footage, entering from the rioter's left (north). As will be the case throughout all the videos discussed herein, the defendant was immediately recognizable, in part because he wore a fur pelt and was carrying a walking stick.

Another rioter-recorded video provides context for this clip. It is an open-source video available on ProPublica.org, part of a trove collected under the title *What Parler Saw During the*

---

[2] This video was titled "Washington D.C. Riots: Footage of the Initial Breach Attack on the West Side of the US Capitol." At the time of this submission, it appears that the video has been removed from YouTube.

*Attack on the Capitol* ("*What Parler Saw*"). As the title suggests, this is a collection of more than 500 videos taken before, during, and after the riot and uploaded to the web service Parler. The video at issue here ("the first Parler video") runs for two minutes and eight seconds. It was time-stamped by Parler at 12:56 p.m. and color-coded gold for "Near Capitol."[3] This video opens on the defendant walking eastbound, across the Capitol's lawn, toward the West Plaza. The defendant remained visible for about the first ten seconds, after which point his path diverged from the person recording.

Several overlapping characteristics support authentication of both of those videos. First, USCP surveillance video shows the police line being overrun, and rioters arriving in the West Plaza, at the same time and in the same manner as depicted in the Buggs video. The physical location recorded in both the Buggs video and the first Parler video—the West Plaza—is the same. The videos appear to be contemporaneous. The relative location of the Capitol makes clear that the first Parler video began slightly north of the Buggs video, and when the defendant appeared in the Buggs video, he entered from north of the camera. Taken together, and corroborated by USCP surveillance video, these videos authentically depict the defendant's arrival at the Capitol.

B.   *The Defendant's Assault On Police Officers in the West Plaza*

At approximately 1:35 p.m., in the West Plaza, a group of rioters pushed against a metal bike-rack barricade and the police line directly behind it in order to breach the police line. The defendant was part of this crowd. To prove the defendant's assault against law enforcement officers, the government will rely in part on video footage taken by another person in the West

---

[3] The government offers this time stamp and color-coded marking for the Court's edification. But these markings likely represent statements by someone at ProPublica and thus would be hearsay. The government will not seek to admit them at trial. The first Parler video is available at https://projects.propublica.org/parler-capitol-videos/ (last accessed Dec. 8, 2021).

Plaza.[4] This video is approximately three minutes and fifteen seconds long and is taken by a person standing behind the group that pushed against police. This footage shows the defendant pushing on the backs of the rioters in front of him, lending his weight and strength to the effort to break through the police line. Significantly, this video makes clear that for at least a portion of the assault, no one stood behind the defendant. That is, the defendant was not forced into the line by others, and his conduct was not involuntary, an accident, or a mistake.

This video is corroborated by USCP surveillance footage, taken from an elevated position high above the West Plaza, which captures this assault against police officers. Although that camera is far from the action, one can identify defendant in the crowd by his unique fur pelt. That video further confirms that, for a period of time, the defendant was at the back of a pack of rioters, acting of his own volition and not being pushed by anyone else. The USCP footage confirms that this rioter footage is authentic.

## C. *The Defendant's Progress, Through Scaffolding, to the Senate Wing Door*

At some point between about 1:40 p.m., when he was seen in the West Plaza, and 2:12 p.m., when he was part of the crowd that breached the Senate Wing Door, the defendant climbed the stairs connecting the West Plaza to the Lower West Terrace (one story above ground level) and the Upper West Terrace (two stories above ground level, where the Senate Wing Door is located). Portions of these staircases were surrounded by scaffolding that had been erected to aid

---

[4] This video appears to have been recorded by a person using the moniker "@statuscoup," and appears to have been live-streamed by JeffMAC Press, a YouTube channel that featured live streams from various sources on January 6, 2021. A portion of this video clip, depicting the defendant's assault, appears to have been featured within the first minute of the HBO Documentary *Four Hours in the Capitol*. The government may also seek to offer the HBO clip based on the common features between it and this footage.

the construction of the inauguration stage and that was covered by a large tarp. UCSP surveillance footage shows the defendant emerging from this covered area at approximately 2:09 p.m.

Footage taken by another rioter briefly shows the defendant inside the scaffolding, and the government will use this footage to help trace the defendant's path through the Capitol grounds. This footage ("the Sullivan video") was taken by John Earle Sullivan, a defendant in case no. 1:21-cr-00078-EGS, and remains available online through YouTube, where Sullivan posted it under the moniker "JaydenX."[5] The Sullivan video runs for 39 minutes and 36 seconds and captures a period beginning shortly before Sullivan entered the Capitol. As the clip begins, Sullivan stood at the top of the stairs, near the end of the covered area, and turned his camera to record the crowd. The defendant was a short distance behind Sullivan, likewise at the top of the stairs, also at the front of the crowd. The defendant's face is visible for about the first 15 seconds of the video, after which point the crowd surged up the stairs toward the Senate Wing Doors. The defendant passed Sullivan on the stairs, and for a time, the defendant's back was visible on the Sullivan video as they climbed. The defendant was, again, immediately recognizable due to his distinct fur pelt.[6] then turned his camera away from the defendant and walked forward.

The Sullivan video appears to capture the moments immediately before the defendant appeared on USCP video as he climbed the steps to the Upper West Terrace. The video features numerous other rioters wearing distinctive clothing, such as the person who led a mob in pursuit of Officer Goodman (discussed below). Upon reaching the Upper West Terrace, Sullivan broke off from the crowd of rioters who would force their way inside so that he could film the mob that

---

[5] The video is available at https://www.youtube.com/watch?v=PfiS8MsfSF4 (last accessed Dec. 8, 2021).

[6] A brief portion of the Sullivan video, showing the defendant's back as he climbed these steps, appears to have been featured within the first minute of the HBO Documentary *Four Hours in the Capitol*.

remained at the Capitol's base. Accordingly, he entered the Capitol building after the defendant. But there are multiple other USCP surveillance videos, unrelated to this defendant, which confirm that Sullivan's video is authentic. For example, from about 15:30 through about 32:00 into the Sullivan video, Sullivan recorded events in the Capitol Rotunda, Statuary Hall, and the anteroom outside the House Chamber.[7] From about 32:00 to the end of the video, Sullivan and other rioters sought to access the House Chamber through a different entrance; Sullivan recorded the shooting of Ashli Babbitt as she attempted to climb through a broken window in pursuit of fleeing Members of Congress.

  D.  *The Defendant's Entry into the Capitol Building and Path to the Ohio Clock Corridor*

According to USCP footage, the defendant walked across the Upper West Terrace to the Senate Wing Door at approximately 2:12:20 p.m., appearing to carry a black object in his right hand. The defendant entered the building, through the breached Senate Wing Door at around 2:13:40 p.m.; he was approximately the twelfth person to enter through the door itself, and about the thirtieth person to enter overall through that area. USCP footage shows that at around 2:12 and 2:13 p.m., rioters outside the Capitol approached the Senate Wing Doors, on the west side of the building. Between about 2:12 and 2:13 p.m., the rioters attempted to break through the Senate Wing Door's windowpanes and succeeded at smashing in the windowpanes on either side of the door. At around 2:13 p.m., the first rioter entered through the broken windows immediately to the right of the Senate Wing Door. From the inside, rioters who entered through the window kicked the door, breaking it and allowing the defendant and others to enter. As the defendant entered the

---

[7] A comparison of this portion of the Sullivan video with USCP surveillance video in and around the Statuary Hall connector, a hallway between the Statuary Hall and the anteroom leading to the House chamber, confirms the authenticity of this portion of the Sullivan video.

building, he was near the front of the crowd, wearing a police vest but was not carrying a riot shield.

USCP Surveillance footage shows that, at approximately 2:14:15 p.m., the defendant moved through a corridor toward stairs that lead to the Ohio Clock Corridor. At around 2:15:00 p.m., that video shows USCP Officer Eugene Goodman at the top of the stairs leading to the Ohio Clock Corridor, pursued by rioters. At around 2:15:10 p.m., Officer Goodman led the crowd into the Ohio Clock Corridor. The defendant reached the top of these stairs at around 2:15:37 p.m., walking side-by-side with a rioter who wore a brown jacket and carried a Confederate battle flag. In the line of the rioters who ascended these stairs, the defendant was approximately the twenty-eighth person from the front. He sat, briefly, outside the Ohio Clock Corridor before entering it at around 2:16:22 p.m.

To further illustrate the defendant's conduct, and what he would have heard and seen within the Capitol, the government will seek to introduce three video clips that depict events around the time of the defendant's entry into the Capitol. The first is a video taken from a person inside the Capitol before, one or more floors above the Senate Wing Door, immediately before it was breached ("the upstairs video"). The second is from ProPublica's *What Parler Saw* collection ("the second Parler video"). It is time-stamped 2:15 p.m. by ProPublica and highlighted in red to designate that it captures footage from inside the Capitol.[8] It is the only video with this dual designation. The third video is footage taken by reporter Igor Bobic of the Huffington Post ("the Bobic video"), which captures Officer Goodman confronting a crowd of rioters, leading them up

---

[8] The government offers this time stamp and color-coded marking for the Court's edification. As these markings likely represent statements by someone at ProPublica, and thus would be hearsay, the government will not seek to admit them at trial. The video is available at https://projects.propublica.org/parler-capitol-videos/ (last accessed December 8, 2021).

a set of stairs and into the Ohio Clock Corridor. This video has been widely distributed by other news outlets and is publicly available.

The upstairs video is one minute and five seconds long. It was taken by a person inside the Capitol Building before it was breached. This person largely aimed their camera into the distance to record the crowd massing on the National Mall and on Pennsylvania Avenue, N.W. But at times the person filming turned their camera down to focus on the Upper West Terrace. From this vantage point, the camera captured multiple rioters, including the defendant, heading toward the Senate Wing Door immediately before a rioter broke it open. Notably, in the upstairs video, the defendant carried a black object in his right hand which appears to be a police vest; near the end of the video, he appears to put it on. This is consistent with other USCP video footage discussed above: in the West Plaza, and within the scaffolding, the defendant was not wearing a police vest; when walking across the Upper West Terrace, he appeared to be carrying a black object; once inside the Capitol, he was wearing a police vest. The upstairs video also features other distinctive and immediately recognizable rioters.

The Bobic video is one minute and eighteen seconds long. It is one, continuous segment, taken from the same camera, filmed from behind Officer Goodman, and then to his side, as he ascended the stairs. The second half of the video shows the same events that are captured by USCP footage but from a different, helpful perspective. It also features rioters with distinctive characteristics who also appear in the USCP footage. The rioter at the front of the crowd, for example, is immediately recognizable: he wore a dark knit cap and a black t-shirt with a Q, patterned with American flag motif over a grey hooded sweatshirt. UCSP surveillance footage

14

shows that this person entered the Capitol about 20 seconds before the defendant.[9] In short, context, comparison, and distinctive characteristics make clear that the Bobic video is authentic.

The second Parler video is one minute and forty-eight seconds long. Like the Bobic video, it is one, continuous segment. This one, however, is taken from the point of view of a rioter. It begins just outside the Senate Wing Door, about five seconds before rioters on the inside kicked it open. This exterior footage of the door breaking is consistent with what USCP cameras captured inside the Capitol Building. The rioter carrying this camera—approximately the seventh person to enter—entered behind a person wearing a plaid jacket and a red Trump hat. The USCP surveillance footage shows that this person, wearing a plaid jacket and a red Trump hat, was followed immediately by a person holding up their cell phone, apparently using it as a camera. The defendant was a few feet behind the person filming the second Parler video and entered the Capitol building seconds later. In fact, at about 24 seconds into the video, the person recording the second Parler video turned to capture the crowd behind him and recorded the defendant carrying a riot shield.[10] This person followed the crowd to the stairs where it confronted Officer Goodman as shown in the Bobic video. The footage stopped at around the time that the crowd reached the top of the stairs, immediately before rioters entered the Ohio Clock Corridor. As with the Bobic video, context, comparison, and distinctive characteristics make clear that the second Parler video is authentic.[11]

---

[9] Other distinctive and immediately recognizable rioters appear in this footage as well.

[10] The second Parler video reveals two people, walking ahead of the person recording, who were carrying riot shields. One of these people stepped out of frame and may have set the shield down or handed it to the defendant. USCP surveillance footage shows that the defendant acquired a riot shield from another rioter.

[11] There are also multiple rioters in distinctive attire who can be seen on this video and on USCP surveillance footage.

E.   *The Defendant's Activity in the Ohio Clock Corridor*

The government will seek to introduce two videos of the defendant's activity in the Ohio Clock Corridor. One is footage of a one-on-one interview between the defendant and a New York Post reporter, in which the defendant described his motivations for joining the riot ("the NY Post video"). It is one minute and 37 seconds long. The other video is, again, from ProPublica's *What Parler Saw* trove ("the third Parler video"). It is eleven seconds long, is time-stamped at 2:22 p.m. by ProPublica and highlighted in red to designate it as within the Capitol.[12]

Authentication of the NY Post video is straightforward. The defendant was face-to-face with the reporter's camera, clearly still dressed in the same fur pelt, carrying the same walking stick, wearing the police vest, and in possession of the riot shield. When speaking with the interviewer, the defendant identified himself as Aaron and said that he traveled to Washington, D.C. from Brooklyn. The background of the NY Post video makes clear that the interview happened within the Capitol Building, and USCP surveillance footage from the Ohio Clock Corridor shows the defendant appearing to speak with a reporter. Taken together, this evidence clearly satisfies the threshold requirement for authentication.

The third Parler video captures the defendant in the Ohio Clock Corridor, standing and apparently engaged in conversation. As in the New York Post footage, he is wearing the pelt and police vest and in possession of the riot shield, which he rested against his foot. The defendant's walking stick was not visible and apparently was obstructed by his body. The video provides a side view of the defendant, which shows that the stolen police vest was haphazardly put on—a fact consistent with the short window of time, based on USCP surveillance video, in which he could

---

[12] As noted above, *supra* notes 2 and 6, the government provides these statements by ProPublica for context, but does not intend to offer them at trial.

have donned the vest, and the upstairs video, which showed that he put it on quickly. The distinctive characteristics of the room, and other people within, make clear that this video recorded events in the Ohio Clock Corridor. In particular, the third Parler video also captures footage of Jacob Chansley, known by the moniker "Q-Anon Shaman," who was recently sentenced for his role in the Capitol attack. *United States v. Chansley*, 1:21-cr-00003-RCL. The government's evidence strongly supports the authenticity of this video.

F.   *The Defendant's Exit from the U.S. Capitol Building*

Finally, the government will seek to introduce a 35-second clip, captured by a person present at the riot and uploaded to TikTok and Twitter ("the Twitter clip"), which shows the police taking the riot shield back from the defendant.[13] At approximately 25 seconds into the video, the person recording turns to his left and begins filming the defendant walking under a stone archway. The defendant was still wearing his distinctive fur pelt, carrying his walking stick in his left hand, wearing the stolen police vest, and carrying the stolen riot shield. He was accompanied by a person wearing a brown jacket and carrying a flag attached to a flagpole. At about 27 to 30 seconds into the video, a police officer—who was briefly visible on camera—chased after the defendant and grabbed the stolen riot shield. The defendant looked back at the police officer, then quickly walked away.

The authenticity of this video is confirmed by reference to USCP surveillance video. Footage from the Ohio Clock Corridor shows that the defendant left the corridor together with this other rioter, who was carrying a Confederate battle flag. Footage further shows that, together, they walked out the Senate Carriage Door, on the eastern side of the Capitol building, and down a set

---

[13] The video is available at the following location:
https://twitter.com/chevlove68/status/1353553762321895424 (last accessed December 8, 2021).

of stairs.[14] Footage from a USCP camera on the eastern side of the Capitol Building's roof establishes that, moments later, the two emerged from a stone arch. That eastern roof footage shows, from a birds-eye view, the same interaction in which the officer reclaimed the stolen riot shield from the defendant. In other words, the USCP surveillance footage fully confirms that the Twitter clip is footage of the same event, and fairly and accurately depicts the defendant's interaction with that police officer.

## Conclusion

For the reasons stated herein, the government respectfully requests that this Court rule *in limine* that the government's video evidence satisfies the authenticity requirement of Fed. R. Evid. 901.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:     s/ Michael J. Romano
Trial Attorney, Detailee
IL Bar No. 6293658
555 4th Street, N.W.
Washington, DC 20530
michael.romano@usdoj.gov
(202) 307-6691

s/ Graciela R. Lindberg
Assistant United States Attorney
Bar No. TX 00797963
11204 McPherson Road, Suite 100A
Laredo, Texas 78045
graciela.linberg@usdoj.gov
(956) 721-4960

---

[14] The Senate Carriage Door is elevated one floor above ground level.