IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No: 21-cr-138-JEB |
| v. | : | |
| | : | 18 U.S.C. §§ 231(a)(3), 641, and 1752(a)(1) |
| AARON MOSTOFSKY | : | |
| Defendant. | : | |

**STATEMENT OF OFFENSE**

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Aaron Mostofsky, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1.  The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2.  On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3.  On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States

1

Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the

crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.  Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Aaron Mostofsky's Participation in the January 6, 2021, Capitol Riot*

8.  On January 6, 2021, Defendant Aaron Mostofsky traveled from New York City to Washington D.C. by bus, texting or posting the message "DC bound stopthesteal."  In Washington D.C., the defendant, dressed as a caveman and carrying a walking stick or rod, was among a crowd outside the U.S. Capitol. The defendant explained to a friend that the fraud in the 2020 Presidential Election was so obvious, even a caveman would know the election was stolen.

9.  At approximately 12:55 p.m. on January 6, 2021, rioters overwhelmed a police perimeter stationed near the Peace Circle. The Peace Circle is due west of the Capitol Building and marks the end of Pennsylvania Avenue, N.W. Within about a minute, rioters had surged from the Peace Circle into the ground-level plaza to the west of the Capitol Building (the West

Plaza). The defendant was present near Peace Circle at around the time of the breach, and reached the West Plaza minutes after the breach, as part of this initial wave of rioters.

10. At approximately 1:35 p.m., in the West Plaza, a group of rioters pushed against a police line that was attempting to adjust a barrier to provide additional space between the crowd of rioters and the Capitol Building, and limit the crowd's access to the Capitol. The defendant joined that group, impeding the efforts of U.S. Capitol Police and Metropolitan Police Department officers to protect the Capitol. Surveillance footage from the roof of the Capitol Building, as well as footage from another member of the crowd, reveals that the defendant was not up against the police line when officers tried to move the fence. Instead, he joined a group of rioters who were resisting the police, intentionally lending his weight and strength to the effort to break through the police line. He was not forced into the line by other rioters, and his conduct was not involuntary, an accident, or a mistake.



11. At approximately 2:09 p.m., the defendant climbed exterior stairs to the Capitol Building's Upper West Terrace, an area elevated about two flights above ground level. The defendant walked with other rioters to the Senate Wing Door, picking up a U.S. Capitol Police

bullet-proof vest as he did so. As other rioters staged at the door and windows, preparing to break them open, the defendant donned this vest.

12. At approximately 2:13 p.m., rioters broke windows next to the Senate Wing Door, entered the Capitol Building, and broke open the Senate Wing Door from inside the building. The defendant entered through this door at 2:13 p.m., moments after the initial breach of the building. He was approximately the twelfth person, overall, to enter through this door.



13. Seconds after entering the Capitol Building, the defendant picked up a U.S. Capitol Police riot shield that had been set aside by another rioter. The defendant followed the crowd to a staircase where the crowd pursued U.S. Capitol Police Officer Eugene Goodman up a staircase and into the Ohio Clock Corridor, just outside the Senate Chamber.

14. While inside the Ohio Clock Corridor, the defendant was interviewed by a reporter from the New York Post and posed with the U.S. Capitol Police vest and shield for the picture below. During this interview, the defendant identified himself as Aaron from Brooklyn, New York. The defendant said that he was at the Capitol "to express my opinion, as a free American, . . . that this election was stolen." The defendant claimed to believe that 85 million people voted for former President Trump, rather than 75 million; claimed that states such as New York were "stolen" from the former President; and claimed to have found the vest and shield "on

the floor." The defendant further stated that Members of Congress "shouldn't be afraid" but "they should get the courage to do their duty . . . to examine the fraud, maybe delay the election."



15. At approximately 2:36pm, the defendant exited the Capitol Building, taking the police vest and riot shield with him. Shortly after exiting the U.S. Capitol, the defendant was stripped of the riot shield by a U.S. Capitol Police officer.

**Elements of the Offenses**

16. Aaron Mostofsky knowingly and voluntarily admits to all the elements of (Count One) Civil Disorder a violation to Title 18 U.S.C. 231(a)(3); (Count Four) Theft of Government Property a violation of Title 18 U.S.C. § 641; and (Count Five) Entering and Remaining in a Restricted Building or Grounds in violation of Title 18 U.S.C. § 1752(a)(1). Specifically, defendant admits that:

- In violation of 18 U.S.C. § 231 (a)(3), the defendant knowingly obstructed, impeded, and interfered with a law enforcement officers while those officers were lawfully engaged in

their official duties incident to a civil disorder. Specifically, the defendant admits that he pushed against officers of the United States Capitol Police or persons assisting the United States Capitol Police, that is, officers of the Metropolitan Police Department. The defendant further admits that he knew at that time of his physical opposition to or interference with law enforcement officers, that the officers were lawfully engaged in the performance of their official duties incident to a civil disorder that was incident to the attack on the United States Capitol Building, also referred to as the Capitol Riot. The defendant does not deny that the Capitol Riot also adversely affected the United States Secret Service that was protecting Vice-President Michael Pence, who was present inside the Capitol during the Capitol Riot. Defendant also does not deny that the Capitol Riot affected commerce within the District of Columbia.

- In violation of 18 U.S.C. § 641, the defendant knowingly stole and converted to his personal use a United States Capitol Police vest and a U.S. Capitol Police riot shield. Defendant and the government agree that these items are collectedly valued at less than $1000.

- In violation of 18 U.S.C. § 1752 (a)(1), the defendant knowingly and without authority to do so, entered and remained in a restricted building, specifically the United States Capitol, where the Vice President was temporarily visiting.

                    Respectfully submitted,

                    MATTHEW M. GRAVES
                    United States Attorney
                    DC Bar No. 481052

By:    /s/
          Graciela R. Lindberg
          Assistant United States Attorney

                                              /s/_____  
                                        Michael Romano  
                                        Trial Attorney

                                              /s/_____  
                                        Norman Gross  
                                        Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I, Aaron Mostofsky, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: January 27, 2022

*Aaron Mostofsky*
Aaron Mostofsky
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 1/27/2022

*David Smith*
David Smith
Attorney for Defendant