**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-138-JEB** |
| **AARON MOSTOFSKY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Aaron Mostofsky to fifteen months' incarceration, in the middle of the applicable advisory Sentencing Guidelines range, three years of supervised release, $2,000 in restitution, and the mandatory special assessment for all three counts of conviction.

## I.    INTRODUCTION

The defendant, Aaron Mostofsky, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' of losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Mostofsky, dressed as a self-professed caveman and carrying a walking stick or rod, was among the first to breach the restricted area around the Capitol.   He forcibly pushed against officers who were attempting to adjust barriers in the West Terrace area to keep rioters from entering the Capitol building.   After impeding officers, Mostofsky joined the crowd breaking into the building itself.   At 2:13 p.m., Mostofsky was the twelfth person to enter the Senate Wing doors, the area where rioters first breached the Capitol building.   Mostofsky stole protective gear, a Capitol Police bullet-proof vest and a riot shield, leaving police officers who might have used those items more vulnerable during the violent attack at the U.S. Capitol.

The government recommends that the Court sentence Mostofsky to 15 months' incarceration, which is the middle of the advisory Guidelines' range of 12-18 months. A 15-month sentence reflects the gravity of Mostofsky's conduct and acknowledges his admission of guilt.

## II.  FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Mostofsky among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a

mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Mostofsky's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., Mostofsky and others   forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.[2]  Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., Mostofsky and other rioters forced their way in, breaking windows and assaulting police officers along the way, while

---

[2] Mostofsky was among the first wave of rioters entering the Capitol's restricted area through the initial breach of the Capitol's perimeter at Peace Circle.   See Exhibit 1.

others in the crowd cheered them on.[3]

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense (ECF 94) ¶¶ 2-7; PSR ¶¶ 18-22.

### *Attempted Breach of the Capitol Building and Assaultive Conduct in the West Front of the Capitol Grounds*

Assaults against police officers on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

---

[3] Mostofsky was among the first wave of rioters to enter the U.S. Capitol.   Specifically, he was the twelfth person to enter the Senate Wing Doors the area of the initial breach into Capitol.   See Exhibit 3.



*Image 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.  At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.  Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Image 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted

5

area to engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Image 1.  They flooded the area labeled "Lower West Plaza," Area C on Government's Image 1, pushing against the barricade there.



*Image 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and

6

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department (MPD) officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).

7

All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control chemical agents and flash-bang grenades, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Image 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers.[4] *See id*. at 27-30.

---

[4] Mostofsky did not bring tactical gear, but he stole U.S. Capitol Police tactical gear during the attack on the U.S. Capitol.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). As set forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol and other losses recently estimated at more than 2.7 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

### *Approach to the Capitol and Breach of the Restricted Area*

Aaron Mostofsky participated in the January 6 attack on the Capitol and stole protective gear intended for the Capitol Police officers protecting the building.  Mostofsky's crimes are documented in his posts, videos provided to the FBI by concerned citizens, body-worn camera

video from the MPD, open-source video, and surveillance footage from inside and outside of the Capitol.

On January 6, 2021, Mostofsky traveled to Washington, D.C. by bus from his home in New York City, and texted or posted "DC bound stopthesteal."   *See* ECF 94 ¶ 8; PSR ¶ 23.   Mostofsky arrived at the Capitol, clothed in what appeared to be animal furs and carrying a stick or rod, to announce that the fraud in the 2020 presidential election was so obvious, even a "caveman" would know the election was stolen, as he explained in a chat with a friend on January 5, 2021.   See ECF 94 ¶ 8; PSR ¶ 23.   Under his cloak Mostofsky had a large black bag.   *See* Exhibit 1 and Image 5.[5]



*Image 5*

---

[5] Videos identified as Exhibits in this filing will be provided to the Court and defense counsel prior to scheduled sentencing hearing via USAFx.

Once on the Capitol grounds near the Peace Circle, Mostofsky saw rioters arguing with Capitol Police officers on the perimeter of the restricted grounds surrounding the U.S. Capitol in Area A in Image 1.   Those officers were standing behind fencing with signs that read:   AREA CLOSED By Order of the United States Capitol Police Board.   *See Id.* and Image 6.   From this location at 12:55 p.m., Mostofsky saw members of the crowd breach the police line and force police to retreat to the West Plaza.   *See* ECF 94 ¶ 9; PSR ¶ 24.



Image 6

Within three minutes of that breach that initiated the entire attack on the U.S. Capitol, Mostofsky was in the West Plaza, near Area B and C in Image 1.   *See* Image 7.



Image 7

Rioters forcibly removed barriers and pursued officers from the Peace Circle to the West

Plaza, where they continued to confront officers. In the West Plaza area, Capitol Police officers

continued their attempts to repulse rioters though they were heavily outnumbered.   Meanwhile,

Mostofsky raised his fist in agreement to chants and siege of the U.S. Capitol.   *See* Image 8.



Image 8

At approximately 1:10 p.m., MPD officers arrived at the West Front to assist in the defense of the U.C. Capitol.   *See* Exhibits 2 and 3.

### *Obstruction of Officers during a Civil Disorder*

Following the initial breach, Mostofsky joined a large crowd on the West Plaza at the foot of the inaugural stage, behind yet another police line.   *See* Images 9, 10, and 11.   In this area, for approximately an hour, the rioters engaged in continuing skirmishes with the police over the fence lines.   At approximately 1:34 p.m., Mostofsky forcibly and intentionally engaged in one of these skirmishes, pushing against a barrier that officers attempting to adjust to provide additional space between the rioters and the Capitol.   *See* ECF 94 ¶ 10; PSR ¶ 25; Exhibits 2, 3 and 4; Image 9, 10, and 11.

In this area, Mostofsky saw rioters yelling at and confronting officers. He saw officers using chemical irritants on the rioters and saw rioters physically assault officers.   *See* Exhibits 2, 3 and 4. Amidst this chaos and just prior to his engagement with officers, Mostofsky cheered rioters efforts, fist bumping another rioter, steps back from the police line. *See* Image 9.



*Image 9 – Mostofsky fist bumps another rioter*

Within seconds of his fist bump, officers attempted to move a barrier, a bike rack, to provide additional space between the rioters and the Capitol, and limit the crowd's access to the Capitol.  *See* ECF 94 ¶ 10; PSR ¶ 25.   Mostofsky saw the officer's actions (Image 10) and as officers announced their actions by shouting over the crowd, "Move back, move back," Mostofsky joined other rioters to impede the officers.  *See* Exhibit 3.   Mostofsky's decision to obstruct officers is especially aggravating given the number of rioters overwhelming the officers in the West Plaza area. *See* Images 3 and 10.



Image 10-Mostofsky watching officers attempt to adjust barrier

In joining the crowd to impede officers' attempts to secure the area, Mostofsky raised his cloak to cover his face and shield himself from chemical irritants as he moved toward other rioters engaging the officers.   *See* Image 11.



Image 11—Mostofsky shielding face as moves towards rioters opposing officers

The rioters that Mostofsky joined were grabbing the barrier and pushing their bodies against the barrier as officers pushed from the other side.   *See* Exhibits 2, 3 and 4.   Mostofsky lent his strength and weight to the rioters efforts by also pushing against the barrier.   As noted in body-worn-camera images below, Mostofsky initially pushed at the barrier from behind other rioters and only his cloak used to cover is visible. See Image 12.



Image 12

As Mostofsky and other rioters exerted force against the barrier, the barrier was lifted and jostled by the pressure from both officers and rioters.   In this encounter, Mostofsky exerted significant force and was eventually propelled against the barrier.   *See* Exhibit 3 and Images 13 and 14.

 

<div style="display:flex;justify-content:space-between;">
Image 13

Image 14
</div>

In forcibly pushing against a barrier that officers tried to move, Mostofsky used both his strength and his body weight to prevent officers' attempts to establish a perimeter of bike racks. *See* Exhibit 4 and Images 15, 16, and 17.   It was those protracted, forceful actions that most directly impeded the police officers' lawful actions in response to a civil disorder, because it prevented from keeping the mob out of the Capitol Building .



Image 15



Image 16



Image 17

After pushing against officers who attempted to secure the area, Mostofsky headed towards the

northwest scaffolding.   *See* Image 18.



Image 18

### *Mostofsky Ascends the Scaffolding*

Undeterred after engaging officers in the West Plaza, Mostofsky climbed the northwest scaffolding to access the Capitol. *See* ECF 94 ¶ 11; PSR ¶ 26; The scaffolding was located at the western face of the Capitol building. *See* Images 2 and 19.



Image 19

In this area, other rioters had pressed past police attempting to hold the line at the top of the northwest stairway. At approximately 2:09 p.m., Mostofsky as part of a large group, climbed the two flights of exterior stairs to the Capitol's Upper West Terrace area. *See* Image 20.



Image 20

At approximately 2:12 p.m., Mostofsky scurried across the Upper West Terrace.   In the Upper West Terrace Mostofsky grabbed a U.S. Capitol Police bullet-proof vest—apparently taking it from a large case nearby, where such vests were stored---and dragged the vest with him as he joined other rioters at the Senate Wing Door.   *See* Image 21 and 22.



Image 21



Image 22

**Breach of the U.S. Capitol**

At 2:13 p.m., rioters broke windows adjacent to the Senate Wing door to the Capitol, entered

through those windows, and broke open the Senate Wing door from the inside, all while Mostofsky

stood nearby, watching and donning the bullet-proof vest he had just taken.   See Exhibit 5.   Within

seconds, Mostofsky entered the Capitol; he was the twelfth person overall to enter through this door.

*See* Exhibits 5 and 6 and Image 23.



Image 23

Moments after his illegal entry into the Capitol, Mostofsky picked up a Capitol Police riot shield. *See* Image 24.   The riot shield had been left by a fellow rioter who swapped it out for a fire extinguisher.   In the image below, Mostofsky is wearing the stolen Capitol Police vest and carrying the shield. *Id.*


Image 24

In this first wave of rioters to enter the Capitol, Mostofsky followed the crowd that pursued Officer Eugene Goodman up a staircase towards the entrance to U.S. Senate chambers.   *See* ECF 94 ¶ 13; PSR ¶ 28 Image 25.



Image 25

Within feet of the Senate Chamber's entrance, Mostofsky flaunted his stolen police vest and riot shield, posing for pictures and submitting to an interview by a *New York Post* reporter.  *See* Images 26 and 27.



Image 26



Image 27

At approximately 2:36 p.m., Mostofsky left the Capitol taking both the police vest and riot shield with him.   *See* Image 25.   He had been inside the Capitol for about twenty minutes.



Image 25

Shortly after Mostofsky left the building, at approximately 2:37 p.m., a Capitol Police officer stripped him of the Capitol Police riot shield. *See* ECF 94 ¶ 15; PSR ¶ 30: Image 23.



Wednesday, January 06, 2021 2:36:56 PM

Image 22

Mostofsky ran from the area.   He returned the police vest on January 12, 2021 through his attorney after charges were initiated.

### *Defendant's Statements*

While inside the U.S. Capitol, Mostofsky voluntarily agreed to an interview by a *New York Post* reporter.   During this interview, Mostofsky was photographed holding the stolen Capitol Police riot shield and wearing the stolen bullet-proof vest over his costume.   *See* Image 24.   Mostofsky stated that he believed the "the election was stolen."   When asked about the riot shield, Mostofsky claimed to have found it on the floor and that lawmakers "shouldn't be afraid; they should get the courage to do their duty to examine the fraud and maybe delay the election." See Exhibit 8.

After January 6, law enforcement officials obtained search warrants for Mostofsky's mobile device and his Facebook and Instagram accounts. The recovered material revealed that Mostofsky claimed to have shut down his social media accounts because he was being harassed; however, he continued to communicate about January 6th events directly with acquaintances via WhatsApp.   On January 8, 2022, Mostofsky described the Capitol on January 6th in a WhatsApp voice note, stating

"things were getting thrown left and right, I was pepper sprayed, tear gassed, flash banged." Serial 62 pg. 37.   In that same January 8th conversation, Mostofsky described his theft of police protective gear as a video game where "I was looking for as much protection, you know when you're playing a video game, and you find this thing ... and you're like I was trying to collect these things that could protect me." *Id.*

In an earlier WhatsApp voice note on January 7, 2021, Mostofsky admitted he had no intention of returning the bullet-proof vest stating he "want[ed] to keep it as a heirloom to my great great great great grandkids as the day when America died." *Id.* pg. 31-2.   In this January 7th conversation Mostofsky explained published photos of him and others in the Ohio Corridor were peacefully talking with cops, "like hey where's the senators, you know, he was like I have no idea. I was just sitting down.   I'm bored.   This is boring..." *Id.*

In a Signal chat communication on January 10, 20021, Mostofsky admitted to trespassing, but claimed his "brother is connected to conservative party and my father's a Judge; so, unlike other situations..[t]hey have nothing on me."     In explaining published photographs of himself inside the Capitol (Image 23), In his communications, Mostofsky exhibited no remorse for his participation in the events of January 6.

## III.   THE CHARGES AND PLEA AGREEMENT

On November 10, 2021 a federal grand jury returned a second superseding indictment charging Mostofsky with Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Obstruction of an Official Proceeding and Aiding and Abetting in violation of 18 U.S.C. § 1512(c)(2) and (2), Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Theft of Government Property in violation of 18 U.S.C. § 641, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a

Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On February 2, 2022, Mostofsky pled guilty to Count One, Civil Disorder in violation of 18 U.S.C. § 231(a)(3), Count Four, Theft of Government Property in violation of 18 U.S.C. § 641, and Count Five, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1).

## IV.    STATUTORY PENALTIES

Mostofsky now faces sentencing on a felony charge of Civil Disorder in violation of 18 U.S.C. § 231(a)(3), and on two misdemeanor charges of Theft of Government Property in violation of 18 U.S.C. § 641 and Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1).

As noted by the plea agreement and the U.S. Probation Office, Mostofsky faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Civil Disorder.

As noted by the plea agreement and the U.S. Probation Office, Mostofsky faces up to 12 months imprisonment, a fine up to $100,000, and a term of supervised release of not more than one year for Count Four, Theft of Government Property and for Count Five, Entering or Remaining in any Restricted Building or Grounds.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based

on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The PSR includes an error in grouping and does not include a Guidelines analysis for Count Five—to which the defendant pleaded guilty. *See* PSR ¶¶ 35-62. Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The PSR does not follow these steps. It concludes (*see* PSR ¶ 41) that Counts Four and Five group—a conclusion with which the government does not agree.

Under U.S.S.G. § 3D1.2,   counts of conviction become part of the same "group"--

   (a) When counts involve the same victim and the same act or transaction.

   (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

   (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

   (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

   Specifically excluded from the operation of this subsection are: §§....2B3.

Application Note 2 to U.S.S.G. § 3D1.2 states in part:

30

2.    The term "victim" is not intended to include indirect or secondary victims.  Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim.  For offenses in which there are no identifiable victims (u.e., drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed.

The government submits the victims who were directly and most seriously affected by the offense—whom the Guidelines directs the sentencing court to focus on, *see* U.S.S.G. § 3D1.2, cmt. n.2—for Counts One,  Four, and Five are different. The victims in Count One were the police officers whose lawful activities to quell a civil disorder were impeded by Mostofsky.   The victim in Count Four was the U.S. Capitol Police Department, the entity who owned the items Mostofsky stole.   *See* PSR ¶¶ 26, 28. Finally, the victim in Count Five was Congress, the entity whose business was impeded by Mostofsky's unlawful trespass in the Capitol Building on January 6.

The PSR's conclusion that "Counts 4 and 5 are grouped together because the counts involve the same victim (the government) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. USSG §3D1.2(b)," PSR ¶ 41, is incorrect.   That conclusion treats Counts Four and Five at too high a level of generality and ignores the fact that Congress and the United States Capitol Police Department are wholly different official entities. *See United States v. Safavian*, 461 F. Supp. 2d 76, 84–85 (D.D.C. 2006) (defendant was convicted of making false statements to (a) GSA-OIG; (b) GSA ethics office, and (3) a Senate Committee; those counts did not group because they had "distinct, separate victims"), *vacated on other grounds*, 528 F.3d 957 (D.C. Cir. 2008); *see generally United States v. Kim*, 896 F.2d 678, 687 (2nd Cir. 990) ("the interests protected by the

immigration laws and the currency laws are so distinct that it is not realistic to consider both offenses to have as a common 'victim' the United States.").

Because the victims of each count were different, the counts do not group under either § 3D1.2(a) or (b). Because none of the counts "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts," none of the counts group under 3D1.2(c). Finally, because the offense level for none of the counts "is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm," and "the offense behavior" was not "ongoing or continuous in nature and the offense guideline is written to cover such behavior," none of the counts group under § 3D1.2(d). Consequently, none of the three counts group with any other group, and there are three separate groups. *See* U.S.S.G. § 3D1.2. The PSR is therefore incorrect when it states that Counts Two and Three group.

The Guidelines analysis for each group is as follows:

Count One: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. §§ 2X5.1 and 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Physical Contact | +3 |
|  | **Total** | **13** |

Count Four: 18 U.S.C. § 641

|  |  |  |
|---|---|---|
| U.S.S.G. §§ 2B1.1 | Base Offense Level | 6 |
|  | **Total** | **6** |

Count Four: 18 U.S.C. § 1752(a)(1)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 6 |
|  | **Total** | **6** |

Under U.S.S.G. § 3D1.4(a) and (b), Count One is assigned one unit and Counts Four and Five are each assigned a half-unit, yielding a total of two units. Under U.S.S.G. § 3D1.4 to determine the combined offense level, two levels are added to the "group" (Count One) with the highest adjusted offense level (of 13). Therefore, the Combined Offense Level is 15.

| | |
|---|---:|
| **Combined Offense Level** | **15** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | <u>-2</u> |
| **Total Adjusted Offense Level:** | **13** |

Notably, the parties stipulated to that Guidelines calculation in their plea agreement. *See* Plea Agreement at ¶¶ 4(A). "As long as the plea agreement is lawful, a defendant should be bound by its terms." *United States v. Libretti*, 38 F.3d 523, 529 (10th Cir. 1994). Should either party object to the Court's acceptance of a stipulation, the Court should disregard it, *United States v. Cianci*, 154 F.3d 106, 109–10 (3d Cir. 1998), if not regard as a breach, *see United States v. Yusuf*, 993 F.3d 167, 178 (3d Cir. 2021) (defendant breached the plea agreement when his attorney "explicitly argued for a sentence below the guidelines range in breach of his plea agreement").

The PSR concluded, ¶¶ 63-69, and the government does not dispute, that Mostofsky's Criminal History Category is I. Based on a combined offense level of 13 and a criminal history category of I, Mostofsky's sentencing guidelines range is 12 to 18 months' imprisonment. See U.S.S.G., Chapt. 5, Part A (Sentencing Table).

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the Guidelines, the Court must consider the sentencing factors in 18 U.S.C. § 3553(a), which include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence at the midpoint of the Guidelines range.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As Mostofsky approached the Capitol building, he helped other rioters break through barriers erected by the Capitol Police, and added his weight and force to a group pushing against the vastly outnumbered police officers who were vainly attempting to prevent the mob from breaching their lines.

In assessing Mostofsky's individual conduct, this Court should consider a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, police; and (9)

whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Here, Mostofsky was in the twelfth person who breached the Senate Wing Door.   That is, Mostofsky watched other rioters violently break open windows and kick open doors to the Capitol, and took advantage of that property destruction to enter the building.   An hour earlier, Mostofsky was amongst the first to breach Peace Circle.   Within that hour on restricted grounds, he impeded the overwhelmed officers in the West Plaza and he stole protective equipment.   Mostofsky knew that he and the mob with him had gained access to the Capitol at that location by unlawful and violent force.   Mostofsky cheered on other rioters as they clashed with police outside the Capitol building, even celebrating with a fist-bump to one of his fellow rioters.

Mostofsky's statements to a New York Post television interviewer were also extremely aggravating.   Although Mostofsky is entitled to express his political views, his statements to the interviewer while the Capitol was under attack illustrate his belief that his views justified his crimes.   By broadcasting those views to a large audience, he encouraged others to follow suit. That was akin to shouting fire in a crowded movie theater, speech which enjoys no First Amendment protection.

By joining a riotous push against the police lines guarding the Capitol, Mostofsky not only ignored police commands, he physically defied them.

Finally, Mostofsky's statements after January 6 showed not only an utter lack of remorse for his crimes, but rather a brazen celebration of them, exulting in his theft of a police vest he planned to show his grandchildren when he recounted with pride, decades in the future, his

participation in the riot.   Although Mostofsky ultimately pleaded guilty to several of the charges against him, the sincerity of his remorse should be viewed in light of the damning video evidence of his crimes.

Mostofsky's theft of protective gear intended for Capitol Police during the deadly attack at the U.S. Capitol was an especially serious crime.   Mostofsky's theft involved a conscious disregard for the safety of police officers whom Mostofsky saw overwhelmed and overrun at the Peace Circle, and physically attacked in the West Plaza.   Mostofsky not only took the property but put on the vest and brandished the shield while posing for pictures inside the Capitol.   In using this stolen protective gear, Mostofsky did more than protect himself and leave officers vulnerable; he chided police by parading through the Capitol and posing for pictures with his 'trophies.'

Mostofsky's actions on January 6 show an absolute disregard for the rule of law and coupled with a willingness to mock officers during this violent attack, warrant the incarceration sentence requested.

**B.       The History and Characteristics of the Defendant**

Mostofsky is a college graduate.   He has no prior criminal history.   And his decision to break the law on January 6 was not a single decision but a series of decisions by an educated person to choose to violate the law.   The defendant's criminal activity began at approximately 1 p.m. when he entered into the restricted area around the Capitol near Peace Circle, continued through an assault or obstruction of officers at approximately 1:34 p.m., continued through his illegal entry into the Capitol at 2:13 p.m., and continued well past his exiting the building at 2:37 p.m.   His theft of government property continued until January 12, 2002 when after charges were initiated, he returned the stolen Capitol Police bullet-proof vest. In comparison to persons without the

defendant's education or economic support, who commit crimes out of economic need, defendant's lack of criminal history and decision to break the law repeatedly because of a perceived political wrong is not persuasive.

Mostofsky's decision to break the law on January 6 was not a single decision but a series of decisions by an educated person to choose to violate the law.   In comparison to persons without Mostofsky' education or economic support, who commit crimes out of economic need, defendant's lack of criminal history and decision to break the law repeatedly because of a perceived political wrong is not persuasive.

On April 28, 2022, the day before this sentencing memorandum was due, Mostofsky submitted to this Court a psychological evaluation of Mostofsky.  Although the government's attorneys have reviewed that report, the government has not had the opportunity to have the report reviewed by a mental health expert before filing this memorandum.   The government is not seeking a continuance of the sentencing hearing but may request permission to file a short supplemental submission regarding the evaluation before the sentencing hearing.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense,

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

this factor supports a sentence of incarceration. Mostofsky's criminal conduct, assaulting a police officer and corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Mostofsky entered the Capitol grounds, the Capitol itself, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the requested incarceration sentence.    Mostofsky has expressed little remorse for his criminal conduct on January 6.  In fact, the only indication that Mostofsky is remorseful for his January 6th criminal conduct is in a two-sentence statement he made to the PSR drafter.   In that statement Mostofsky claims, "he should not have engaged with a law enforcement

officer at a barricade in the restricted area and should not have taken the police vest and shield."
PSR ¶34.   Mostofsky also "indicated he feels remorse for what he has done and vows that the
conduct will never be repeated." *Id.*

Mostofsky does not apologize to the several officers he obstructed.   He does not address
how his use of protective equipment during this violent riot left officers vulnerable.   Mostofsky
does not address his decision to be among the first to enter the Capitol, even after seeing the
violence with which was used to enter building.   And Mostofsky does not address his decision to
parade within the capitol with stolen police equipment to further chide officers.

A better gauge of Mostofsky remorse or lack thereof are his communications in the days
immediately following January 6th. In those communications, Mostofsky showed no remorse.
Instead, Mostofsky claimed he planned to keep the stolen police vest as an heirloom for his
grandchildren.   Mostofsky claimed overconfidence as opposed to shame, when he claimed
because of his family connections, "They have nothing on me."   Mostofsky's comments about
taking police gear "like it was a video game" or being "bored" while inside the Capitol, show
smugness not contrition.   Mostofsky's serious crimes and lack of remorse compel a sentence
sufficient to provide specific deterrence from committing future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens
of thousands of sentences and worked with the help of many others in the law enforcement
community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United
States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and
adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 231 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, no Capitol riot defendants have been sentenced to a Civil Disorder violation of 18 U.S.C. §  231.   And here, Mostofsky faces a sentence for a Civil Disorder offense, and two misdemeanor violations of theft and illegal entry into a restricted building. Particularly given the absence of strongly comparable cases involving other January 6 defendants, a sentence within the Guidelines range would not create an unwarranted disparity under 18 U.S.C. § 3553(a)(6).   *See United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) (defendant's Guidelines range sentence of 40 years' incarceration did not create an unwarranted disparity; the D.C. Circuit "applies the presumption" that a court "may presume that a Guidelines-compliant sentence is reasonable"); *see also United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) ("the district court adequately considered the need to avoid unwarranted disparities and did not abuse its discretion" when it denied a downward variance from the applicable Guidelines range; other defendants who received downward variance in other cases were not "similarly situated" with defendant).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Accordingly, the recommendation here does not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mostofsky must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Mostofsky played in the riot on January 6.[9] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Mostofsky's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 137.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 15 months, which is a mid-range sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000 and the mandatory $100 special assessment for the felony count of conviction and $25 special assessment for each misdemeanor count of conviction.

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      */s/Gracie Lindberg*
Graciela R. Lindberg
TX Bar No. 00797963
Assistant United States Attorney
11204 McPherson Road, Suite 100A
Laredo, Texas 28045
Office: 956-721-4960
graciela.lindberg@usdoj.gov

/s/ Michael Romano
Michael J. Romano
Trial Attorney
Detailed to the U.S. Attorney's Office
for the District of Columbia
IL Bar No. 6293658
601 D Street, N.W.
Washington, D.C. 20004
Office: 202-307-6691
michael.romano@usdoj.gov

45