**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 21-cr-138-JEB |
|  | ) |
|  | ) |
| AARON MOSTOFSKY, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**SENTENCING MEMORANDUM OF AARON MOSTOFSKY**

Nicholas D. Smith
David B. Smith
David B Smith PLLC
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Aaron Mostofsky*

# <u>TABLE OF CONTENTS</u>

Introduction .................................................................................................. 1

Factual background ........................................................................................ 2

    A.    Mostofsky's background, family, and character ........................... 2

    B.    The charges, plea agreement, and presentence investigation report ........... 9

    C.    Factual inaccuracies in the government's sentencing submission ........... 11

Argument ...................................................................................................... 14

    I.    Sentencing procedure .................................................................. 14

    II.    The § 3553(a) factors favor a significant downward variance ........... 14

        A.    The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)) ........... 14

            1.    USSG §3D1 policy ................................................. 15

            2.    Unlike in this case, the civil disorder charge is virtually always used to criminalize acts of violence ........... 16

            3.    The matters submitted under seal with the Court ........... 18

            4.    First-time offender status and atypical conduct ........... 18

            5.    Mostofsky's good deeds ........................................ 19

            6.    Mostofsky's community and family support ........... 20

            7.    Mostofsky's remorse ........................................... 20

        B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6)) ........... 21

        C.    The seriousness of the offense and deterrence (§ 3553(a)(2)) ........... 28

Conclusion .................................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**                                                                        **Page**

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................ 14, 19

*Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................ 14, 15, 19

*Spears v. United States*, 555 U.S. 261 (2009) ...................................................... 14

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) ........................................ 20

*United States v. Booker*, 543 U.S. 220 (2005) ................................................... 14, 19

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) ..................................... 16-17

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ............................................ 20

*United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008) ................................... 18

*United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) ........................................ 17

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) ...................................... 16-17

*United States v. Martin*, 2020 U.S. Dist. LEXIS 179542 (E.D.N.Y. Dec. 17, 2012) ...... 20

*United States v. Maynard*, 405 U.S. 156 (1972) ................................................... 29

*United States v. Munoz-Nava*, 524 F.3d 1142 (10th Cir. 2008) ............................ 18

*United States v. Polizzi*, 549 F. Supp. 2d 308 (E.D.N.Y. 2008) ............................ 29

*United States v. Ransom*, 756 F.3d 770 (D.C. Cir. 2014) ..................................... 19

*United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009) ...................................... 20

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ........................................ 19

*United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) .......................................... 19

*United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) ....................................... 17

**STATUTES**

18 U.S.C. § 3553 ................................................................................................. passim

18 U.S.C. § 231 .................................................................9, 17

18 U.S.C. § 641 .....................................................................9

18 U.S.C. § 1752 .........................................................9, 10, 22

**OTHER PROVISIONS**

U.S.S.G. §3D1 ..................................................................15-16

**Introduction**

Mostofsky traveled on January 6 from his Brooklyn apartment to Washington, D.C., to attend the former president's "Stop the Steal" rally on the Ellipse.  He wore his 2020 Purim costume, a fur pelt.  Mostofsky frequently dons costumes at events, as the letters submitted on his behalf attest.  To put the matter with understatement, the New Yorker is quirky even by the standards of his home city.  Unable to hear much at the noisy rally, he drifted with the crowd towards the Capitol, cutting a path with a hermit's gnarled walking stick to the front of an unruly cluster of protesters near police barriers standing in the West Plaza.  Even the ones not dressed in raccoon seemed inspired by the delusion that Congress could somehow reverse the outcome of a presidential election held over two months before that point.

As some police officers thrust the barriers forward to push back the crowd, Mostofsky lent his weight on the protester line pushing in the wrong direction.  Shortly thereafter, he entered the Capitol Building, where he remained for about 20 minutes, posing for a photographer.  In a visual-historical irony that no mind is capable of dreaming up and the defendant would not even recognize much less endorse, Mostofsky from Brooklyn was digitally captured, imperishably, cane in hand, under the oil portrait gaze of Charles Sumner.  He then exited the building wrapped in a police vest he had picked up off the ground.  Flustered, Mostofsky boarded a Brooklyn bound bus still wearing it, his sole post-neolithic article of clothing.  (Mostofsky's counsel later returned the vest undamaged to agents of the Federal Bureau of Investigation.  The fur pelt was seized.)

Mostofsky broke the law by interfering with police during a riot, entering the Capitol Building, and taking the police vest.  For his foolish conduct, he is sincerely remorseful.  Having been raised to be grateful for what the country has made possible for his family, Mostofsky is

1

ashamed by the disgraceful scene at the Capitol that day.  On January 6, he was a Zelig in over his head.  That is why, although he has little money, he agreed to make a $2,000 restitution payment to defray the repair costs for damage of which he was not the proximate cause.

But the other side of the ledger is not without significant considerations.  A penalty falling within the Guidelines sentencing range in Mostofsky's plea agreement would be "greater than necessary," 18 U.S.C. § 3553(a), along a number of dimensions.  A Guidelines sentence would also create unwarranted sentence disparities between other January 6 defendants, including those sentenced by this Court, and Mostofsky. That the top end of the initial Guidelines range sought by the government was four times higher than the still excessive sentence it now requests should give the Court some pause.  Aside from Mostofsky's interaction with an officer at the barrier, which lasted no more than a few seconds and resulted in no injury or property damage, and the returned police vest, nothing distinguishes his conduct from that of dozens of January 6 misdemeanants who received probationary sentences.  Indeed, his conduct was a good deal less serious than that of some misdemeanants.  The charges here themselves— and the intense media focus on them and attendant toxic publicity—have brought profound and lasting shame on Mostofsky and his family.  A felony conviction will hobble his career prospects throughout the 35-year-old's life.  In that context, a sentence of significant home confinement, probation, and a plan of extensive community service, would strike the right balance between deterrence and rehabilitation.

**Factual background**

### A.    Mostofsky's background, family, employment history, and character

Thirty-five years old, Mostofsky was born in 1986 in Brooklyn, New York to an Orthodox Jewish family.  When he was 14 months old, his mother died of an aneurysm.  Family

2

members attribute some of his eccentricity to this tragedy.  Letters in Support of Mostofsky, Exh. 1, p. 16.

In 2003 Mostofsky graduated from a Yeshiva high school in Brooklyn.  He went on to matriculate at Brooklyn College from which he transferred to the Bernard & Anne Spitzer School of Architecture where, in 2012, he completed a Bachelor of Science in Architecture.  For about seven years thereafter he held an assistant architect and draftsman position in New York. Beginning in April 2020, however, the pandemic meant declining work for Mostofsky, who began performing odd jobs in the architecture field, such as producing drawings of building facades and stairs.



Notwithstanding those problems, or perhaps because of them, Mostofsky's friends, family and colleagues all describe a person who is shy, impractical, and harmless, but generous, thoughtful, and not self-centered.  In nonmedical Yiddish, this type of character is summarized as a *luftmensch*, a man whose head is in the clouds. Those who have observed him from childhood know Mostofsky as "a kind and gentle soul," Exh. 1, p. 1, "sensitive and empathetic," *id.* at 2, "loyal", *id.* at 8, "sweet and timid," *id.* at 4, "super thoughtful," *id.* at 10, "happy-go-lucky, *id.* at 13, "considerate," *id.* at 15, and "quirky." *Id.* at 17.

A theme that runs through all the letters submitted on his behalf is Mostofsky's generosity with his time in helping friends, family and strangers when they are in need.  For example, Esther Deutsch, a friend, met Mostofsky through a project they founded together called "Cookies for Kindness," an initiative to deliver care packages and home-baked cookies to city workers, first responders and homeless shelters in New York City.  Exh. 1, p. 9.  Mostofsky baked the cookies.  *Id.*

Shea Rubenstein runs the Jewish Community Council of Marine Park (JCCMP), an organization that serves the communal needs of the local area and beyond. Exh. 1, p. 27. In her words, Mostofsky "has been very active in assisting the activities of [the JCCMP]; particularly over the past four years with regard [to] the distribution of food and provisions to those people who require such assistance within the locality." *Id.*

Another friend, Sarah Friedson, recalls the time her 100-year-old grandfather passed away. Friedson had recently started keeping kosher, which "made the already stressful task of assembling meals for [her] family even more challenging." Exh. 1, p. 26. Mostofsky had catered food delivered to Friedson's house, so her family "could breathe a sigh of relief for a couple of days." *Id.* She was "moved to tears by his thoughtfulness." *Id.*

Similarly, Shlomo Shasha, another friend of Mostofsky's, recalls the time Shasha's father was sitting shiva for his mother. Completely distraught, the father had little energy left. Mostofsky went grocery shopping for the family and assisted in every way needed. Exh. 1, p. 28.

Betsalel Touitou arrived in the US as a student and did not know anyone. Exh. 1, p. 8. Mostofsky "was one of the first [people] that gave [him] a feeling of being at home." Touitou's grandmother passed away and a *minyan* of ten Jewish men was needed to recite the mourner's kaddish. Mostofsky "insisted on being part of that quorum morning, afternoon and night. [He] showed up every day and also helped to set up the services." *Id.*

A chorus of rabbis is in accord. Rabbi Nachum Meltzer notes that Mostofsky has been a member of his weekly Bible group for the past 10 years. Exh. 1, p. 23. Mostofsky has "always been a positive influence on the entire group." He "takes it upon himself to cheer people up when they are going through hard times by making their problems his problems." Many times,

5

Mostofsky has "offered his professional services as an architect pro bono to the members of [the] group, in one case saving one of [the Rabbi's] students thousands of dollars." *Id.*

Rabbi Moshe Faskowitz "has been the rabbi of the Mostofsky family for almost 40 years." Here is how he describes Mostofsky's character: "Aaron has devoted much of his time to soothing the hearts of those that are lonely and inspiring those that are down and need encouragement.  He rarely turns down any request for assistance by me or any of the synagogue administrators.  He has participated in Meals on Wheels activity for senior citizens.  He has led the youth group division in our children's program.  He was entrusted by our parent body to care for our precious young ones and demonstrated an uncanny ability to bring out the best in them all." Exh. 1, p. 22.

Rabbi Dovid Cynamon, a rabbi in the Flatbush community, is a "close mentor" of Mostofsky's.  Exh. 1, p. 20.  He explains that "when the holidays draw near, Aaron cleans cars for others, babysits children, and donates money to those in need.  I receive calls constantly from Aaron inquiring about my welfare and the welfare of others.  When he is not found in the synagogue praying and studying, Aaron can [] be found assisting another." *Id.*

Yoni Berger relates an episode not involving the highest spiritual stakes, perhaps, but which still reflects Mostofsky's generous spirit in its details.  Yoni lost his brother's beloved cat. Exh. 1, p. 32.  He couldn't find the creature anywhere after a long, futile search.  So, he asked for Mostofsky's help.  Though he was in the middle of pressing work, Mostofsky came straight to Yoni.  For the next eight hours Mostofsky launched an investigation into the fugitive feline.  He "interview[ed] everyone entering or leaving that block." He printed out lost cat signs and placed them on "every post in the area." The next day, Yoni got a phone call tip.  A person of interest whom Mostofsky had interrogated the day before alerted Yoni that the fugitive was spotted

hiding in another person's backyard.  Shortly thereafter, the pet was recovered.  On another occasion, Mostofsky "assisted [Yoni] for over 15 hours of real labor" in building a *sukkah* from scratch.  *Id.*

Another through-line in the letters submitted to the Court is Mostofsky's kindness to children and their adoration of him.  Though he is not married and has no children of his own, Mostofsky is a kind of surrogate father to many.  Mostofsky is "a family favorite, [who] willingly babysit[s] and play[s] with and read[s] to his younger nieces and nephews. . ." Exh. 1, p. 4.  Mostofsky is the "best friend" of D.M., his three-year-old nephew.  *Id.* at 6.  Any time D.M.'s father and mother have an emergency and need help, Mostofsky "has dropped everything, run over to our house, and helped." The night before D.M.'s second birthday, Mostofsky "stayed up all night helping [D.M.'s father] build a kitchen so we could surprise him. My boys adore [Mostofsky]. He spends hours with them on weekends. . .When they know uncle Aaron is coming, their faces light up with joy.  He will spend an entire afternoon building train tracks or reading to [the children.]" Exh. 1, p. 7.  D.M.'s father cannot "imagine having to explain to [his children] why they can't see uncle Aaron." *Id.*

Mostofsky's older sister, Illana, has two children.  When the children were infants, Mostofsky "would lovingly feed them bottles and change their diapers.  As they became toddlers, Aaron played games with them or read them books for hours." Exh. 1, p. 10.  Later on, the children wanted to start playing basketball.  Mostofsky constructed a basketball hoop for them.  And whenever "there is a heavy snowstorm, Aaron immediately reaches out to [Illana] to inquire if [she] could use his assistance in shoveling snow in front of [her] home. The bitter cold temperatures never stop Aaron from being incredibly generous.  In fact, I can't think of anything that stands in the way of Aaron's generosity." *Id.*

Another family member echoes Illana's sentiments: "To watch Aaron with his nephews . . . is to marvel at his kindness and generally peaceful and loving spirit.  Children are often the best indicators of who a person really is and see through the facades . . ." Exh. 1, p. 13.  He notes that while Mostofsky is not married himself, "his absence would have a profound effect on those who rely on his love and care right now.  Those people include his elderly grandmother. . . who is currently suffering the beginning stages of dementia.  Hearing of his incarceration . . .would have a devastating effect on her.  [Mostofsky's] nephews would miss his daily interactions, care, and love.  His aunts and uncles, brothers and sister, parents and grandparents would be greatly diminished without him." *Id.*

Neil Fink, another family member, explains that Mostofsky has "formed a close bond with [Fink's] children.  He [takes] them to the park, ball games and to other nice trips. . . My children adore him, and haven't been able to sleep well these last few months and keep asking 'what will happen to Aaron?'"  Exh. 1, p. 15.  "When members of our extended family or close friends were sick in the hospital, it was Aaron who rushed to be at their side.  When a family in the neighborhood suffered from a devastating financial loss, it was Aaron who took up collections for them." *Id.*

Nachman, Mostofsky's older brother, adds, "My children love their uncle tremendously.  Especially with my younger ones, the question before every Jewish holiday is, when is Uncle Aaron coming for meals.  It is the highlight of the holiday when he comes." Exh. 1, p. 17.  And "it's not only the family and friends that [Mostofsky's] always there to help. It's random strangers in the community as well.  He joins me every year in packing hundreds upon hundreds of boxes of food to be delivered to families in need for the Passover holiday, a holiday that [can be] extremely expensive, especially with a larger family." *Id.*

8

The Aleph Institute is a charitable organization founded in 1981 by the Lubavitcher Rebbe to provide assistance and rehabilitation to prisoners.  Aleph will be submitting a letter on behalf of Mostofsky.[1] The organization has met with Mostofsky at counsel's request to get a better understanding of his character and his remorse and to offer insight into possible alternative sentences for him.  Aleph's sentencing philosophy may be summarized as, "prison [is] for those we are afraid of, not those whom we are mad at based on their behavior." In the organization's experience, lengthy periods of incarceration inhibit people from fulfilling their potential and devastate the family and community left behind, breeding bitterness, anger, insensitivity, and eventual recidivism.

After reviewing Mostofsky's social history, family life, lack of criminal history, and his medical history, Aleph concludes that he is a strong candidate for alternative sentencing.  It notes that he began volunteering at the JCCMP in 2018.  Since March 2022, Mostofsky has volunteered approximately 10 hours per week preparing for upcoming JCCMP events and filing office paperwork.  He will also be volunteering in JCCMP's food pantry, stocking shelves, taking inventory and organizing distribution.

### B.      The charges, plea agreement, and presentence investigation report

Pursuant to a plea agreement, Mostofsky pled guilty on February 2, 2022 to Count One of the Second Superseding Indictment (18 U.S.C. § 231(a)(3)); Count Four (18 U.S.C. § 641); and Count Five (18 U.S.C. § 1752(a)(1)).  Count One is a felony and Counts Four and Five are misdemeanor offenses.

---

[1] Counsel believes that he will have Aleph's letter ready for submission on Monday, May 2.

Count One, the civil-disorder offense, rests on Mostofsky's brief interaction with a police officer at a barrier in the West Plaza of the Capitol Grounds. Statement of the Offense, ECF No. 94, p. 4. Specifically, he jointed a "group of rioters push[ing] against a police line that was attempting to adjust a barrier to provide additional space between the crowd of rioters and the Capitol Building, and limit the crowd's access to the Capitol." *Id.*

Count Four, theft of government property, rests on Mostofsky's theft of a U.S. Capitol Police vest and shield, collectively valued at less than $1,000. Statement of the Offense, ECF No. 94, p.7.

Count Five, unlawful entry into a restricted area, rests on Mostofsky's entry into the "restricted area" around the Capitol Grounds on January 6, so designated under § 1752. Statement of the Offense, ECF No. 94, p. 7.

The plea agreement provides a final Estimated Offense Level of 13, based on the calculations set forth therein. Plea Agreement, ECF No. 93, p. 3. Because Mostofsky has no criminal history and thus stands in Criminal History Category I, the agreement provides an estimated Guidelines range of 12-18 months' incarceration. *Id.* at 4.

On April 29, the Probation Office filed its final presentence investigation report (PSR). The Office disagreed with the plea agreement's grouping analysis. The agreement stated that Counts One, Four and Five constituted three distinct grouping units under U.S.S.G. §§3D1.2, 3D1.4. However, the Office determined that the victim of the theft in Count Four—the U.S. Capitol Police—was the same as the trespass victim in Count Five—Congress—as both are part

of the legislative branch.  PSR, p. 24.  Therefore, the Office calculated the final Estimated

Offense Level at 12.  That would yield a Guidelines range of 10-16 months' incarceration.[2]

Under the plea agreement, Mostofsky agreed to make a restitution payment to the

Architect of the Capitol in the amount of $2,000.  Plea Agreement, ECF No. 93, p. 8.  Had

Mostofsky gone to trial, the government would not have been able to secure this payment

through mandatory or even discretionary restitution even if the defendant had been convicted of

every count.  This payment is possible solely because the Court "may . . . order restitution in any

criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3).

### C.      Factual inaccuracies in the government's sentencing submission

On April 29, the government submitted a 45-page sentencing memorandum.  ECF No.

100.  Many of its pages, perhaps most of them, are quite similar to those submitted by the

government in other January 6 sentencings. *E.g.*, *United States v. William Merry*, 21-cr-748-JEB,

ECF No. 41 (D.D.C. 2021).  A good deal of the government's more incendiary language

concerning Mostofsky can be found replicated in other sentencing memoranda it has filed,

simply substituting in another defendant's name.  *E.g.*, *Merry*, 21-cr-748-JEB, ECF No. 41, p. 2

(Merry "*stormed* past multiple police lines") (emphasis added); *id.* (he "*penetrated* the U.S.

Capitol") (emphasis added); *id.* at 1 (Merry "participated" in an "*attack*") (emphasis added).

The government does draw from the parties' Statement of the Offense.  ECF No. 100, pp.

11-28.  Mostofsky stands by that document—as it is actually written.  ECF No. 94.  However,

some of the government's factual characterizations are not linked to stipulations in the Statement

of the Offense.

---

[2] Mostofsky will not brief this Guidelines dispute on the merits but he addresses similar themes below in connection with § 3553(a) and variances based on policy considerations.

Start at the beginning of the government's submission.  Mostofsky, represents the government, "participated" in an "attack" on January 6.  ECF No. 100, p. 1.  Its memorandum uses the word "attack" 27 times.  However, it is false to say Mostofsky "participated" in an "attack." One must always be on guard against distortion of meaning under the pressure of politics.  But that is particularly true in court (as opposed to in a newspaper column) and in respect of an incendiary word like "attack."  When the government asks the Court to enhance Mostofsky's punishment because he joined an *attack* on someone, one can only assume the government uses the term in its nonfigurative sense.  After all, it would be grossly inappropriate to argue for an enhanced punishment based on a figurative, nonphysical "attack"—such as a verbal outburst—without at least conveying to the Court that the secondary sense is what the government means by "the defendant attacked" someone.  In the literal sense, of course, to "attack" a person is to "try to hurt or defeat [him or her] using violence."[3]

Mostofsky's Statement of the Offense does not stipulate that he tried to hurt or defeat anyone using violence.  Nor does it stipulate that he aided and abetted such an attack.  It does not stipulate that he solicited an attack.  ECF No. 94.  He did not do those things.  The government's representation that Mostofsky "participated" in an "attack" is unsupported by any conventional legal basis.  It is an attempt to secure collective punishment, i.e., a call for Mostofsky to be punished on account of other defendants who did indeed attack people on January 6.  Of course, that runs contrary to the foundational principle that responsibility is individual.

Next, the government contends that Mostofsky entered the Capitol Building with the intent to "*disrupt the peaceful transfer of power*. . ." ECF No. 100, p. 2 (emphasis added).  Going

---

[3] *Attack*, Cambridge Online Dictionary, def. 1,
http://dictionary.cambridge.org/us/dictionary/english/attack.

further, the government insinuates by implication that Aaron Mostofsky himself is a "*danger to our democracy*," and "*incredibly dangerous*," and launched a "*disturbing attack on a free electoral system*," one with worldwide "diplomatic" ramifications for the fate of a form of government stretching back over two millennia.  ECF No. 100, p. 10 (emphasis added).

There is indeed in the government's language something dangerous and disturbing.  But it has little to do with Mostofsky.  While it may be fitting for a politician, columnist or historian to bring those sweeping concepts to bear in contemplating the event in its totality, it seems irresponsible to do so in seeking a criminal punishment for a particular person who is swallowed up by them, who is not some leading figure in the story.  It is what a periwigged Public Accuser would shout to a frothing assembly in Year One of the Republic.  Mostofsky accepts responsibility for the specific crimes to which he pled guilty—not for being Guy Fawkes.  He is a harmless Brooklynite who wears silly costumes.  The government's rhetoric itself is dangerous.

The government represents that Mostofsky "mock[ed] officers" during the "violent attack"; "assault[ed] police officers" as he "scurried"[4] into the Capitol; and "cheered" in response to others assaulting officers.  ECF No. 100, pp. 3, 36.  Those representations are false. In fact, as a part of the plea agreement, the government agreed to dismiss an assault charge. These allegations have no basis in the Statement of the Offense.   ECF No. 94.  That document does not state that Mostofsky assaulted officers or "cheered" as they were assaulted.  *Id.*  The government's memorandum displays an image of Mostofsky with his arm raised.  ECF No. 100, p. 14, Image 8.  It also displays a grainy image of Mostofsky which it characterizes as "Mostofsky fist bump[ing] another rioter." *Id.* at 15, Image 9.  These appear to be its sole pieces of evidence in support of the representations that Mostofsky "mock[ed] officers" and "cheered"

---

[4] Using verbs that liken Mostofsky to vermin is another piece of dubious rhetoric.

as they were assaulted.  There is no basis for inferring from those images that Mostofsky was

"cheering" on assaults or "mocking officers."  He was not.  Given the serious nature of those

allegations, the Court should ask the government to provide the factual basis for them or to

explain why it made the serious representations without one.

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular

case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*,

543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552

U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under

the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make

its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at

101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. §

3553(a) and § 3661.  As the Court knows, the most basic requirement of § 3553(a) is that the

"court shall impose a sentence sufficient, but not greater than necessary to comply with the

purposes of [§ 3553(a)]. . ." § 3553(a).

**II.     The § 3553(a) factors favor a significant downward variance**

**A.      The nature and circumstances of the offense and the history and
           characteristics of the defendant (§ 3553(a)(1))**

Seven considerations under § 3553(a)(1) warrant a significant downward variance in

Mostofsky's case: (1) policy considerations concerning the grouping of his convictions; (2) that,

unlike in this case, the civil disorder charge is virtually always used in connection with a

defendant's acts of violence; (3) the matters submitted under seal with the Court; (4) first-time

14

offender status and atypical conduct; (5) Mostofsky's good deeds; (6) his family and community support; and (7) his sincere remorse.

       1.        **U.S.S.G. §3D1 policy**

As noted above, the Probation Office grouped Count Four (theft of U.S. Capitol Police property) and Count Five (entering the Capitol Building, a restricted area) under U.S.S.G. §3D1.1, but the plea agreement provided that none of the counts of conviction may be grouped together for sentencing.  If the Probation Office is correct, Mostofsky's Guidelines range is 10-16 months' incarceration; if the plea agreement is correct, the range is 12-18 months' incarceration.

Should the Court follow the Probation Office's calculation, it can skip this section of Mostofsky's submission.  But if it concludes that the Probation Office erred, the Court should still vary downward to the 10-16 month range for policy reasons.  *Kimbrough*, 552 U.S. at 101.

The government contends that where victims are abstract government entities and not people, counts involving them may not be grouped for sentencing purposes to the extent the victim entities belong to different branches of the federal government.  PSR, p. 24.  It further contends that Count Four's victim was the U.S. Capitol Police (which owned the police vest) and Count Five's victim was Congress (whose members were protected by the restricted area Mostofsky entered).  *Id.*  It seems to argue that because the Capitol Police are not members of Congress, counts involving them should not be grouped together under U.S.S.G. §3D1.2(a) ("When counts involve the same victim and the same act or transaction.") or §3D1.2(b) ("When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.").  PSR, p. 24.  The government cites to *United States v. Safavian*, 461 F. Supp. 2d 76, 84–85 (D.D.C. 2006).

15

To the extent the Court concurs with the government's general grouping principle, it should decline to apply it here on the following policy ground: The Capitol Police and Congress do not belong to different branches of the federal government. The Capitol Police is not an Executive branch law enforcement agency. Just like Congress, it is part of the legislative branch of government and controlled by the Capitol Police Board, a congressional entity. *See* Capitol Police Board, https://www.uscp.gov/the-department/oversight/capitol-police-board. *See also* 5 U.S.C. §§ 101, 105 (USCP not an Executive department or agency).

In *Safavian*, the defendant made false representations to the GSA and, separately, to a congressional committee, at different times. 461 F. Supp. 2d at 84–85. The Court treated the GSA and Congress as distinct victims for grouping purposes. *Id.* But unlike the U.S. Capitol Police and Congress here, the GSA and Congress are not both a part of the legislative branch. GSA is an independent agency.

The government argues that such a policy distinction "treats Counts Four and Five at too high a level of generality and ignores the fact that Congress and the U.S. Capitol Police Department are wholly different official entities." ECF No. 100, p. 31. But, according to the government itself, the grouping criterion for entity victims is not "different official entities" but instead whether the victims belong to the same or "different *branches of the federal government.*" PSR, p. 24 (emphasis added). Because the U.S. Capitol Police and Congress are part of the same branch of government, the Court should vary downward to the 10-16 month Guidelines range, assuming it disagrees with the Probation Office's calculation.

## 2. Unlike in this case, the civil disorder charge is virtually always used to criminalize acts of violence

In his motion to dismiss Count One, Mostofsky showed that the seldom-used civil disorder offense has traditionally been applied not just to violent conduct, but to acts of

aggravated violence.  *See, e.g.*, *United States v. Wood*, 2021 U.S. Dist. LEXIS 134774, at *2 (D. Del. July 20, 2021) (defendant threw bricks at police); *United States v. Patton*, 2021 U.S. Dist. LEXIS 108479, at *2 (D. Utah June 8, 2021) (defendant set a police car on fire); *United States v. Featherston*, 461 F.2d 1119, 1122 (5th Cir. 1972) (defendants made explosives for the "coming revolution"); *United States v. Casper*, 541 F.2d 1275, 1277 (8th Cir. 1976) (defendants shot at law enforcement); *United States v. McArthur*, 419 F. Supp. 186, 192 (D.N.D. 1975) (same); *United States v. Jaramillo*, 380 F. Supp. 1375, 1377 (D. Neb. 1974) (same).  In response to his motion, the government did not cite a single case where § 231(a)(3) had been applied to nonviolent acts.  ECF No. 57.

Mostofsky also submitted a chart showing that—except for in his case—nearly every January 6 defendant charged under § 231(a)(3) had been accused of unquestionably violent conduct.  ECF No. 47-1.  Most of the January 6 civil-disorder defendants allegedly shoved, hit, tased, punched, or struck law enforcement officers.  *Id.*  Mostofsky did none of those things.  He "len[t] his weight and strength" to a group of people "push[ing] against a police line." Statement of the Offense, ECF No. 94, p. 4.

The Court rejected this argument in connection with Mostofsky's dismissal motion. Mem. Op. at 20.  However, it added that "[i]t may well be—and indeed appears to be thus far in the January 6 cases—that many of the prosecutions under the [civil disorder] statute will involve violent conduct." *Id.*

The Sentencing Commission set base offense levels with the "typical case[] in mind." *United States v. Butler*, 954 F.2d 114, 118 (2d Cir. 1992).  Because the very brief moment where Mostofsky pushed on the barricade did not involve the sort of violence that § 231(a)(3) is ordinarily used to prosecute, a significant downward variance is warranted.

17

### 3.    The matters submitted under seal with the Court

███████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

### 4.    First-time offender status and atypical conduct

The fact that Mostofsky is a first-time offender, and that the offense conduct is atypical

for him, is an appropriate basis for a downward variance.  *United States v. Huckins*, 529 F.3d

1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-

month range to below the calculated Guidelines range was reasonable and permissibly took into

account the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142,

1143 (10th Cir. 2008) (downward variance to one year imprisonment and one year home

confinement from recommended Guidelines range of 65-78 months imprisonment supported by

district court's finding of several factors including that defendant had no felony criminal record

and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Mostofsky's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis.  *See United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

**5.      Mostofsky's good deeds**

After *Booker-Gall-Kimbrough*, the case law is clear that good works, both exceptional and otherwise, whether performed pre-indictment or post-indictment, are a valid basis for a downward variance.  *See Tomko*, 562 F.3d at 560 (3d Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008).

As outlined above, the letters submitted on Mostofsky's behalf show, in the words of Rabbi Moshe Faskowitz, that "Aaron has devoted much of his time to soothing the hearts of those that are lonely and inspiring those that are down and need encouragement." Exh. 1, p. 22. Both pre-indictment and post-indictment, Mostofsky "has been very active in [community service]; particularly over the past four years with regard [to] the distribution of food and provisions to those people who require such assistance within the locality." *Id.* at 27.   This history of good deeds warrants a downward variance.

### 6. Mostofsky's community and family support

The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance. *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

As shown above, the letters submitted on Mostofsky's behalf demonstrate that he has the unequivocal emotional and financial support of a tightknit family. One family member explains that Mostofsky's "absence would have a profound effect on those who rely on his love and care right now. Those people include his elderly grandmother. . . who is currently suffering the beginning stages of dementia. Hearing of his incarceration . . .would have a devastating effect on her. [Mostofsky's] nephews would miss his daily interactions, care, and love. His aunts and uncles, brothers and sister, parents and grandparents would be greatly diminished without him." Exh. 1, p. 13. These are weighty reasons for a downward variance.

### 7. Mostofsky's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Mostofsky is truly remorseful for his criminal misbehavior on January 6. PSR, p. 11. He "vows that the conduct will never be repeated." *Id.* The government's sentencing submission belittles Mostofsky's expressions of remorse. ECF No. 100, p. 39. His "two-sentence statement," the government argues, is not enough sentences. *Id.* Mostofsky does not "apologize

to the several officers he obstructed." *Id.*  The government omits that Mostofsky and his counsel unsuccessfully attempted to meet with those officers.  Had the invitation been accepted, Mostofsky would have apologized directly.  In any case, Mostofsky will be offering more than a two-sentence statement of remorse at the sentencing hearing.  In addition, the Court should consider Mostofsky's agreement to make a $2,000 restitution payment to the Architect of the Capitol a very real demonstration of remorse.  As discussed, Mostofsky did not destroy anything at the Capitol; he was not required to make that payment under the restitution statute but he elected to do so, despite having very little money, in order to make amends for his participation in the shameful episode.  Exploiting its awesome powers to invade his private communications, the government cherry-picks and takes out of context text messages it claims Mostofsky sent "immediately following January 6." ECF No. 100, p. 40.  That the defendant did not instantaneously express remorse in certain texts curated by the government does not mean he is unremorseful today.[5]  To the extent there is any doubt on this score, Mostofsky's remorse will be apparent enough at sentencing.

**B.      Avoiding unwarranted sentence disparities (§ 3553(a)(6))**

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

---

[5] The government cites to a Signal chat that it represents Mostofsky sent in January 2021, where the defendant allegedly said his "'father's a Judge, so, unlike other situations...[t]hey have nothing on me.'" ECF No. 100, p. 28.  The Court will notice that, unlike the government's other citations to Mostofsky's texts, this chat is not attached as an exhibit.  Mostofsky's counsel asked the government to produce it immediately, as Mostofsky does not recall sending it.  The Court will also notice the ellipsis entered by the government after the clause about his father and before "[t]hey have nothing on me." The government's use of this supposed chat to imprison Mostofsky is low.

The government requests that the Court impose a sentence of 15 months' incarceration. ECF No. 100, p. 1. That would create a great many unwarranted sentence disparities between other January 6 defendants and Mostofsky.

Consider first the sentences of January 6 misdemeanants. Over 100 have been sentenced for the following three crimes: Parading in the Capitol Building, 40 U.S.C. § 5104(e)(2)(G); Disorderly Conduct in the Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and Entry into a Restricted Area, 18 U.S.C. § 1752(a). Apart from Mostofsky's pushing on a barricade for a few moments and the police vest, his conduct was indistinguishable from that of dozens of misdemeanants who received sentences of probation. Indeed, having spent no more than 20 minutes inside the Capitol Building without incident, Mostofsky's conduct was less serious than that of some misdemeanants who have received probationary sentences:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Danielle Doyle, 21cr324 | Parading in Capitol | 2 mos. probation | Entered the Capitol Building by climbing through broken window, remained inside for about 30 minutes. |

| | | | |
|---|---|---|---|
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |
| Jenny Cudd, 21cr68 | Parading in Capitol, Entering Restricted Area | 2 mos. probation | Entered the Capitol Building. |
| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to |

| | | | demonstrate against Congress. |
|---|---|---|---|
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only |

| | | | |
|---|---|---|---|
| | | | broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
| Andrew Ericson, 21cr506 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's conference room, stealing a possession of the Speaker's. |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |

| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
|---|---|---|---|
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Rachael Pert, Dana Winn, 21cr139 | Entering a restricted area | 12 mos. probation | Entered the Capitol Building, Pert later saying, "We were trying to storm them to stop the vote . . ." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

But even if the Court were to look to theft-of-government-property sentences in the

January 6 investigation, the government's requested sentence of 15 months' incarceration would

create wild disparities:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Jason Riddle, 21cr304 | Theft, Parading in Capitol | 90 days incarceration, 36 mos. probation, 60 hours community service | Stole Senate procedure book |
| Robert Petrosh, 21cr347 | Theft | 10 days incarceration, 12 mos. supervised release | Stole microphones from a lectern belonging to Speaker of the House (worth $438). |
| William Merry Jr., 21cr748 | Theft | 45 days incarceration, 9 mos. supervised release. | Stole part of a sign belonging to Speaker of the House |

26

Indeed, although it is not an apples-to-apples comparison to juxtapose January 6 assault sentences with Mostofsky's nonviolent civil disorder offense, were the Court to do so the government's 15-month request would still yield unwarranted disparities.  Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021).  Leffingwell *punched two U.S. Capitol Police officers in the head.  Leffingwell*, 21-cr-5-ABJ, ECF No. 31, p. 2.  That was after he posted himself at a Capitol entrance and encouraged others to join him in his "efforts to assault the Capitol." *Id.*  Leffingwell pled guilty to assaulting law enforcement officers under § 111(a).  Judge Jackson imposed a sentence of six months' incarceration—*less than half the sentence the government requests for Mostofsky, who assaulted no one*.

Or consider the government's sentencing arguments in *United States v. William Merry, Jr.*, 21-cr-748-JEB (D.D.C. 2021), where this Court imposed a sentence of 45 days' incarceration and nine months of supervised release.  Merry, the government contended,

> (1) was well aware that police officers were trying to disperse the crowd assembled outside of the Capitol, and yet he *surged towards the Capitol Building* anyway; (2) he *stormed past multiple police lines* after witnessing rioters forcibly remove barricades, leading his 21-year-old niece into the mob along with him; (3) *he penetrated the U.S. Capitol all the way to the Speaker's suite* and *exited through a broken window*; (4) *he encouraged his niece to pick up a shard of Speaker Pelosi's office sign*, which had just been smashed by another rioter, and then proudly displayed the stolen shard on Capitol grounds; (5) *he roamed the Capitol tauntingly chanting "Nancy, Nancy"* (i.e., Speaker Pelosi), *calling her a "c\*\*t" on multiple occasions*; and (6) his conduct after breaching the Capitol—when the import of his actions should have been clear—suggests a lack of remorse.

*Merry, Jr.*, 21-cr-748-JEB, ECF No. 41, p. 2 (emphasis added).

Merry prowled the Capitol Building for nearly 40 minutes—approximately twice as long as Mostofsky remained in the building.  *Id.* at 9.

Because Merry was also guilty of theft and entered the building, it appears that virtually the only difference between his fact pattern and Mostofsky's that does not turn in Mostofsky's favor is the latter's brief pushing on the barricade outside the building.  And yet the sentence this

Court imposed on Merry *is about 10% of the sentence the government requests for Mostofsky*. For all these reasons, imposing a sentence on the order of that requested by the government would create many unwarranted sentence disparities.  § 3553(a)(6).

### C.     The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

The government argues that specific deterrence will not be achieved unless Mostofsky serves over a year in prison.  ECF No. 100, pp. 39-40.  Tellingly, it does not even indicate what future crime Mostofsky is to be deterred *from*.  *Id.*  In the 35 years of his life, Mostofsky has no criminal history.  The crimes in this case are perhaps the most context- and time-specific ones the Court will have encountered on the bench.  Consider all the contingencies having nothing to do with the defendant that were necessary for the crime to occur in the first place.  Mostofsky was attending a political rally when a large crowd began drifting towards the Capitol.  He did not direct them there.  He had no preconceived plan to head to the Capitol himself.  The crowd then turned into a mob which then led to a riot in the shadow of the Capitol Building.  This had never happened before in its long history.  Mostofsky did not whip up the mob.  Nor did he foresee one forming.  Like hundreds of others in the area, Mostofsky entered the building in an unprecedented scene of chaos.  Mostofsky has no history of seeking out and inflaming riots.

This case has already turned Mostofsky's life upside down.  He was originally indicted on eight counts—four of them felonies.  His house was raided by a SWAT team.  In mainstream and social media, the case has made him the target of continuous savage attacks.  He has received death threats.  He and his family have incurred profound and lasting shanda from this

scandal.  With a felony conviction, Mostofsky, 35, may struggle to find gainful employment for the rest of his life.  The government's suggestion that these heavy blows are insufficient to deter the one-time, situational crimes Mostofsky committed is baseless.

Particularly in the kind of community in which Mostofsky lives, shame is a potent force of deterrence.  The Court can and should consider the deterrence power of shame.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the felony convictions); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

**Conclusion**

In the huge ongoing effort to hold the right people accountable for the Capitol riot, it is surely important to heed the risk that a similar event could occur again in the future.  But there are risks on the other side of the equation too, ones involving the criminal justice system, and these could be just as likely to materialize as another Capitol riot, if not more likely.  Keeping a mob out of the Capitol is essential.  So are basic principles like individual responsibility and avoidance of collective punishment.  Mostofsky deeply regrets his participation in the awful episode.  He has already paid and will continue to pay a severe price.  Many similarly situated January 6 protesters have received probationary sentences.  Taking all these factors together, a sentence of significant home confinement, together with probation and community service would be sufficient but not greater than necessary in this case.

Dated: May 1, 2022                                    Respectfully submitted,

                                                     */s/ David B. Smith*
                                                     David B. Smith (D.C. Bar No. 403068)
                                                     108 N. Alfred St.
                                                     Alexandria, VA 22314

Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Aaron Mostofsky*

## Certificate of Service

I hereby certify that on the 1st day of May, 2022, I filed the foregoing submission with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

Graciela Lindberg
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Aaron Mostofsky*

30