```
 1                 UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2    ---------------------------X

 3     UNITED STATES OF AMERICA

 4                  v.           Criminal Case 21-138 (JEB)

 5    AARON MOSTOFSKY,

 6              Defendant

 7    ---------------------------X
                                      Washington, D.C
 8                                    Friday, May 6, 2022
                                      11:00 a.m.
 9
                  TRANSCRIPT OF A SENTENCING HEARING
10             BEFORE THE HONORABLE JAMES E. BOASBERG
                  UNITED STATES DISTRICT JUDGE
11    APPEARANCES:

12    For the Government: Graciela Rodriguez Lindberg, AUSA
                          U.S. ATTORNEY'S OFFICE
13                        Laredo Division,
                          Southern District of Texas
14                        11204 McPherson Road, Suite 100a
                          Laredo, TX 78045
15                        (956) 723-6523

16                        Michael John Romano, AUSA
                          U.S. DEPARTMENT OF JUSTICE
17                        1331 F Street NW
                          Washington, DC 20004
18                        (202) 307-6691

19    For the Defendant: Nicholas D. Smith, Esq.
                         DAVID B. SMITH, PLLC
20                       7 East 20th Street, Suite 4r
                         New York, NY 10003
21                       (917) 902-3869

22

23

24    Court Reporter:    Lisa Walker Griffith, RPR
                         U.S. District Courthouse, Room 6507
25                       Washington, D.C.  20001
                         (202) 354-3247
```

1                          **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Good morning, everyone.

3    We're here for a sentencing in criminal matter 21-138, *The*

4    *United States of America versus Aaron Mostofsky*.

5              Beginning with counsel for the government, if you

6    could please approach the lectern and identify yourselves

7    for the record.

8              MR. ROMANO:  Good morning, Your Honor.  Michael

9    Romano for the United States.  With me by video

10   teleconference is Graciela Lindberg, and then seated with me

11   at counsel table is Agent Cummings with the FBI.

12             THE COURT:  Thank you, welcome.  Everyone can,

13   should retain their masks except when speaking, during

14   delivering your allocution, you may take them off.  Thank

15   you.

16             MR. SMITH:  Good morning, Judge.  Nicholas Smith

17   for defendant Aaron Mostofsky.

18             THE COURT:  Good morning to you.

19             Mr. Mostofsky, good morning.

20             MS. LUSTIG:  Good morning, Your Honor.  Crystal

21   Lustig from the probation office.

22             THE COURT:  Thank you, Ms. Lustig.  Thanks for

23   your work.

24             We're here today for sentencing.  I have reviewed

25   the presentence investigation report and recommendation, and

1  appreciate, as always, your work on that, Ms. Lustig.  I

2  have reviewed the sentencing memorandum submitted by the

3  government as well as the video selections that the

4  government identified.

5          I have reviewed the defense's sentencing

6  memorandum, as well as the 30 plus letters submitted on

7  behalf of defense.  There has also been a neuropsychological

8  examination submitted by the defense, which I have reviewed,

9  as well as a detailed letter from the Alif Institute on his

10 behalf.

11         So, anything preliminary before we begin,

12 Mr. Romano?

13         MR. ROMANO:  Your Honor, I think the first area to

14 start, because there may be a dispute over the calculation

15 of the guidelines, would be there before we discuss the

16 3553(a) factors.

17         THE COURT:  Right.  I've reviewed that.  I

18 ultimately, I don't believe that it will, has an effect on

19 the sentence.  I know it does not have an effect on the

20 sentence I impose, whether the guidelines are 10 to 16 or 12

21 to 18 months.  The issue relates to a grouping of counts.

22         I don't reach this as a legal matter.  But I

23 think, for the defendant's benefit, I'll use the lower

24 guideline of 10 to 16, although, as I said, it doesn't

25 affect the sentence I would impose.

1          MR. ROMANO:  Certainly, and if the Court would

2     indulge me, I would like to be heard just for a moment

3     because the decision that the Court makes certainly could

4     end up being argued in other cases involving Capitol riot

5     defendants.

6          THE COURT:  Let me just put on the record that I'm

7     adopting it largely because that was part of a plea

8     agreement.  I'm not doing so as a legal finding.  I have not

9     analyzed or examined the arguments put forth on both sides.

10    And therefore, I do not find that, if the grouping decision

11    was erroneous, I make no decision on that point.

12          And I'm simply deferring to the defense based on

13    the fact that it was in the plea agreement and with the rule

14    of lenity that I make no finding as to the correct

15    application of that grouping decision.

16          MR. ROMANO:  I do, just for my own clarity then,

17    Your Honor, the plea agreement, the calculation under the

18    plea agreement was consistent with what the government

19    submitted in our sentencing memorandum, the 12- to 18-month

20    range.

21          THE COURT:  I'm sorry.  You're right that it is a

22    12- to 18-month, was in the plea agreement.  I'm sorry.  I

23    misremembered that.

24          My decision, as I said, is not based on an

25    analysis or a supporting determination which is the proper

1   application.  It doesn't affect my sentence at all.  So

2   essentially, based on the rule of lenity given the fact that

3   the defendant is the only reason I'm self-holding, but again

4   I don't, I do not make a legal finding on that issue, nor

5   should anyone believe that such a decision should be, in any

6   form, precedential.

7           MR. ROMANO:  Okay, understood, Your Honor.  Thank

8   you.

9           THE COURT:  Mr. Smith, anything preliminary?

10          MR. SMITH:  No, Your Honor.

11          THE COURT:  Okay.  Mr. Romano, I'll hear from you.

12          MR. ROMANO:  Thank you.  Just for the Court's

13  benefit, I likely will play some segments from some of the

14  videos understanding that the Court has reviewed it, but

15  there are a few things that I want to draw the Court's

16  attention to.

17          THE COURT:  Certainly.

18          MR. ROMANO:  To begin with, Your Honor, we're

19  requesting a sentence, a term of 15 months of incarceration

20  be followed by three years of supervised release.  It is the

21  government's position, understanding the decision the Court

22  has made on the sentencing guidelines, that 15 months

23  nonetheless remains within the guidelines range, that the

24  Court has found that nothing here warrants a departure or

25  variance from that range.  Certainly, that this case should

1    not be treated similarly to the misdemeanor cases that have

2    been before this and other courts.

3            I want to start by speaking to the nature and

4    circumstances of the offense, starting generally with the

5    nature and circumstances of a charge under Section 231.  My

6    understanding is that this is the first of the 231 charges

7    on which a person will be sentenced in connection with

8    January 6th.

9            And fundamentally, that charge not only is a

10   felony by definition in the statute, but it's the

11   government's view that it represents felony conduct, conduct

12   of a different type than the misdemeanor offenses charged

13   under 18 U.S.C. 1752 and 40 U.S.C. 5104.

14           A charge of civil disorder under 231 requires

15   obstruction of a law enforcement officer incident to, of and

16   during the commission of the civil disorder.  That type of

17   offense, which requires interference with law enforcement,

18   is qualitatively different from the misdemeanor offenses,

19   which generally require a presence in a restricted area or

20   in the Capitol building plus something else.

21           Participation in a civil disorder is especially

22   important here because civil disorder is central to the

23   nature of the offense.  And that gives rise to a couple of

24   points that I want to make.

25           First of all, the statute criminalizes

1    participation in any civil disorder, not just a civil

2    disorder like January 6th.  January 6, 2021 featured what

3    was perhaps one of the most serious or maybe the most

4    serious civil disorders in the history of our country.

5         So the events of this case already suggests it is

6    sort of on a larger magnitude than some of the conduct

7    captured by the statute.  But the fact also that a civil

8    disorder is central to the nature of the offense addresses

9    some of the arguments that the defense puts forth about

10   collective guilt and the idea that the government is seeking

11   to hold the defendant accountable for other people's

12   conduct.

13        The offense requires participation in or the

14   existence of some degree of collective activity to begin

15   with and then conduct by this defendant to interfere with

16   the police.  So all that was just to speak about 231

17   generally, and why the 231 charge merits a more significant

18   sentence than the misdemeanor cases that the Court is

19   familiar with.

20        But I also want to talk about the defendant's

21   specific conduct here.  So, here, we will turn to videos.

22   And there are essentially four moments that are significant

23   and highlighted by these videos.  The first of those moments

24   involves the 12:55 breach of the police line at the P

25   circle.

1          We know the defendant was present at around that

2     time and would have been aware of this breach because video

3     footage from Exhibit 1 and Exhibit 2 shows him arriving in

4     the West Plaza at around the same time as other rioters who

5     had been involved in the breach arrived at the West Plaza.

6     Exhibit 1 shows him appearing on camera walking across the

7     front of the person recording's camera at about five to six

8     minutes into the video.

9          Exhibit 2, which is footage taken by another

10    rioter who was walking eastbound across the grass near the

11    walkway begins with the defendant also walking eastbound

12    across that grass.  And in that video, officers who were

13    present at the P circle line, can be seen after they have

14    retreated.

15         So the defendant was there at the riot from the

16    moment it became a civil disorder, from the moment that

17    rioters pushed past police lines into the restricted area.

18    I'll forego playing Exhibits 1 and 2 unless the Court has

19    any specific questions about those.

20         But there, we see that the defendant would have

21    been aware of the nature of this event from the very

22    beginning.  Nonetheless -- I'm sorry, that's Exhibit 1 and

23    Exhibit 9.  I misspoke.

24         Exhibits 2 through 4 relate to the next event,

25    which is the 1:35 pushing against the police line.  Here, I

1    want to focus on Exhibit 2, which is from the U.S. Capitol

2    Police.  It's footage from the dome camera up near the top

3    of the building looking down on the West Plaza.

4              I'm going to, just as soon as this comes up, I'll

5    direct the Court's attention to where Mr. Mostofsky is.

6              (Exhibit 2 video played)

7              So we are starting at, this is the standard.

8    You'll see the time stamp.  The video starts at one minute

9    and -- 1:34 P.M. on the nose.  I'm going move this up to

10   about 1:35 and 25 seconds.

11             Now, so we see the police line here.  The police

12   are trying to move the barricades.  I'll move this back a

13   little bit so we can get a sense for where the defendant is

14   and when he joins the fray.  So right now, we're at about

15   one minute into Exhibit 2.  If you see here where my mouse

16   is indicating, there is a Texas flag.  The defendant is a

17   little bit up on the screen of that.  I will highlight him

18   as soon as I see him.

19             So that is still -- I'm sorry.  That is still too

20   far in because the police are already moving the barricade.

21   Okay.  So here is before the police have started to move the

22   barricade.  The defendant is here, where I'm indicating with

23   my mouse.  The barricade has not yet begun to move.

24             So the defendant is back a little bit from the

25   line.  He's not up against the line.  As the line moves, he

1  is not responding to force, being jostled around, or

2  anything like that.  It appears that his head was turned

3  there.  And then, as the police begin to move, the defendant

4  moves forward and begins pressing on the backs of other

5  rioters, eventually making his way farther up into the

6  crowd.

7        He can still be seen over here where my mouse is

8  pushing against the fence, identified again by his clothing.

9  And I will keep the mouse near him.  The thing to note from

10  this dome camera footage is how long he is struggling

11  against the police line.  This is upwards of a minute that

12  he is engaged with trying to prevent officers from setting

13  the fence.  And then the camera goes away and snaps back.

14  He is still here in the crowd.  By now, it appears that he

15  has disengaged.

16        (Exhibit 2 video stopped)

17        So that's longer than a minute, probably about a

18  minute and a half.  And the Court can see in the other

19  exhibits that the defendant was struggling.  He was pushing

20  hard against the back of the line of other rioters.

21        The Court can see from the body worn camera how

22  much his face was communicating that struggle as he came up

23  to the police line and was trying to interfere with the work

24  of police.  This is felony conduct.  It is violent,

25  assaultive conduct.  And certainly, it is of a degree that's

1    more serious than say any of the trespass-based offenses.

2              Then at about just after 2:00 P.M., at about

3    2: 10, the defendant was part of the crowd that charged up

4    the staircase leading to the Senate wing door.  I'm going

5    play a brief segment from that video.

6              (Exhibit 10 video played)

7              So this is Exhibit 10, this footage taken -- pause

8    real quick.  You can see the defendant at the base here.

9    You should be able to see him leading or near the front of

10   the crowd as the crowd charges up the stairs.  This was

11   footage taken by another participant in the riot.

12             (Exhibit 10 video resumed)

13             And the defendant is on the stairs to the right

14   here.

15             (Exhibit 10 video stopped)

16             So I'm pausing here near the end at 1 minute and

17   35 seconds.  There are a couple of things worth noting here.

18   First is that, although this particular rioter's camera

19   loses track of the defendant after he gets up the stairs,

20   after the cameraman gets up the stairs, all of the crowd was

21   stopped at the top of the stairs by another police line with

22   another set of barricades.

23             Whether or not the defendant was involved in

24   pushing through those barricades, and we have no concrete

25   evidence that he was, he certainly would have witnessed yet

1   another violent breach of another police line that was

2   necessary as he made his way with other rioters to the

3   Capitol.

4           Second is, if I can draw the Court's attention to

5   this black case that you can see in the upper left-hand

6   portion of the screen, members of the Capitol Police have

7   described that case to us as the sort of place where the

8   police vests were stored that the defendant stole.

9           Now the defendant had said that he found his vest

10  on the ground.  It could have been on the ground.  It could

11  have been in one of those cases.  We don't know.  But that

12  likely roughly the area where he obtained that black vest.

13          Then, so in Exhibit 11, we can see the defendant

14  walking up to the Senate wing door, which is this area in

15  the lower right portion of the screen, that will be

16  breached.  This is immediately after the footage that we

17  just watched.  I will point out the defendant when he

18  appears.

19          (Exhibit 11 video played)

20          There he is.  So he has just entered at 49 seconds

21  in the lower right-hand portion of the screen.  He appears

22  to be dragging a black object behind him.  That's the police

23  vest that, in the next exhibit, we will see him putting on.

24  Now he's lost in the crowd that's amassing before the Senate

25  wing door.  It's difficult to see what happens with him from

```
 1    there.
 2              (Exhibit 11 video stopped)
 3              But from Exhibit 12, this is footage taken by a
 4    person that we believe to be a Congressional staffer or a
 5    person who works in the building from right before the
 6    building was breached.  So it's the same, view of the same
 7    event but from a floor above the Senate wing doors.
 8              (Exhibit 12 video played)
 9              Here he is.  I missed him as he
10    approached.  But he was carrying a black object,
11    which I can go back to if the Court would like.  And
12    here, as other rioters are preparing to breach the
13    doors, it's very brief, but you can see him kind of
14    shrug up and start to put the vest on.  Right there.
15    And you can see the lettering on the vest as he does
16    so.
17              (Exhibit 12 video stopped)
18              So all of that happens right before the breach of
19    the Senate wing doors.  The defendant was front and center
20    for the breaches.  You could see from that video footage,
21    but you can also see it through other exhibits that we
22    submitted.
23              (Exhibit 6 video played)
24              This Exhibit 6, this ProPublica exhibit,
25    shows the breach of the Senate wing doors from the
```

1    perspective of one of the rioters.

2             (Exhibit 6 video stopped)

3             That's particularly significant because, if we

4    turn to Exhibit 5, we can see the defendant entered

5    immediately behind the camera person who recorded that

6    footage.  In Exhibit 5, I am going to advance the feed to

7    approximately 2 minutes and 45 seconds.

8             (Exhibit 5 video played)

9             So here we see the door is about to be breached.

10   One of the nearby windows is broken in.  Rioters will come

11   through that and open the door.  Now we see here this person

12   who has the white hood with the camera, that is the person

13   who, I believe, recorded the video footage in Exhibit 6, and

14   you can see the defendant enters right behind him.

15            That demonstrates that Exhibit 6 represents what

16   the defendant would have seen and heard.  And, as the Court

17   is familiar from review of Exhibit 6, it was a loud,

18   chaotic, violent scene where it was readily apparent that

19   other people who were nearby were doing violence to the

20   Capitol to breach the doors.

21            And then the violent rhetoric and the intensity of

22   the crowd continued as people entered.  One of the things

23   that is most noteworthy to me before that video concludes

24   with a confrontation with Officer Goodman, who the rioters

25   then chased up the stairs, was one of the rioters shouting,

1    "Where are they counting the fucking votes", which I think

2    perfectly demonstrates that that rioter and the other

3    rioters all knew what they were about.  They were all

4    jointly enthusiastic participants in this scene.

5                (Exhibit 5 video stopped)

6                And I'll stop there with the videos because I

7    don't think I necessarily need to go through each individual

8    run, but these videos collectively show, Your Honor, that

9    not just a moment of violence against law enforcement at

10   about 1:35 in the West Plaza, but enthusiastic participation

11   by the defendant in a civil disorder for a period of about

12   an hour and a half from the time when he entered the

13   restricted area to the time when he left the east side of

14   the Capitol and had the riot shield taken back by the

15   Capitol Police officer.

16               So unquestionably, this is serious both in the

17   statute criminalizing the conduct but also in the

18   defendant's own conduct.  The nature and seriousness of this

19   offense is extremely high and suggests a sentence of

20   incarceration.  The riot was an assault on our democracy.

21   It was an assault on the peaceful transfer of power on free

22   and fair elections, and the defendant was part of that.

23               Whether or not he traveled from Brooklyn with the

24   intent to riot, whether or not it was premeditated, he had

25   multiple opportunities to stop, multiple opportunities not

1    to press deeper into the Capitol grounds and then into the

2    Capitol itself, and he chose to continue.

3           The charges to which he has pleaded guilty here,

4    the civil disorder charge, the theft charge and the entering

5    and remaining charge, all fairly encapsulate the scope of

6    his conduct.

7           Speaking to the nature and seriousness of the

8    offense, there are a few defense arguments I want to respond

9    to.  The defendant claims at, I believe, page 17 of his

10   submission, that his conduct was not an assault.  That's

11   false.  It clearly is an assault.

12          He claims, at page six and elsewhere, that his

13   conduct was similar to that of many people who are charged

14   with misdemeanors.  I think, as the Court can see from the

15   video, that's clearly false.  Pushing against a police line

16   for a minute is not misdemeanor conduct.  Arming oneself

17   before storming the Capitol is not misdemeanor conduct.

18          Standing side by side with people who broke

19   windows to enter at the tip of the sphere is not misdemeanor

20   conduct.  And the evidence clearly shows that he understood

21   the collective nature of this action and chose to join it.

22          Turning now to the history and characteristics of

23   the defendant, Your Honor, the government submits that we do

24   not support a downward departure or a variance but instead

25   recommend a sentence within the guidelines range.

1    There are several arguments here that I want to

2  respond to.  First of all, there is a sense from the

3  defendant's submission that his showing up in costume

4  somehow demonstrates that he was being a bit silly and maybe

5  was a bit naive.

6    The costuming was intentional.  It was intended to

7  make a point.  As we mentioned in our sentencing memorandum,

8  the defendant had communicated to others that the fraud of

9  the election was so obvious even a cave man would know the

10 election was stolen.  That's what the costume was for.

11   The defendant's sentencing memorandum and

12 submission under seal stresses mental health issues, but I

13 don't see in any part of the submission an explanation of

14 how those affected his ability to appreciate the

15 wrongfulness of his conduct.

16   Indeed, there is a suggestion in the reports,

17 which is quoted in the memorandum, that he sort of got swept

18 up in the crowd and his conduct wasn't knowing.  He didn't

19 intend to break any laws.  At the time the defendant pleaded

20 guilty, however, he acknowledged the criminal intent

21 necessary for the Court to find guilt.  So, to the extent

22 that this report stands in contradiction to that, we would

23 encourage the Court to disregard those portions of the

24 report.

25   We also see a general argument that, as an

educated member of a social group that condemns the events

of January 6th, this defendant has more to lose, and so he

should be sentenced more leniently.  But at the same time,

we view his education, his connections and his status to be

factors that should have given him the resources to resist

participating in the riot.

He, despite having that community support, despite

having that education, despite having those connections, he

did choose to participate over a long period of time.  His

education means he should have known better.

The fact that his father is a judge means that he

should have been better able than other defendants to

understand why the claims of election fraud were false,

especially when they failed in front of multiple different

judges in multiple different courts across the country.

Also, the fact that he sought to keep the vest as a souvenir

for his descendants, even though he eventually turned it

over, suggests that this was not a momentary lapse in

judgment.

Section 5H1.3 suggests that mental and emotional

conditions can be relevant in determining whether a

departure is warranted if present to an unusual degree and

if they distinguish this case from the typical cases covered

by the guidelines.  We suggest that language of that

provision suggests that this case is not that sort of

 1   exceptional or unusual case.  So the defendant's history and

 2   characteristics suggest a sentence of incarceration.

 3        Turning now to deterrence, the defense argues that

 4   prison is not necessary at all to promote the goals of

 5   deterrence, especially not specific deterrence, citing both

 6   the extreme nature of the event and the defendant's lack of

 7   prior history.  Of course the defendant's lack of prior

 8   criminal history is already taken into account in the

 9   calculation of his guidelines range.  The extreme nature of

10   this event is something that we think cuts in favor of a

11   sentence of incarceration.

12        But there are several reasons why deterrence

13   counsels a sentence of incarceration.  First, the Court has

14   to look to general as well as specific deterrence, has to

15   look to the communicating to other defendants and other

16   members of the public how serious this offense is, and

17   discouraging other people from committing offenses.

18        Second, as to specific deterrence, the defense

19   highlights that the government doesn't say what particular

20   future events this defendant is to be deterred from.  We

21   certainly don't think he's a risk to, say, grab a weapon and

22   rob somebody.  But we also submit that there is a real risk

23   of continued and future political violence in this country

24   and that the defendant needs to be deterred from

25   participating in an event like this again.  Even if it were

1    to be a rare event, specific deterrence still has value in a

2    case like this.

3          In evaluating the need for deterrence, considering

4    remorse and acceptance of responsibility is certainly a

5    factor.  And the defendant has accepted responsibility by

6    pleading guilty.  But it appears, from the arguments he

7    raises, that his acceptance of responsibility may be limited

8    to acknowledging the conduct in the statement of offense.

9    He hasn't demonstrated remorse.  In the aftermath of the

10   riot, he was proud of his conduct.

11         He hasn't shown remorse in his interview with the

12   presentence writer.  He hasn't shown remorse in his

13   sentencing submission.  In fact, his submission generally

14   attacks the government's evidence, accuses the government of

15   overstating its case, and presents information in which he

16   tries to argue that he was swept up without knowing what he

17   was doing.

18         And I certainly don't want to conflate the

19   defense's litigation strategy with the defendant's own

20   remorse or lack of remorse.  But when these are arguments

21   presented on his behalf, I think there are legitimate

22   questions that the Court should have.  And the Court should

23   question the defendant fulsomely.

24         Also I would note, Your Honor, that acceptance of

25   responsibility is already factored into the guidelines

1    calculation, and the defendant not only has the benefit of

2    that two-point reduction but also has the benefit of a

3    decision to plead away certain charges.

4              If the defendant were to be sentenced on a charge

5    of assaulting an officer or obstruction of Congress after

6    trial, both of those charges would feature substantially

7    higher guidelines calculations.  He could be looking at a

8    range of anywhere up to 57 to 71 months, which would

9    probably be the range that we would be arguing for on a 1512

10   charge following conviction at trial or something less than

11   that but more than what he's facing if he were convicted of

12   a 111 charge.

13             So, the guidelines calculations already take into

14   account a consideration of this defendant's conduct versus

15   others.  They already take into account considerations of

16   acceptance of responsibility.  We also submit that the

17   payment of the agreed-upon restitutionary amount does not

18   amount to any sort of extraordinary acceptance such that he

19   should receive a reduction in his sentencing.

20             Finally, Your Honor, on the 3553(a) factors, we

21   submit that the sentence we are requesting would not lead to

22   any unwarranted sentencing disparities.  As I said at the

23   top, this is, from what I understand, the first of the 231

24   charges to come to sentencing.

25             And so, going back to the point that I just made

about that there could have been a sentence on an assault

charge or an obstruction charge, there are people who have

been sentenced on those charges.  There are people who were

involved in assaults on officers that were more serious than

what we saw here.

There are people who penetrated deeper into the

Capitol.  Considering, for instance, *Jacob Chansley*,

sometimes known as QAnon shaman, who I believe Judge Lambert

sentenced to 41 months, he entered at the same time as the

defendant but was inside for longer, got into the Senate

chamber, and was leading a group of rioters in threatening

language towards Senators within the Senate chambers.  And

that sentence was substantially higher than what we're

asking for here.

So in looking at disparities in sentencing, it's

worth taking into account that it's our view that this

conduct falls between the misdemeanor conduct that the Court

sees in many cases and assaultive or obstructive conduct

that is more serious than what the defendant did.  Our

sentencing guidelines calculation takes all of that into

account.

So, in conclusion, nothing that the defense raises

warrants a variant from the guidelines.  Certainly, we don't

think that the level that's recommended by pretrial of five

months, which is about 50 percent down from where they

1   calculated the low end of the guidelines to be, is

2   appropriate, although there's a lot that otherwise we agree

3   with in the pretrial submission.  And we ask for a sentence

4   of 15 months of incarceration to be followed by three years

5   of supervised release.

6            THE COURT:  All right.  Thank you very much,

7   Mr. Romano.  Appreciate your thoroughness.

8            Mr. Smith.

9            MR. SMITH:  Good morning, Judge.  So I'm going

10  speak to some of Mr. Mostofsky's own arguments in the

11  sentencing submission and address or try to address some of

12  the government's at the same time.  Then I'm going to allow

13  Mr. Mostofsky to address the Court, himself, which I think

14  will adequately account for some of the remorse questions

15  that Mr. Romano has raised.

16            I think I'd like to say at the outset that we will

17  stipulate that the images and videos Mr. Romano has shown

18  the Court are very emotionally powerful, and that that

19  indeed is the purpose of showing them in court to raise the

20  Court's blood, so to speak, and its anger perhaps.  But we

21  would submit that, if you unpack the reasoning that

22  Mr. Romano offered the Court, that it's quite hollow in a

23  lot of respects.

24            We think Mr. Mostofsky is different from other

25  January 6 cases that have been sentenced along a number of

1  dimensions here.  And the first and most important one is

2  the defendant's purpose.  The defendant's purpose goes to a

3  lot of the points Mr. Romano was raising.

4        One of the points he just raised was that

5  Mr. Mostofsky's purpose was assaulting democracy and

6  preventing the transfer of power and that the evidence that

7  Mr. Romano presented in his presentation demonstrates this.

8  That is false.  That was not Mr. Mostofsky's purpose.

9        We've described him in the sentencing memo as a

10 zealot.  And what we mean by that, is there's a character in

11 a film who has this uncanny ability to appear in historical

12 times and places.  It's a silly concept.  But the basic idea

13 is that Mr. Mostofsky was not someone who appeared at the

14 Capitol to impose his vision of government on the country.

15        The fur pelt he wore was not some sort of symbolic

16 gesture about what was going on in the Capitol.  The single

17 comment Mr. Mostofsky made about the cave man was an

18 off-the-cuff remark.  As the letters submitted on

19 Mr. Mostofsky's behalf attest, Mr. Mostofsky wears costumes

20 at all kinds of events, including what the government is

21 calling the cave man costume.  It is not a commentary on

22 what he was doing that day.

23        Mr. Mostofsky had no plan to go to the Capitol

24 that day.  He had a plan to attend the rally, and he drifted

25 with the crowd, hundreds of people, towards the Capitol.

That's not an excuse, but that's no indication that

Mr. Mostofsky's purpose was to interfere with democracy or

the transfer of power.

So one distinction between the great many January

6 defendants and Mr. Mostofsky here is that he was not there

to interfere with the transfer of power.  He was a

spectator.  He should not have been there.  He did things he

should not have done.

But there's a big difference between an ideolog,

who is motivated to commit violence, and someone who ends up

doing bad things when they find themself in a crowd.  That's

a very big difference between this defendant and many other

defendants.

One of the next points that Mr. Romano raised was

that this is the first civil disorder and sentencing and

that Mr. Mostofsky's conduct fits within the typical conduct

that's prosecuted under the civil disorder statute.  That is

quite wrong.

We submitted a chart in connection with our motion

to dismiss, showing that virtually every other January 6

defendant charged under this statute has committed acts of

violence that are not debatable, so punching police

officers, shoving, tasing, macing, poking police officers in

the eye, tripping them.  I mean, you could go down the

entire list and compare them to Mr. Mostofsky's, and they're

1    dissimilar.

2           We submitted -- we showed that, in almost every

3    Section 231 case before January 6, the acts of violence that

4    were prosecuted under the statute are similar to the other

5    January 6 defendants and not Mr. Mostofsky's case.

6           They involve throwing bricks at police officers,

7    setting off bombs, the most typical case is an act of

8    violence on a Native American reservation, which is where

9    the statute was normally used before January 6.  Those cases

10   usually involve shooting at police officers.  So it is wrong

11   to say that Mr. Mostofsky's conduct is the quintessential

12   civil disorder conduct.

13          Mr. Romano said that the riot at the Capitol was

14   unique in our his history and that suggesting that, not only

15   is this offense the typical civil disorder offense, but this

16   is far beyond the typical offense in its severity.  That

17   might be true in connection with the nature of the riot.

18   That is not true in connection with Mr. Mostofsky's conduct.

19          In fact, if you were to use the literal language

20   of the statute, as Mr. Romano suggests, there would be --

21   you could suggest that virtually every person who was in the

22   restricted order had committed a civil disorder offense,

23   including dozens of people who were standing at the police

24   line in the video that Mr. Romano showed.

25          But, unlike Mr. Mostofsky, they're not charged

with civil disorder, at least not all of them.  So one question in this case is why Mr. Mostofsky was charged with four felonies and four misdemeanors initially.

The point I would like to make right here is that the government's initial four felonies in this case came with a determination that the sentencing range in this case was 41 to 51 months.  Then it became something like 20 to 30 months.  Now it's 15 months.  I think the very fact that the government is wildly swinging in its estimate of what the appropriate guidelines range here is telling.

The second dimension on which Mr. Mostofsky's case is different from other January 6 cases is character, Your Honor.  So, if the Court were to get its impression of Mr. Mostofsky's character from Mr. Romano's presentation, you might be sort of surprised to see what you find in the letters submitted on Mr. Mostofsky's behalf.

Mr. Mostofsky has a significant history of good deeds.  He is not the Guy Fawkes terrorist that the government is trying to insinuate with its carefully crafted video selection.  Mr. Mostofsky's good deeds include working for a charitable organization called Cookies for Kindness, which deliver baked goods to city workers.

He was also, he also has a history of helping out with the JCC of Marine Park.  He has a long history of helping friends and family members and strangers when

they're in need.  Three rabbis have submitted letters in

support of Mr. Mostofsky.

One of them said, quote, Mr. Mostofsky has always

been a positive influence on the Bible study group he

participates in for the past 10 years.  He takes it upon

himself to cheer people up when they're going through hard

times by making their problems his problems.  End quote.

Your Honor, I've read a number of January 6

sentencing memos, both the government's and the defendant's.

I haven't seen any with good deeds, like those listed for

Mr. Mostofsky.  He is a kind of surrogate father for a lot

of children.  It goes on and on.  And the good deeds and the

family support that Mr. Mostofsky have are a very

significant reason for a downward variance that I haven't

seen in many other January 6 cases.

On disparity, Your Honor, Mr. Romano suggested

that the chart Mr. Mostofsky has submitted showing that 75

or more probationary sentences for January 6 defendants is

immaterial in this case, mainly because those were --

Mr. Romano was drawing a distinction, a formal one, between

misdemeanor offenses and felony offenses.

If Your Honor were to look at the conduct in those

cases, I think it will conclude that the distinction

Mr. Romano is trying to draw is an artificial formal one.

The conduct in those misdemeanor cases involve serious

1   conduct and, in some cases, more serious than

2   Mr. Mostofsky's.

3          Many of those defendants stayed in the Capitol

4   longer than Mr. Mostofsky.  He was inside for about 20

5   minutes.  They were inside for longer in many cases.  Some

6   of them used drugs.

7          Some of them, in the verb the government uses,

8   penetrated to very sensitive parts of the Capitol building,

9   including the Speaker of the House's personal offices, where

10  they pulled legs up on her desk and stole things from her

11  office, et cetera.  Mr. Mostofsky did not do those things.

12  Many of those defendants received sentences of probation.

13         Mr. Romano says that what makes all the difference

14  in the world is the episode where Mr. Mostofsky is pushing

15  on the fence and that he was the 12th member, perhaps, of

16  the crowd that entered the Capitol building through one of

17  the doors.  If that does make some difference, Your Honor,

18  we don't think it makes a difference, the kind of difference

19  that would account for a delta between probation and 15

20  months.

21         The disparity case, and in particular, we'd like

22  to focus the Court's attention was the *Merry* case where this

23  Court imposed a 45-day sentence of incarceration on

24  defendant who entered the building, who was inside the

25  building for about twice as long as Mr. Mostofsky.  He

1    exited the building, I think, through a broken window and

2    very similar circumstances that to those that Mr. Romano

3    showed regarding Mr. Mostofsky's entry into the building.

4    It was a misdemeanor theft case.

5         So, Your Honor, the sentence that this Court

6    imposed in the *Merry* case is 10 percent of what the

7    government is requesting here.  So the only difference that

8    we can see between that case and this one is the moment at

9    the barricade.

10        But to the extent that adds something to the *Merry*

11   sentence, we don't understand how it could add 90 percent of

12   the time of the *Merry* sentence.  That is certainly not going

13   beyond what probation recommended, which itself is only a

14   third of what the government is asking for here.

15        In that case alone, there's a disparity issue that

16   the government hasn't addressed.  And we think there's a

17   reason it omitted addressing the *Merry* case.

18        The second particular disparity case we'd like to

19   focus on is the *Leffingwell* case, which we cited, a case

20   where Judge Jackson imposed a six-month sentence.  In that

21   case, the defendant punched two police officers in the head

22   inside the building.  The allegation -- I think, the

23   statement of offense suggested the defendant had posted

24   himself at one of the doors of the Capitol and was directing

25   other protestors to enter.

1        It is virtually impossible to make an argument

2  that someone who punches, takes the intentional act of

3  violence, extreme violence, against a police officer is

4  somehow conduct less severe than Mr. Mostofsky's.  That's

5  not an argument, I think, that you will even hear the

6  government make.  That case would create an unwarranted

7  disparity.

8        I'd like to address the vest.  Mr. Romano

9  suggested that, because of a few stray text messages that

10  Mr. Mostofsky sent after the 6th saying that, in jest, that

11  he would give the vest to his great grandchildren, that

12  this, that that indicates that his decision to take the vest

13  was not a brief lapse in judgment.  All of the facts, the

14  rest of the facts in this case show something to the

15  contrary.

16        There's video evidence in this case showing that,

17  when Mr. Mostofsky was wearing the vest inside the Capitol

18  building, he had friendly conversations with police

19  officers.  I think we've said in our papers that

20  Mr. Mostofsky recalls that one of the officers indicated

21  that he could keep the vest as a souvenir.  The government

22  has interviewed that officer, and the officer does not

23  remember that comment.

24        But what's not at dispute is that there was a very

25  substantive lengthy conversation and friendly one between

the officer and Mr. Mostofsky as he's wearing the vest in which the officer did not ask Mr. Mostofsky to remove the vest, take it off or return it.

That's not an excuse.  That doesn't justify his behavior.  But it's certainly a different kind of theft than a premeditated decision to steal money or property from the government.

So, Your Honor, another point that Mr. Romano made was that -- was on the barrier moment, the barrier incident involving Mr. Mostofsky was that, the length of the video clip of over one minute shows sort of aggravates the nature of the conduct.  But I think, if Your Honor watches that clip closely, you'll see that, at a certain point, Mr. Mostofsky couldn't move.  In fact, one of the clips the government didn't play shows Mr. Mostofsky saying, I can't move, when he's in this rugby scrum of police officers there.

So this isn't to excuse his decision to walk towards the barrier and engage.  But the length of the video, the length of the period in which he's engaging with the barrier is not an indication that Mr. Mostofsky was continuing to intentionally interfere.  There was a point in which he couldn't back out, and you can hear that in the video clip.

THE COURT:  I'm sorry.  Given the video, I think

1    that's a tougher argument to make.  I understand the

2    close-up video, but the dome video, that shows a lot of

3    voluntary forward movement.

4            MR. SMITH:  And, Your Honor, if there wasn't

5    voluntary formal movement forward, then there probably would

6    not be an offense, Your Honor, or there certainly would be

7    different offenses.  That's why Mr. Mostofsky's pled guilty.

8            But we're just making a slightly different point

9    that the length of the video itself, his engagement at the

10   line after he made the decision to walk towards it is itself

11   aggravating, which is what Mr. Romano is suggested.  But

12   there's video clips following that one that he did not play

13   that show that he could not move after he made this initial

14   movement forward.

15           Your Honor, in the second clip, immediately

16   following that one that Mr. Romano showed, where the crowd

17   is walking up the stairs towards the Capitol, and then a

18   fence comes down, the lead members of that group pull the

19   fence down, and there was a suggestion that Mr. Mostofsky

20   was sort of right there and was a part, must have seen that

21   barricade coming down.

22           The reason that the Court could not see

23   Mr. Mostofsky in that clip is that he was down the stairs at

24   that point.  He didn't participate in the barrier coming

25   down.  And there is no evidence showing that he actually saw

1    that happening.

2            THE COURT:  To the extent the government's point

3    is he knew what was going on because he could see all of

4    this around him, I don't think that's really a disputed

5    issue.  Your point, which I take, is that he wasn't one of

6    the ones who knocked the barricade down at that juncture.  I

7    think -- and I agree that there is no evidence he did.

8            The government's point seems to me a fairly

9    innocuous one, which is he could see all of this going on

10   around him.  He knew this wasn't sort of innocent presence.

11           MR. SMITH:  One thing we'd like to emphasize is

12   that, when Mr. Mostofsky found himself in this crowd, and

13   he'll explain this to you himself, he had never been in a

14   situation like this before.  This felt like being in some

15   kind of war zone with the tear gas flying around, you know,

16   pepper spray.  There were fights between -- a really raucous

17   scene.

18           He didn't know how to act.  He made mistakes.  He

19   exercised bad judgment to be sure.  But this is not a

20   circumstance he had found himself in before.  And he felt at

21   sea, Your Honor.  That's the truth.

22           So these sorts of, looking at these videos, in

23   retrospect, these that cover matters of seconds, Your Honor,

24   I think allows a viewer now to sort of think and to process

25   the information in a more deliberate way than someone who

1   was there in the moment would.

2           So, Your Honor, on deterrence, Mr. Romano I think

3   indicated that a felony conviction itself is not really a

4   significant deterrence.  I think this is a little bit glib,

5   Your Honor.  I think, if someone, a professional such as

6   Mr. Romano, were to find himself in a situation where he

7   would lose his Bar license and wouldn't be able to earn a

8   living anymore, I think even Mr. Romano would acknowledge

9   that a circumstance like that might deter him from doing

10  whatever bad conduct was involved in that circumstance.

11          A felony conviction is nothing to sneeze at.  It's

12  going to hobble Mr. Mostofsky's ability to earn a living for

13  a long time.  He's 35 years old.  This could have a dramatic

14  effect on his life.  The suggestion that that's not

15  sufficient to deter Mr. Mostofsky from what?

16          Normally, as Your Honor knows, when we're talking

17  about specific deterrence, the thing that the defendant

18  needs to be deterred from is the thing he did, is the reason

19  he's in court.  That's what specific deterrence means.

20  Mr. Romano made a gesture at the possibility that maybe a

21  January 6 wouldn't happen again, but I think that's a little

22  bit of an understatement.

23          There was a concatenation of circumstances here

24  involving Mr. Mostofsky's offense that was like the planets

25  aligning.  Mr. Mostofsky did not direct the mob towards the

1    Capitol.  In fact, that circumstance had never occurred

2    before.  There's no history of him attending riots, being

3    some sort of, you know, like soldier at riots.  He doesn't

4    do that kind of thing.  Even when there have been riots in

5    the past, Mr. Mostofsky hasn't attended them.

6            So what, exactly, is it that he's being deterred

7    from?  It's not clear.  And I think the Court would agree

8    that, under modern sentencing, deterrence is the key factor

9    in sentencing.  You know, it's not revenge.  And I think

10   kind of revenge is really Mr. Romano's theme when it comes

11   down to it.

12           THE COURT:  I also think the government's argument

13   in many of these cases is more linked to general and

14   specific deterrence.  So I certainly take your point on

15   that.

16           MR. SMITH:  So I think the point we're trying to

17   make, Your Honor, is that a social phenomenon is not under

18   this defendant's power to create or not create.  The kind of

19   notion that Mr. Mostofsky needs to be punished more than

20   hobbling his career prospects and bringing great shame upon

21   his head in order to stop other people from doing what

22   they're doing is tenuous at best.

23           So I just want to make sure I haven't missed

24   something.

25           THE COURT:  Sure.  Take your time.

1          MR. SMITH:  Mr. Mostofsky is going to speak to

2   remorse himself, but I think I'd like to address some points

3   that the government has made so that he doesn't have to.  It

4   suggests that, because he sent a couple of text messages in

5   the days after January 6 that speak about the situation in

6   jest that he might give the vest to his grandchildren or

7   something about his father and they can't get me.

8          Judge, I think there's not really that much to be

9   gleaned about his impressions of the event a year later or

10  months later from a few stray text messages.  He is

11  remorseful.  He regrets having been there.

12         He specifically regrets the convictions to which,

13  the crime to which he has pled guilty.  Mr. Romano suggested

14  that he has not fully accepted remorse because his counsel

15  makes the argument that he did not intend to interfere with

16  the transfer of power.

17         That is a really disappointing argument, Your

18  Honor, because the defendant did not have that purpose, like

19  I said.  He hasn't pled guilty to that offense.  We think it

20  is an overstatement.  We would think it's exaggeration and

21  unfair to direct those kinds of concepts out of individuals

22  not responsible for the mob.

23         So that's why we think, when you take all of these

24  things together, Your Honor, that certainly not a sentence

25  of 15 months of incarceration, not a sentence of five months

 1   incarceration, but given all of these factors that a

 2   sentence of significant home detention and significant

 3   community service would be appropriate.  Thank you, Your

 4   Honor.

 5          THE COURT:  All right.  Mr. Smith, thank you,

 6   both, for your presentation today and your zealous

 7   representation throughout the proceedings.  I know that

 8   you've made a lot of vigorous and strong arguments on behalf

 9   of your client throughout.  And, as someone who has not

10   previously appeared in our court, I appreciate that conduct.

11   Thank you.

12          MR. SMITH:  Thank you, Your Honor.

13          THE COURT:  Mr. Mostofsky, I'm happy to hear

14   anything you would like to say.

15          THE DEFENDANT:  Good afternoon, Your Honor.  I am

16   grateful to have the opportunity to address the Court, and I

17   would like to explain how I find myself in this situation.

18   I traveled down to D.C. on January 6 for the rally and had

19   no plans to go into the Capitol.  As I walked towards the

20   Capitol, I walked with many big groups, and I was not

21   expecting to see any of the chaos to be occurring at the

22   Capitol.

23          When it started getting chaotic to a point where I

24   had never experienced, I started to make bad decisions.

25   When I was in the west front of the Capitol, to me, it felt

1   like a war scene.  There was tear gas, pepper stray, flash

2   bangs and rubber bullets flying all around.

3          I saw a group of protestors push against the

4   barrier with the police on the other side.  I could have and

5   should have walked away, but I walked towards the barrier

6   and pushed back.  I should not have done that.  I feel sorry

7   for the officers that had to deal with that chaos.

8          But I want to make something clear, I did not

9   intend to harm any police officers nor did I celebrate when

10  any officers were injured.  I did not nor do not wish any

11  harm against them.

12          As I walked towards the Capitol, I found an

13  abandoned shield laying on the ground.  Despite the words

14  "police" on the shield, I took the shield.  The same was the

15  case regarding the vest.  I found a box full of vests.  Even

16  though it said "police", I put one on.

17          Then I entered the building.  I realized I should

18  have not gone in.  When I went inside, I had no intentions

19  to cause any harm to anyone, cause any damages nor stop

20  anyone from doing their jobs.  I spent the last year and a

21  half thinking of the mistakes I have made to get me here,

22  living with many regrets that will follow me into the

23  future.

24          When I reflect on the actions on that day, I am

25  ashamed of my contribution to the chaos of that day.  And I

1    apologize to the members of Congress and all of their

2    employees and to the Capitol Police officers that were

3    attended that day.

4           I understand all of my actions have consequences,

5    but I implore to Your Honor please to have mercy.

6           THE COURT:  Okay.  Thank you very much,

7    Mr. Mostofsky.

8           The guidelines, as I've said, I find are 10 to 16

9    months.  And I'm very familiar with the 3553(a) factors,

10   which I don't need to state.  As I've said before in these

11   January 6 sentencings, the cornerstone of our democratic

12   republic is the peaceful transfer of power after free and

13   fair elections.

14          Our system only functions if our representatives

15   are those elected by the people, not those installed by

16   violence or insurrection.  What you and others did on

17   January 6, Mr. Mostofsky, was nothing less than an attempt

18   to undermine that system of government.

19          We're reminded by events in Europe today that, if

20   our republic enshrines violence, not the ballot, as an

21   appropriate way to maintain power and govern others, then

22   who are we to complain when other countries follow that

23   example and attempt to impose their will by military might?

24          What you and others did on that day imposed an

25   indelible stain on how our nation is perceived, both at home

1   and abroad, and that can't be undone.  Nor can I say that,

2   like some people that I have sentenced, you were merely

3   curious, someone who wandered into the Capitol after the

4   fray to take a look around.  On the contrary, you were

5   literally on the front lines of this attack.  You were there

6   pushing against police barricades and then were one of the

7   first 25 or so people to enter after the breach of the

8   Senate wing door.

9         I think the government's term of enthusiastic

10  participation is an apt one here.  You also did pick up a

11  police vest and a shield, and a riot shield.  What's

12  critical for you to understand and for the public to

13  understand is that, without conduct like yours, without

14  people on the front lines pushing, the barricades wouldn't

15  have fallen, the Capitol would not have been overrun, people

16  would not have been killed, others would not have suffered

17  serious physical and mental injuries.

18        As a result of that, you have pled guilty to a

19  serious crime, a felony of civil disorder.  And I agree with

20  your lawyer that, that a plea to that felony has serious

21  ramifications regardless of prison time.

22        Those things being said, I also am fully aware

23  that, once inside the Capitol, you only stayed for 20

24  minutes, that you didn't break anything or assault anyone

25  inside.  Indeed, in the interview that we've, that the

1   government submitted and I've reviewed, your demeanor

2   remains remarkably calm.  You weren't yelling, screaming,

3   inciting others.  You did little boasting on social media,

4   even though you didn't really show any remorse either

5   following the offense.  Your conduct was essentially

6   neutral.

7          And I do find that the remorse that you've

8   displayed today in your sentencing comments is genuine, and

9   I don't have a belief that you aren't remorseful for what

10  happened.

11         I also feel that I have a good sense of who you

12  are based on all of the letters I received from your family

13  members, from friends, from people in your community.  I

14  believe, also having reviewed the neuropsychological

15  examination, also gives me a sense, a better sense of who

16  you are than perhaps some others who have appeared in front

17  of me.

18         So, I take notice of the lack of criminal record,

19  the lack of advanced planning to overturn the election, the

20  lack of social media incitement prior to the event.  And I'm

21  certainly struck by the detail in the letters regarding your

22  kindness and generosity, and selflessness toward others in

23  your community and those good deeds.  Those, as Mr. Smith

24  seeks, those do lessen the time that I'm going to give you,

25  because I believe that they weigh in your favor.

Relying on the letters and the examination as opposed to my own attempt to intuit your character, it does seem that what you did was abnormal for you, almost as if this were a play, a performance.  That you dressed up as a cave man and then acted a role as if this was some fantasy game.  Donning the vest indeed seems more like further costuming than an intentional jab in the eye to police.

It seems that perhaps, like your interest in "Star Wars" and other fantasy that I read about, that you somehow got sucked into the fantasy of a stolen election.  But as you say in your interview, New York really voted for Trump, not Biden, even though, among the conspiracy theorists, that's certainly one I've not heard before, particularly given that Biden won over 60 percent of the vote in New York.

I don't see any letters explaining how you went down this rabbit hole of election fantasy and what drove you to come to Washington in the first place.

Ultimately, I hope you've learned your lesson and that, when you get out of prison, that your focus will be on retaining all of what is good in your character.  Your, as I said, the way you interact with your nieces and nephews, the way you interact with your friends, because those are all admirable.

And that I hope you will leave some of the fantasy

1  world behind, because I hope at this point, you understand

2  that your indulgence in that fantasy has led to this tragic

3  situation, tragic for our country about what happened that

4  day, tragic for you in what you did and what you have sewn

5  and the effect it will have on your life.

6        I believe that, based on all of what I've said and

7  all of what I've read, and in determining the appropriate

8  sentencing consistency and deterrence and the other 3553(a)

9  factors, that 8 months is the appropriate sentence to impose

10  in this case, 8 months.

11       Again, this is a serious felony charge.  Your

12  conduct was serious at the barricade and entering the

13  Senate.  But I also would have given you more had I not

14  discounted a number of months for all of the good that I

15  have read about.

16       So it is the sentence of this Court that, on each

17  count, I sentence you to 8 months in prison, Counts I, IV

18  and V, those sentences to be served concurrently.  That will

19  be followed by a 12-month term of supervised release as to

20  each count, also to run concurrently; a special assessment

21  of $100 on Count I and $25 on each of the other two for a

22  total of $150.

23       I will also order 200 hours of community service

24  during your supervised release.  I will waive the imposition

25  of any fine.  I will also order a reentry progress hearing

1  within 45 days of release, as well as $2,000 of restitution

2  to the architect of the Capitol, payable in monthly

3  installments of $100 to commence 30 days after release.

4          Mr. Smith, did you wish to have me recommend a

5  specific facility?

6          MR. SMITH:  Thank you, Judge.  You anticipated me,

7  yes.  We'd like to, in light of Mr. Mostofsky's family in

8  the New York City area, have the Court enter a

9  recommendation for Otisville.

10          THE COURT:  For Otisville.

11          MR. SMITH:  Yes.

12          THE COURT:  Okay.  I will so recommend.

13          MR. SMITH:  Thank you.

14          THE COURT:  Do you wish self-surrender?

15          MR. SMITH:  Yes, Your Honor.  We would ask for a

16  couple of weeks, if that's okay, just to get his --

17          THE COURT:  If you wish 30 days, I'm happy to

18  provide that, if that's what you wish.

19          MR. SMITH:  Yes, Judge, I think we'd like 30 days.

20          THE COURT:  Okay.  So self-surrender, as directed

21  by the Bureau of Prisons, on or after June 5, 2022.

22          I'm sorry, Mr. Romano.  I should have asked any

23  objection to self-surrender?

24          MR. ROMANO:  No objection to self-surrender, Judge

25  or Your Honor.  So I don't forget, the government moves to

1   dismiss the remaining counts in the indictment.

2              THE COURT:  That is granted.  The remaining counts

3   are dismissed.

4              Mr. Mostofsky, you do have the right to appeal the

5   sentence imposed by the Court.  If you choose to appeal, you

6   must file any appeal within 14 days after the entry of

7   judgment.  Do you understand that?  You have to say yes or

8   no.

9              THE DEFENDANT:  Yes.  Yes, Your Honor.

10              THE COURT:  Thank you.  You also have a right to

11   challenge the conviction entered or sentence imposed if new

12   or currently unavailable information becomes available to

13   you or on a claim that you received ineffective assistance

14   of counsel in entering your plea or in connection with

15   sentencing.  Do you understand that?

16              THE DEFENDANT:  Yes, Your Honor.

17              THE COURT:  If you're unable to afford the cost of

18   an appeal, you may request permission from the Court to file

19   an appeal without a cost.

20              Are there any objections to the sentence imposed

21   not already noted or any further points that either side

22   wishes to raise, Mr. Romano?

23              MR. ROMANO:  No, Your Honor.

24              THE COURT:  Mr. Smith?

25              MR. SMITH:  No, Your Honor.

1          THE COURT:  Mr. Mostofsky, good luck to you, sir.

2     I look forward to seeing you in a hearing following your

3     release from prison.  Thank you.

4          (Whereupon, the hearing concluded at 12:15 p.m.)

5

6                              oo0oo

7

8

9                    CERTIFICATE OF REPORTER

10                    I, Lisa Walker Griffith, certify that the

11    foregoing is a correct transcript from the record of

12    proceedings in the above-entitled matter.

13

14

15

16

17    _____6-15-22

      Lisa Walker Griffith, RPR              Date
18

19

20

21

22

23

24

25